# EXHIBIT L

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

-----------------------------------------------X     Case No.:

FALLS LAKE NATIONAL INSURANCE COMPANY,        1:22-cv-01473-KAM-PK

Plaintiff,

**KALNITECH CONSTRUCTION
CORP.'S RESPONSE TO
PLAINTIFF'S FIRST REQUEST
FOR DOCUMENTS AND OTHER
DISCLOSURE**

-against-

KALNITECH CONSTRUCTION CORP.,
DAVS PARTNERS LLC, STALIN RODRIGO
REYES ESPINOZA and ASK ELECTRICAL
CONTRACTING CORP.,

Defendants.

---------------------------------------------- X

Defendant Kalnitech Construction Corp. ("Kalnitech") by its attorneys, Sacco & Fillas LLP , as

and for a response to Plaintiff FALLS LAKE NATIONAL INSURANCE COMPANY's First Request for

Documents and Other Disclosure, allege(s) upon information and belief, as follows:

## I.     PRELIMINARY STATEMENT

1.     Kalnitech reserves the right to object to the competency, relevancy, materiality or

admissibility at trial of any documents produced in response to Plaintiff's irst Request for Documents and

Other Disclosure on any ground, including the ground that one or more documents are irrelevant and

immaterial to the issues in this action. Kalnitech's search for documentation is ongoing and it reserves the

right to rely on any facts, documents, or other evidence that it may develop, or which may come to its

attention at a later time. Kalnitech expressly reserves the right to supplement its responses as and to the

extent it may locate additional responsive documents. The production of any document otherwise protected

by the attorney-client, work product, or other privilege is not and should not be considered a waiver of any

privilege or objection to production.

## II.     GENERAL OBJECTIONS

1.     Kalnitech objects to the Requests to the extent that they seek information which is

protected from discovery by the attorney-client privilege, the work product doctrine and/or any other applicable privilege, doctrine, exemption or immunity.

2.      Kalnitech objects to the document requests to the extent that they require the disclosure of confidential, proprietary, or otherwise protected information.

3.      Kalnitech objects to the requests to the extent that they seek information that is not relevant to the subject matter involved in the pending action and not reasonably calculated to lead to the discovery of admissible evidence.

4.      Kalnitech objects to the document requests to the extent that they require Kalnitech to provide or search for any information that is not within their possession, is in the public domain and/or is already possessed by the Plaintiff, Plaintiff's counsel, or persons/entities who are not parties to this litigation.

5.      Kalnitech's general objections shall be deemed applicable as to <u>each request</u> without the need to specifically reference or incorporate them into a specific response and are not waived, nor in any way limited, by the following Responses.

6.      Kalnitech reserves the right to supplement these Responses as discovery and investigation continues.

### III.    RESPONSES TO PLAINTIFF'S FIRST REQUEST FOR DOCUMENTS AND OTHER DISCLOSURE

1.      Copies of all discovery exchanged in the Espinoza Action, including but not limited to any bill of particulars, interrogatories, notices to admit, combined discovery demands, demands for document production and deposition transcripts.

**Response:** Kalnitech objects to this Request as it demands documents which are already in Plaintiff's possession and/or which are publicly filed and available.  To the extent a response is required, see Responses Bates Stamp No 1-248.

2.       Copies of all contracts, subcontracts, agreements, checks, receipts, bills, invoices, bank statements, and any other documents and materials by, between, or involving any party in the Espinoza Action as to the work at issue in the Espinoza Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

3.       Copies of any and all W-2 forms issued to Stalin Rodrigo Espinoza in effect on the date of the occurrence alleged in the Espinoza Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

4.   Copies of any and all 1099 Forms issues to Stalin Rodrigo Espinoza in effect on the date of the occurrence alleged in the Espinoza Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

5.   Copies of any and all documents, including but not limited to all claim petitions, answers, petitioners' examining reports, respondents' examining reports, report of all treating doctors and bills, discovery demands, discovery responses, deposition transcripts, hearing transcripts, motions, orders, correspondence, claims files, and any other materials with respect to any workers' compensation action and or clean the relevant to Stalin Rodrigo Reyes Espinoza and the accident asserted in the Espinoza Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

6.   Copies of any employee files, check receipts, employee logs, payroll records, and any other documents and/or record pertaining to Stalin Rodrigo Espinoza's employment at the time of the occurrence alleged in the Espinoza Action, as well as one year prior to the loss at issue.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

7.  Copies of any and all communications between Stalin Rodrigo Reyes Espinoza, his agents, servants, and/or representatives and any of the defendants to this lawsuit, their servants, agents, and/or representatives relevant to the work at issue in the Espinoza Action, the investigation of the Espinoza Action, and the claims asserted in the Underlying Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.  To the extent a response is required, see Responses Bates Stamp No 1-248.

8.  Copies of any and all communications between any of the defendants to this lawsuit, its agents, servants, and/or representatives and Jim Associates Corp., their servants, agents, and/or representatives relevant to the work at issue in the Espinoza Action, the investigation of the Espinoza Action, and the claims asserted I the Underlying Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.  To the extent a response is required, see Responses Bates Stamp No 1-248.

9.  Copies of any and all accident reports, incident reports, or any other report or complaint made in response to the incident alleged in the Espinoza Action.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.  To the extent a response is required, see Responses Bates Stamp No 1-248.

10. Copies of any work logs and sign in sheets or books for the date of the occurrence alleged I the Espinoza Action and 2 months prior to the occurrence alleged in the Espinoza Action.

**Response:** This Request is objected to as unduly burdensome and not calculated to lead to admissible discovery, as it requests documents already in Plaintiff's possession as part of its' appointed insurance defense counsel's defense of Kalnitech in the Underlying Action.

11. The names and address of any witnesses to the incident alleged in the Espinoza Action and/or

individuals working on June 28, 2019 at 217-14 Hempstead Avenue, Queens, NY 11429.

**Response:** Kalnitech is not in possession of any documents responsive to this Request.

**PLEASE TAKE FURTHER NOTICE**, Kalnitech reserves its right to update, supplement, and/or

amend all above responses until and upon the time of trial.

Dated: Astoria, New York

   March 13, 2023

<u>/s/ Morris Schlaf</u>

**SACCO & FILLAS, LLP**
*Attorneys for Defendant Kalnitech Construction Corp.*
31-19 Newtown Avenue
Astoria, NY 11102,
(718) 269-2226
File No.: 28464-22

To:
Steven Verveniotis
MIRANDA SLONE SKLARIN VERVENIOTIS LLP
*Attorneys for Plaintiff*
Via e-mail

1

2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF KINGS
3      ------------------------------------------X
       STALIN RODRIGO REYES ESPINOZA,

4

                                  PLAINTIFF,
5

                   -against-           Index No.:
6                                      515197/19

7      DAVS PARTNERS LLC AND KALNITECH
       CONSTRUCTION COMPANY,

8

                                  DEFENDANTS.
9      ------------------------------------------X

10

                        DATE: April 11, 2022
11                      TIME: 11:00 a.m.

12

13

14            EXAMINATION BEFORE TRIAL of the

15     Defendant, DAVS PARTNERS LLC, taken by the

16     respective parties, pursuant to a Court

17     Order, held at the above date and time,

18     before Aileen Koven, a Notary Public of the

19     State of New York.

20

21

22

23

24

25

Page 2

1
2    A P P E A R A N C E S:
3
4    GORAYEB & ASSOCIATES
     Attorneys for the Plaintiff
5      100 William Street
     New York, New York 10038
6      BY: KENNETH KLEIN, ESQ.
7
8    RICHMAN & LEVINE, P.C
     Attorneys for the Defendant
9      DAVS PARTNERS LLC
     666 Old Country Road
10     Garden City, New York 11530
     BY: KEITH RICHMAN, ESQ.
11
12
     MICHAEL SWIMMER LAW OFFICES
13     Attorneys for the Defendant
     KALNITECH CONSTRUCTION COMPANY
14     605 Third Avenue
     New York, New York 10158
15     BY: ROBERT BRIGANTIC, ESQ.
16
               *           *           *
17
18
19
20
21
22
23
24
25

1

2                 221. UNIFORM RULES FOR THE
                    CONDUCT OF DEPOSITIONS

3     221.1 Objections at Depositions
      (a) Objections in general. No objections

4     shall be made at a deposition except those
      which, pursuant to subdivision (b), (c) or

5     (d) of Rule 3115 of the Civil Practice Law
      and Rules, would be waived if not

6     interposed, and except in compliance with
      subdivision (e) of such rule.    All

7     objections made at a deposition shall be
      noted by the officer before whom the

8     deposition is taken, and the answer shall
      be given and the deposition shall proceed

9     subject to the objections and to the right
      of a person to apply for appropriate relief

10    pursuant to Article 31 of the CPLR.
      (b) Speaking objections restricted. Every

11    objection raised during a deposition shall
      be stated succinctly and framed so as not

12    to suggest an answer to the deponent and,
      at the request of the questioning attorney,

13    shall include a clear statement as to any
      defect in form or other basis of error or

14    irregularity.    Except to the extent
      permitted by CPLR Rule 3115 or by this

15    rule, during the course of the examination
      persons in attendance shall not make

16    statements or comments that interfere with
      the questioning.

17    221.2 Refusal to answer when objection is
      made. A deponent shall answer all questions

18    at a deposition, except (i) to preserve a
      privilege or right of confidentiality, (ii)

19    to enforce a limitation set forth in an
      order of the court, or (iii) when the

20    question is plainly improper and would, if
      answered, cause significant prejudice to

21    any person.    An attorney shall not direct
      a deponent not to answer except as provided

22    in CPLR Rule 3115 or this subdivision.
      Any refusal to answer or direction not to

23    answer shall be accompanied by a succinct
      and clear statement of the basis therefor.

24    If the deponent does not answer a question,
      the examining party shall have the right to

25    complete the remainder of the deposition.

1
2          221. UNIFORM RULES FOR THE
                 CONDUCT OF DEPOSITIONS
3
     221.3 Communication with the deponent
4          An attorney shall not interrupt the
     deposition for the purpose of communicating
5    with the deponent unless all parties
     consent or the communication is made for
6    the purpose of determining whether the
     question should not be answered on the
7    grounds set forth in section 221.2 of these
     rules and, in such event, the reason for
8    the communication shall be stated for the
     record succinctly and clearly.
9
10         IT IS FURTHER STIPULATED AND AGREED
     that the transcript may be signed before
11   any Notary Public with the same force and
     effect as if signed before a clerk or a
12   Judge of the court.
13
           IT IS FURTHER STIPULATED AND AGREED
14   that the examination before trial may be
     utilized for all purposes as provided by
15   the CPLR.
16
           IT IS FURTHER STIPULATED AND AGREED
17   that all rights provided to all parties by
     the CPLR cannot be deemed waived and the
18   appropriate sections of the CPLR shall be
     controlling with respect hereto.
19
20         IT IS FURTHER STIPULATED AND AGREED
     by and between the attorneys for the
21   respective parties hereto that a copy of
     this examination shall be furnished,
22   without charge, to the attorneys
     representing the witness testifying herein.
23
24
25

```
1               HUDSON
2  D W A Y N E  H U D S O N, called as a
3  witness, having been first duly sworn by a
4  Notary Public of the State of New York, was
5  examined and testified as follows:
6  EXAMINATION BY
7  MR. KLEIN:
8       Q.    Please state your name for the
9  record.
10       A.    Dwayne Hudson.
11       Q.    What is your address?
12       A.    4423 Seton Avenue, Bronx, New
13  York 10466.
14       Q.    Good morning, Mr. Hudson.
15       A.    Good morning.
16       Q.    My name is Kenneth Klein.  I am
17  with the law firm of Gorayeb & Associates
18  and we represent the Plaintiff in this
19  lawsuit.  I will be asking you some
20  questions this morning.  If you don't
21  understand my question, there is something
22  wrong with the transmission, if I am not
23  speaking loud enough, I am speaking too
24  fast, if I use a word you are not familiar
25  with, any reason at all you do not
```

1                    HUDSON

2    understand my question, tell me and I will

3    try to fix the problem for you.

4         A.    Okay.  Thank you.

5         Q.    The court reporter can't take

6    down nods of the head that usually comes up

7    with a yes or no answer.  So you just have

8    to verbalize all of your answers.  Okay?

9         A.    Yes.

10        Q.    Finally, anytime you want to

11   take a break, go to the bathroom, get a

12   call, make a call, just to stretch, any

13   reason at all, you need a break as long as

14   there is no open question, tell me and we

15   will accommodate you.

16        A.    Okay.

17        Q.    If there is an open question

18   you just have to answer the question before

19   you take the break.

20        A.    Yes.

21        Q.    In preparation for today's

22   deposition, did you review anything?

23        A.    I just had a meeting a few

24   minutes ago.  Just kind of jog my memory

25   about some stuff, about the dates.  That's

Page 7

```
 1                      HUDSON
 2    about it.
 3          Q.    Did you speak to anybody?
 4          A.    Yes.  I spoke to the lawyer
 5    here.
 6          Q.    Other than your lawyer, did you
 7    speak to anybody?
 8          A.    No.
 9          Q.    I saw when you were sitting in
10    the other chair you had a yellow notepad in
11    front of you, do you have notes on that
12    pad?
13          A.    Just dates.  Just some dates I
14    have there.
15          Q.    If you are going to use that to
16    testify we have to mark that as an exhibit.
17    We will make that Plaintiff's Exhibit 7.
18    Can you give that document to your attorney
19    when we're finished with the deposition
20    today.
21          A.    Yes.
22          Q.    He will make copies.
23          A.    Yes.
24          Q.    He will send copies to
25    everyone.
```

1                    HUDSON

2        A.    Okay.

3              MR. RICHMAN:  Will do, no

4         problem.

5              MR. KLEIN:  Thank you.

6              (Whereupon, piece of paper was

7         deemed marked as Plaintiff's Exhibit

8         7 for identification as of this date

9         by the Reporter.)

10       Q.    Are you currently employed,

11   sir?

12       A.    Yes.

13       Q.    By who?

14       A.    Employed by New York Electric.

15       Q.    When did you become employed by

16   New York Electric?

17       A.    Three weeks ago.

18       Q.    Back in June of 2019, were you

19   employed?

20       A.    Yes.

21       Q.    By who?

22       A.    A.S.K. Electric.

23       Q.    When did you first --

24              MR. BRIGANTIC:  Excuse me.

25         We're going to have an issue here.

1           HUDSON

2       Just before you get rolling, I

3       subpoenaed documents from A.S.K.

4       Electric and because this was a

5       deposition of DAVS Partners I did not

6       make a stink about the fact that

7       A.S.K. never responded to my

8       subpoena.  If A.S.K. Electric which

9       is going to likely be a party to this

10      litigation after this deposition is

11      going to appear as the witness

12      designee for Davs, that can be an

13      issue.  Because Davs --

14          MR. RICHMAN:  We understand

15      your position.

16          MR. BRIGANTIC:  I am not

17      waiving a deposition of A.S.K.'s

18      deposition.

19          MR. RICHMAN:  No one said you

20      are waiving.  I am not taking a

21      position that you are waiving.  Right

22      now A.S.K. is not a party.  Why don't

23      you proceed.

24          MR. BRIGANTIC:  Then how is

25      this a party deposition?

Page 10

```
 1                    HUDSON
 2            MR. RICHMAN:  He is here on
 3       behalf of -- how is this a party
 4       deposition?  Then there should be no
 5       party deposition.  Because A.S.K. is
 6       not a party.  Then we should cancel
 7       the deposition altogether.
 8            MR. BRIGANTIC:  Can you ask the
 9       witness to step outside your office
10       for a minute?
11            MR. RICHMAN:  Sure.
12            MR. BRIGANTIC:  Off the record.
13            (Whereupon, a discussion was
14       held off the record.)
15            MR. BRIGANTIC:  I just want to
16       put on the record that we had a
17       conversation off the record so that
18       we didn't add up all the stuff into
19       the transcript and it was agreed that
20       by proceeding today with Mr. Hudson's
21       deposition Mr. Hudson being a former
22       employee of A.S.K. Electric that my
23       client Kalnitech Construction Corp.
24       is in no way waiving a deposition of
25       A.S.K. Electric or a representative
```

1                      HUDSON

2          of Davs Partners itself.

3                  MR. RICHMAN:   That's agreed to.

4                  MR. BRIGANTIC:   Thank you.   I

5          appreciate the courtesy.

6          Q.    So Mr. Hudson, you testified

7     that on June 28, 2019 you were employed by

8     A.S.K. Electric; is that correct?

9          A.    Yes.

10         Q.    When did you start with A.S.K.

11    Electric?

12         A.    I start in 2013.

13         Q.    What was your position on June

14    28, 2019?

15         A.    I was in charge of electric,

16    the foreman running the project, doing

17    electric for the new office.

18         Q.    Were you a project manager?

19         A.    Yes.

20         Q.    Your employer was A.S.K.

21    Electric; is that correct?

22         A.    Yes.

23         Q.    Then what were your duties as

24    project manager back in June 2019?

25         A.    Well, my duties like I say I am

Page 12

1                    HUDSON

2    in charge of electric.  So from the demo to

3    the new buildup and the guys doing work

4    need me, also electricians.  I would be in

5    charge of them plus I also work on the

6    project myself, also.

7         Q.    Are you familiar with a company

8    known as Davs Partners?

9         A.    I only familiar with the boss.

10   I just found out about the company right

11   now.  I work for A.S.K. Electric.  I

12   believe David owns -- I'm saying I work for

13   A.S.K. Electric.  They're company Davs.

14   Davs Partners I heard is the owner that's

15   under the contract.  That's on the project,

16   the same owner.  My boss David Kleeman,

17   David Kleeman, they also own Davs Partners.

18        Q.    How do you spell Kleeman?

19        A.    K-l-e-e-m-a-n.

20        Q.    So David Kleeman is the boss of

21   A.S.K. Electric; is that correct?

22        A.    Yes.

23        Q.    To your understanding, he is

24   also a partner in Davs Partners?

25        A.    Yes.  Yes.

Page 13

1                    HUDSON

2          Q.     Are you familiar with certain

3     property at 217-14 Hempstead Avenue in

4     Queens?

5          A.     Yes, that's the location of the

6     new office I was working on.

7          Q.     Do you know who the owner of

8     that property is now?

9          A.     David Kleeman.

10         Q.     Do you know when he became

11    owner of the property?

12         A.     I don't know.

13         Q.     When you say he is the owner,

14    are you saying he is the owner individually

15    or as Davs Partners LLC or you don't know?

16         A.     For me.  I don't know.  His has

17    new office and so I am saying he is the

18    owner of the new office.  I don't know

19    about the old background behind the

20    David -- the Davs Partners, that I don't

21    know.

22         Q.     Could you describe what is

23    there, what that property looks like?  In

24    other words, is it a five story building, a

25    two story building, one story building,

Page 14

1                    HUDSON
2    what is there?
3         A.    It's actually one story
4    building.  Half of it, the basement and one
5    story.  Pretty long property.  So it kind
6    of almost extends the full length of the
7    property.
8         Q.    You said there is a basement
9    and a first floor?
10        A.    Yes.
11        Q.    Is that how it looked back in
12   June of 2019?
13        A.    Well, yes.  Yes.  It was under
14   construction.  So we just renovating it.
15   Everything brand new, AC, you know, brand
16   new electric.  With different designs that
17   they put based off of the plan they were
18   working on.
19        Q.    Was it a new building being
20   built or was it an existing building being
21   renovated?
22        A.    Existing building being
23   renovated.
24        Q.    When did that project start,
25   approximately?

Page 15

1                       HUDSON

2          A.    Up until the incident the

3     project go on for about six months.

4          Q.    Has the project been completed?

5          A.    Yes.

6          Q.    As of when?

7          A.    Exact date, I do not know.  But

8     from the accident I think it was maybe like

9     another three months.  Everything was

10    finished and they moved in.

11         Q.    Are you familiar with the term

12    general contractor?

13         A.    Yes.

14         Q.    What is your understanding of

15    that term?

16         A.    So a general contractor is

17    hired to do a project.  So in other words,

18    the general contractor on that job was Gus.

19    He was doing the build out and then we were

20    doing the electric which I work for A.S.K.

21    Electric.  So I was doing the build out.  I

22    do not take orders from Gus.  I take it

23    from David.

24              MR. BRIGANTIC:  Move to strike

25         that.  Go ahead.

Page 16

1                    HUDSON

2        Q.    So you said that the general

3    contractor, was that a person named Gus or

4    a company named Gus?

5        A.    Well, the person named Gus.

6        Q.    Does he have a last name?

7        A.    All of that should be in the

8    notes.  I just know him as Gus.  I am

9    pretty sure in the notes the lawyer can

10   give you the exact name.  The last name.

11       Q.    I only want to know what you

12   know.  Not what your lawyer knows.

13       A.    Yes.

14       Q.    So let me finish.  We can't

15   talk over each other.  If you don't know

16   something you can say I don't know or I

17   don't remember.  That's okay.  I just don't

18   want you to guess.  You don't know Gus's

19   last name; correct?

20       A.    No.

21       Q.    Do you know, does he work for a

22   company?

23       A.    I do not know none of this

24   information from him.  I know him on the

25   project.  That he is doing that project.

800.727.6396                A Veritext Company                Responses Bates Stamp No 16
www.veritext.com

Page 17

1                          HUDSON

2       The office at that time.

3             Q.     Do you know if Gus was retained

4       under a contract?

5             A.     I do not know.

6             Q.     A.S.K. Electric was retained in

7       connection with this project; correct?

8             A.     Yes.

9             Q.     To do what in general?

10            A.     It was their new office.  They

11      were relocating to a new Hempstead office

12      that was being built.

13            Q.     Did you ever see the contract?

14            A.     No.

15            Q.     I am going to show it to you

16      and ask you if you ever saw this.

17                   (Whereupon, the aforementioned

18            contract was marked as Plaintiff's

19            Exhibit 1 for identification as of

20            this date by the Reporter.)

21            Q.     Do you recognize any

22      signatures, sir?

23            A.     Yes.  David Kleeman.

24            Q.     He signed for A.S.K. Electric?

25            A.     Repeat the question again.

Page 18

1              HUDSON
2        Q.    Do you see on the right side
3    David Kleeman's name?
4        A.    Yes.
5        Q.    Under the portion for A.S.K.
6    Electric?
7        A.    Yes.
8        Q.    You recognize his signature,
9    right?
10       A.    Yes.
11       Q.    You never saw this contract;
12   correct?
13       A.    No.
14             MR. KLEIN:   That was Exhibit 1.
15       Q.    Sir, were subcontractors
16   retained in connection with the project?
17       A.    Yes.
18       Q.    Who retained the
19   subcontractors?
20       A.    Well, they had various, the AC,
21   guys that take care of the AC and like I
22   said the construction part which Gus he
23   take care of that.  They have the exterior
24   work which is under Gus also.  So that's
25   the only thing I know.

Page 19

1                    HUDSON

2          Q.    Did you ever hear of a company

3    called JIM Associates Corporation?

4          A.    No.

5                (Whereupon, the aforementioned

6           proposal was marked as Plaintiff's

7           Exhibit 2 for identification as of

8           this date by the Reporter.)

9          Q.    Sir, do you see this proposal

10   dated May 27, 2019?

11         A.    Yes.

12         Q.    On the screen?

13         A.    Yes.

14         Q.    This is Exhibit 2.  Did you

15   ever see this document?

16         A.    No.

17         Q.    Do you see on the left side it

18   says Jim Associates Corporation?

19         A.    Yes.

20         Q.    It says to the right prepared

21   by Jorge Moscoso?

22         A.    Yes.

23         Q.    Do you know who Jorge Moscoso

24   is?

25         A.    That's another contractor that

Page 20

1                    HUDSON
2    came in to finish up the project.
3         Q.    Is Jorge affiliated with Jim
4    Associates or is he with another company?
5         A.    That I do not know.
6         Q.    You don't known if Jorge
7    Moscoso is employed by Jim Associates; is
8    that correct?
9         A.    No.
10        Q.    You see where it says customer
11   Gus?
12        A.    Yes.
13        Q.    You don't know who Gus works
14   for; correct?
15        A.    I don't know who Gus works for.
16   I know Gus.  Gus was the general contractor
17   doing the project.
18             MR. BRIGANTIC:  Move to strike
19         that as nonresponsive.
20        Q.    Do you know if there was any
21   contract between Gus and Jim Associates
22   other than this proposal?
23        A.    No.
24        Q.    Did you ever see any other
25   proposals between Jim Associates and Gus?

Page 21

1                        HUDSON

2          A.    No.

3          Q.    Can you bring up Exhibit 3.

4                (Whereupon, the aforementioned

5           proposal dated June 12, 2019 was

6           marked as Plaintiff's Exhibit 3 for

7           identification as of this date by the

8           Reporter.)

9          Q.    Sir, you see this proposal

10    dated June 12, 2019?

11         A.    Yes.

12         Q.    It's Exhibit 3?

13         A.    Yes.

14         Q.    It's from Jim Associates

15    Corporation.  Do you see that, sir?

16         A.    Yes.

17         Q.    Can you go to the second page?

18    Can you bring up to the bottom?  Do you see

19    on this page, sir, that Jorge Moscoso

20    signed for Jim Associates?

21         A.    Yes.

22         Q.    David Kleeman signed on behalf

23    of somebody else?

24         A.    Yes, I see that.

25         Q.    Do you know if he signed for

Page 22

1                          HUDSON

2     Gus?

3          A.    No, I'm not sure.

4          Q.    Do you know if there is any

5     relationship between David Kleeman and Gus?

6          A.    The only thing I know they know

7     each other.  I think they're friends.

8     That's about it.

9          Q.    You don't know if Gus is part

10    of Davs Partners LLC; correct?

11         A.    No.

12         Q.    Just for the record Exhibit 4

13    is a proposal dated June 26, 2019 which

14    also has that general condition page which

15    I just showed the witness.  That's Exhibit

16    4.

17               (Whereupon, the aforementioned

18          proposal dated June 26, 2019 was

19          marked as Plaintiff's Exhibit 4 for

20          identification as of this date by the

21          Reporter.)

22         Q.    You never saw any of those

23    proposals before, right?

24         A.    No.

25         Q.    Were you at the project on June

Page 23

1                     HUDSON
2      28, 2019?
3           A.    Yes.
4           Q.    Why were you there?
5           A.    Same as usual.  Finishing up
6      the project.
7           Q.    What hours was the project
8      ongoing?  In other words, nine to five,
9      eight to four, what were the hours?
10          A.    From seven to 3:30.
11          Q.    Was it five days a week, six
12     days a week?
13          A.    Five days a week.
14          Q.    Monday to Friday?
15          A.    Yes.
16          Q.    What time did you arrive at
17     work that day?
18          A.    As usual.  I arrive at work
19     6:45.
20          Q.    What is the first thing you did
21     when you got to work?
22          A.    First thing I do when I get to
23     work.  The guy I am working with I give him
24     the task that he is doing.  I will also get
25     myself prepared and ready.  Gus will be

Page 24

1              HUDSON

2    there to set his guys up.  The place will

3    be open up.  We just continue our regular

4    workday.

5         Q.    How many workers did Gus have

6    working under him?

7         A.    It's various.  There are guys

8    coming in and out.  Some days we will have

9    maybe four or five guys there.  Other times

10   just only have two guys.  Two always be

11   there.  But sometimes --

12        Q.    What type of work did Gus's

13   workers do at the project?

14        A.    They do anything from framing,

15   sheetrock work.  Guys working on the

16   exterior of the building, cement work.

17   Basically everything -- they do everything

18   except for the electric and security and AC

19   work.

20        Q.    Did Gus workers wear any

21   particular type of T shirts at the job?

22        A.    No, not really.

23        Q.    Did A.S.K. employees wear any

24   type of T-shirts at the job?

25        A.    Yes.  We always wear our

Page 25

```
 1                      HUDSON
 2    T-shirt, blue that shows the company logo.
 3    A.S.K. Electric.
 4         Q.    So A.S.K. wore blue shirts,
 5    right?
 6         A.    Yes.  With the company logo.
 7         Q.    Did A.S.K. provide any
 8    supervision to Jim Associates?
 9         A.    No.
10         Q.    Did they direct Jim Associates
11    workers?
12         A.    No.
13         Q.    Provide any ladders to Jim
14    Associates workers?
15         A.    No.
16         Q.    Any equipment or tools?
17         A.    No.
18         Q.    Do you know if Davs provided
19    any such material or equipment to Jim
20    Associates?
21         A.    No.
22         Q.    No, you don't know or no, they
23    didn't?
24         A.    No, they didn't.  Jim -- they
25    have their own tools and they work with
```

Page 26

```
 1                    HUDSON
 2    their own tools.
 3         Q.    Just so I am clear, Jim
 4    Associates is a different company than the
 5    company that Gus was with?
 6         A.    Gus -- that I don't know fully.
 7    I am not going to try to answer or guess.
 8    I am not really sure.
 9         Q.    Do you know if Gus was employed
10    by Jim Associates?
11         A.    That I don't know.
12         Q.    How many companies were working
13    at the project on June 28, 2019?
14         A.    It was I would say three
15    companies.  You got AC.  You got A.S.K.
16    Electric and you got Jim.  Jim and Gus guys
17    working together.
18         Q.    Did you have the authority to
19    stop working if you saw an unsafe
20    condition?
21         A.    Yes.
22         Q.    Did you have the authority to
23    stop work if there was an unsafe work
24    method being used?
25         A.    Yes.
```

Page 27

```
 1                      HUDSON
 2        Q.    Did that apply if you saw a Jim
 3   Associates worker doing something
 4   dangerous?
 5        A.    Yes, I would stop it 100
 6   percent.
 7        Q.    Are you familiar with an
 8   accident involving one of Jim Associates
 9   workers?
10        A.    Yes.
11        Q.    Do you know someone by the name
12   Stalin Rodrigo Reyes Espinoza?
13        A.    That's the guy that got hurt.
14        Q.    Did you know him before he got
15   hurt?
16        A.    No.  I probably saw the guy I
17   think -- we have different guys in and out.
18   I probably saw him twice on that project.
19   He is a fairly new guy that started working
20   there.
21        Q.    Did you see that person's
22   accident occur?
23        A.    I so happened to turn my head.
24   When I heard the commotion I was working
25   ten feet away.  I so happened to turn and I
```

```
 1                    HUDSON
 2    saw him tumbling down with a ladder.
 3         Q.    I would like you to tell me
 4    what caused you to look in the direction of
 5    where the Plaintiff was or the worker was,
 6    what brought your attention to that area?
 7         A.    I heard a noise.  I was working
 8    on the electrical panel which was ten feet
 9    away from where I heard the commotion.  So
10    when I turn and I look towards the closet
11    and then I saw him coming down.
12         Q.    Tell me exactly what you saw.
13         A.    All right.  I saw pretty much
14    he's tumbling down like head first.  The
15    ladder and the everything.  So he fall kind
16    of head first into the corner of the closet
17    on the right-hand side.  There is an
18    opening on the left-hand side of the closet
19    that he was working above that opening.
20         Q.    Are you finished?
21         A.    No.  I am saying there is an
22    opening on the left-hand side he was
23    working.  He was working on top.  When I
24    heard the commotion and I looked he fall
25    all the way to the right-hand side.  Him
```

Page 29

1                        HUDSON

2    and the ladder tumble down and he went down

3    head first.

4         Q.    Did the ladder fall over?

5         A.    Yes.

6         Q.    What type of ladder was it?

7         A.    That was a regular A frame six

8    foot ladder.

9         Q.    Do you know whose ladder it

10   was?

11        A.    That belonged to his boss that

12   he was working for.

13        Q.    Who was that?

14        A.    I'm not 100 percent sure if it

15   was Jim or if it was Gus's ladder.  But it

16   definitely belonged to general contractor.

17        Q.    When you saw him tumbling head

18   first, was he already falling when you saw

19   him or?

20        A.    Yes.

21        Q.    So you didn't see him go onto

22   the ladder before he started to fall?

23        A.    No.

24        Q.    You saw him after you started

25   to fall?

Page 30

1                    HUDSON
2         A.    When I heard the noise I turned
3    my head and I saw him coming down.
4         Q.    Was there anybody holding the
5    ladder at the time that you turned and saw
6    this?
7         A.    No.  He was by himself.
8         Q.    Did you ever speak to the
9    injured worker?
10        A.    No.  Prior to the incident I
11   never spoke to him.
12        Q.    How about after the incident,
13   did you speak to him?
14        A.    Yes.  I was trying to make sure
15   he was okay.  I called 911.  I saw that he
16   was hurt.  So I trying to make sure he is
17   okay.
18        Q.    Did you ask him how the
19   accident happened?
20        A.    No.
21        Q.    Did he tell you how the
22   accident happened?
23        A.    He pretty much didn't -- he
24   pretty much wasn't really talking much.  He
25   was hurt.  So he wasn't really talking

Page 31

```
 1                    HUDSON
 2   much.
 3        Q.    Did you do any type of accident
 4   report after this incident?
 5        A.    Yes.  I sent an accident report
 6   to my office.
 7        Q.    For A.S.K. Electric?
 8        A.    Yes.
 9             MR. BRIGANTIC:  Was that
10          produced?
11             MR. KLEIN:  I never seen it.
12             MR. BRIGANTIC:  I never seen
13          it.
14             MR. KLEIN:  But they're not a
15          party.
16             MR. BRIGANTIC:  This is not --
17          this is completely inappropriate.  I
18          subpoenaed documents.  We were told
19          there are no documents that A.S.K.
20          Electric has anyway and now in a case
21          where the Plaintiff has already been
22          deposed and this witness is appearing
23          there is an accident report we've
24          never seen.  How is that possible?
25             MR. RICHMAN:  I've never seen
```

Page 32

1                        HUDSON
2           it either.  I will make an inquiry.
3                   MR. BRIGANTIC:  During the next
4           break why don't you check and before
5           this witness leaves if we can get a
6           copy of the report.
7                   MR. KLEIN:  Let me finish up
8           here and we can check to get it for
9           today.  I doubt it.
10          Q.    Other than yourself, do you
11     know any other witnesses?
12          A.    Of the accident?
13          Q.    Right.
14          A.    Just the guys who were working
15     there.  There was another worker I was with
16     Sayed he was working under me.  He didn't
17     see the accident.  The regular workers that
18     was there.
19          Q.    Did you personally prepare the
20     accident report?
21          A.    No.  I believe what it was I
22     told him what happened and the date and I
23     sent out a photograph but personally I
24     don't remember me actually signing it.  It
25     was more like a verbal report that I give.

Page 33

1                      HUDSON

2         Q.    You never saw --

3         A.    I didn't sign any documents or

4    anything.

5         Q.    You never saw a completed --

6         A.    Yes.

7         Q.    You never saw a written

8    accident report made regarding this

9    incident?

10        A.    Yes.  I never did.

11        Q.    If there was one, do you know

12   if A.S.K. Electric gave one to Davs

13   Partners?

14        A.    No.

15        Q.    No, you don't know?

16        A.    No, I don't know.

17        Q.    How about that photo you said

18   you took, do you still have that photo?

19        A.    I do not have it.  The office

20   should have it.  I sent it.

21        Q.    What was it a photo of?

22        A.    It was a photo of the injured

23   guy on the ground.

24        Q.    Can you bring up Exhibit 5

25   please.

Page 34

1                      HUDSON

2              (Whereupon, the aforementioned

3          photograph was marked as Plaintiff's

4          Exhibit 5 for identification as of

5          this date by the Reporter.)

6       Q.    Do you recognize this

7  photograph, sir?

8       A.    Yes.

9       Q.    What is it a photograph of?

10      A.    That's where the guy was

11 working.  At the time there was nothing

12 inside of it.  There is a little storage

13 section inside the closet on the left-hand

14 side.  I recognize that storage section.

15      Q.    The ladder was below that

16 opening?

17      A.    Yes.

18      Q.    Do you recall how tall the

19 ladder was?

20      A.    It was six foot A frame ladder.

21 Open fully extended to six foot to the top.

22      Q.    Could you bring up Exhibit 6?

23             (Whereupon, the aforementioned

24         photograph was marked as Plaintiff's

25         Exhibit 6 for identification as of

Page 35

1                    HUDSON
2        this date by the Reporter.)
3        Q.    Do you see the photograph, sir?
4        A.    Yes.
5        Q.    Do you recognize the person in
6   the yellow shirt lying on the ground?
7        A.    Yes.  That's the guy that fell
8   at the accident.
9        Q.    Did you take this photograph?
10       A.    Yes.
11       Q.    Did you take any other
12   photographs?
13       A.    No, just the one.
14       Q.    You didn't take the one I just
15   showed you before the black and white one?
16       A.    No.
17       Q.    This is the only one you took,
18   right?
19       A.    That's the only photograph I
20   took.
21       Q.    Did other Gus employees wear
22   yellow T-shirts like this gentleman has on?
23            MR. BRIGANTIC:  Objection to
24        the form of the question.
25            MR. RICHMAN:  Objection.  You

Page 36

```
 1                    HUDSON
 2         are assuming he is an employee of
 3         Gus.
 4              MR. KLEIN:  Well, no.  I am
 5         asking did Gus's employees wear
 6         yellow T-shirts similar to the one
 7         the person on the floor is wearing.
 8              MR. RICHMAN:  How can he answer
 9         that question if he doesn't know --
10              MR. KLEIN:  I will phrase it
11         this way.
12      Q.    Did you see any other workers
13   at the project wearing yellow T-shirts like
14   the person wearing the yellow T-shirt lying
15   on the floor has on?
16      A.    My honest opinion they were
17   various different shirts and I actually
18   don't really pay so much attention to
19   exactly what they wear, what they wear.
20      Q.    After you took this photograph,
21   did you ever see this worker again?
22      A.    Never saw him again.
23      Q.    Do you know Jorge Moscoso?
24      A.    Jorge Moscoso?
25      Q.    Yes.
```

Page 37

1                    HUDSON

2        A.    No.

3        Q.    Do you know if he was at the

4    project on the day of the incident?

5        A.    Who is Jorge Moscoso?  I don't

6    know who that is.

7        Q.    He was on that proposal I

8    showed you Exhibit 2 that said he prepared

9    the proposal from Jim Associates.

10       A.    Okay.  That's information I do

11   not know.  I just know the two main persons

12   which are Gus and Jim.  My boss David.

13       Q.    Was there somebody named Jim?

14       A.    Jim.

15       Q.    Yes.  You said you know someone

16   named Jim and Gus.  I am asking you was

17   there a person named Jim?

18       A.    No.  George and Gus.  Jim -- I

19   know George had a brother.  It was him and

20   his brother.  They run the company.

21       Q.    Was George Jorge or you don't

22   know?

23       A.    I don't know the last names.

24       Q.    Was Gus there on the date of

25   the accident?

Page 38

1                       HUDSON

2          A.    He wasn't there when the

3     accident happened.  I called him so --

4          Q.    You called him later?

5          A.    Afterwards.

6          Q.    When he showed up afterwards,

7     did you talk to him about the accident?

8          A.    Yes.  Yes, I explained what I

9     saw, what happened.  The fact that the

10    emergency crew came in.

11         Q.    Did Gus ask you who the worker

12    worked for?

13         A.    He did after.  He knows -- they

14    know all of this information.  He didn't

15    have to ask me or question me who does he

16    work for.  They are obviously familiar with

17    whoever comes to the site.

18              MR. BRIGANTIC:  Move to strike.

19          Go ahead.

20         Q.    Did you ever ask the injured

21    worker who he worked for?

22         A.    No.

23         Q.    What was your understanding as

24    to who he worked for?

25         A.    I know he works for the general

Page 39

1                    HUDSON
2    contractor.  If it's Gus or George, I don't
3    know exactly.  I know he works for the
4    general contractor that is doing the
5    sheetrock, the general construction part of
6    the job.
7         Q.    So to your understanding, was
8    Jim Associates the general contractor?
9         A.    Up to now, Jim, I don't know if
10   he filled in.  I know George and Gus.
11   Jim -- is Jim George's brother?  I don't
12   know.
13             MR. BRIGANTIC:  I am going to
14        move to strike that.  Sir, we're not
15        here to educate you.
16             MR. RICHMAN:  If you don't know
17        the answer, right, if you don't know,
18        say you don't know.
19        A.    Yes.
20             MR. KLEIN:  I have nothing
21        further at this time.
22   EXAMINATION BY
23   MR. BRIGANTIC:
24        Q.    Mr. Hudson, how far did you go
25   in school?

Page 40

1                           HUDSON

2           A.    I actually finished high

3    school, just in Jamaica.   What we have is

4    CXE.   These are back in Jamaica.   These are

5    the final exams that we do that's by the

6    government.

7           Q.    So you went to school in

8    Jamaica?

9           A.    Yes, yes.   I finished high

10   school, graduated.

11          Q.    When did you come to the U.S.?

12          A.    I came to the U.S. it was in

13   2000 -- 2005 -- 2005 or so.

14          Q.    Mr. Hudson, how old were you

15   when you came to the U.S.?

16          A.    Probably around 20.   Like

17   around 20, 24.   24 or so.

18          Q.    So you were around 24 in or

19   about 2005?

20          A.    Yes.

21          Q.    Let's do this.   How old --

22   sorry --

23               MR. RICHMAN:   Ask him how old

24        he is now.

25          Q.    How old are you now?

Page 41

1                    HUDSON
2        A.    I'm 29 right now.
3        Q.    Before you came to the U.S.,
4   have you done any construction work?
5        A.    No.
6        Q.    Have you done any training with
7   respect to construction work?
8        A.    No.
9        Q.    After you got to the U.S., what
10  kind of work did you start out doing?
11       A.    I started out -- actually
12  carpentry.  I started doing carpentry.  But
13  not experienced.  Just basically assisting,
14  cleaning up, stuff like that.
15       Q.    Did that work have a title?
16       A.    Basically just helping the
17  person that was in charge.
18       Q.    Was that a carpenter
19  apprentice?
20       A.    Yes.
21       Q.    How long did you do that work?
22       A.    I did it for I would say six
23  months.  Then electrician came on the job.
24  I started learning electric.
25       Q.    Did you ever get licensed as a

Page 42

```
 1                    HUDSON
 2   carpenter?
 3        A.    No.
 4        Q.    Did you get licensed as an
 5   electrician?
 6        A.    No.
 7        Q.    Are you presently licensed as
 8   an electrician?
 9        A.    No.
10        Q.    So after doing six months work
11   of carpentry apprentice work then you
12   started doing electric work?
13        A.    Yes.   Electrical contractor
14   that came to the job we were working and I
15   asked if he could teach me and I started
16   learning electric.
17        Q.    What was the name of that
18   company?
19        A.    It was a private guy.  He was
20   pretty much working on his own.  He didn't
21   have a licensed company or anything.  It
22   was a small contractor, starting out.
23        Q.    What was his name?
24        A.    His name was Rocky the name of
25   the guy that teach me.
```

Page 43

1                        HUDSON

2          Q.    Is that his formal name?

3          A.    No.  We just call him Rocky.

4          Q.    What is his formal name?

5          A.    His formal name, I don't

6     remember.  It's been a long time.

7          Q.    How long did you work for him?

8          A.    I work for him around two

9     years.

10         Q.    Do you know where his business

11    was located?

12         A.    He just -- he lived in

13    Rosedale.  So he didn't have an office.  He

14    just pretty much, I meet him at the job

15    site.  He didn't have an office.  Just

16    Rosedale where he worked.

17         Q.    Now, after doing two years of

18    work for him, what was your next job?

19         A.    I continue electric.  I work

20    two years.  I always look to move on and

21    move myself up.  So I continued doing

22    electrical ever since.

23         Q.    Listen to me.  After you did

24    the two years work with Rocky, what was

25    your -- who did you work for next?

Page 44

```
 1                    HUDSON
 2        A.    After I left Rocky I worked for
 3    City-Wide.
 4        Q.    City-Wide?
 5        A.    Yes.
 6        Q.    What kind of business is
 7    City-Wide?
 8        A.    Electrical company.
 9        Q.    Electrical contractor?
10        A.    Yes.
11        Q.    How long did you work for them?
12        A.    I worked for them for a few
13    years.  I would say maybe six years or so.
14        Q.    You were able to do that even
15    though you weren't licensed as an
16    electrician?
17        A.    Yes.  The company has the
18    license so we work under their permit.
19        Q.    While you were working with
20    City-Wide, did you take any additional
21    training?
22        A.    No.  Just on the job training.
23        Q.    You left City-Wide at some
24    point; correct?
25        A.    Yes.
```

Page 45

1                    HUDSON

2          Q.    What was the next job you

3     worked at?

4          A.    A.S.K. Electric.

5          Q.    So you went from City-Wide to

6     A.S.K. Electric?

7          A.    Yes.

8          Q.    How did you come to work for

9     A.S.K. Electric?

10         A.    In City-Wide there was a worker

11    I used to work with.  His name is Chico.

12    He got fired from City-Wide and then he

13    start work for A.S.K. Electric.  So he

14    asked me, begging me to come aboard, come

15    aboard.  I waited till another two years,

16    pretty much another two years and I decided

17    to go.

18         Q.    You started work for A.S.K.

19    Electric in or about 2013?

20         A.    Yes.

21         Q.    Prior to working for A.S.K.

22    Electric, did you have any OSHA training?

23         A.    I got the -- no.  I got my OSHA

24    training while working with A.S.K.

25    Electric.

Page 46

```
1                        HUDSON
2          Q.     Where did you do that training?
3          A.     Long Island City.  There is a
4    training school in Long Island City.
5          Q.     When did you do it?
6          A.     The exact date, I don't
7    remember.  First there was an OSHA 30 and
8    as the year progressed we have to keep
9    updating it.
10          Q.     So you obtained an OSHA card?
11          A.     Yes.  Obtained an OSHA card.
12    Whenever that expires we have to redo it.
13          Q.     What type of training did that
14    involve?
15          A.     Safety.  All of it has to do
16    with safety on the job.  Everything with
17    safety, proper PE.
18          Q.     Did you learn about anything as
19    far as what you needed to do if there was
20    an accident at the workplace?
21          A.     Yes.  It went through all
22    examples and scenarios that happened.
23          Q.     Do you know what a controlling
24    employer is?
25          A.     Yes.
```

Page 47

1                    HUDSON

2          Q.    What is a controlling employer?

3          A.    Somebody -- it has to be their

4     way or the highway.  Meaning they very

5     stern behind whatever they want you to do.

6     They pretty much don't let you breathe.

7     You have to do it their way or that's it.

8          Q.    When I ask you about

9     controlling employer, does a controlling

10    employer have any specific responsibilities

11    on a job site?

12         A.    I would say they pretty much

13    responsible.  If it's their project they

14    responsible for the project.  They want it

15    to get done a certain way.  Normally like I

16    say safety is always first.  Once you

17    follow all the rules and everything then

18    the project will go through smooth.

19         Q.    With respect to the job that

20    we're talking about today, when did you

21    first start working at that job site?

22         A.    From the date of the accident

23    we started six months prior to when the

24    accident start.

25         Q.    So you personally started

Page 48

1                    HUDSON
2    working at the job site six months before
3    this accident occurred?
4         A.    Yes, approximately six months.
5    Yes.
6         Q.    When you started at the job
7    site, what was your title?
8         A.    I am there to do the electric
9    for the new office.  Taking care of the
10   electric.
11        Q.    Did you have a particular
12   title?
13        A.    Yes.  I am the foreman,
14   electrical foreman that is doing the
15   project.
16        Q.    So you were a foreman on the
17   job?
18        A.    Yes.
19        Q.    Were you also the project
20   manager?
21        A.    Not the project manager.  Just
22   for electric.
23        Q.    Didn't you testify earlier in
24   this deposition that you were the project
25   manager?

```
 1                    HUDSON
 2          MR. RICHMAN:  No, he didn't
 3       testify to that.
 4     A.    No, I did not testify to that.
 5          MR. RICHMAN:  Just be clear.  I
 6       want to make a statement for the
 7       record.  Just to be clear he always
 8       said he is the project manager only
 9       for Electric.
10          MR. BRIGANTIC:  I move to
11       strike that.  That's your testimony.
12       That's not his.  The witness is
13       testifying.
14     Q.    Did this job site have sign in
15  sheets?
16     A.    No.
17     Q.    On the day of the accident the
18  only trades that were on the site was the
19  AC, A.S.K. Electric and Jim Associates?
20     A.    Yes.
21     Q.    Was Kalnitech Construction on
22  the job site?
23     A.    I do not know them as that
24  name.  So I -- what I told you, I don't
25  know the names behind all of these
```

1                   HUDSON

2    projects.  I just find out about all of

3    that stuff just now as we speak.  Like I

4    said in terms of the AC, us and Electric

5    and Gus and George, I don't know the exact

6    name and everything that they work under.

7    I just know them as they're responsible for

8    the project.

9              MR. BRIGANTIC:  Move to strike

10         that.

11        Q.    When you say that you just

12   found out about these things, what do you

13   mean by that?

14        A.    By you asking me these names

15   about the companies and everything.  That's

16   what I meant.  So you asked me about the

17   name of the company.  I don't know all of

18   these names that are associated with the

19   project.  It's not like I had -- I didn't

20   have -- I go to do the job with electrical

21   part.  I don't see all the paperwork, the

22   contracts for the projects.  That stuff.

23   That stuff.

24        Q.    The purpose of this job was to

25   renovate this building; is that correct?

Page 51

1                    HUDSON

2         A.    Yes.

3         Q.    After the job was completed,

4    what person or entity was going to occupy

5    the building?

6         A.    My boss which is David Kleeman.

7         Q.    Was it being renovated to be

8    occupied by A.S.K. Electric?

9         A.    Yes, yes.  They transferring

10   from their own location to the new office.

11        Q.    You testified that you had the

12   authority to stop work if you observed

13   unsafe activities going on at the site;

14   correct?

15        A.    Yes.  Yes.

16        Q.    Did you observe the Plaintiff

17   and how he was using the ladder prior to

18   this accident?

19        A.    I did not.  I did not see if he

20   had the ladder or anything.  When I heard

21   the commotion I turned and I looked.

22        Q.    Why did you have the authority

23   to stop work?

24        A.    I am doing the job for my boss

25   that owns the building.  I also had OSHA 62

Page 52

1                    HUDSON
2    training, safety.  So if I see any
3    conditions and only based on me being a
4    responsible person.  If I see something
5    that's dangerous I am going to stop it.
6    That also protects everybody.  I like the
7    job go smooth and there is no issues.
8         Q.    So you were there as the
9    owner's representative?
10        A.    Well, yes, for Electric.  I am
11   there if anything happened to the job I
12   could pick up the phone and call my boss
13   and say listen, there is a situation here
14   and I will pass on the information.
15        Q.    Was the Plaintiff doing
16   electrical work?
17        A.    No.
18        Q.    You had the authority to issue
19   a stop work, a stop work order if you
20   observed him doing something unsafe;
21   correct?
22        A.    Yes.  I would stop a person in
23   a heartbeat.
24        Q.    You had that authority as the
25   owner's representative; correct?

Page 53

```
 1                    HUDSON
 2      A.    Yes.
 3      Q.    While you were on the job site,
 4   you were working for A.S.K. Electric;
 5   correct?
 6      A.    Yes.
 7      Q.    What is a prime contractor?
 8      A.    A prime contract?
 9      Q.    Yes.
10      A.    Well, I mean a prime contract,
11   I am just saying --
12            MR. RICHMAN:  Only if you know.
13      A.    I don't know.  I have to look
14   it up.
15      Q.    I don't want you to guess.
16   It's not a question of you looking it up.
17   I am asking you, from your --
18            MR. RICHMAN:  If you don't know
19         you don't know.
20            MR. BRIGANTIC:  Let me finish.
21         I am trying to be fair with the
22         witness.
23      Q.    What I am asking you is, you
24   worked in the construction industry now for
25   approximately 17 years?
```

Page 54

1                    HUDSON

2        A.    Yes, approximately.

3        Q.    So what I am asking you based

4   on your past work history and your

5   experience, do you know what a prime

6   contract is?

7        A.    Yes.  It would be the

8   contractor, whoever is assigned to do the

9   project.  The contract details what the

10  project entails and what you need to get

11  done.

12       Q.    That's the prime contractor?

13       A.    Well, that's coming from my

14  perspective.

15       Q.    Do you know what a subcontract

16  is?

17       A.    Yes.

18       Q.    What is a subcontract?

19       A.    Well, a subcontract, after you

20  have the main contract it would be the

21  prime contract.  The subcontract will be

22  they pass on the work to another party to a

23  portion of it.  Like, for example, we as

24  electricians would be a subcontractor to

25  AC.  AC work would be a subcontractor of

Page 55

1                    HUDSON

2   the main contract.

3        Q.    When you talk about a main

4   contract or the prime contract, who are the

5   parties to such a contract?

6        A.    I don't know.

7        Q.    Well, I am asking generally,

8   who would usually be the parties to a prime

9   contractor?

10              MR. RICHMAN:  Note my

11         objection.  You can answer the

12         question.

13       A.    It would be the person that

14  owns the project.  They would basically

15  have the main contract drawn up to get the

16  job done.  So I would say maybe in this

17  case David.

18              MR. RICHMAN:  Don't guess.

19       Q.    When the Plaintiff was injured,

20  you took the photograph of him on the

21  ground; correct?

22       A.    No.  At first I attend to him.

23  I took the photograph after I called the

24  ambulance.

25       Q.    So you called the ambulance;

Page 56

1                         HUDSON

2    correct?

3           A.     Yes.   I called the ambulance,

4    911.

5           Q.     How is it that you came to call

6    the ambulance?

7           A.     Because I am the one that was

8    the closest.   I saw what happened.   I saw

9    he was injured and like with any person, it

10   doesn't matter what position, what they

11   told -- the first thing you would do is you

12   would seek medical help.   So at that time

13   if he's injured, the first thing I did

14   which I did the right thing was to call 911

15   to have them call over to assist.

16          Q.     So the first person you called

17   after the accident was 911; correct?

18          A.     Yes, because he was injured.

19   If it was something not serious I probably

20   would have maybe reached out.   I would have

21   reached out to my boss or so.   The person

22   is injured on the ground, it would be

23   selfish for me not to make emergency call.

24          Q.     Now, after you did that, did

25   you eventually call your boss?

Page 57

1                         HUDSON
2          A.    That was the second phone call.
3          Q.    How soon after you called 911,
4     did you call your boss?
5          A.    Right after.
6          Q.    Your boss is David Kleeman?
7          A.    Yes.
8          Q.    David Kleeman is your boss at
9     A.S.K. Electric?
10         A.    Yes.
11         Q.    He is also the owner of this
12    property?
13         A.    Yes.
14         Q.    After the Plaintiff fell, did
15    he get up before you took the photo of him?
16         A.    He did not get up.
17         Q.    You were shown a photograph of
18    the Plaintiff laying on the ground?
19         A.    No.
20         Q.    Earlier in this deposition you
21    were shown a photograph of the Plaintiff
22    laying on the ground; correct?
23         A.    Yes.
24         Q.    Did you take that photograph?
25         A.    Yes.   I take that photograph, I

Page 58

```
 1                        HUDSON
 2    did not move him.  The guys that were
 3    there, they kind of moved him out of the
 4    closet.  He fell inside of the closet.  He
 5    was inside the closet.  His other
 6    co-workers that were there, kind of moved
 7    him a little bit away from where he fell
 8    and he was laying there.  Like I said after
 9    I call, after I call 911 and I call David,
10    I took a picture.
11         Q.    So the photograph that you took
12    of him, did you take it with your cell
13    phone?
14         A.    No.  What I did I passed the
15    picture onto the office.  That would be
16    kept in the records.
17         Q.    When you passed it onto the
18    office, that is the office of A.S.K.
19    Electric?
20         A.    Yes.  I send it to David, to
21    David and yes, I meant to say I sent it to
22    David.  I text David a picture.
23         Q.    You texted it; correct?
24         A.    Yes.
25         Q.    You didn't e-mail?
```

Page 59

1                        HUDSON

2          A.     No.   I text him the picture.

3          Q.     You said that you gave him a

4    verbal report of what happened?

5          A.     Yes.   I explained the situation

6    how the accident happened and, you know,

7    the procedures after.

8          Q.     What did Mr. Kleeman say?

9          A.     He was very concerned.   The

10   ambulance.

11         Q.     Did he tell you to call anyone

12   else?

13         A.     I don't remember exactly the

14   conversation but I believe because at the

15   time Gus wasn't there.   I had Gus's number

16   so I -- he didn't tell me to call anyone to

17   be honest.   He made the phone call but with

18   me I also call Gus.   Like I have Gus

19   number.

20         Q.     Did you text Gus a picture of

21   the accident, a picture of the Plaintiff?

22         A.     Not to my knowledge.   No, I

23   don't --

24         Q.     Now, when you did your training

25   for OSHA and your safety training, did you

Page 60

```
 1                    HUDSON
 2   learn anything about whether you would need
 3   to notify the local OSHA office of a work
 4   site accident?
 5        A.    No.
 6        Q.    Did you notify that the
 7   accident took place?
 8        A.    No.
 9        Q.    To your knowledge, did OSHA
10   know -- did anyone put OSHA on notice that
11   this accident had occurred?
12        A.    No.
13        Q.    To your knowledge, did OSHA do
14   an investigation of this accident?
15        A.    No one came to investigate --
16   OSHA didn't come to the site to
17   investigate.
18        Q.    With respect to the photograph
19   that you took of the Plaintiff as I
20   understand your testimony it does not
21   depict how he landed?
22        A.    No.  It does not depict how he
23   landed.
24        Q.    It does not depict where he
25   landed?
```

Page 61

1                      HUDSON
2          A.     It's very close to.  Right
3     there in the corner, the right-hand side of
4     the closet, that's where he landed.
5          Q.     It does not depict his body
6     position when he landed?
7          A.     No.  No.
8          Q.     Where did the ladder go after
9     the accident?
10         A.     The ladder was leaning back on
11    the side.  If you look on the left-hand
12    side of the picture, the ladder -- after
13    that I don't know where the ladder went but
14    the ladder was seen in the picture.
15         Q.     Did you ever see the ladder
16    again?
17         A.     No.  No.
18         Q.     After the accident, did you
19    inspect the ladder?
20         A.     Yes.  The ladder is in good
21    working condition.
22         Q.     Why did you inspect the ladder?
23         A.     Because I'm curious to see what
24    happened.  I was just curious to see what
25    could have happened, why he fell.  The

```
 1                      HUDSON
 2     ladder was fine.  So it had to be a
 3     situation where he probably had it set up
 4     incorrectly.
 5          Q.    To your knowledge, did Gus look
 6     at the ladder?
 7          A.    I do not know.
 8          Q.    Prior to this accident
 9     occurring you started working on the site
10     six months earlier; correct?
11          A.    Yes.
12          Q.    Was that when the project
13     started?
14          A.    No.  The project started
15     before.  They did the demolition and they
16     did some restructure and the reframing and
17     then I started once the frame was up.  I
18     started running the wires and installing
19     the panels and stuff.
20          Q.    So the sequence of the work was
21     that the demolition got done first?
22          A.    Yes.
23          Q.    Then the framing.  Then the
24     interior renovation, right?
25          A.    Yes.  Yes.
```

Page 63

1                    HUDSON

2        Q.    You were on the site from the

3    first time the interior renovation started,

4    right?

5        A.    After the framers finished with

6    the partition with the offices and I came

7    there when I install the electric.

8        Q.    How long did you remain on the

9    site working?

10        A.    From start to finish.  From

11    when I came.  When I started to when the

12    project was done, completed.

13        Q.    So you were there on-site for

14    the entire duration of the project while

15    the interior renovation was being done?

16        A.    Yes.  Up until the point where

17    I was 100 percent done with all the new

18    devices, the lights and then I was taken

19    off the project.  So I am assuming they

20    probably still have small other works,

21    maybe the carpenters were doing.  For me,

22    the electric, when the painting was done,

23    all the new devices, lights and I completed

24    that.  Then I was taken off the project.

25        Q.    Now, we talked about Jorge

Page 64

1                    HUDSON
2    Moscoso.  You mentioned his brother.  Who
3    is his brother?
4         A.    I don't know much about his
5    brother.  I am familiar with George and his
6    brother.  The first time I met his brother
7    when his brother came there.  I am not
8    familiar with his brother.  I am familiar
9    with George from seeing him.
10        Q.    Why did you leave A.S.K.
11   Electric?
12        A.    Me?
13        Q.    Yes.
14        A.    I just move onto another
15   opportunity.  There was no --
16        Q.    When did you last work for
17   A.S.K. Electric?
18        A.    About two months ago was the
19   last time.
20        Q.    Did you tell Mr. Kleeman you
21   were leaving?
22        A.    Well, it was with the
23   supervisor.  I had a disagreement with the
24   decision and I decided to leave.  So I
25   didn't give notice or anything.  I just the

Page 65

```
 1                        HUDSON
 2      supervisor, I am not going to do what he
 3      proposed and I was going to quit.
 4           Q.     Who was the supervisor?
 5           A.     Wazim.
 6           Q.     How do you spell that?
 7           A.     W-a-z-i-m.
 8           Q.     Does Wazim, is that a first
 9      name or a last name?
10           A.     That's what we call him.  I
11      believe that's not his real name.  I think
12      Asad, something something.  Everyone call
13      him Wazim.  I don't know if it's actual
14      name?
15           Q.     He worked for A.S.K. Electric?
16           A.     Yes.  He is a supervisor for
17      A.S.K. Electric.
18           Q.     What did he ask you to do that
19      you refused to do?
20           A.     Well, I started a project.  It
21      was two floors.  A nice project.  I am into
22      the project probably like I would say 70
23      percent into the project.  Pretty much they
24      were having some issues with materials and
25      stuff like that.  He wanted another person
```

Page 66

```
 1                    HUDSON
 2   to take over the job.  I should work all of
 3   them.  I was too far into the project.  I
 4   take my job very seriously.  The project
 5   was beautiful, real nice.  To me I think
 6   that was a slap in the face.  I refused to
 7   do it.
 8        Q.    Well, did he say that he wasn't
 9   satisfied with your work on the project?
10        A.    Not a matter of -- that's the
11   thing.  It is not a matter of not
12   satisfied.  It's the case where there was
13   something that was going on in the project.
14   It started to affect in terms of my
15   materials or so.  If I am not mistaken it
16   was before Covid and then Covid came and
17   everything get all expensive.  It was a
18   matter of me ordering materials and a
19   matter of certain stuff that they didn't
20   want me to do which is not a case where
21   they kind of critique certain stuff.  If
22   they wanted me to go that direction they
23   should have mentioned to me from before and
24   the way I was doing it was nothing wrong.
25   It's just the materials were really getting
```

Page 67

```
 1                      HUDSON
 2    to them.  It's two floors -- like 300
 3    circuits.  I think that's what caused the
 4    whole back and forth.  Yes.
 5         Q.    I am a little unclear.  Did
 6    they want you to use less material?  What
 7    exactly was the issue?
 8         A.    No.  The issue was -- it was a
 9    set of pipes that we were feeding.  It was
10    a set of boxes that was feeding us the
11    pipes.  The pipes were taking a little
12    longer to get done and the path that was
13    chosen from in the beginning.  I try to
14    choose easiest path.  It's taking a little
15    longer to get the pipes done.  It was a
16    case where the job was 85 percent sheetrock
17    completed, 85 percent sheetrock.  So the
18    other issue with the pipe work taking a
19    longer time.  Obviously like I said, the
20    materials, all the materials are actually
21    on the job.  There is nobody taking nothing
22    off the job.
23         Q.    Who is Vanessa Kleeman?
24         A.    I do not know.  I am
25    assuming -- I am not sure, his daughter or
```

Page 68

1                         HUDSON

2    wife.  I don't know.

3          Q.    I don't want you to assume.

4                MR. RICHMAN:  Don't guess.

5          Q.    I don't want you to assume.

6    Whether or not you know Mr. Kleeman's wife

7    name, did you ever speak to Mr. Kleeman's

8    wife?

9          A.    There was a company party, in a

10   brief introduction.

11         Q.    Did you ever discuss this

12   particular project that we're here for

13   today with Mrs. Kleeman?

14         A.    No.

15         Q.    As we sit here today, do you

16   know who owns this ladder?

17         A.    The general contractor, they

18   own the ladder.

19         Q.    So it was owned by A.S.K.

20   Electric?

21         A.    No.  Not A.S.K. Electric.

22   George and Gus company.  One of them owned

23   the ladder.  I don't know exactly who but

24   it wasn't A.S.K. Electric.

25         Q.    When you spoke to Mr. Kleeman

Page 69

1                     HUDSON
2    after this accident occurred, you gave him
3    a verbal report; correct?
4         A.    Yes.
5         Q.    You also texted him a
6    photograph that you took of the Plaintiff;
7    correct?
8         A.    Yes.
9         Q.    At any time did you write an
10   e-mail or some other form of report to Mr.
11   Kleeman or anybody else as an accident
12   report?
13        A.    No.  No.
14        Q.    So to your knowledge, did
15   anyone prepare an accident report?
16        A.    Not to my knowledge.  Not to my
17   knowledge.  I don't remember me signing any
18   paper.
19        Q.    After the accident you spoke to
20   the Plaintiff?
21        A.    No, I never seen him again.
22   They took him away.  I never seen him
23   again.
24        Q.    I didn't ask you that whether
25   you saw him again.  I am asking, after the

```
 1                      HUDSON
 2     accident did you speak to the Plaintiff?
 3          A.    No.
 4          Q.    He didn't tell you what
 5     happened?
 6          A.    No.   I didn't talk to him after
 7     the accident.   More than me concerned with
 8     how he was doing and he barely couldn't
 9     respond.   I never really spoke.
10          Q.    Did you speak to anyone else at
11     the scene about the accident?
12          A.    Yes.   Everybody was curious as
13     to what happened.   So I went over and over
14     again what happened.
15          Q.    When you went over and over
16     again, who did you speak to?
17          A.    Well, different from the
18     workers that was there when Gus arrived.   I
19     spoke to him and I explained what happened.
20              MR. BRIGANTIC:   Strike that as
21          nonresponsive.
22          Q.    When you say you went over and
23     over things, who did you speak to that was
24     there when the accident occurred?
25          A.    Well, just the workers.   Me and
```

Page 71

1                         HUDSON
2     the workers.  For example, the guy I was
3     working with say yesterday, I explained
4     what happened.  The other guys, some of
5     them was working downstairs.  When they
6     come up, I explained to them what happened.
7          Q.    But did you speak to the
8     employees who were working in or around the
9     Plaintiff?
10          A.    I spoke to the person that was
11     in the building.  I was the only one right
12     where the accident took place.  So the
13     commotion, everyone in the back, wherever
14     they come forward to see what happened.
15          Q.    When this accident occurred,
16     you were the person closest to the
17     accident?
18          A.    Yes.  I was ten feet away, this
19     was closet and two electrical panels close
20     by.  I was working on one of them.
21          Q.    Was anyone else in the
22     immediate area?
23          A.    Not to my knowledge.  No.
24     There was nobody else in the line of site
25     or close by.  Down the hall, in the

Page 72

1                          HUDSON
2      basement, they were working in the
3      building.
4           Q.     To your knowledge, who took the
5      photograph of the boxes?
6           A.     That I don't know.
7                  MR. BRIGANTIC:   I am going to
8             mark my own copy of the contract as
9             an exhibit.   I will do a screen share
10            myself.
11                 (Whereupon, the aforementioned
12            contract was marked as Defendant's
13            Exhibit A for identification as of
14            this date by the Reporter.)
15          Q.     Mr. Hudson, do you see what I
16     put up on the --
17          A.     Yes.
18          Q.     Can you read for me what the
19     title of this document is?
20          A.     Yes.   Short form prime contract
21     between owner and contractor.
22          Q.     So you see that.   You read off
23     the title of the document.
24                 Now, was your testimony you
25     never seen this document before; correct?

1                     HUDSON

2          A.    No, I never seen it before.

3          Q.    In the second line down it says

4    it's a -- it's between A.S.K. Electric

5    Corp. that's your employer, right?

6          A.    Yes.

7          Q.    And Davs Partners LLC; correct?

8          A.    Yes.

9          Q.    So, it's between the owner and

10   A.S.K. Electric, correct?

11         A.    Yes.

12         Q.    A.S.K. Electrical?

13         A.    Yes.

14         Q.    So we're clear, the signature.

15   You see on the left Davs Partners, it's

16   signed by Vanessa Kleeman for Davs

17   Partners; correct?

18         A.    Yes, I see that.

19         Q.    You don't know who Vanessa

20   Kleeman is?

21         A.    No.

22         Q.    On behalf of A.S.K. Electrical

23   Corp., it was signed by David Kleeman, do

24   you see that?

25         A.    Yes.   On the right.

Page 74

1                    HUDSON
2          Q.    So is there any signature here
3    of a guy by the name of Gus?
4          A.    Yes, I do not see.  The one
5    above it is not that clear.  Yes.  I don't
6    recognize no other signature by Gus.
7          Q.    So it's between Davs Partners
8    LLC and A.S.K. Electrical Corp., right?
9          A.    Yes.
10         Q.    This is the prime contract;
11   correct?
12         A.    Yes.
13         Q.    You explained earlier what a
14   prime contract is; right?
15         A.    Yes, I tried to.  Yes.
16         Q.    Doesn't this indicate to you
17   that A.S.K. Electrical was serving as the
18   general contractor?
19              MR. RICHMAN:  Objection.  You
20         are now being argumentative.  Move
21         on.
22              MR. BRIGANTIC:  Unless you are
23         instructing him not to answer.
24              MR. RICHMAN:  I am objecting to
25         the question.  You can answer if you

Page 75

```
 1                       HUDSON
 2        can.   This has been asked several
 3        times already.   I am not going to go
 4        too much further.
 5        Q.      You can answer, Mr. Hudson.
 6        A.      Repeat the question.
 7                (Whereupon, the referred to
 8         question was read back by the
 9         Reporter.)
10        A.      I'm not sure.
11        Q.      Wouldn't it be fair to say you
12   don't know who the general contractor was
13   on this job?
14                MR. RICHMAN:  Objection.  You
15         already asked him who the general
16         contractor was.
17                MR. BRIGANTIC:  This is a
18         different question.  The objection is
19         noted.
20        Q.      You can answer, Mr. Hudson.
21                MR. BRIGANTIC:  Read that back.
22                (Whereupon, the referred to
23         question was read back by the
24         Reporter.)
25        A.      Yes.  Gus, general contractor.
```

Page 76

1                    HUDSON

2         Q.     You just testified that you

3    don't know who the general contractor is;

4    correct?

5              MR. RICHMAN:  Objection.  He

6         did not say that.

7         A.     I did not say that.

8         Q.     What is your basis for the

9    assertion that Gus is the general

10   contractor?

11        A.     Because when I got there Gus is

12   in charge of the project.  So Gus doing

13   besides the electric, the AC and the

14   security, Gus is doing the entire project.

15   He is responsible for the project, for the

16   sheetrock, the general build out.  The

17   general renovation.

18        Q.     He was doing sheetrock?

19        A.     Well, when I say sheetrock it's

20   part of the construction.  You have floor,

21   sheetrock, you have the tiles.  So he is

22   pretty much doing everything except the

23   electric.

24        Q.     Let's just be clear.  Gus had

25   nothing to do with the air conditioning?

Page 77

1                    HUDSON

2       A.    No.   It's a different crew to

3    do AC.

4       Q.    Gus had nothing to do with the

5    electrical?

6       A.    Nothing, nothing to do with

7    electrical.

8       Q.    Gus had nothing to do with the

9    security?

10      A.    No.   Nothing to do with

11   security.

12      Q.    But he had something to do with

13   other construction activities?

14      A.    Yes.   Yes.   The rest of the

15   construction.

16      Q.    What do you mean the rest of?

17   Did he do the plumbing?

18      A.    No.   No.

19      Q.    He didn't do the plumbing

20   either, right?

21      A.    No.   He didn't do the plumbing.

22      Q.    Did he do the demolition?

23      A.    That I don't know.   Because I

24   came there after the demolition was done,

25   framing was done.   That's when I came

Page 78

1                        HUDSON
2    there.   Any question about before, I don't
3    know.
4          Q.    You don't know about the
5    demolition?
6          A.    I don't know.
7          Q.    Do you know whether he did the
8    framing?
9          A.    I don't know exactly.   The
10   framing was done when I got there.   The
11   framing was done ready for us to work
12   there.
13         Q.    So you don't know whether he
14   did the framing either, right?
15         A.    No.
16         Q.    Was there any work done on the
17   roof?
18         A.    There was a unit going on the
19   roof.   There was also -- putting on a new
20   tar, top on the roof.
21         Q.    Who did the roofing?
22         A.    Well, the guys, I don't know if
23   they are connected to George.   They're
24   separate guys doing the exterior work.   Not
25   connected to George.

```
 1                   HUDSON
 2        Q.    Who hired George?
 3              MR. RICHMAN:  If you know.
 4        Q.    Don't look at your lawyer for
 5   your answer.
 6              MR. RICHMAN:  I don't want him
 7         to guess.  You're asking questions
 8         that you already asked.
 9              MR. BRIGANTIC:  It's not clear
10         to me whether I got an answer.
11        Q.    Who hired George?
12        A.    I do not know.
13        Q.    Would it surprise you to know
14   that A.S.K. Electric hired George?
15              MR. RICHMAN:  Objection.  Don't
16         answer that question.  Don't answer
17         it.  It's not a proper question.  You
18         know that.
19              MR. BRIGANTIC:  That's all
20         right.  I will show him a document in
21         a second.
22              MR. RICHMAN:  No.  Showing him
23         a document doesn't give the answer to
24         a question.  You asked the question
25         five times already.  Enough is
```

Page 80

```
 1                    HUDSON
 2        enough.
 3              MR. BRIGANTIC:  I haven't used
 4        a document before nor has the
 5        Plaintiff.  We're going to use the
 6        document.
 7              MR. RICHMAN:  Go ahead.
 8        Q.    I am going to mark as Defendant
 9   Kalnitech Exhibit B the subcontract between
10   A.S.K. Electric and Jim Associates.  Have
11   you ever seen this document before?
12              (Whereupon, subcontract between
13        A.S.K. Electric and Jim Associates
14        was marked as Defendant's Exhibit B
15        for identification as of this date by
16        the Reporter.)
17        A.    No.
18        Q.    Prior to my showing this to
19   you, have you ever seen A.S.K. Electrical
20   contracting Corp. form of subcontract?
21        A.    No.
22        Q.    Are you in any way involved in
23   the sub contracts?
24        A.    No.
25        Q.    What does this say right under
```

Page 81

1                        HUDSON
2    A.S.K. Electrical Contracting Corp., what
3    is the title of this document?
4         A.    Master subcontract agreement.
5         Q.    I am going to scroll down and
6    you see identified as the subcontractor Jim
7    Associates?  Do you see that?
8         A.    Yes, I saw that.
9         Q.    Do you see the name under there
10   identified as president Jorge Moscoso, do
11   you see that?
12        A.    Yes.
13        Q.    The contractor is identified as
14   A.S.K. Electrical contracting Corp., right?
15   Have you ever seen this work order form for
16   this project?
17        A.    No.  None of these forms, I
18   haven't seen them.  The office deals with
19   all of this paperwork.
20        Q.    It says the contract document.
21   Underneath contract documents it's signed
22   Jorge Moscoso on behalf of Jim Associates
23   and on the other side it's signed by A.S.K.
24   Electrical Contracting Corp. by David
25   Kleeman, do you see that?

Page 82

1                       HUDSON

2          A.    Yes, I see it.  I see that.

3          Q.    Do you recognize Mr. Kleeman's

4    signature?

5          A.    It looks different.  I don't

6    recognize it right here.  Based on the

7    documents you showed me before, it looks,

8    yes.  I don't see his signature there.

9          Q.    Does this document refresh your

10   recollection that you might have that it

11   was actually A.S.K. Electrical Contracting

12   Corp. --

13         A.    No.

14         Q.    You have to let me finish.  Mr.

15   Hudson, does this refresh any recollection

16   that you might have that it was A.S.K.

17   Electrical Contracting Corp. and not Gus

18   who hired Jorge Moscoso?

19         A.    No.

20         Q.    You think it was your belief

21   that Gus hired Jorge Moscoso?

22         A.    I don't know.

23         Q.    You don't know, right?

24         A.    I don't know.

25         Q.    Do you know what a toolbox

Page 83

1                        HUDSON
2    meeting is?
3         A.    Yes.  It's called toolbox
4    talks.
5         Q.    What is a toolbox meeting?
6         A.    We go over various safety, with
7    all the tools that we use.  We keep a
8    meeting, we go over and choose various
9    topics, tool safety.  Accidents that can
10   cause using a particular tool.  All to
11   prevent any such injuries from happening.
12        Q.    When you are on a job site, do
13   toolbox meetings usually get held in the
14   mornings?
15        A.    No.  We normally do it once a
16   week.  If we're in the city working once a
17   week, only for our workers, electrical.  We
18   don't do it for the rest of the
19   contractors, the rest of the workers.
20        Q.    Your answer was only with
21   respect to electrical workers?
22        A.    Yes.  Because if I am
23   responsible for the -- when I am
24   responsible for the guys working we only do
25   toolbox talks only for electric.

Page 84

1                      HUDSON

2          Q.    To your knowledge, were there

3    toolbox meetings for the other workers?

4          A.    I am not sure.  I only focus on

5    me and my -- the workers that work with.

6          Q.    Did you have workers working

7    under you?

8          A.    Yes.

9          Q.    How many workers did you have

10   working under you?

11         A.    On a regular, I had one guy.

12   Me and him during the project.

13   Occasionally maybe we get an extra person

14   or two persons to come in.  In the

15   beginning it was me and my helper and we do

16   the whole project.

17         Q.    You would report to Mr.

18   Kleeman?

19         A.    Yes.  He pretty stopped by

20   almost as much as he can.  On the way for

21   him going home he stopped by his office

22   quite often.

23         Q.    What kind of work does Mr.

24   Kleeman do other than maybe owning Davs

25   Partners?

Page 85

1                     HUDSON

2          A.    I don't know.  I know he owns

3     A.S.K. Electric and I don't know what other

4     kind of work he does.

5          Q.    To your knowledge, is Mr.

6     Kleeman a licensed electrician?

7          A.    Yes.

8          Q.    He is?

9          A.    Yes.

10         Q.    So do you know whether he has

11    knowledge of actually working on a job

12    site?

13         A.    Yes, yes.  He is very good.  He

14    knows everything about a job.

15         Q.    How frequently did he stop by

16    this work site?

17         A.    If he is not busy sometimes for

18    the five days I might see him like three

19    days out of the five days.

20         Q.    For the duration of the

21    project, on average, would he be at the

22    work site approximately three out of every

23    five days?

24         A.    Yes.

25         Q.    When he was on the job site,

Diamond Reporting
A Veritext Company
800.727.6396                                    Responses to objections 85
www.veritext.com

Page 86

1                    HUDSON

2    what did he do?

3          A.     He always doing something.

4    It's his own office.  If he has to check in

5    something that he wants to be changed, he

6    will give instruction or if he decide to

7    work something like, for example, if they

8    were doing the cage, there is a cage with

9    all the security stuff in there.  He come

10   and help us, set it up.  He basically like,

11   I say it's his project and he will check

12   everybody.  There was nobody off limits of

13   what is getting done.  He is paying to get

14   it done.  We pretty much have to do it to

15   his satisfaction.

16         Q.     So he had supervisory authority

17   over the entire job site?

18         A.     He owns the place.  So, yes.

19         Q.     Did he direct the work?

20         A.     Well, he would give

21   instructions.  For example, he tells me

22   what he wants to get done and I will do my

23   part and direct the workers that are

24   working underneath me.  He tells the

25   general contractor what needs to get done.

Page 87

1                    HUDSON
2    They will do it.
3         Q.    You keep referring to the
4    general contractor but you testified
5    earlier you don't know who that is.
6              MR. RICHMAN:  He did testify
7         that ten times already.  He said Gus
8         was the general contractor.
9              MR. BRIGANTIC:  We established
10        after we looked at the document.
11             MR. RICHMAN:  Bob, you showed
12        him a document.  The document said
13        what it said.  You asked him numerous
14        times who he believed the general
15        contractor was and he has said Gus.
16        So stop asking him the same question.
17             MR. BRIGANTIC:  Stop
18        testifying.
19             MR. RICHMAN:  I am not
20        testifying.
21             MR. BRIGANTIC:  Stop with the
22        colloquy and stop testifying.
23             MR. RICHMAN:  I am not
24        testifying.
25             MR. BRIGANTIC:  I am not here

```
1                    HUDSON
2         for your testimony.  I am here for
3         the witness.  May I proceed?
4              MR. RICHMAN:  If you are not --
5         if you are going to ask the same
6         questions again.
7              MR. BRIGANTIC:  I am not asking
8         the same questions.  We are operating
9         now with respect to what David
10        Kleeman did on the work site.  We
11        didn't talk about that so far this
12        morning.  Let me move on.
13        Q.   Mr. Hudson, who was in
14   charge -- when you are on a work site, do
15   you have to sequence the work?
16        A.   Yes.
17        Q.   What does that mean?
18        A.    Meaning that you plan out the
19   day.  You plan out what the workers to do.
20   Sometimes I am in charge of ten, 15 guys.
21   So I plan out the sequence.  So when we
22   start in the morning everyone gets their
23   project.  I team them up with who is going
24   to work and I send them out.  As they go
25   along I check on them to see if they have
```

Page 89

1                    HUDSON

2    difficulties and assist.  When all of that

3    is done I am working foreman.  I go and

4    work and I do something.  Still I keep an

5    eye and everything that is getting done.

6         Q.    You sequence the work so it can

7    get done in an orderly fashion?

8         A.    Yes.  Plus we also have to meet

9    deadlines.  We definitely have to plan it

10   out.  If not it's going to be chaos, people

11   working on top of people and nothing is

12   going to get done.

13        Q.    On this job site, was there

14   documents that set forth what the schedule

15   would be, how long each trade would be

16   there and what they will do?

17        A.    I didn't see any documents that

18   showed that.  All I know, he wants to move

19   into his new office.  We try to get a

20   project done as perfect as possible and as

21   fast as I possible for him to move in.

22   Exact dates, no, I didn't see any documents

23   with exact dates.

24        Q.    On this particular job site,

25   who was responsible for scheduling the

Page 90

1                    HUDSON
2    work?
3         A.    David, he is responsible for
4    scheduling the work.  I went there to do my
5    part and he would schedule with AC guy,
6    with the plumbers and like I say Gus always
7    pretty much there every day.  So he know
8    what needs to get done from David.
9         Q.    So David would instruct Gus
10   what to do?
11        A.    Yes.  Instruct all of us.  It
12   could be something, for example, he tells
13   us Monday, he don't want to tell us again
14   and again.  He tell us what needs to be
15   done.  He come and observe and make sure
16   it's getting done.
17        Q.    If there had to be a change
18   order David would have to approve that?
19        A.    Well, in this case he just said
20   hey, I like that to be changed.  It's not a
21   regular process of being in the city where
22   it's kind of major to work in a change
23   order.  With him he say hey, I would like
24   for you to have an extra light in the
25   office.  Just by saying it we do it.  We

Page 91

```
 1                          HUDSON
 2    don't have to wait or get any other
 3    approval.  We do basically what he wants.
 4         Q.    So regardless of whether there
 5    was the formality of the written change
 6    order, David Kleeman would be the guy to
 7    decide what he wanted done or not done?
 8         A.    Yes.
 9         Q.    He would confer with all the
10    trades, right?
11         A.    Yes.  He interacts with all of
12    us.  He interact with me, Gus, the plumber.
13    He definitely interacted.
14         Q.    After the accident occurred,
15    you never saw or talked to the Plaintiff
16    again, right?
17         A.    No.
18         Q.    Do you know if A.S.K.
19    Electrical conducted an investigation?
20         A.    I do not know.
21         Q.    Did this project have an
22    architect?
23         A.    I do not know.  I do not know
24    to be honest.
25         Q.    Do you ever recall David
```

Page 92

1              HUDSON
2    Kleeman being on the scene conferring with
3    an architect?
4         A.    No.
5         Q.    Did A.S.K. Electrical have a
6    project file?
7         A.    I do not know.
8         Q.    Did you ever see a project
9    file?
10        A.    No.
11        Q.    Did you personally, whether or
12   not there was a project file, did you work
13   with documents regarding this project?
14        A.    Just the blueprint.
15        Q.    Where was the blueprint kept?
16        A.    I kept a blueprint by my box.
17        Q.    Was there a blueprint available
18   for all the trades to refer to?
19        A.    Yes.  Yes.  Everybody has their
20   print that they work off of, work with.
21        Q.    Was it the same copy that you
22   used?
23        A.    Well, they would have whatever
24   trade they are working.  Mine I deal with
25   electrical and I kind of had everything.

1                    HUDSON

2    But then they have to focus on if they do

3    the plumbing, they focus on the plumbing

4    drawing, the mechanical focus on mechanical

5    drawings.  The general contractor focuses

6    on their build out.

7         Q.    When you say you had

8    everything, what do you mean by that?

9         A.    Well, the full set of drawings.

10   That shows everything.

11        Q.    Did the other trades have a

12   full set of drawings?

13        A.    Yes.  Yes.  They have their

14   drawings but they also have access to the

15   main big drawing that if they need to come

16   and take a look at something that they deal

17   with their part of work.  It's there.  They

18   also had their drawings.  Some of them had

19   small printout of the same drawing.  But

20   the big main one was there on the job site

21   for anybody to use.

22        Q.    Was any equipment kept on-site

23   in the event that a trade wanted to use

24   equipment?

25        A.    Yes.  We have our own tools,

1                    HUDSON

2    kept on-site.  The contractor, they had

3    their own tools.  We only use what is

4    provided by A.S.K. Electric and our own

5    personal tools.  The other trade, their

6    boss supply them with the tools they need

7    to get the job done.

8         Q.    I understand that.  What I am

9    asking is, putting aside that the trades

10   themselves might bring equipment onto the

11   site for their own use, was there equipment

12   at the job site for trades to use if they

13   wanted to or if they needed to?

14        A.    No.  Only, like I said, stuff

15   that they use it, whatever they provide for

16   them.  For us, whatever we need was

17   provided for us.  There was no equipment

18   like any type of machine or anything that

19   anybody could use.  Whatever they using is

20   specialized to that particular trade and to

21   who was going to use it.

22        Q.    Going back to the accident.

23   Did you see the Plaintiff work on the

24   ladder before he fell?

25        A.    No, I did not.

1                   HUDSON

2        Q.    If you were going to work on

3   this ladder in the position where it was,

4   how would you properly use the ladder?

5        A.    There is two ways he could have

6   done it.  You could -- it depends on the

7   fact that the ladder -- the top of the

8   ladder is actually pretty much the same

9   height of the level where he was working.

10  So it could definitely open the ladder,

11  walk up and walk into the space or if he

12  decided to lean the ladder up against it he

13  has to make sure that it is something

14  secure and they put the ladder so he

15  doesn't slide out.  So the proper way would

16  be to always best to open the ladder.

17  That's the proper way.  It's designed to be

18  opened up not leaned against.  There are

19  special ladders that lean up against the

20  walls.  It's designed to opened up, full

21  extend out and you climb up onto it.

22       Q.    When you say you open the

23  ladder, you mean he has an A frame ladder

24  you open both sides and it locks into

25  place?

Page 96

1                    HUDSON

2        A.    Yes.  You open both sides and

3    there are two supports, the left and right.

4    You have to make sure those are fully

5    extended before you actually climb on the

6    ladders.  Fully horizontal.

7        Q.    Prior to this accident

8    happening, you did not notice which way he

9    was using the ladder?

10       A.    I did not notice.

11       Q.    If you had seen him on the

12   ladder leaning up against the wall, would

13   you have told him not to do it that way?

14       A.    Yes, 100 percent.

15       Q.    Why is that?

16       A.    There is always a possibility.

17   When you have it leaned up depending,

18   because during the construction you have

19   all kind of particles, dust, all of this

20   stuff.  When you lean up on the side there

21   is always the risk of sliding from

22   underneath you.  There is always a risk.

23       Q.    After the accident occurred,

24   did you inspect to see whether the parts of

25   the ladder, when you open it up, that lock

Page 97

1                    HUDSON

2    in place, whether that was working

3    properly?

4        A.    Yes.  It was working properly.

5        Q.    Now, you said that at the top

6    of the ladder it was even with where that

7    opening was in the picture?

8        A.    Yes.  Approximately even with

9    where the opening is.  It's a closet and

10   when you walk into the closet then you have

11   a little storage section on the left-hand

12   side that was framed out.  Inside was

13   completely framed out.  To access it you

14   have to climb on the ladder to climb into

15   the storage area.

16       Q.    What was the purpose of that

17   little storage area?

18       A.    Just extra storage for the

19   office.  It's a big office.  Extra storage

20   where they can store files or whatever they

21   want to store it.  Try to utilize as much

22   space as possible.

23       Q.    At the time the Plaintiff was

24   injured, what was he doing in that area?

25       A.    I don't know exactly what he

```
 1                    HUDSON
 2   was doing.  I know to finish up inside
 3   there the plywood was laid down and
 4   everything.  Pretty much finish up.  You
 5   have to sheetrock, plaster and maybe finish
 6   it and installing the doors.  I don't know
 7   exactly what it was but it was something
 8   that has to do with inside the storage area
 9   that I believe he was working on.
10        Q.    To your knowledge, was the
11   Plaintiff wearing a tool belt when he was
12   injured?
13        A.    Well, no.  I don't know.  When
14   he fall down I didn't see a tool belt or
15   anything.  I couldn't answer that whether
16   he was wearing a tool belt.
17        Q.    To your knowledge, was he
18   wearing a harness?
19        A.    No harness.
20        Q.    There was no one else around
21   him within his vicinity?
22        A.    No.  It was just me working at
23   the panel and he was by the closet.
24        Q.    Let me make a five minute
25   break, see whether I have anything at this
```

Page 99

1                          HUDSON

2    moment.

3          A.      Thank you.

4                  (Whereupon, an off-the-record

5            discussion was held.)

6          Q.      Mr. Hudson, it's my

7    understanding that you would either like to

8    revise or extend your answer to a

9    particular question.  Go ahead and do that

10   if you would like.

11         A.      Okay.  Yes.  So if you guys

12   remember when I said I didn't see exactly

13   how he had the ladder when he went into the

14   storage area to work.  But I heard, when I

15   heard the sound I turned around and I saw

16   him falling down.  I said the ladder was

17   open but now I am really thinking about it.

18   There is no way he could have fallen if the

19   ladder was open.  He had to have the ladder

20   closed and lean upright above the opening.

21   The opening below the storage area.

22                 MR. RICHMAN:  Can we call the

23            open area the cubby?

24         A.      The cubby.

25         Q.      So it's your belief that he did

Page 100

1                         HUDSON

2      not have the ladder open but that it was

3      leaning up against a wall?

4           A.    Yes.  I am not sure how he had

5      it.  That's the only way he would be able

6      to fall the way he fall.  He had to have it

7      leaned up against the cubby.

8           Q.    After the accident, you said

9      you inspected the ladder, did you look at

10     the feet of the ladder?

11          A.    Yes.  I did inspection, I look

12     at the ladder to see any defects, any

13     issues with the ladder.

14          Q.    Can describe what the feet, the

15     bottom part of this ladder is in terms of

16     the feet of the ladder?

17          A.    All ladders have like a rubber.

18     It has a rubber insulation.  A fiberglass

19     ladder.  Fiberglass and rubber feet at the

20     bottom.

21          Q.    This one did?

22          A.    I don't remember 100 percent.

23     It's been a long time ago.  I don't

24     remember if this one had.  All I know is I

25     did not see any issues with the ladder.  I

1                          HUDSON
2    am assuming it had.  I didn't see any
3    issues or anything that arise any suspicion
4    that maybe the ladder was defective why it
5    fall.  The ladder was in good condition.
6          Q.    Now as I understand your
7    testimony, you had to make a phone call.
8    Mr. Kleeman was not at the site when this
9    accident occurred?
10         A.    No, he was not.
11         Q.    Did he come to the scene, to
12   the work site on the same day later?
13         A.    No.  He was away somewhere.  I
14   don't know if he was hunting or fishing, he
15   was away somewhere.  He did not come the
16   site the same day of the accident.
17         Q.    How soon after the accident did
18   he then come back to the work site?
19         A.    I don't remember exactly but I
20   know it was as soon as possible.  But
21   whatever he was doing he came back as soon
22   as possible.  I don't remember the exact
23   time or so when he came back.  I know he
24   came back as soon as possible.
25         Q.    Was it the next day?

1                    HUDSON

2        A.    I don't remember to be honest.

3   I don't remember if it was the next day.

4        Q.    When he did come back, the next

5   time that he came back to the work site,

6   after the accident, did he do any

7   inspection or investigation?

8        A.    Well, he asked me what happened

9   and he look and I showed him where the

10  accident occurred and he basically just

11  checked.  Checked to see exactly based on

12  whatever I told him that happened.  Based

13  on whatever he heard from what I told Gus

14  about the accident which is the same thing

15  I told him what happened.

16       Q.    Do you know what a waiver of

17  lien is?

18       A.    It's when somebody wants -- a

19  waiver of lien, that's when you restrict

20  somebody from -- for example, if you are

21  finishing up the a project and somebody

22  owes somebody money.  You can issue a

23  waiver of lien against that property.

24       Q.    Isn't it where if you do work

25  on a job site and you get paid you waive

Page 103

1                          HUDSON
2    any continuing lien, right?
3          A.    Not sure.  I am not sure.
4          Q.    Have you ever seen a waiver of
5    lien?
6          A.    If what?
7          Q.    Have you ever seen a waiver of
8    lien?
9          A.    No, never seen.
10         Q.    Have you ever signed one?
11         A.    No.
12               MR. BRIGANTIC:  I am going to
13          show you Defendant's Exhibit C.  Did
14          you see what I put up on the screen?
15         A.    Yes.
16         Q.    Can you read off the very top
17   line which is the title of the document?
18         A.    Final combined waiver of lien
19   and general release.
20               (Whereupon, the aforementioned
21          waiver of lien was marked as
22          Defendant's Exhibit C for
23          identification as of this date by the
24          Reporter.)
25         A.    To whom it may concern.

1                      HUDSON

2          Q.    You never seen this document

3     before?

4          A.    No.

5          Q.    This refers to Jim Associates

6     Corp. having been employed by A.S.K.

7     Electrical Corp. to furnish labor and/or

8     materials for the building at 217-14

9     Hempstead Avenue, Queens.  Do you see that

10    in the first paragraph?

11         A.    Yes.  I just read it.

12         Q.    Does this refresh any

13    recollection you might have, whether it was

14    A.S.K. Electrical that hired Jim

15    Associates?

16         A.    No.  In terms of the paperwork

17    I never seen the paperwork that dealt with

18    the project.  Only paperwork I deal with

19    the prints that they gave me to proceed

20    with the build out for the electric.

21         Q.    There is a paragraph that

22    starts now, do you see that paragraph?

23         A.    Yes.

24         Q.    The next paragraph after that

25    is whereas.  Do you see that?

Page 105

1               HUDSON

2        A.    Yes.

3        Q.    Can you read for me what the

4   first sentence in that whereas paragraph?

5        A.    Whereas Jim Associates Corp.

6   the undersigned, as releasor, successors

7   and assigns, in consideration of $62,891

8   total cumulative dollars and other goods

9   and valuable consideration, has released

10  and does release and forever discharge Davs

11  Partners the owner and A.S.K. Electrical

12  Corp., general contractor, collectively

13  referred to herein as the releases and each

14  of the respective releases, shareholders,

15  officers, directors, employees, agents,

16  representatives, successors and assigns

17  from all actions, causes of actions, sums

18  of money, or any other liability arising

19  out of or in connection with the project

20  and work contracted for and demands

21  whatsoever, in law, admiralty or equity,

22  which against either or both of the

23  releasees.

24       Q.    That's the first sentence.  You

25  can stop there.

```
1                    HUDSON
2         A.    Okay.
3         Q.    You would agree with me that
4    this waiver of lien refers to Davs Partners
5    LLC as the owner and A.S.K. Electrical
6    Corp. as the general contractor; correct?
7         A.    I do not want to say.  Even
8    though I read it, I do not want to say.  I
9    still think this is something that should
10   definitely be between the lawyer and you
11   guys.  I do not want to give any statement
12   based on these documents which I am seeing
13   right now.
14        Q.    I'm sorry, Mr. Hudson.  That is
15   not responsive to my question.  All my
16   question is would you agree with me that
17   the waiver of lien refers to Davs Partners
18   LLC as the owner?
19        A.    Yes.
20        Q.    And A.S.K. Electrical as the
21   general contractor?
22        A.    Yes.  It said it on the
23   document.
24        Q.    Okay.  Does this refresh your
25   recollection you might have that it was
```

Page 107

1                          HUDSON
2     actually A.S.K. Electrical Corp. that was
3     the general contractor?
4          A.    No.   Not based on this
5     document.   I know that -- like I said I
6     work for A.S.K.
7               It was their project that I'm
8     doing.
9               MR. BRIGANTIC:   That's all I
10          have subject to any follow-up to
11          anything else that anyone else may
12          have.   Thank you, Mr. Hudson.
13               MR. KLEIN:   I have a few
14          follow-up.
15     EXAMINATION BY
16     MR. KLEIN:
17          Q.    Sir, when you began working on
18     the morning of the accident, was the worker
19     who was involved in the accident, was he
20     already working?
21          A.    No.
22          Q.    Did you see him bring the
23     ladder up into that cubbyhole area that we
24     described?
25          A.    No.

Diamond Reporting
A Veritext Company
Responses Berlin Starppings.com

Case 1:22-cv-01473-KAM-PK   Document 53-13   Filed 05/30/23   Page 114 of 254 PageID #:
825

Page 108

1                    HUDSON

2        Q.    When did you first become aware

3    that he was working in that area?

4        A.    When I start -- when I started

5    working on the panel I only became aware of

6    it when I heard the noise from the whole

7    tumbling.

8        Q.    So you only became aware that

9    he was working in that cubbyhole area after

10   you heard a noise?

11       A.    Yes.

12       Q.    Which you later found out to be

13   the accident?

14       A.    Yes.  I heard the noise.  I

15   turned my head to the left and I saw him

16   coming down.  If it was a case where I

17   noticed any -- if I go there physically to

18   check and I see and I notice anything that

19   was wrong or saw something incorrectly I

20   would definitely fix the issue to prevent

21   accident.  It's always good to have an

22   accident free environment.

23       Q.    So you never saw him before you

24   heard that noise; is that correct?

25       A.    No.

Page 109

1                    HUDSON

2          Q.    What was the size of the

3    cubbyhole area?

4          A.    I would say, roughly say about

5    five feet by five feet.  Five feet.

6          Q.    Five feet by five feet square?

7          A.    Yes.

8          Q.    Are you saying that a six foot

9    A frame ladder cannot have been set up in

10   that area fully opened?

11              MR. BRIGANTIC:  Objection to

12         the form of the question.  He can

13         answer.

14         A.    Yes.  If it was fully opened it

15   created a distance between him and the

16   cubby.  But he probably had it turned the

17   other way.  Maybe if say he was to face the

18   ladder and outside and maybe climb up on

19   the side but there is no way if he have it

20   fully open it creates a gap.  If he climb

21   up to go to the cubby and fully open, you

22   create a gap distance between the safe

23   landing of the cubby and the top of the

24   ladder.  It definitely would be a wrong way

25   to have it opened to climb in there.

Page 110

1                         HUDSON
2           Q.     Could you bring up Exhibit 6
3      please.  You see that red toolbox?
4           A.     Yes.
5           Q.     Going inside that space, is
6      that where the cubbyhole area is?
7           A.     Is there anyway you can zoom
8      out?
9           Q.     Where is the cubbyhole.  Is it
10     where --
11          A.     Sorry.  If I am standing in the
12     closet, the cubby is on the left-hand side.
13          Q.     Where is the closet?  Is it
14     where his head is, the worker on the floor
15     head or in the area where that red toolbox
16     is?
17          A.     No.  It's where the red toolbox
18     is and the ladder is inside the closet.
19          Q.     There is no door or anything
20     closing off that cubbyhole area; correct,
21     it's an open entranceway in there?
22          A.     It was actually on the
23     construction.  Eventually there would be a
24     door installed to close it off.
25          Q.     But at the time of the accident

Page 111

1                    HUDSON
2    there was no door there; correct?
3         A.    No.
4         Q.    You don't know if he was
5    working in the hole in the wall or if he
6    was working by standing on the ladder;
7    correct?
8         A.    Based on how I see him coming
9    down, he had to be working inside the hole
10   and -- based on how he fell, he had to be
11   working inside the cubbyhole and up and
12   exiting the hole.  That's when the whole
13   accident occurred.  Based on how I saw him
14   falling.
15        Q.    Before he fell, did you
16   actually see him place one of his feet on
17   the ladder, yes or --
18        A.    No.
19        Q.    Did you ever see him place any
20   feet on top of the ladder, yes or no?
21        A.    No.
22        Q.    When you saw him for the very
23   first time, tell me where his feet were.
24        A.    He came down head first.  So
25   the cubby is on the left-hand side.  He

Page 112

```
 1                     HUDSON
 2   came tumbling down head first on the
 3   right-hand side.
 4        Q.   Where were his feet when you
 5   first saw him?
 6        A.   His feet were facing towards
 7   the cubby on the left-hand side.
 8        Q.   When you saw the ladder at that
 9   time, was it opened or closed?
10        A.   The ladder was, it had to be
11   closed.  It had to be closed.
12        Q.   Not what it had to be.  When
13   you saw it was it opened or closed?
14        A.   Closed.
15             MR. RICHMAN:  Hold on.  For the
16        record when you say closed, does that
17        mean the A frame is not A frame or it
18        means something else?
19        A.   It would be closed being
20   exactly how you see the ladder right there.
21   Like folded in.  That I consider it closed.
22             MR. RICHMAN:  Just to clarify
23        for the record.  The way that you see
24        the ladder now is what you are
25        referring to as a closed ladder;
```

Page 113

1                        HUDSON

2          correct.

3          A.      Yes.

4          Q.      To your understanding, what was

5     the reason he would use the ladder in a

6     closed position like that?

7          A.      Well, to get inside the cubby.

8     The cubby is probably approximately, I

9     would say, almost six feet high.  You need

10    a ladder to get inside the cubby.

11         Q.      If the ladder was placed

12    sideways along the opening, wouldn't he be

13    able to get into the opening that way?

14         A.      Yes.  Yes.  You would be able

15    to.

16         Q.      You didn't see him get into the

17    opening; correct?

18         A.      No.  I didn't see him get into

19    the opening.

20         Q.      You didn't see him get out of

21    the opening?

22         A.      No.  Just when he tumbling,

23    coming down.

24         Q.      You believe that using a ladder

25    in a closed position is an improper use of

1                      HUDSON

2    a ladder; correct?

3          A.     If you don't have the right

4    type of ladder.  We all do it on-site but

5    it's not recommended if you don't have the

6    proper type.  Depending on certain place

7    you're working you need various different

8    size ladders.

9          Q.     Would the ladder that is shown

10   in the photograph Exhibit 6 would be the

11   proper ladder to use under those

12   circumstances?

13         A.     I would recommend a shorter

14   ladder.

15         Q.     But if there was no shorter

16   ladder available, could the ladder shown in

17   this Exhibit 6 have been used?

18         A.     Yes.  It could be used.  They

19   had to be careful.  Properly set it up.

20         Q.     In a closed position though?

21         A.     Yes.  Yes.  There is always a

22   risk.  The way the ladder is right there,

23   there is always a risk whenever you use a

24   ladder like that.

25         Q.     But it could be used that way;

Page 115

1                        HUDSON
2    correct?
3         A.     Yes.   In cases where you do use
4    it that way, they do not recommend it.
5         Q.     Now, who did you tell about the
6    accident again?
7         A.     I told David Kleeman which is
8    my boss.   I said on the phone about the
9    accident, I called Gus.   I told him what
10   happened.
11        Q.     Did you tell him that you saw
12   the ladder in a closed position?
13        A.     No.   I didn't tell him that I
14   saw the ladder in a closed position.
15        Q.     Why didn't you tell him you saw
16   the ladder in a closed position?
17        A.     No.   The reason -- no.   The
18   thing I am saying is, I only -- I know they
19   keep asking me before.   I know this whole
20   thing, you keep asking me before how he had
21   it before.   I pretty much saw when the
22   whole thing, when he is tumbling over.   So
23   the ladder was closed.   But as how before,
24   I don't know how he had it before or how it
25   was cleaned up before.   The way you are

1                    HUDSON

2    looking at the ladder right now, the ladder

3    was tumbled over on top of him.  So the way

4    it is positioned right now, it's moved.

5         Q.    Did you tell David Kleeman that

6    you saw the ladder in a closed position

7    after the accident, yes or no?

8         A.    Yes.  I told him I saw it in a

9    closed position.

10        Q.    So that would be something that

11   would be included in an accident report

12   because you would consider that something

13   important; correct?

14        A.    Yes.  Like I said I explained

15   to them what happened.  Exactly what

16   happened and if there was paperwork I was

17   filling out or signed, that would be

18   something that would be included in an

19   accident report.

20        Q.    Were there any shorter ladders

21   available for the worker to use?

22        A.    I do not know.  His boss

23   provided him with all the stuff that they

24   need and for us, we didn't have a shorter

25   ladder there for him to use.  He was using

Page 117

1                      HUDSON
2    his company ladder.  So I don't know if
3    they had a shorter one for him to use.
4               MR. KLEIN:   Thank you very
5          much, sir.  Nothing further.
6               MR. BRIGANTIC:   I have a very
7          brief follow-up.
8    EXAMINATION BY
9    MR. BRIGANTIC:
10        Q.    Mr. Hudson, after the accident
11   happened, where was the ladder?
12        A.    The ladder, just how you see
13   the ladder.  The ladder was taken off of
14   him and they leave the ladder off.
15        Q.    So right after the accident
16   occurred, the ladder was laying on top of
17   the Plaintiff?
18        A.    Yes.  The him, the ladder,
19   everything was tumbled down to the right of
20   the closet.
21        Q.    Somebody picked up that ladder
22   and put it up against the wall?
23        A.    It is naturally -- we pick the
24   ladder up off of him.  I can't tell you the
25   way -- the way it's positioned right now.

1                    HUDSON

2     If somebody purposely put it that side, the

3     ladder was taken up off of him.

4          Q.    Who did that?

5          A.    There was other workers who run

6     and came right when the whole thing

7     happened.  I was more concerned because I

8     saw the blood coming from his face.  I was

9     more concerned if he is okay while calling

10    for the ambulance.  Calling 911 to make

11    sure to get help.

12         Q.    Were they the coworkers of the

13    Plaintiff?

14         A.    Yes.

15         Q.    Do you know whether they spoke

16    to the Plaintiff before they picked up the

17    ladder off of him?

18         A.    No.  Everybody was trying to

19    find out, make sure he is okay.  They

20    trying to talk to him, make sure he is

21    okay.

22         Q.    Do you happen to know whose

23    legs are in that photograph?

24         A.    That's one of the co-workers

25    that work with the Plaintiff on the ground.

Page 119

```
 1                      HUDSON
 2   You can tell he has like the same piece of
 3   the T-shirt.
 4        Q.    I am asking, do you happen to
 5   know the name of that person?
 6        A.    No.
 7             MR. BRIGANTIC:   That's all I
 8        have.   Thank you.
 9             (Whereupon, at 2:00 p.m., the
10        Examination of this witness was
11        concluded.)
12
13             °          °          °          °
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 120

1                    HUDSON

2              D E C L A R A T I O N

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                    _____

15

                    DWAYNE HUDSON

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____

22      NOTARY PUBLIC

23

24

25

Page 121

```
 1                    HUDSON
 2              E X H I B I T S
 3
 4    PLAINTIFF'S EXHIBITS
 5
 6    EXHIBIT    EXHIBIT                    PAGE
 7    NUMBER     DESCRIPTION
 8     Exh 1     contract                    17
 9     Exh 2     proposal                    19
10     Exh 3     proposal dated
11               June 12, 2019               21
12     Exh 4     proposal dated
13               June 26, 2019               22
14     Exh 5     photograph                  34
15     Exh 6     photograph                  34
16     Exh 7     piece of paper was deemed   8
17          (Exhibits retained by court reporter)
18    DEFENDANT'S EXHIBITS
19
20    EXHIBIT    EXHIBIT                    PAGE
21    NUMBER     DESCRIPTION
22      A        contract                    72
23      B        subcontract                 80
24      C        waiver of lien             103
25          (Exhibits retained by Counsel.)
```

```
 1                    HUDSON

 2

 3              I  N  D  E  X

 4

 5  EXAMINATION BY                        PAGE

 6  MR.  KLEIN                         5,  107

 7  MR.  BRIGANTIC                        39

 8

 9    INFORMATION AND/OR DOCUMENTS REQUESTED

10  INFORMATION AND/OR DOCUMENTS        PAGE

11  (None)

12

13

14        QUESTIONS MARKED  FOR  RULINGS

15  PAGE  LINE  QUESTION

16  (None)

17

18

19

20

21

22

23

24

25
```

Page 123

1                      HUDSON
2              C E R T I F I C A T E
3
4    STATE OF NEW YORK          )
                                :  SS.:
5    COUNTY OF SUFFOLK          )
6
7          I, AILEEN KOVEN, a Notary Public for
8    and within the State of New York, do hereby
9    certify:
10         That the witness whose examination is
11   hereinbefore set forth was duly sworn and
12   that such examination is a true record of
13   the testimony given by that witness.
14         I further certify that I am not
15   related to any of the parties to this
16   action by blood or by marriage and that I
17   am in no way interested in the outcome of
18   this matter.
19         IN WITNESS WHEREOF, I have hereunto
20   set my hand this 29th day of April 2022.

21

22   _____
                     AILEEN KOVEN
23
24
25

Page 124

1                          ERRATA SHEET
                    VERITEXT/NEW YORK REPORTING, LLC
2

     CASE NAME: Reyes Espinoza, Stalin Rodrigo v. DAVS Partners LLC Et
     Al.
3    DATE OF DEPOSITION: 4/11/2022
     WITNESSES' NAME: Dwayne  Hudson
4

5      PAGE    LINE (S)       CHANGE              REASON
       ___|_____|_____|_____
6
       ___|_____|_____|_____
7
       ___|_____|_____|_____
8
       ___|_____|_____|_____
9
       ___|_____|_____|_____
10
       ___|_____|_____|_____
11
       ___|_____|_____|_____
12
       ___|_____|_____|_____
13
       ___|_____|_____|_____
14
       ___|_____|_____|_____
15
       ___|_____|_____|_____
16
       ___|_____|_____|_____
17
       ___|_____|_____|_____
18
       ___|_____|_____|_____
19
       ___|_____|_____|_____
20
21                                 _____
                                   Dwayne  Hudson
22   SUBSCRIBED AND SWORN TO BEFORE ME
     THIS ____ DAY OF _____, 20__.
23
24
     _____          _____
25   (NOTARY PUBLIC)                    MY COMMISSION EXPIRES:

| & | 221.2  3:17 4:7 | 7 | 50:4 54:25,25 |
|---|---|---|---|
| **&**  2:4,8 5:17 | **221.3**  4:3 | **7**  7:17 8:8 121:16 | 76:13 77:3 90:5 |
| **1** | **24**  40:17,17,18 | **70**  65:22 | **access**  93:14 97:13 |
| **1**  17:19 18:14 | **24693**  123:21 | **72**  121:22 | **accident**  15:8 27:8 |
| 121:8 | **26**  22:13,18 121:13 | **8** | 27:22 30:19,22 |
| **100**  2:5 27:5 29:14 | **27**  19:10 | **8**  121:16 | 31:3,5,23 32:12,17 |
| 63:17 96:14 | **28**  11:7,14 23:2 | **80**  121:23 | 32:20 33:8 35:8 |
| 100:22 | 26:13 | **85**  67:16,17 | 37:25 38:3,7 |
| **10038**  2:5 | **29**  41:2 | **9** | 46:20 47:22,24 |
| **10158**  2:14 | **29th**  123:20 | **911**  30:15 56:4,14 | 48:3 49:17 51:18 |
| **103**  121:24 | **2:00**  119:9 | 56:17 57:3 58:9 | 56:17 59:6,21 |
| **10466**  5:13 | **3** | 118:10 | 60:4,7,11,14 61:9 |
| **107**  122:6 | **3**  21:3,6,12 121:10 | **a** | 61:18 62:8 69:2 |
| **11**  1:10 | **30**  46:7 | **a.m.**  1:11 | 69:11,15,19 70:2,7 |
| **11530**  2:10 | **300**  67:2 | **a.s.k.**  8:22 9:3,7,8 | 70:11,24 71:12,15 |
| **11:00**  1:11 | **31**  3:10 | 9:22 10:5,22,25 | 71:17 91:14 94:22 |
| **12**  21:5,10 121:11 | **3115**  3:5,14,22 | 11:8,10,20 12:11 | 96:7,23 100:8 |
| **15**  88:20 | **34**  121:14,15 | 12:13,21 15:20 | 101:9,16,17 102:6 |
| **17**  53:25 121:8 | **39**  122:7 | 17:6,24 18:5 | 102:10,14 107:18 |
| **19**  121:9 | **3:30**  23:10 | 24:23 25:3,4,7 | 107:19 108:13,21 |
| **2** | **4** | 26:15 31:7,19 | 108:22 110:25 |
| **2**  19:7,14 37:8 | **4**  22:12,16,19 | 33:12 45:4,6,9,13 | 111:13 115:6,9 |
| 121:9 | 121:12 | 45:18,21,24 49:19 | 116:7,11,19 |
| **20**  40:16,17 120:19 | **4/11/2022**  124:3 | 51:8 53:4 57:9 | 117:10,15 |
| 124:22 | **4423**  5:12 | 58:18 64:10,17 | **accidents**  83:9 |
| **2000**  40:13 | **5** | 65:15,17 68:19,21 | **accommodate** |
| **2005**  40:13,13,19 | **5**  33:24 34:4 | 68:24 73:4,10,12 | 6:15 |
| **2013**  11:12 45:19 | 121:14 122:6 | 73:22 74:8,17 | **accompanied**  3:23 |
| **2019**  8:18 11:7,14 | **515197/19**  1:6 | 79:14 80:10,13,19 | **action**  123:16 |
| 11:24 14:12 19:10 | **6** | 81:2,14,23 82:11 | **actions**  105:17,17 |
| 21:5,10 22:13,18 | **6**  34:22,25 110:2 | 82:16 85:3 91:18 | **activities**  51:13 |
| 23:2 26:13 121:11 | 114:10,17 121:15 | 92:5 94:4 104:6 | 77:13 |
| 121:13 | **605**  2:14 | 104:14 105:11 | **actual**  65:13 |
| **2022**  1:10 123:20 | **62**  51:25 | 106:5,20 107:2,6 | **add**  10:18 |
| **21**  121:11 | **62,891**  105:7 | **a.s.k.'s**  9:17 | **additional**  44:20 |
| **217-14**  13:3 104:8 | **666**  2:9 | **able**  44:14 100:5 | **address**  5:11 |
| **22**  121:13 | **6:45**  23:19 | 113:13,14 | **admiralty**  105:21 |
| **221**  3:2 4:2 | | **aboard**  45:14,15 | **affect**  66:14 |
| **221.1**  3:3 | | **ac**  14:15 18:20,21 | **affiliated**  20:3 |
| | | 24:18 26:15 49:19 | **aforementioned** 17:17 19:5 21:4 |

22:17 34:2,23
72:11 103:20
**agents** 105:15
**ago** 6:24 8:17
64:18 100:23
**agree** 106:3,16
**agreed** 4:10,13,16
4:20 10:19 11:3
**agreement** 81:4
**ahead** 15:25 38:19
80:7 99:9
**aileen** 1:18 123:7
123:22
**air** 76:25
**al** 124:2
**altogether** 10:7
**ambulance** 55:24
55:25 56:3,6
59:10 118:10
**answer** 3:8,12,17
3:17,21,22,23,24
6:7,18 26:7 36:8
39:17 55:11 74:23
74:25 75:5,20
79:5,10,16,16,23
83:20 98:15 99:8
109:13
**answered** 3:20 4:6
**answers** 6:8
**anybody** 7:3,7
30:4 69:11 93:21
94:19
**anytime** 6:10
**anyway** 31:20
110:7
**appear** 9:11
**appearing** 31:22
**apply** 3:9 27:2
**appreciate** 11:5
**apprentice** 41:19
42:11

**appropriate** 3:9
4:18
**approval** 91:3
**approve** 90:18
**approximately**
14:25 48:4 53:25
54:2 85:22 97:8
113:8
**april** 1:10 123:20
**architect** 91:22
92:3
**area** 28:6 71:22
97:15,17,24 98:8
99:14,21,23
107:23 108:3,9
109:3,10 110:6,15
110:20
**argumentative**
74:20
**arising** 105:18
**arrive** 23:16,18
**arrived** 70:18
**article** 3:10
**asad** 65:12
**aside** 94:9
**asked** 42:15 45:14
50:16 75:2,15
79:8,24 87:13
102:8
**asking** 5:19 36:5
37:16 50:14 53:17
53:23 54:3 55:7
69:25 79:7 87:16
88:7 94:9 115:19
115:20 119:4
**assertion** 76:9
**assigned** 54:8
**assigns** 105:7,16
**assist** 56:15 89:2
**assisting** 41:13

**associated** 50:18
**associates** 2:4 5:17
19:3,18 20:4,7,21
20:25 21:14,20
25:8,10,14,20 26:4
26:10 27:3,8 37:9
39:8 49:19 80:10
80:13 81:7,22
104:5,15 105:5
**assume** 68:3,5
**assuming** 36:2
63:19 67:25 101:2
**attend** 55:22
**attendance** 3:15
**attention** 28:6
36:18
**attorney** 3:12,21
4:4 7:18
**attorneys** 2:4,8,13
4:20,22
**authority** 26:18,22
51:12,22 52:18,24
86:16
**available** 92:17
114:16 116:21
**avenue** 2:14 5:12
13:3 104:9
**average** 85:21
**aware** 108:2,5,8

**b**
**b** 3:4,10 80:9,14
121:2,23
**back** 8:18 11:24
14:11 40:4 61:10
67:4 71:13 75:8
75:21,23 94:22
101:18,21,23,24
102:4,5
**background** 13:19
**barely** 70:8

**based** 14:17 52:3
54:3 82:6 102:11
102:12 106:12
107:4 111:8,10,13
**basement** 14:4,8
72:2
**basically** 24:17
41:13,16 55:14
86:10 91:3 102:10
**basis** 3:13,23 76:8
**bathroom** 6:11
**beautiful** 66:5
**began** 107:17
**begging** 45:14
**beginning** 67:13
84:15
**behalf** 10:3 21:22
73:22 81:22
**belief** 82:20 99:25
**believe** 12:12
32:21 59:14 65:11
98:9 113:24
**believed** 87:14
**belonged** 29:11,16
**belt** 98:11,14,16
**best** 95:16
**big** 93:15,20 97:19
**bit** 58:7
**black** 35:15
**blood** 118:8
123:16
**blue** 25:2,4
**blueprint** 92:14,15
92:16,17
**bob** 87:11
**body** 61:5
**boss** 12:9,16,20
29:11 37:12 51:6
51:24 52:12 56:21
56:25 57:4,6,8
94:6 115:8 116:22

**[bottom - companies]**

**bottom** 21:18
100:15,20
**box** 92:16
**boxes** 67:10 72:5
**brand** 14:15,15
**break** 6:11,13,19
32:4 98:25
**breathe** 47:6
**brief** 68:10 117:7
**brigantic** 2:15
8:24 9:16,24 10:8
10:12,15 11:4
15:24 20:18 31:9
31:12,16 32:3
35:23 38:18 39:13
39:23 49:10 50:9
53:20 70:20 72:7
74:22 75:17,21
79:9,19 80:3 87:9
87:17,21,25 88:7
103:12 107:9
109:11 117:6,9
119:7 122:7
**bring** 21:3,18
33:24 34:22 94:10
107:22 110:2
**bronx** 5:12
**brother** 37:19,20
39:11 64:2,3,5,6,6
64:7,8
**brought** 28:6
**build** 15:19,21
76:16 93:6 104:20
**building** 13:24,25
13:25 14:4,19,20
14:22 24:16 50:25
51:5,25 71:11
72:3 104:8
**buildup** 12:3
**built** 14:20 17:12

**business** 43:10
44:6
**busy** 85:17

**c**

**c** 2:2 3:4 103:13,22
120:2 121:24
123:2,2
**cage** 86:8,8
**call** 6:12,12 43:3
52:12 56:5,14,15
56:23,25 57:2,4
58:9,9,9 59:11,16
59:17,18 65:10,12
99:22 101:7
**called** 5:2 19:3
30:15 38:3,4
55:23,25 56:3,16
57:3 83:3 115:9
**calling** 118:9,10
**cancel** 10:6
**card** 46:10,11
**care** 18:21,23 48:9
**careful** 114:19
**carpenter** 41:18
42:2
**carpenters** 63:21
**carpentry** 41:12
41:12 42:11
**case** 31:20 55:17
66:12,20 67:16
90:19 108:16
124:2
**cases** 115:3
**cause** 3:20 83:10
**caused** 28:4 67:3
**causes** 105:17
**cell** 58:12
**cement** 24:16
**certain** 13:2 47:15
66:19,21 114:6

**certify** 120:4,8
123:9,14
**chair** 7:10
**change** 90:17,22
91:5 124:5
**changed** 86:5
90:20
**chaos** 89:10
**charge** 4:22 11:15
12:2,5 41:17
76:12 88:14,20
**check** 32:4,8 86:4
86:11 88:25
108:18
**checked** 102:11,11
**chico** 45:11
**choose** 67:14 83:8
**chosen** 67:13
**circuits** 67:3
**circumstances**
114:12
**city** 2:10 44:3,4,7
44:20,23 45:5,10
45:12 46:3,4
83:16 90:21
**civil** 3:5
**clarify** 112:22
**cleaned** 115:25
**cleaning** 41:14
**clear** 3:13,23 26:3
49:5,7 73:14 74:5
76:24 79:9
**clearly** 4:8
**clerk** 4:11
**client** 10:23
**climb** 95:21 96:5
97:14,14 109:18
109:20,25
**close** 61:2 71:19
71:25 110:24

**closed** 99:20 112:9
112:11,11,13,14
112:16,19,21,25
113:6,25 114:20
115:12,14,16,23
116:6,9
**closest** 56:8 71:16
**closet** 28:10,16,18
34:13 58:4,4,5
61:4 71:19 97:9
97:10 98:23
110:12,13,18
117:20
**closing** 110:20
**collectively** 105:12
**colloquy** 87:22
**combined** 103:18
**come** 40:11 45:8
45:14,14 60:16
71:6,14 84:14
86:9 90:15 93:15
101:11,15,18
102:4
**comes** 6:6 38:17
**coming** 24:8 28:11
30:3 54:13 108:16
111:8 113:23
118:8
**comments** 3:16
**commission**
124:25
**commotion** 27:24
28:9,24 51:21
71:13
**communicating**
4:4
**communication**
4:3,5,8
**companies** 26:12
26:15 50:15

[company - davs]                                                        Page 4

| | | | |
|---|---|---|---|
| **company** 1:7 2:13 12:7,10,13 16:4,22 19:2 20:4 25:2,6 26:4,5 37:20 42:18,21 44:8,17 50:17 68:9,22 117:2 | 49:21 53:24 76:20 77:13,15 96:18 110:23 | **corp** 10:23 73:5,23 74:8 80:20 81:2 81:14,24 82:12,17 104:6,7 105:5,12 106:6 107:2 | 113:7,8,10 |
| | **continue** 24:3 43:19 | | **cubbyhole** 107:23 108:9 109:3 110:6 110:9,20 111:11 |
| | **continued** 43:21 | **corporation** 19:3 19:18 21:15 | **cumulative** 105:8 |
| **complete** 3:25 | **continuing** 103:2 | **correct** 11:8,21 | **curious** 61:23,24 70:12 |
| **completed** 15:4 33:5 51:3 63:12 63:23 67:17 | **contract** 12:15 17:4,13,18 18:11 20:21 53:8,10 54:6,9,20,21 55:2 55:4,4,5,15 72:8 72:12,20 74:10,14 81:20,21 121:8,22 | 12:21 16:19 17:7 18:12 20:8,14 22:10 44:24 50:25 51:14 52:21,25 53:5 55:21 56:2 56:17 57:22 58:23 62:10 69:3,7 72:25 73:7,10,17 74:11 76:4 106:6 108:24 110:20 111:2,7 113:2,17 114:2 115:2 116:13 120:9 | **currently** 8:10 |
| | | | **customer** 20:10 |
| | | | **cxe** 40:4 |
| **completely** 31:17 97:13 | | | |
| | | | **d** |
| **compliance** 3:6 | | | **d** 3:5 5:2,2 120:2 122:3 |
| **concern** 103:25 | **contracted** 105:20 | | |
| **concerned** 59:9 70:7 118:7,9 | **contracting** 80:20 81:2,14,24 82:11 82:17 | | **dangerous** 27:4 52:5 |
| **concluded** 119:11 | | | **date** 1:10,17 8:8 15:7 17:20 19:8 21:7 22:20 32:22 34:5 35:2 37:24 46:6 47:22 72:14 80:15 103:23 124:3 |
| **condition** 22:14 26:20 61:21 101:5 | **contractor** 15:12 15:16,18 16:3 19:25 20:16 29:16 39:2,4,8 42:13,22 44:9 53:7 54:8,12 55:9 68:17 72:21 74:18 75:12,16,25 76:3,10 81:13 86:25 87:4,8,15 93:5 94:2 105:12 106:6,21 107:3 | | |
| **conditioning** 76:25 | | **counsel** 121:25 | |
| **conditions** 52:3 | | **country** 2:9 | |
| **conduct** 3:2 4:2 | | **county** 1:2 123:5 | **dated** 19:10 21:5 21:10 22:13,18 121:10,12 |
| **conducted** 91:19 | | **course** 3:15 | |
| **confer** 91:9 | | **court** 1:2,16 3:19 4:12 6:5 121:17 | **dates** 6:25 7:13,13 89:22,23 |
| **conferring** 92:2 | | | |
| **confidentiality** 3:18 | | **courtesy** 11:5 | **daughter** 67:25 |
| | | **covid** 66:16,16 | **david** 12:12,16,17 12:20 13:9,20 15:23 17:23 18:3 21:22 22:5 37:12 51:6 55:17 57:6,8 58:9,20,21,22,22 73:23 81:24 88:9 90:3,8,9,18 91:6 91:25 115:7 116:5 |
| **connected** 78:23 78:25 | **contractors** 83:19 | **coworkers** 118:12 | |
| | **contracts** 50:22 80:23 | **cplr** 3:10,14,22 4:15,17,18 | |
| **connection** 17:7 18:16 105:19 | **controlling** 4:18 46:23 47:2,9,9 | **create** 109:22 | |
| **consent** 4:5 | **conversation** 10:17 59:14 | **created** 109:15 | |
| **consider** 112:21 116:12 | | **creates** 109:20 | |
| **consideration** 105:7,9 | **copies** 7:22,24 | **crew** 38:10 77:2 | |
| | **copy** 4:21 32:6 72:8 92:21 | **critique** 66:21 | **davs** 1:7,15 2:9 9:5 9:12,13 11:2 12:8 12:13,14,17,24 13:15,20 22:10 |
| **construction** 1:7 2:13 10:23 14:14 18:22 39:5 41:4,7 | **corner** 28:16 61:3 | **cubby** 99:23,24 100:7 109:16,21 109:23 110:12 111:25 112:7 | |

[davs - electric]                                                                                        Page 5

25:18 33:12 73:7
73:15,16 74:7
84:24 105:10
106:4,17 124:2
**day** 23:17 37:4
49:17 88:19 90:7
101:12,16,25
102:3 120:19
123:20 124:22
**days** 23:11,12,13
24:8 85:18,19,19
85:23
**deadlines** 89:9
**deal** 92:24 93:16
104:18
**deals** 81:18
**dealt** 104:17
**decide** 86:6 91:7
**decided** 45:16
64:24 95:12
**decision** 64:24
**deemed** 4:17 8:7
121:16
**defect** 3:13
**defective** 101:4
**defects** 100:12
**defendant** 1:15
2:8,13 80:8
**defendant's** 72:12
80:14 103:13,22
121:18
**defendants** 1:8
**definitely** 29:16
89:9 91:13 95:10
106:10 108:20
109:24
**demands** 105:20
**demo** 12:2
**demolition** 62:15
62:21 77:22,24
78:5

**depending** 96:17
114:6
**depends** 95:6
**depict** 60:21,22,24
61:5
**deponent** 3:12,17
3:21,24 4:3,5
**deposed** 31:22
**deposition** 3:4,7,8
3:8,11,18,25 4:4
6:22 7:19 9:5,10
9:17,18,25 10:4,5
10:7,21,24 48:24
57:20 124:3
**depositions** 3:2,3
4:2
**describe** 13:22
100:14
**described** 107:24
**description** 121:7
121:21
**designed** 95:17,20
**designee** 9:12
**designs** 14:16
**details** 54:9
**determining** 4:6
**devices** 63:18,23
**different** 14:16
26:4 27:17 36:17
70:17 75:18 77:2
82:5 114:7
**difficulties** 89:2
**direct** 3:21 25:10
86:19,23
**direction** 3:22
28:4 66:22
**directors** 105:15
**disagreement**
64:23
**discharge** 105:10

**discuss** 68:11
**discussion** 10:13
99:5
**distance** 109:15,22
**document** 7:18
19:15 72:19,23,25
79:20,23 80:4,6,11
81:3,20 82:9
87:10,12,12
103:17 104:2
106:23 107:5
**documents** 9:3
31:18,19 33:3
81:21 82:7 89:14
89:17,22 92:13
106:12 122:9,10
**doing** 11:16 12:3
15:19,20,21 16:25
20:17 23:24 27:3
39:4 41:10,12
42:10,12 43:17,21
48:14 51:24 52:15
52:20 63:21 66:24
70:8 76:12,14,18
76:22 78:24 86:3
86:8 97:24 98:2
101:21 107:8
**dollars** 105:8
**door** 110:19,24
111:2
**doors** 98:6
**doubt** 32:9
**downstairs** 71:5
**drawing** 93:4,15
93:19
**drawings** 93:5,9
93:12,14,18
**drawn** 55:15
**duly** 5:3 120:5
123:11

**duration** 63:14
85:20
**dust** 96:19
**duties** 11:23,25
**dwayne** 5:10
120:15 124:3,21

**e**

**e** 2:2,2 3:6 5:2
12:19,19 58:25
69:10 120:2 121:2
122:3 123:2,2
**earlier** 48:23
57:20 62:10 74:13
87:5
**easiest** 67:14
**educate** 39:15
**effect** 4:11
**eight** 23:9
**either** 32:2 77:20
78:14 99:7 105:22
**electric** 8:14,16,22
9:4,8 10:22,25
11:8,11,15,17,21
12:2,11,13,21
14:16 15:20,21
17:6,24 18:6
24:18 25:3 26:16
31:7,20 33:12
41:24 42:12,16
43:19 45:4,6,9,13
45:19,22,25 48:8
48:10,22 49:9,19
50:4 51:8 52:10
53:4 57:9 58:19
63:7,22 64:11,17
65:15,17 68:20,21
68:24 73:4,10
76:13,23 79:14
80:10,13 83:25
85:3 94:4 104:20

Diamond Reporting
A Veritext Company

| | | | |
|---|---|---|---|
| **electrical** 28:8 | **equity** 105:21 | 22:12,15,19 33:24 | **falling** 29:18 99:16 |
| 42:13 43:22 44:8 | **errata** 124:1 | 34:4,22,25 37:8 | 111:14 |
| 44:9 48:14 50:20 | **error** 3:13 | 72:9,13 80:9,14 | **familiar** 5:24 12:7 |
| 52:16 71:19 73:12 | **espinoza** 1:3 27:12 | 103:13,22 110:2 | 12:9 13:2 15:11 |
| 73:22 74:8,17 | 124:2 | 114:10,17 121:6,6 | 27:7 38:16 64:5,8 |
| 77:5,7 80:19 81:2 | **esq** 2:6,10,15 | 121:20,20 | 64:8 |
| 81:14,24 82:11,17 | **established** 87:9 | **exhibits** 121:4,17 | **far** 39:24 46:19 |
| 83:17,21 91:19 | **et** 124:2 | 121:18,25 | 66:3 88:11 |
| 92:5,25 104:7,14 | **event** 4:7 93:23 | **existing** 14:20,22 | **fashion** 89:7 |
| 105:11 106:5,20 | **eventually** 56:25 | **exiting** 111:12 | **fast** 5:24 89:21 |
| 107:2 | 110:23 | **expensive** 66:17 | **feeding** 67:9,10 |
| **electrician** 41:23 | **everybody** 52:6 | **experience** 54:5 | **feet** 27:25 28:8 |
| 42:5,8 44:16 85:6 | 70:12 86:12 92:19 | **experienced** 41:13 | 71:18 100:10,14 |
| **electricians** 12:4 | 118:18 | **expires** 46:12 | 100:16,19 109:5,5 |
| 54:24 | **exact** 15:7 16:10 | 124:25 | 109:5,6,6 111:16 |
| **emergency** 38:10 | 46:6 50:5 89:22 | **explained** 38:8 | 111:20,23 112:4,6 |
| 56:23 | 89:23 101:22 | 59:5 70:19 71:3,6 | 113:9 |
| **employed** 8:10,14 | **exactly** 28:12 | 74:13 116:14 | **fell** 35:7 57:14 |
| 8:15,19 11:7 20:7 | 36:19 39:3 59:13 | **extend** 95:21 99:8 | 58:4,7 61:25 |
| 26:9 104:6 | 67:7 68:23 78:9 | **extended** 34:21 | 94:24 111:10,15 |
| **employee** 10:22 | 97:25 98:7 99:12 | 96:5 | **fiberglass** 100:18 |
| 36:2 | 101:19 102:11 | **extends** 14:6 | 100:19 |
| **employees** 24:23 | 112:20 116:15 | **extent** 3:14 | **file** 92:6,9,12 |
| 35:21 36:5 71:8 | **examination** 1:14 | **exterior** 18:23 | **files** 97:20 |
| 105:15 | 3:15 4:14,21 5:6 | 24:16 78:24 | **filled** 39:10 |
| **employer** 11:20 | 39:22 107:15 | **extra** 84:13 90:24 | **filling** 116:17 |
| 46:24 47:2,9,10 | 117:8 119:10 | 97:18,19 | **final** 40:5 103:18 |
| 73:5 | 122:5 123:10,12 | **eye** 89:5 | **finally** 6:10 |
| **enforce** 3:19 | **examined** 5:5 | **f** | **find** 50:2 118:19 |
| **entails** 54:10 | **examining** 3:24 | **f** 123:2 | **fine** 62:2 |
| **entire** 63:14 76:14 | **example** 54:23 | **face** 66:6 109:17 | **finish** 16:14 20:2 |
| 86:17 | 71:2 86:7,21 | 118:8 | 32:7 53:20 63:10 |
| **entity** 51:4 | 90:12 102:20 | **facing** 112:6 | 82:14 98:2,4,5 |
| **entranceway** | **examples** 46:22 | **fact** 9:6 38:9 95:7 | **finished** 7:19 |
| 110:21 | **exams** 40:5 | **fair** 53:21 75:11 | 15:10 28:20 40:2 |
| **environment** | **excuse** 8:24 | **fairly** 27:19 | 40:9 63:5 |
| 108:22 | **exh** 121:8,9,10,12 | **fall** 28:15,24 29:4 | **finishing** 23:5 |
| **equipment** 25:16 | 121:14,15,16 | 29:22,25 98:14 | 102:21 |
| 25:19 93:22,24 | **exhibit** 7:16,17 8:7 | 100:6,6 101:5 | **fired** 45:12 |
| 94:10,11,17 | 17:19 18:14 19:7 | **fallen** 99:18 | **firm** 5:17 |
| | 19:14 21:3,6,12 | | |

**first** 5:3 8:23 14:9
23:20,22 28:14,16
29:3,18 46:7
47:16,21 55:22
56:11,13,16 62:21
63:3 64:6 65:8
104:10 105:4,24
108:2 111:23,24
112:2,5 120:5
**fishing** 101:14
**five** 13:24 23:8,11
23:13 24:9 79:25
85:18,19,23 98:24
109:5,5,5,6,6
**fix** 6:3 108:20
**floor** 14:9 36:7,15
76:20 110:14
**floors** 65:21 67:2
**focus** 84:4 93:2,3,4
**focuses** 93:5
**folded** 112:21
**follow** 47:17
107:10,14 117:7
**follows** 5:5
**foot** 29:8 34:20,21
109:8
**force** 4:11
**foregoing** 120:8
**foreman** 11:16
48:13,14,16 89:3
**forever** 105:10
**form** 3:13 35:24
69:10 72:20 80:20
81:15 109:12
**formal** 43:2,4,5
**formality** 91:5
**former** 10:21
**forms** 81:17
**forth** 3:19 4:7 67:4
89:14 123:11

**forward** 71:14
**found** 12:10 50:12
108:12
**four** 23:9 24:9
**frame** 29:7 34:20
62:17 95:23 109:9
112:17,17
**framed** 3:11 97:12
97:13
**framers** 63:5
**framing** 24:14
62:23 77:25 78:8
78:10,11,14
**free** 108:22
**frequently** 85:15
**friday** 23:14
**friends** 22:7
**front** 7:11
**full** 14:6 93:9,12
95:20
**fully** 26:6 34:21
96:4,6 109:10,14
109:20,21
**furnish** 104:7
**furnished** 4:21
**further** 4:10,13,16
4:20 39:21 75:4
117:5 120:8
123:14

**g**

**gap** 109:20,22
**garden** 2:10
**general** 3:3 15:12
15:16,18 16:2
17:9 20:16 22:14
29:16 38:25 39:4
39:5,8 68:17
74:18 75:12,15,25
76:3,9,16,17 86:25
87:4,8,14 93:5
103:19 105:12

106:6,21 107:3
**generally** 55:7
**gentleman** 35:22
**george** 37:18,19
37:21 39:2,10
50:5 64:5,9 68:22
78:23,25 79:2,11
79:14
**george's** 39:11
**getting** 66:25
86:13 89:5 90:16
**give** 7:18 16:10
23:23 32:25 64:25
79:23 86:6,20
106:11
**given** 3:8 120:10
123:13
**go** 6:11 15:3,25
21:17 29:21 38:19
39:24 45:17 47:18
50:20 52:7 61:8
66:22 75:3 80:7
83:6,8 88:24 89:3
99:9 108:17
109:21
**going** 7:15 8:25
9:9,11 17:15 26:7
39:13 51:4,13
52:5 65:2,3 66:13
72:7 75:3 78:18
80:5,8 81:5 84:21
88:5,23 89:10,12
94:21,22 95:2
103:12 110:5
**good** 5:14,15
61:20 85:13 101:5
108:21
**goods** 105:8
**gorayeb** 2:4 5:17
**government** 40:6

**graduated** 40:10
**ground** 33:23 35:6
55:21 56:22 57:18
57:22 118:25
**grounds** 4:7
**guess** 16:18 26:7
53:15 55:18 68:4
79:7
**gus** 15:18,22 16:3
16:4,5,8 17:3
18:22,24 20:11,13
20:15,16,16,21,25
22:2,5,9 23:25
24:5,20 26:5,6,9
26:16 35:21 36:3
37:12,16,18,24
38:11 39:2,10
50:5 59:15,18,18
59:20 62:5 68:22
70:18 74:3,6
75:25 76:9,11,12
76:14,24 77:4,8
82:17,21 87:7,15
90:6,9 91:12
102:13 115:9
**gus's** 16:18 24:12
29:15 36:5 59:15
**guy** 23:23 27:13
27:16,19 33:23
34:10 35:7 42:19
42:25 71:2 74:3
84:11 90:5 91:6
**guys** 12:3 18:21
24:2,7,9,10,15
26:16 27:17 32:14
58:2 71:4 78:22
78:24 83:24 88:20
99:11 106:11

[h - instruct]

| h | | | |
|---|---|---|---|
| **h** 5:2 121:2 | **helper** 84:15 | 56:1 57:1 58:1 | **important** 116:13 |
| **half** 14:4 | **helping** 41:16 | 59:1 60:1 61:1 | **improper** 3:20 |
| **hall** 71:25 | **hempstead** 13:3 | 62:1 63:1 64:1 | 113:25 |
| **hand** 28:17,18,22 | 17:11 104:9 | 65:1 66:1 67:1 | **inappropriate** |
| 28:25 34:13 61:3 | **hereinbefore** | 68:1 69:1 70:1 | 31:17 |
| 61:11 97:11 | 120:11 123:11 | 71:1 72:1,15 73:1 | **incident** 15:2 |
| 110:12 111:25 | **hereto** 4:18,21 | 74:1 75:1,5,20 | 30:10,12 31:4 |
| 112:3,7 123:20 | **hereunto** 123:19 | 76:1 77:1 78:1 | 33:9 37:4 |
| **happen** 118:22 | **hey** 90:20,23 | 79:1 80:1 81:1 | **include** 3:13 |
| 119:4 | **high** 40:2,9 113:9 | 82:1,15 83:1 84:1 | **included** 116:11 |
| **happened** 27:23 | **highway** 47:4 | 85:1 86:1 87:1 | 116:18 |
| 27:25 30:19,22 | **hired** 15:17 79:2 | 88:1,13 89:1 90:1 | **incorrectly** 62:4 |
| 32:22 38:3,9 | 79:11,14 82:18,21 | 91:1 92:1 93:1 | 108:19 |
| 46:22 52:11 56:8 | 104:14 | 94:1 95:1 96:1 | **index** 1:5 |
| 59:4,6 61:24,25 | **history** 54:4 | 97:1 98:1 99:1,6 | **indicate** 74:16 |
| 70:5,13,14,19 71:4 | **hold** 112:15 | 100:1 101:1 102:1 | **individually** 13:14 |
| 71:6,14 102:8,12 | **holding** 30:4 | 103:1 104:1 105:1 | **industry** 53:24 |
| 102:15 115:10 | **hole** 111:5,9,12 | 106:1,14 107:1,12 | **information** 16:24 |
| 116:15,16 117:11 | **home** 84:21 | 108:1 109:1 110:1 | 37:10 38:14 52:14 |
| 118:7 | **honest** 36:16 | 111:1 112:1 113:1 | 122:9,10 |
| **happening** 83:11 | 59:17 91:24 102:2 | 114:1 115:1 116:1 | **injured** 30:9 33:22 |
| 96:8 | **horizontal** 96:6 | 117:1,10 118:1 | 38:20 55:19 56:9 |
| **harness** 98:18,19 | **hours** 23:7,9 | 119:1 120:1,15 | 56:13,18,22 97:24 |
| **head** 6:6 27:23 | **hudson** 5:1,10,14 | 121:1 122:1 123:1 | 98:12 |
| 28:14,16 29:3,17 | 6:1 7:1 8:1 9:1 | 124:3,21 | **injuries** 83:11 |
| 30:3 108:15 | 10:1,21 11:1,6 | **hudson's** 10:20 | **inquiry** 32:2 |
| 110:14,15 111:24 | 12:1 13:1 14:1 | **hunting** 101:14 | **inside** 34:12,13 |
| 112:2 | 15:1 16:1 17:1 | **hurt** 27:13,15 | 58:4,5 97:12 98:2 |
| **hear** 19:2 | 18:1 19:1 20:1 | 30:16,25 | 98:8 110:5,18 |
| **heard** 12:14 27:24 | 21:1 22:1 23:1 | i | 111:9,11 113:7,10 |
| 28:7,9,24 30:2 | 24:1 25:1 26:1 | **identification** 8:8 | **inspect** 61:19,22 |
| 51:20 99:14,15 | 27:1 28:1 29:1 | 17:19 19:7 21:7 | 96:24 |
| 102:13 108:6,10 | 30:1 31:1 32:1 | 22:20 34:4,25 | **inspected** 100:9 |
| 108:14,24 | 33:1 34:1 35:1 | 72:13 80:15 | **inspection** 100:11 |
| **heartbeat** 52:23 | 36:1 37:1 38:1 | 103:23 | 102:7 |
| **height** 95:9 | 39:1,24 40:1,14 | **identified** 81:6,10 | **install** 63:7 |
| **held** 1:17 10:14 | 41:1 42:1 43:1 | 81:13 | **installed** 110:24 |
| 83:13 99:5 | 44:1 45:1 46:1 | **ii** 3:18 | **installing** 62:18 |
| **help** 56:12 86:10 | 47:1 48:1 49:1 | **iii** 3:19 | 98:6 |
| 118:11 | 50:1 51:1 52:1 | **immediate** 71:22 | **instruct** 90:9,11 |
| | 53:1 54:1 55:1 | | |

**instructing** 74:23
**instruction** 86:6
**instructions** 86:21
**insulation** 100:18
**interact** 91:12
**interacted** 91:13
**interacts** 91:11
**interested** 123:17
**interfere** 3:16
**interior** 62:24
63:3,15
**interposed** 3:6
**interrupt** 4:4
**introduction**
68:10
**investigate** 60:15
60:17
**investigation**
60:14 91:19 102:7
**involve** 46:14
**involved** 80:22
107:19
**involving** 27:8
**irregularity** 3:14
**island** 46:3,4
**issue** 8:25 9:13
52:18 67:7,8,18
102:22 108:20
**issues** 52:7 65:24
100:13,25 101:3

**j**

**jamaica** 40:3,4,8
**jim** 19:3,18 20:3,7
20:21,25 21:14,20
25:8,10,13,19,24
26:3,10,16,16 27:2
27:8 29:15 37:9
37:12,13,14,16,17
37:18 39:8,9,11,11
49:19 80:10,13
81:6,22 104:5,14

105:5
**job** 15:18 24:21,24
39:6 41:23 42:14
43:14,18 44:22
45:2 46:16 47:11
47:19,21 48:2,6,17
49:14,22 50:20,24
51:3,24 52:7,11
53:3 55:16 66:2,4
67:16,21,22 75:13
83:12 85:11,14,25
86:17 89:13,24
93:20 94:7,12
102:25
**jog** 6:24
**jorge** 19:21,23
20:3,6 21:19
36:23,24 37:5,21
63:25 81:10,22
82:18,21
**judge** 4:12
**june** 8:18 11:7,13
11:24 14:12 21:5
21:10 22:13,18,25
26:13 121:11,13

**k**

**k** 12:19
**kalnitech** 1:7 2:13
10:23 49:21 80:9
**keep** 46:8 83:7
87:3 89:4 115:19
115:20
**keith** 2:10
**kenneth** 2:6 5:16
**kept** 58:16 92:15
92:16 93:22 94:2
**kind** 6:24 14:5
28:15 41:10 44:6
58:3,6 66:21
84:23 85:4 90:22
92:25 96:19

**kings** 1:2
**kleeman** 12:16,17
12:18,20 13:9
17:23 21:22 22:5
51:6 57:6,8 59:8
64:20 67:23 68:13
68:25 69:11 73:16
73:20,23 81:25
84:18,24 85:6
88:10 91:6 92:2
101:8 115:7 116:5
**kleeman's** 18:3
68:6,7 82:3
**klein** 2:6 5:7,16
8:5 18:14 31:11
31:14 32:7 36:4
36:10 39:20
107:13,16 117:4
122:6
**know** 13:7,10,12
13:15,16,18,21
14:15 15:7 16:8
16:11,12,15,16,18
16:21,23,24 17:3,5
18:25 19:23 20:5
20:13,15,16,20
21:25 22:4,6,6,9
25:18,22 26:6,9,11
27:11,14 29:9
32:11 33:11,15,16
36:9,23 37:3,6,11
37:11,15,19,22,23
38:14,25 39:3,3,9
39:10,12,16,17,18
43:10 46:23 49:23
49:25 50:5,7,17
53:12,13,18,19
54:5,15 55:6 59:6
60:10 61:13 62:7
64:4 65:13 67:24
68:2,6,16,23 72:6

73:19 75:12 76:3
77:23 78:3,4,6,7,9
78:13,22 79:3,12
79:13,18 82:22,23
82:24,25 85:2,2,3
85:10 87:5 89:18
90:7 91:18,20,23
91:23 92:7 97:25
98:2,6,13 100:24
101:14,20,23
102:16 107:5
111:4 115:18,19
115:24 116:22
117:2 118:15,22
119:5
**knowledge** 59:22
60:9,13 62:5
69:14,16,17 71:23
72:4 84:2 85:5,11
98:10,17
**known** 12:8 20:6
**knows** 16:12 38:13
85:14
**koven** 1:18 123:7
123:22

**l**

**l** 12:19 120:2
**labor** 104:7
**ladder** 28:2,15
29:2,4,6,8,9,15,22
30:5 34:15,19,20
51:17,20 61:8,10
61:12,13,14,15,19
61:20,22 62:2,6
68:16,18,23 94:24
95:3,4,7,8,10,12
95:14,16,23,23
96:9,12,25 97:6,14
99:13,16,19,19
100:2,9,10,12,13
100:15,16,19,25

101:4,5 107:23
109:9,18,24
110:18 111:6,17
111:20 112:8,10
112:20,24,25
113:5,10,11,24
114:2,4,9,11,14,16
114:16,22,24
115:12,14,16,23
116:2,2,6,25 117:2
117:11,12,13,13
117:14,16,18,21
117:24 118:3,17
**ladders** 25:13
95:19 96:6 100:17
114:8 116:20
**laid** 98:3
**landed** 60:21,23
60:25 61:4,6
**landing** 109:23
**law** 2:12 3:5 5:17
105:21
**lawsuit** 5:19
**lawyer** 7:4,6 16:9
16:12 79:4 106:10
**laying** 57:18,22
58:8 117:16
**lean** 95:12,19
96:20 99:20
**leaned** 95:18
96:17 100:7
**leaning** 61:10
96:12 100:3
**learn** 46:18 60:2
**learning** 41:24
42:16
**leave** 64:10,24
117:14
**leaves** 32:5
**leaving** 64:21

**left** 19:17 28:18,22
34:13 44:2,23
61:11 73:15 96:3
97:11 108:15
110:12 111:25
112:7
**legs** 118:23
**length** 14:6
**level** 95:9
**levine** 2:8
**liability** 105:18
**license** 44:18
**licensed** 41:25
42:4,7,21 44:15
85:6
**lien** 102:17,19,23
103:2,5,8,18,21
106:4,17 121:24
**light** 90:24
**lights** 63:18,23
**limitation** 3:19
**limits** 86:12
**line** 71:24 73:3
103:17 122:15
124:5
**listen** 43:23 52:13
**litigation** 9:10
**little** 34:12 58:7
67:5,11,14 97:11
97:17
**lived** 43:12
**llc** 1:7,15 2:9
13:15 22:10 73:7
74:8 106:5,18
124:1,2
**local** 60:3
**located** 43:11
**location** 13:5
51:10
**lock** 96:25

**locks** 95:24
**logo** 25:2,6
**long** 6:13 14:5
41:21 43:6,7
44:11 46:3,4 63:8
89:15 100:23
**longer** 67:12,15,19
**look** 28:4,10 43:20
53:13 61:11 62:5
79:4 93:16 100:9
100:11 102:9
**looked** 14:11
28:24 51:21 87:10
**looking** 53:16
116:2
**looks** 13:23 82:5,7
**loud** 5:23
**lying** 35:6 36:14

### m

**m** 12:19 65:7
**machine** 94:18
**mail** 58:25 69:10
**main** 37:11 54:20
55:2,3,15 93:15,20
**major** 90:22
**manager** 11:18,24
48:20,21,25 49:8
**mark** 7:16 72:8
80:8
**marked** 8:7 17:18
19:6 21:6 22:19
34:3,24 72:12
80:14 103:21
122:14
**marriage** 123:16
**master** 81:4
**material** 25:19
67:6
**materials** 65:24
66:15,18,25 67:20
67:20 104:8

**matter** 56:10
66:10,11,18,19
123:18
**mean** 50:13 53:10
77:16 88:17 93:8
95:23 112:17
**meaning** 47:4
88:18
**means** 112:18
**meant** 50:16 58:21
**mechanical** 93:4,4
**medical** 56:12
**meet** 43:14 89:8
**meeting** 6:23 83:2
83:5,8
**meetings** 83:13
84:3
**memory** 6:24
**mentioned** 64:2
66:23
**met** 64:6
**method** 26:24
**michael** 2:12
**mine** 92:24
**minute** 10:10
98:24
**minutes** 6:24
**mistaken** 66:15
**moment** 99:2
**monday** 23:14
90:13
**money** 102:22
105:18
**months** 15:3,9
41:23 42:10 47:23
48:2,4 62:10
64:18
**morning** 5:14,15
5:20 88:12,22
107:18

**mornings** 83:14
**moscoso** 19:21,23
20:7 21:19 36:23
36:24 37:5 64:2
81:10,22 82:18,21
**move** 15:24 20:18
38:18 39:14 43:20
43:21 49:10 50:9
58:2 64:14 74:20
88:12 89:18,21
**moved** 15:10 58:3
58:6 116:4

**n**

**n** 2:2 5:2,2 12:19
120:2 122:3
**name** 5:8,16 16:6
16:10,10,19 18:3
27:11 42:17,23,24
42:24 43:2,4,5
45:11 49:24 50:6
50:17 65:9,9,11,14
68:7 74:3 81:9
119:5 124:2,3
**named** 16:3,4,5
37:13,16,17
**names** 37:23 49:25
50:14,18
**naturally** 117:23
**need** 6:13 12:4
54:10 60:2 93:15
94:6,16 113:9
114:7 116:24
**needed** 46:19
94:13
**needs** 86:25 90:8
90:14
**never** 9:7 18:11
22:22 30:11 31:11
31:12,24,25 33:2,5
33:7,10 36:22
69:21,22 70:9

72:25 73:2 91:15
103:9 104:2,17
108:23
**new** 1:2,19 2:5,5
2:10,14,14 5:4,12
8:14,16 11:17
12:3 13:6,17,18
14:15,16,19 17:10
17:11 27:19 48:9
51:10 63:17,23
78:19 89:19 123:4
123:8 124:1
**nice** 65:21 66:5
**nine** 23:8
**nods** 6:6
**noise** 28:7 30:2
108:6,10,14,24
**nonresponsive**
20:19 70:21
**normally** 47:15
83:15
**notary** 1:18 4:11
5:4 120:22 123:7
124:25
**note** 55:10
**noted** 3:7 75:19
**notepad** 7:10
**notes** 7:11 16:8,9
**notice** 60:10 64:25
96:8,10 108:18
**noticed** 108:17
**notify** 60:3,6
**number** 59:15,19
121:7,21
**numerous** 87:13

**o**

**o** 5:2 120:2
**objecting** 74:24
**objection** 3:11,17
35:23,25 55:11
74:19 75:14,18

76:5 79:15 109:11
**objections** 3:3,3,3
3:7,9,10
**observe** 51:16
90:15
**observed** 51:12
52:20
**obtained** 46:10,11
**obviously** 38:16
67:19
**occasionally** 84:13
**occupied** 51:8
**occupy** 51:4
**occur** 27:22
**occurred** 48:3
60:11 69:2 70:24
71:15 91:14 96:23
101:9 102:10
111:13 117:16
**occurring** 62:9
**office** 10:9 11:17
13:6,17,18 17:2,10
17:11 31:6 33:19
43:13,15 48:9
51:10 58:15,18,18
60:3 81:18 84:21
86:4 89:19 90:25
97:19,19
**officer** 3:7
**officers** 105:15
**offices** 2:12 63:6
**okay** 6:4,8,16 8:2
16:17 30:15,17
37:10 99:11 106:2
106:24 118:9,19
118:21
**old** 2:9 13:19
40:14,21,23,25
**once** 47:16 62:17
83:15,16

**ongoing** 23:8
**open** 6:14,17 24:3
34:21 95:10,16,22
95:24 96:2,25
99:17,19,23 100:2
109:20,21 110:21
**opened** 95:18,20
109:10,14,25
112:9,13
**opening** 28:18,19
28:22 34:16 97:7
97:9 99:20,21
113:12,13,17,19
113:21
**operating** 88:8
**opinion** 36:16
**opportunity** 64:15
**order** 1:17 3:19
52:19 81:15 90:18
90:23 91:6
**ordering** 66:18
**orderly** 89:7
**orders** 15:22
**osha** 45:22,23 46:7
46:10,11 51:25
59:25 60:3,9,10,13
60:16
**outcome** 123:17
**outside** 10:9
109:18
**owes** 102:22
**owned** 68:19,22
**owner** 12:14,16
13:7,11,13,14,18
57:11 72:21 73:9
105:11 106:5,18
**owner's** 52:9,25
**owning** 84:24
**owns** 12:12 51:25
55:14 68:16 85:2
86:18

**p**

**p** 2:2,2
**p.c** 2:8
**p.m.** 119:9
**pad** 7:12
**page** 21:17,19
  22:14 121:6,20
  122:5,10,15 124:5
**paid** 102:25
**painting** 63:22
**panel** 28:8 98:23
  108:5
**panels** 62:19 71:19
**paper** 8:6 69:18
  121:16
**paperwork** 50:21
  81:19 104:16,17
  104:18 116:16
**paragraph** 104:10
  104:21,22,24
  105:4
**part** 18:22 22:9
  39:5 50:21 76:20
  86:23 90:5 93:17
  100:15
**particles** 96:19
**particular** 24:21
  48:11 68:12 83:10
  89:24 94:20 99:9
**parties** 1:16 4:5,17
  4:21 55:5,8
  123:15
**partition** 63:6
**partner** 12:24
**partners** 1:7,15
  2:9 9:5 11:2 12:8
  12:14,17,24 13:15
  13:20 22:10 33:13
  73:7,15,17 74:7
  84:25 105:11
  106:4,17 124:2

**parts** 96:24
**party** 3:24 9:9,22
  9:25 10:3,5,6
  31:15 54:22 68:9
**pass** 52:14 54:22
**passed** 58:14,17
**path** 67:12,14
**pay** 36:18
**paying** 86:13
**pe** 46:17
**people** 89:10,11
**percent** 27:6 29:14
  63:17 65:23 67:16
  67:17 96:14
  100:22
**perfect** 89:20
**permit** 44:18
**permitted** 3:14
**person** 3:9,21 16:3
  16:5 35:5 36:7,14
  37:17 41:17 51:4
  52:4,22 55:13
  56:9,16,21 65:25
  71:10,16 84:13
  119:5
**person's** 27:21
**personal** 94:5
**personally** 32:19
  32:23 47:25 92:11
**persons** 3:15
  37:11 84:14
**perspective** 54:14
**phone** 52:12 57:2
  58:13 59:17 101:7
  115:8
**photo** 33:17,18,21
  33:22 57:15
**photograph** 32:23
  34:3,7,9,24 35:3,9
  35:19 36:20 55:20
  55:23 57:17,21,24

  57:25 58:11 60:18
  69:6 72:5 114:10
  118:23 121:14,15
**photographs**
  35:12
**phrase** 36:10
**physically** 108:17
**pick** 52:12 117:23
**picked** 117:21
  118:16
**picture** 58:10,15
  58:22 59:2,20,21
  61:12,14 97:7
**piece** 8:6 119:2
  121:16
**pipe** 67:18
**pipes** 67:9,11,11
  67:15
**place** 24:2 60:7
  71:12 86:18 95:25
  97:2 111:16,19
  114:6 120:11
**placed** 113:11
**plainly** 3:20
**plaintiff** 1:4 2:4
  5:18 28:5 31:21
  51:16 52:15 55:19
  57:14,18,21 59:21
  60:19 69:6,20
  70:2 71:9 80:5
  91:15 94:23 97:23
  98:11 117:17
  118:13,16,25
**plaintiff's** 7:17 8:7
  17:18 19:6 21:6
  22:19 34:3,24
  121:4
**plan** 14:17 88:18
  88:19,21 89:9
**plaster** 98:5

**please** 5:8 33:25
  110:3
**plumber** 91:12
**plumbers** 90:6
**plumbing** 77:17
  77:19,21 93:3,3
**plus** 12:5 89:8
**plywood** 98:3
**point** 44:24 63:16
**portion** 18:5 54:23
**position** 9:15,21
  11:13 56:10 61:6
  95:3 113:6,25
  114:20 115:12,14
  115:16 116:6,9
**positioned** 116:4
  117:25
**possibility** 96:16
**possible** 31:24
  89:20,21 97:22
  101:20,22,24
**practice** 3:5
**prejudice** 3:20
**preparation** 6:21
**prepare** 32:19
  69:15
**prepared** 19:20
  23:25 37:8
**presently** 42:7
**preserve** 3:18
**president** 81:10
**pretty** 14:5 16:9
  28:13 30:23,24
  42:20 43:14 45:16
  47:6,12 65:23
  76:22 84:19 86:14
  90:7 95:8 98:4
  115:21
**prevent** 83:11
  108:20

[prime - relief]                                                          Page 13

prime 53:7,8,10
  54:5,12,21 55:4,8
  72:20 74:10,14
print 92:20
printout 93:19
prints 104:19
prior 30:10 45:21
  47:23 51:17 62:8
  80:18 96:7
private 42:19
privilege 3:18
probably 27:16,18
  40:16 56:19 62:3
  63:20 65:22
  109:16 113:8
problem 6:3 8:4
procedures 59:7
proceed 3:8 9:23
  88:3 104:19
proceeding 10:20
process 90:21
produced 31:10
progressed 46:8
project 11:16,18
  11:24 12:6,15
  14:24 15:3,4,17
  16:25,25 17:7
  18:16 20:2,17
  22:25 23:6,7
  24:13 26:13 27:18
  36:13 37:4 47:13
  47:14,18 48:15,19
  48:21,24 49:8
  50:8,19 54:9,10
  55:14 62:12,14
  63:12,14,19,24
  65:20,21,22,23
  66:3,4,9,13 68:12
  76:12,14,15 81:16
  84:12,16 85:21
  86:11 88:23 89:20

91:21 92:6,8,12,13
  102:21 104:18
  105:19 107:7
projects 50:2,22
proper 46:17
  79:17 95:15,17
  114:6,11
properly 95:4 97:3
  97:4 114:19
property 13:3,8
  13:11,23 14:5,7
  57:12 102:23
proposal 19:6,9
  20:22 21:5,9
  22:13,18 37:7,9
  121:9,10,12
proposals 20:25
  22:23
proposed 65:3
protects 52:6
provide 25:7,13
  94:15
provided 3:21
  4:14,17 25:18
  94:4,17 116:23
public 1:18 4:11
  5:4 120:22 123:7
  124:25
purpose 4:4,6
  50:24 97:16
purposely 118:2
purposes 4:14
pursuant 1:16 3:4
  3:10
put 10:16 14:17
  60:10 72:16 95:14
  103:14 117:22
  118:2
putting 78:19 94:9

q

queens 13:4 104:9
question 3:20,24
  4:6 5:21 6:2,14,17
  6:18 17:25 35:24
  36:9 38:15 53:16
  55:12 74:25 75:6
  75:8,18,23 78:2
  79:16,17,24,24
  87:16 99:9 106:15
  106:16 109:12
  122:15
questioning 3:12
  3:16
questions 3:17
  5:20 79:7 88:6,8
  122:14
quit 65:3
quite 84:22

r

r 2:2 120:2 123:2
raised 3:11
reached 56:20,21
read 72:18,22 75:8
  75:21,23 103:16
  104:11 105:3
  106:8
ready 23:25 78:11
real 65:11 66:5
really 24:22 26:8
  30:24,25 36:18
  66:25 70:9 99:17
reason 4:7 5:25
  6:13 113:5 115:17
  124:5
recall 34:18 91:25
recognize 17:21
  18:8 34:6,14 35:5
  74:6 82:3,6

recollection 82:10
  82:15 104:13
  106:25
recommend
  114:13 115:4
recommended
  114:5
record 4:8 5:9
  10:12,14,16,17
  22:12 49:7 99:4
  112:16,23 123:12
records 58:16
red 110:3,15,17
redo 46:12
refer 92:18
referred 75:7,22
  105:13
referring 87:3
  112:25
refers 104:5 106:4
  106:17
reframing 62:16
refresh 82:9,15
  104:12 106:24
refusal 3:17,22
refused 65:19 66:6
regarding 33:8
  92:13
regardless 91:4
regular 24:3 29:7
  32:17 84:11 90:21
related 123:15
relationship 22:5
release 103:19
  105:10
released 105:9
releasees 105:23
releases 105:13,14
releasor 105:6
relief 3:9

[relocating - see]

**relocating** 17:11
**remain** 63:8
**remainder** 3:25
**remember** 16:17
  32:24 43:6 46:7
  59:13 69:17 99:12
  100:22,24 101:19
  101:22 102:2,3
**renovate** 50:25
**renovated** 14:21
  14:23 51:7
**renovating** 14:14
**renovation** 62:24
  63:3,15 76:17
**repeat** 17:25 75:6
**report** 31:4,5,23
  32:6,20,25 33:8
  59:4 69:3,10,12,15
  84:17 116:11,19
**reporter** 6:5 8:9
  17:20 19:8 21:8
  22:21 34:5 35:2
  72:14 75:9,24
  80:16 103:24
  121:17
**reporting** 124:1
**represent** 5:18
**representative**
  10:25 52:9,25
**representatives**
  105:16
**representing** 4:22
**request** 3:12
**requested** 122:9
**respect** 4:18 41:7
  47:19 60:18 83:21
  88:9
**respective** 1:16
  4:21 105:14
**respond** 70:9

**responded** 9:7
**responsibilities**
  47:10
**responsible** 47:13
  47:14 50:7 52:4
  76:15 83:23,24
  89:25 90:3
**responsive** 106:15
**rest** 77:14,16
  83:18,19
**restrict** 102:19
**restricted** 3:10
**restructure** 62:16
**retained** 17:3,6
  18:16,18 121:17
  121:25
**review** 6:22
**revise** 99:8
**reyes** 1:3 27:12
  124:2
**richman** 2:8,10
  8:3 9:14,19 10:2
  10:11 11:3 31:25
  35:25 36:8 39:16
  40:23 49:2,5
  53:12,18 55:10,18
  68:4 74:19,24
  75:14 76:5 79:3,6
  79:15,22 80:7
  87:6,11,19,23 88:4
  99:22 112:15,22
**right** 3:9,18,24
  9:21 12:10 18:2,9
  19:20 22:23 25:5
  28:13,17,25 32:13
  35:18 39:17 41:2
  56:14 57:5 61:2,3
  62:24 63:4 71:11
  73:5,25 74:8,14
  77:20 78:14 79:20
  80:25 81:14 82:6

  82:23 91:10,16
  96:3 103:2 106:13
  112:3,20 114:3,22
  116:2,4 117:15,19
  117:25 118:6
**rights** 4:17
**risk** 96:21,22
  114:22,23
**road** 2:9
**robert** 2:15
**rocky** 42:24 43:3
  43:24 44:2
**rodrigo** 1:3 27:12
  124:2
**rolling** 9:2
**roof** 78:17,19,20
**roofing** 78:21
**rosedale** 43:13,16
**roughly** 109:4
**rubber** 100:17,18
  100:19
**rule** 3:5,6,14,15,22
**rules** 3:2,5 4:2,7
  47:17
**rulings** 122:14
**run** 37:20 118:5
**running** 11:16
  62:18

        **S**

**s** 2:2 5:2 121:2
  124:5
**safe** 109:22
**safety** 46:15,16,17
  47:16 52:2 59:25
  83:6,9
**satisfaction** 86:15
**satisfied** 66:9,12
**saw** 7:9 17:16
  18:11 22:22 26:19
  27:2,16,18 28:2,11
  28:12,13 29:17,18

  29:24 30:3,5,15
  33:2,5,7 36:22
  38:9 56:8,8 69:25
  81:8 91:15 99:15
  108:15,19,23
  111:13,22 112:5,8
  112:13 115:11,14
  115:15,21 116:6,8
  118:8
**sayed** 32:16
**saying** 12:12 13:14
  13:17 28:21 53:11
  90:25 109:8
  115:18
**says** 19:18,20
  20:10 73:3 81:20
**scenarios** 46:22
**scene** 70:11 92:2
  101:11
**schedule** 89:14
  90:5
**scheduling** 89:25
  90:4
**school** 39:25 40:3
  40:7,10 46:4
**screen** 19:12 72:9
  103:14
**scroll** 81:5
**second** 21:17 57:2
  73:3 79:21
**section** 4:7 34:13
  34:14 97:11
**sections** 4:18
**secure** 95:14
**security** 24:18
  76:14 77:9,11
  86:9
**see** 17:13 18:2
  19:9,15,17 20:10
  20:24 21:9,15,18
  21:24 27:21 29:21

| | | | |
|---|---|---|---|
| 32:17 35:3 36:12 | 114:19 123:11,20 | **sign** 33:3 49:14 | **slap** 66:6 |
| 36:21 50:21 51:19 | **seton** 5:12 | **signature** 18:8 | **slide** 95:15 |
| 52:2,4 61:15,23,24 | **seven** 23:10 | 73:14 74:2,6 82:4 | **sliding** 96:21 |
| 71:14 72:15,22 | **share** 72:9 | 82:8 123:21 | **small** 42:22 63:20 |
| 73:15,18,24 74:4 | **shareholders** | **signatures** 17:22 | 93:19 |
| 81:6,7,9,11,25 | 105:14 | **signed** 4:10,11 | **smooth** 47:18 52:7 |
| 82:2,2,8 85:18 | **sheet** 124:1 | 17:24 21:20,22,25 | **somebody** 21:23 |
| 88:25 89:17,22 | **sheetrock** 24:15 | 73:16,23 81:21,23 | 37:13 47:3 102:18 |
| 92:8 94:23 96:24 | 39:5 67:16,17 | 103:10 116:17 | 102:20,21,22 |
| 98:14,25 99:12 | 76:16,18,19,21 | **significant** 3:20 | 117:21 118:2 |
| 100:12,25 101:2 | 98:5 | **signing** 32:24 | **soon** 57:3 101:17 |
| 102:11 103:14 | **sheets** 49:15 | 69:17 | 101:20,21,24 |
| 104:9,22,25 | **shirt** 25:2 35:6 | **similar** 36:6 | **sorry** 40:22 |
| 107:22 108:18 | 36:14 119:3 | **sir** 8:11 17:22 | 106:14 110:11 |
| 110:3 111:8,16,19 | **shirts** 24:21,24 | 18:15 19:9 21:9 | **sound** 99:15 |
| 112:20,23 113:16 | 25:4 35:22 36:6 | 21:15,19 34:7 | **space** 95:11 97:22 |
| 113:18,20 117:12 | 36:13,17 | 35:3 39:14 107:17 | 110:5 |
| **seeing** 64:9 106:12 | **short** 72:20 | 117:5 | **speak** 7:3,7 30:8 |
| **seek** 56:12 | **shorter** 114:13,15 | **sit** 68:15 | 30:13 50:3 68:7 |
| **seen** 31:11,12,24 | 116:20,24 117:3 | **site** 38:17 43:15 | 70:2,10,16,23 71:7 |
| 31:25 61:14 69:21 | **show** 17:15 79:20 | 47:11,21 48:2,7 | **speaking** 3:10 |
| 69:22 72:25 73:2 | 103:13 | 49:14,18,22 51:13 | 5:23,23 |
| 80:11,19 81:15,18 | **showed** 22:15 | 53:3 60:4,16 62:9 | **special** 95:19 |
| 96:11 103:4,7,9 | 35:15 37:8 38:6 | 63:2,9,13 71:24 | **specialized** 94:20 |
| 104:2,17 | 82:7 87:11 89:18 | 83:12 85:12,16,22 | **specific** 47:10 |
| **selfish** 56:23 | 102:9 | 85:25 86:17 88:10 | **specified** 120:11 |
| **send** 7:24 58:20 | **showing** 79:22 | 88:14 89:13,24 | **spell** 12:18 65:6 |
| 88:24 | 80:18 | 93:20,22 94:2,11 | **spoke** 7:4 30:11 |
| **sent** 31:5 32:23 | **shown** 57:17,21 | 94:12 101:8,12,16 | 68:25 69:19 70:9 |
| 33:20 58:21 | 114:9,16 | 101:18 102:5,25 | 70:19 71:10 |
| **sentence** 105:4,24 | **shows** 25:2 93:10 | 114:4 | 118:15 |
| **separate** 78:24 | **side** 18:2 19:17 | **sitting** 7:9 | **square** 109:6 |
| **sequence** 62:20 | 28:17,18,22,25 | **situation** 52:13 | **ss** 123:4 |
| 88:15,21 89:6 | 34:14 61:3,11,12 | 59:5 62:3 | **stalin** 1:3 27:12 |
| **serious** 56:19 | 81:23 96:20 97:12 | **six** 15:3 23:11 29:7 | 124:2 |
| **seriously** 66:4 | 109:19 110:12 | 34:20,21 41:22 | **standing** 110:11 |
| **serving** 74:17 | 111:25 112:3,7 | 42:10 44:13 47:23 | 111:6 |
| **set** 3:19 4:7 24:2 | 118:2 | 48:2,4 62:10 | **start** 11:10,12 |
| 62:3 67:9,10 | **sides** 95:24 96:2 | 109:8 113:9 | 14:24 41:10 45:13 |
| 86:10 89:14 93:9 | **sideways** 113:12 | **size** 109:2 114:8 | 47:21,24 63:10 |
| 93:12 109:9 | | | 88:22 108:4 |

started   27:19
  29:22,24 41:11,12
  41:24 42:12,15
  45:18 47:23,25
  48:6 62:9,13,14,17
  62:18 63:3,11
  65:20 66:14 108:4
starting   42:22
starts   104:22
state   1:2,19 5:4,8
  123:4,8
stated   3:11 4:8
statement   3:13,23
  49:6 106:11
statements   3:16
step   10:9
stern   47:5
stink   9:6
stipulated   4:10,13
  4:16,20
stop   26:19,23 27:5
  51:12,23 52:5,19
  52:19,22 85:15
  87:16,17,21,22
  105:25
stopped   84:19,21
storage   34:12,14
  97:11,15,17,18,19
  98:8 99:14,21
store   97:20,21
story   13:24,25,25
  14:3,5
street   2:5
stretch   6:12
strike   15:24 20:18
  38:18 39:14 49:11
  50:9 70:20
stuff   6:25 10:18
  41:14 50:3,22,23
  62:19 65:25 66:19
  66:21 86:9 94:14

96:20 116:23
sub   80:23
subcontract   54:15
  54:18,19,21 80:9
  80:12,20 81:4
  121:23
subcontractor
  54:24,25 81:6
subcontractors
  18:15,19
subdivision   3:4,6
  3:22
subject   3:9 107:10
subpoena   9:8
subpoenaed   9:3
  31:18
subscribed   120:18
  124:22
successors   105:6
  105:16
succinct   3:23
succinctly   3:11 4:8
suffolk   123:5
suggest   3:12
sums   105:17
supervision   25:8
supervisor   64:23
  65:2,4,16
supervisory   86:16
supply   94:6
supports   96:3
supreme   1:2
sure   10:11 16:9
  22:3 26:8 29:14
  30:14,16 67:25
  75:10 84:4 90:15
  95:13 96:4 100:4
  103:3,3 118:11,19
  118:20
surprise   79:13

suspicion   101:3
swimmer   2:12
sworn   5:3 120:5
  120:18 123:11
  124:22

**t**

t   24:21,24 25:2
  35:22 36:6,13,14
  119:3 120:2 121:2
  123:2,2
take   6:5,11,19
  15:22,22 18:21,23
  35:9,11,14 44:20
  57:24,25 58:12
  66:2,4 93:16
taken   1:15 3:8
  63:18,24 117:13
  118:3
talk   16:15 38:7
  55:3 70:6 88:11
  118:20
talked   63:25 91:15
talking   30:24,25
  47:20
talks   83:4,25
tall   34:18
tar   78:20
task   23:24
teach   42:15,25
team   88:23
tell   6:2,14 28:3,12
  30:21 59:11,16
  64:20 70:4 90:13
  90:14 111:23
  115:5,11,13,15
  116:5 117:24
  119:2
tells   86:21,24
  90:12
ten   27:25 28:8
  71:18 87:7 88:20

term   15:11,15
terms   50:4 66:14
  100:15 104:16
testified   5:5 11:6
  51:11 76:2 87:4
testify   7:16 48:23
  49:3,4 87:6 120:5
testifying   4:22
  49:13 87:18,20,22
  87:24
testimony   49:11
  60:20 72:24 88:2
  101:7 120:6,10
  123:13
text   58:22 59:2,20
texted   58:23 69:5
thank   6:4 8:5 11:4
  99:3 107:12 117:4
  119:8
therefor   3:23
thing   18:25 22:6
  23:20,22 56:11,13
  56:14 66:11
  102:14 115:18,20
  115:22 118:6
things   50:12 70:23
think   15:8 22:7
  27:17 65:11 66:5
  67:3 82:20 106:9
thinking   99:17
third   2:14
three   8:17 15:9
  26:14 85:18,22
tiles   76:21
till   45:15
time   1:11,17 17:2
  23:16 30:5 34:11
  39:21 43:6 56:12
  59:15 63:3 64:6
  64:19 67:19 69:9
  97:23 100:23

| | | | |
|---|---|---|---|
| 101:23 102:5 110:25 111:23 112:9 120:10 | transcript 4:10 10:19 120:9,9 | undersigned 105:6 understand 5:21 | **w** |
| **times** 24:9 75:3 79:25 87:7,14 | **transferring** 51:9 **transmission** 5:22 | 6:2 9:14 60:20 94:8 101:6 | **w** 5:2 65:7 **wait** 91:2 |

undersigned 105:6
understand 5:21
6:2 9:14 60:20
94:8 101:6
understanding
12:23 15:14 38:23
39:7 99:7 113:4
uniform 3:2 4:2
unit 78:18
unsafe 26:19,23
51:13 52:20
updating 46:9
upright 99:20
use 5:24 7:15 67:6
80:5 83:7 93:21
93:23 94:3,11,12
94:15,19,21 95:4
113:5,25 114:11
114:23 115:3
116:21,25 117:3
usual 23:5,18
usually 6:6 55:8
83:13
utilize 97:21
utilized 4:14

**v**

v 124:2
valuable 105:9
vanessa 67:23
73:16,19
various 18:20 24:7
36:17 83:6,8
114:7
verbal 32:25 59:4
69:3
verbalize 6:8
veritext 124:1
vicinity 98:21

101:23 102:5
110:25 111:23
112:9 120:10
times 24:9 75:3
79:25 87:7,14
title 41:15 48:7,12
72:19,23 81:3
103:17
today 7:20 10:20
32:9 47:20 68:13
68:15
today's 6:21
told 31:18 32:22
49:24 56:11 96:13
102:12,13,15
115:7,9 116:8
tool 83:9,10 98:11
98:14,16
toolbox 82:25 83:3
83:5,13,25 84:3
110:3,15,17
tools 25:16,25 26:2
83:7 93:25 94:3,5
94:6
top 28:23 34:21
78:20 89:11 95:7
97:5 103:16
109:23 111:20
116:3 117:16
topics 83:9
total 105:8
trade 89:15 92:24
93:23 94:5,20
trades 49:18 91:10
92:18 93:11 94:9
94:12
training 41:6
44:21,22 45:22,24
46:2,4,13 52:2
59:24,25

transcript 4:10
10:19 120:9,9
transferring 51:9
transmission 5:22
trial 1:14 4:14
tried 74:15
true 120:9 123:12
truth 120:5
try 6:3 26:7 67:13
89:19 97:21
trying 30:14,16
53:21 118:18,20
tumble 29:2
tumbled 116:3
117:19
tumbling 28:2,14
29:17 108:7 112:2
113:22 115:22
turn 27:23,25
28:10
turned 30:2,5
51:21 99:15
108:15 109:16
twice 27:18
two 13:25 24:10
24:10 37:11 43:8
43:17,20,24 45:15
45:16 64:18 65:21
67:2 71:19 84:14
95:5 96:3
type 24:12,21,24
29:6 31:3 46:13
94:18 114:4,6

**u**

u 5:2
u.s. 40:11,12,15
41:3,9
unclear 67:5
underneath 81:21
86:24 96:22

w 5:2 65:7
wait 91:2
waited 45:15
waive 102:25
waived 3:5 4:17
waiver 102:16,19
102:23 103:4,7,18
103:21 106:4,17
121:24
waiving 9:17,20
9:21 10:24
walk 95:11,11
97:10
wall 96:12 100:3
111:5 117:22
walls 95:20
want 6:10 10:15
16:11,18 47:5,14
49:6 53:15 66:20
67:6 68:3,5 79:6
90:13 97:21 106:7
106:8,11
wanted 65:25
66:22 91:7 93:23
94:13
wants 86:5,22
89:18 91:3 102:18
way 10:24 28:25
36:11 47:4,7,15
66:24 80:22 84:20
95:15,17 96:8,13
99:18 100:5,6
109:17,19,24
112:23 113:13
114:22,25 115:4
115:25 116:3
117:25,25 123:17
ways 95:5
wazim 65:5,8,13

| | | |
|---|---|---|
| we've 31:23 | 45:13,18 50:6 | 62:9 63:9 71:3,5,8 |
| wear 24:20,23,25 | 51:12,23 52:16,19 | 71:20 72:2 83:16 |
| 35:21 36:5,19,19 | 52:19 54:4,22,25 | 83:24 84:6,10 |
| wearing 36:7,13 | 60:3 62:20 64:16 | 85:11 86:24 89:3 |
| 36:14 98:11,16,18 | 66:2,9 67:18 | 89:11 92:24 95:9 |
| week 23:11,12,13 | 78:11,16,24 81:15 | 97:2,4 98:9,22 |
| 83:16,17 | 84:5,23 85:4,16,22 | 107:17,20 108:3,5 |
| weeks 8:17 | 86:7,19 88:10,14 | 108:9 111:5,6,9,11 |
| went 29:2 40:7 | 88:15,24 89:4,6 | 114:7 |
| 45:5 46:21 61:13 | 90:2,4,22 92:12,20 | workplace 46:20 |
| 70:13,15,22 90:4 | 92:20 93:17 94:23 | works 20:13,15 |
| 99:13 | 95:2 99:14 101:12 | 38:25 39:3 63:20 |
| whatsoever | 101:18 102:5,24 | write 69:9 |
| 105:21 | 105:20 107:6 | written 33:7 91:5 |
| whereof 123:19 | 118:25 | wrong 5:22 66:24 |
| white 35:15 | workday 24:4 | 108:19 109:24 |
| wide 44:3,4,7,20 | worked 38:12,21 | **x** |
| 44:23 45:5,10,12 | 38:24 43:16 44:2 | |
| wife 68:2,6,8 | 44:12 45:3 53:24 | x 1:3,9 121:2 |
| william 2:5 | 65:15 | 122:3 |
| wires 62:18 | worker 27:3 28:5 | **y** |
| witness 4:22 5:3 | 30:9 32:15 36:21 | y 5:2 |
| 9:11 10:9 22:15 | 38:11,21 45:10 | year 46:8 |
| 31:22 32:5 49:12 | 107:18 110:14 | years 43:9,17,20 |
| 53:22 88:3 119:10 | 116:21 | 43:24 44:13,13 |
| 123:10,13,19 | workers 24:5,13 | 45:15,16 53:25 |
| witnesses 32:11 | 24:20 25:11,14 | yellow 7:10 35:6 |
| witnesses' 124:3 | 27:9 32:17 36:12 | 35:22 36:6,13,14 |
| word 5:24 | 58:6 70:18,25 | yesterday 71:3 |
| words 13:24 15:17 | 71:2 83:17,19,21 | york 1:2,19 2:5,5 |
| 23:8 | 84:3,5,6,9 86:23 | 2:10,14,14 5:4,13 |
| wore 25:4 | 88:19 118:5,24 | 8:14,16 123:4,8 |
| work 12:3,5,11,12 | working 13:6 | 124:1 |
| 15:20 16:21 18:24 | 14:18 23:23 24:6 | **z** |
| 23:17,18,21,23 | 24:15 26:12,17,19 | z 65:7 |
| 24:12,15,16,19 | 27:19,24 28:7,19 | zoom 110:7 |
| 25:25 26:23,23 | 28:23,23 29:12 | |
| 38:16 41:4,7,10,15 | 32:14,16 34:11 | |
| 41:21 42:10,11,12 | 42:14,20 44:19 | |
| 43:7,8,18,19,24,25 | 45:21,24 47:21 | |
| 44:11,18 45:8,11 | 48:2 53:4 61:21 | |

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to
the witness for examination and shall be read to or
by him or her, and any changes in form or substance
which the witness desires to make shall be entered
at the end of the deposition with a statement of
the reasons given by the witness for making them.
The deposition shall then be signed by the witness
before any officer authorized to administer an
oath. If the witness fails to sign and return the
deposition within sixty days, it may be used as
fully as though signed. No changes to the
transcript may be made by the witness more than
sixty days after submission to the witness for
examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019. PLEASE REFER TO THE APPLICABLE STATE RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.

Page 1

1

2    SUPREME COURT OF THE STATE OF NEW YORK

3          COUNTY OF KINGS

4    - - - - - - - - - - - - - - - - - - - -x

5    STALIN RODRIGO REYES ESPINOZA,

6                        Plaintiff,

7          -against-

8    DAVS PARTNERS LLC AND KALNITECH
     CONSTRUCTION COMPANY,

9
                        Defendants.

10

     - - - - - - - - - - - - - - - - - - - -x

11

                 Veritext Virtual

12

                 November 17, 2021

13               12:11 p.m.

14

15     EXAMINATION BEFORE TRIAL of STALIN

16   RODRIGO REYES ESPINOZA, the Plaintiff in

17   the above-entitled action, held at the

18   above time and place, taken before Carol

19   Ellinghaus, a Notary Public of the State

20   of New York, pursuant to an Order and

21   stipulations between Counsel.

22

23               *      *      *

24

25

```
 1
 2    APPEARANCES:
 3       GORAYEB & ASSOCIATES, PC
                Attorneys for Plaintiff
 4              100 William Street, Ste. 1900
                New York, New York 10039
 5
         BY:   JARED TURCO, ESQ.
 6
 7       RICHMAN & LEVINE, PC
                Attorneys for Defendant
 8              Davs Partners, LLC
                666 Old Country Road
 9              Garden City, New York 11530
10       BY:   KETH RICHMAN, ESQ.
11
12       LAW OFFICE OF MICHAEL SWIMMER
                Attorneys for Defendant
13              Kalnitech Construction Company
                605 3rd Avenue, 9th Floor
14              New York, New York 10158
15       BY:   ROBERT BRIGANTIC, ESQ.
16       ALSO PRESENT:   Daniel Rodriguez,
                            Spanish Interpreter
17                        Nora Youmans,
                            Spanish Interpreter
18
                    *      *      *
19
20
21
22
23
24
25
```

Page 3

```
 1
 2                    STIPULATIONS
 3      IT IS HEREBY STIPULATED, by and among
 4   the attorneys for the respective parties
 5   hereto, that:
 6      All rights provided by the C.P.L.R.,
 7   and Part 221 of the Uniform Rules for the
 8   Conduct of Depositions, including the
 9   right to object to any question, except as
10   to form, or to move to strike any
11   testimony at this examination is reserved;
12   and in addition, the failure to object to
13   any question or to move to strike any
14   testimony at this examination shall not be
15   a bar or waiver to make such motion at,
16   and is reserved to, the trial of this
17   action.
18      This deposition may be sworn to by the
19   witness being examined before a Notary
20   Public other than the Notary Public before
21   whom this examination was begun, but the
22   failure to do so or to return the original
23   of this deposition to counsel, shall not
24   be deemed a waiver of the rights provided
25   by Rule 3116, C.P.L.R., and shall be
```

Page 4

1

2    controlled thereby.

3        The filing of the original of this

4    deposition is waived.

5        IT IS FURTHER STIPULATED, a copy of

6    this examination shall be furnished to the

7    attorney for the witness being examined

8    without charge.

9

10

11

12

13                    *        *        *

14

15

16

17

18

19

20

21

22

23

24

25

1

2          MR. RICHMAN:  It is my

3     understanding that our conversation

4     with counsel for Kalnitech and counsel

5     for the plaintiff, have stipulated

6     that the plaintiff is being produced

7     here today for a deposition on the

8     issue of liability only.

9          After that counsel will confer

10    with each other to establishing a

11    continuation of the plaintiff's

12    deposition for damages and I, on

13    behalf of A.S.K. Electric, will

14    produce documents that were subpoenaed

15    by Kalnitech's counsel and that

16    plaintiff's counsel will consider

17    whether or not based upon that

18    production, to bring in as a party

19    defendant A.S.K. Electric and that

20    will give the ability of A.S.K.

21    Electric to bring in as third-party

22    Jim, which apparently was a

23    subcontractor subcontractor of A.S.K.

24    Electric so that everything can be in

25    this case and properly the subject of

Page 6

1

2        the litigation and the issues so that

3        everything can be considered and

4        resolved.

5               MR. TURCO:  We agree to produce

6        our client for a subsequent

7        supplemental deposition with regard to

8        the damages only, and we will also

9        work with counsel and Court for a

10       mutually convenient date for our

11       client's damages deposition.

12              I would also like to state that

13       my client's deposition was adjourned

14       over three times at the request of

15       defendants.  We have complied with

16       providing all medical authorizations

17       with regards to all treatment

18       regarding this accident.  We have

19       complied with all Court Orders to-date

20       and as of the date of this deposition,

21       we have not received one piece of

22       discovery from either attorney from

23       Davs Partners or attorney for

24       Kalnitech, despite several Court

25       Orders, the last one being September

Page 7

1

2    10, 2021, which also directed

3    defendants to respond to our Combined

4    Demands on or before October 28, 2021,

5    and we still have not received same.

6         However, there were several

7    Court Orders that were not complied

8    with.  Nonetheless, we are here with

9    our client and ready to proceed.

10        MR. BRIGANTIC:  If I may, I am

11   agreeing to go forward with this

12   deposition only because our call to

13   the court for judicial intervention

14   has not resulted in Judge Landicino

15   being able to hear from us.

16        It is my understanding as of the

17   time this deposition is being started,

18   Judge Landicino's law clerk is

19   attempting to get Judge Landicino and

20   explain to him what the issue is and

21   perhaps have judicial intervention.  I

22   am going forward today, only over

23   objection.

24        I also object to the fact that

25   prior to today and not until yesterday

Page 8

1

2        that the plaintiff produced over one

3        hundred pages of documents yesterday

4        afternoon at 3:30 in the afternoon

5        when I wasn't in the office, which I

6        have not been able to review.

7            Therefore, when the plaintiff

8        says they are in the compliance with

9        the Order, it's only because the

10       documents were produced yesterday

11       afternoon at 3:30.

12           There is no procedure in the

13       Compliance Conference Order or the

14       CPLR that permits a plaintiff to

15       demand their deposition partially on

16       several issues only.  I have asked for

17       where did the authority for doing this

18       exist and I have received no response

19       from plaintiff's office.

20           The attempt to limit this

21       deposition and biforate it is nowhere

22       permitted in the orders or the CPLR as

23       I see it.  But we will go forward

24       simply because the witness is here and

25       it is with our objection.

Page 9

1

2          I would like to point out with

3     respect to the documents that we need

4     in order to adequately depose this

5     witness, Davs Partners, who is the

6     owner of this project and property in

7     a labor law case, has produced nothing

8     and they indicate to me that they have

9     no documents because the real party

10    and interest who is not a party to the

11    litigation is A.S.K. Electric, who

12    subcontracted with both my client,

13    Kalnitech, and also subcontracted with

14    the Plaintiff's employer, Jim

15    Associates.

16          Prior to this deposition, I

17    subpoenaed documents from A.S.K.

18    Electric and I was told before the

19    return date of that deposition by

20    Mr. Richman, that he represents A.S.K.

21    Electric and the documents will be

22    provided by the return date.  The

23    return date went, it passed.  A.S.K.

24    Electric has not produced the

25    documents.  When I asked yesterday

Page 10

1

2      what the status of that production

3      was, I was told that the client still

4      hadn't supplied the documents to

5      Mr. Richmond's office even for review.

6           Why I am being compelled to go

7      forward with the deposition of the

8      plaintiff when the real party and

9      interest, the GC who also has some

10     co-existing relationship with the

11     owner of this project resulting in the

12     production of no documents at all, is

13     not appropriate or proper.

14           As far as production of

15     documents, I subpoenaed documents from

16     the plaintiff's employer and I did

17     provide those documents to the

18     plaintiff's office.

19           If we are in default of any

20     discovery obligations, I will correct

21     those.  The fact that written

22     discovery has not been completed, has

23     been on all sides and even the

24     plaintiff just produced a ton of

25     documents yesterday late afternoon.

Page 11

1

2          That is why I am doing this but

3      I am doing it over objection,

4      reserving the right to seek any relief

5      that may be appropriate.

6          MR. TURCO:  Let the record

7      reflect, that Mr. Brigantic's

8      soliloquy is ripe with inadequacies --

9          MR. BRIGANTIC:  I did not insult

10     you or call you names or anything

11     else.  It is inappropriate, Counsel.

12         MR. TURCO:  You are also yelling

13     now.

14         MR. BRIGANTIC:  I am not

15     yelling.

16         MR. TURCO:  You are also making

17     misrepresentations.  For the record,

18     we have not received your response to

19     the Preliminary Conference Order, we

20     have not received your response from

21     your office to the Compliance

22     Conference Order, and we have not

23     received a response from your office

24     to the final preconference and we did

25     provide authorizations for medical and

Page 12

1

2      treatment to your office in 2019.

3              So we are actually in full

4      compliance with all discovery, so that

5      portion of your record is inaccurate.

6              We, as a courtesy, forwarded you

7      copies of medical records that you

8      have not received directly from the

9      providers yet yesterday.  We did not

10     release documents that we were Court

11     Ordered to exchange.  We, as a

12     courtesy, provided your office with

13     medical records further as a courtesy.

14             In addition to the three or four

15     adjournments of my client's

16     deposition, we advised you that since

17     you did not have all the medical

18     records directly from the providers,

19     as a courtesy we would produce our

20     client more than once and we would

21     produce him solely for the issue of

22     liability, which is what I put on the

23     record today.

24             So despite your representations,

25     that is inaccurate.  It was Court

Page 13

```
 1
 2        Ordered depositions for my client.  If
 3        you would like to proceed with the
 4        entirety of my client's deposition
 5        today, I'll not produce him on a
 6        separate date.  If you do not want the
 7        courtesy of two separate depositions,
 8        then we will continue to the end of
 9        the day, you will get your time, and
10        that is that.
11             MR. BRIGANTIC:  You already
12        stipulated it was a liability
13        deposition only.  You already agreed
14        to bring him back on damages.  I am
15        only stating that the liability
16        portion is going forward over my
17        objection for the reasons stated.
18             MR. RICHMAN:  Let's move
19        forward.
20             THE COURT REPORTER:  Would you
21        like a copy of the transcript,
22        Counselor?
23             MR. BRIGANTIC:  Absolutely.
24
25
```

Page 14

```
 1              S. Espinoza
 2  D A N I E L   R O D R I Q U E Z,
 3  The interpreter, having first been duly
 4  sworn by the Notary Public, interpreted
 5  from English to Spanish and from Spanish
 6  to English to the best of his ability, as
 7  follows:
 8  S T A L I N   R O D R I G O   R E Y E S
 9  E S P I N O Z A,
10  the Witness herein, having first been
11  duly sworn by the Notary Public, was
12  examined and testified as follows:
13  EXAMINATION BY
14  MR. RICHMAN:
15      Q.    What is your name?
16      A.    Stalin Rodrigo Reyes Espinoza.
17      Q.    Where do you reside?
18      A.    151 Avenue O, Apartment B3,
19  Brooklyn, New York 11204.
20           MR. BRIGANTIC:  When the
21      plaintiff is brought back, will he be
22      brought back before or after the
23      defendants are deposed?
24           MR. TURCO:  Before.  Assuming
25      Keith doesn't want to produce out of
```

Page 15

```
1              S. Espinoza
2      order.
3            MR. RICHMAN:  Right.
4            Good afternoon.  My name is
5      Keith Richman.  I am an attorney and
6      my client is Davs Partners, LLC.
7            Davs Partners, LLC is a
8      defendant in this lawsuit and you are
9      the plaintiff; is that correct?
10           THE WITNESS:  [Not responding.]
11           MR. RICHMAN:  Repeat the
12     question, Danny.
13           MR. TURCO:  Please read it back.
14           [The requested portion of the
15     record was read.]
16           THE WITNESS:  Yes.
17           MR. RICHMAN:  Sir, first of all,
18     I want to make sure that you
19     understand the interpreter and the
20     translation.  If you have trouble
21     understanding the translation today,
22     please let me know.
23           Okay?
24           THE WITNESS:  Yes, I understand.
25           MR. RICHMAN:  I am going to be
```

Page 16

```
 1              S. Espinoza
 2      asking questions in English.  The
 3      interpreter will interpret that into
 4      Spanish and you are going to give all
 5      your answers in Spanish.
 6              Is that acceptable to you?
 7              THE WITNESS:  I agree.
 8              MR. RICHMAN:  Please wait until
 9      the interpreter asks the question to
10      you and please answer all of your
11      questions verbally.  The interpreter
12      and the court reporter cannot take
13      down any hand gestures or nods of the
14      head.
15              Do you understand that?
16              THE WITNESS:  I understand.
17              MR. RICHMAN:  When a question is
18      asked of you, please do not guess or
19      give any approximations to the answers
20      to the questions and please if you do
21      not know the answer, please respond by
22      saying you don't know or you don't
23      understand the question.
24              THE WITNESS:  I understand.
25      Q.    What is your full name?
```

```
                                        Page 17
 1                  S. Espinoza
 2      A.     Stalin Rodrigo Reyes Espinoza.
 3      Q.     Have you ever been known by any
 4  other names?
 5      A.     No.
 6      Q.     What is your current address?
 7      A.     151 Avenue O, Apartment B3,
 8  Brooklyn, New York.
 9      Q.     How long have you lived there?
10      A.     Approximately around two to
11  three years.
12      Q.     Is that an apartment building or
13  is that an apartment as part of a house?
14      A.     An apartment of a building.
15      Q.     Who do you live there with?
16      A.     With my brothers.
17             THE INTERPRETER:  I have to ask
18        him to clarify if it's singular or
19        plural.
20      A.     With a brother and the others
21  ones, I just know them.
22      Q.     What is your brother's name?
23      A.     Manuel Euclides Espinoza.
24      Q.     How long have you been living
25  with your brother?
```

Page 18

                    S. Espinoza
1
2    A.    Since I arrived.
3    Q.    The day you arrived from where?
4    A.    From Ecuador.
5    Q.    Before you were living in this
6  apartment --
7              [Telephone interruption.]
8         MR. BRIGANTIC:  I need to take
9    that.  It's the call from the Court.
10             [A pause in the proceedings.]
11        MR. BRIGANTIC:  I just got a
12   call back from the law clerk Steven
13   Burseio [phonetically].  He wants us
14   to set up a conference call with him.
15        MR. RICHMAN:  Please read back
16   the last question and answer.
17             [The requested portion of the
18   record was read.]
19   Q.    Sir, before you came to the
20  United States, you were living in Ecuador;
21  correct?
22   A.    Yes.
23   Q.    What is the date that you moved
24  to the United States?
25   A.    I came the 30th of July in 2018.

```
                                    Page 19
 1            S. Espinoza
 2     Q.    When you came to the United
 3  States, did you come as a visitor or did
 4  you obtain a work visa?
 5     A.    No.
 6     Q.    You are not understanding the
 7  question.
 8            When you first came to the
 9  United States, did you come as a visitor
10  or something else?
11     A.    No.
12            MR. BRIGANTIC:  It's not
13        responsive.
14            MR. TURCO:  Do you understand
15        the question?
16            When you first came to the
17        United States, did you come as a
18        visitor?
19            THE WITNESS:  No.
20            MR. TURCO:  Did you come here to
21        work?
22            THE WITNESS:  Can you please
23        repeat.
24     Q.    When you first came to the
25  United States, did you come here to be
```

Page 20

```
 1              S. Espinoza
 2   employed?
 3       A.    I came to work.
 4       Q.    When you came to the United
 5   States on July 30 of 2018, who did you
 6   come here with, if anyone?
 7       A.    I came alone.
 8       Q.    After you came to the United
 9   States, did there come a time after you
10   arrived in the United States, that your
11   brother came to the United States?
12       A.    Yes.
13       Q.    When did your brother arrive,
14   the brother you are now living in your
15   apartment with?
16       A.    I arrived to where my brother
17   lives with him.
18             MR. TURCO:  The question was did
19       your brother come after you?
20             When did your brother come?
21             THE WITNESS:  He came some
22       further time ago.
23       Q.    When you first came to the
24   United States, where did you live?
25       A.    Approximately around Avenue U
```

Page 21

```
 1              S. Espinoza
 2   but I don't remember exactly.
 3       Q.    Who did you live with when you
 4   first came to the United States?
 5       A.    Can you please repeat because I
 6   did not understand.
 7              MR. RICHMAN:  Please read it
 8       back.
 9              [The requested portion of the
10       record was read.]
11       A.    I found or I got together with
12   my brother and I stayed to live with him.
13       Q.    I thought your brother came to
14   the United States after you arrived in the
15   United States; is that correct?
16       A.    No.  He was already living here.
17       Q.    When you first came to the
18   United States, you moved in with your
19   brother; correct?
20       A.    Yes.
21       Q.    When you first came to the
22   United States, was your brother employed?
23       A.    Yes.
24       Q.    What did he do?
25       A.    Construction.
```

```
                                          Page 22
 1                  S. Espinoza
 2      Q.     Who did he work for?
 3      A.     I have no idea.
 4      Q.     When you first arrived here, did
 5  you seek employment or did you have
 6  employment arranged before you the came to
 7  the United States?
 8      A.     When I arrived I looked for
 9  work.
10      Q.     How did you look for work?
11      A.     It was through people that I
12  know.
13      Q.     What kind of work did you look
14  for?
15      A.     Construction.
16      Q.     When is the first time that you
17  became employed in the United States after
18  you arrived?
19      A.     Close to the 4th of October when
20  I came.
21      Q.     That is October 4, 2018?
22      A.     Yes.
23      Q.     What was your first employment?
24      A.     Construction.
25      Q.     Who were you employed by?
```

```
                                        Page 23
 1                  S. Espinoza
 2      A.     Can you please repeat.
 3      Q.     Who were you employed by?
 4      A.     I don't know the exact name.
 5      Q.     Was it a company or an
 6  individual or something else?
 7      A.     I don't know exactly what kind
 8  of company it was or nothing.
 9      Q.     Do you know where the company
10  was located?
11      A.     I was just taken there to go
12  work.  I don't know nothing else.
13      Q.     Were you paid money for your
14  employment?
15      A.     I did not understand.
16      Q.     Did you get paid a salary for
17  working at your first employment?
18      A.     Yes.
19      Q.     How much?
20      A.     Around six hundred.
21      Q.     That is $600 per week?
22      A.     Yes.
23      Q.     How many hours did you work?
24      A.     I don't know exactly.
25      Q.     Was it more than forty hours a
```

Responses Bates Stamp No 167

Page 24

S. Espinoza

1
2    week, if you know?

3                THE INTERPRETER:  I am asking
4        him to repeat and speak louder.

5        A.    Eight hours daily.

6        Q.    How many days a week?

7        A.    Five.

8        Q.    What kind of construction work
9    did you do?

10       A.    Laborer.

11       Q.    Can you describe exactly the
12   kind of work you did as a laborer?

13       A.    I used to do everything.

14       Q.    Can you itemize for me what you
15   mean by you did everything?

16       A.    I would sweep, I would take down
17   the sheetrock from the truck, I would be
18   helping the foreman, and go pick up the
19   food.

20       Q.    Anything else?

21       A.    Sometimes I would place
22   sheetrocks [sic].

23       Q.    How long did you --

24             MR. RICHMAN:  Withdrawn.

25       Q.    Do you know the names of any of

Page 25

1              S. Espinoza
2    the people that you work with at this
3    company or person as a laborer?
4        A.    No, because I did not know all
5    of them.
6        Q.    Do you have any records that you
7    could produce indicating the names of any
8    of the individuals or companies that you
9    worked for at this time?
10       A.    No.
11       Q.    Did you get paid by cash or
12   check?
13       A.    Check.
14       Q.    Do you have copies of any of
15   your paychecks?
16       A.    No.
17             MR. BRIGANTIC:  Can I ask is
18        there a lost wage claim.
19             MR. TURCO:  Yes, there is.
20             MR. RICHMAN:  Yes, there is.
21             MR. BRIGANTIC:  Thank you,
22        sorry.
23             MR. TURCO:  Did you need copies
24        of his paychecks from 2018?
25             MR. RICHMAN:  No.

Page 26

```
 1                S. Espinoza
 2      Q.     For how long a period of time,
 3  did you work for this person or company,
 4  from October 4, 2018 until when?
 5      A.     I don't remember exactly.
 6      Q.     Approximately how long?
 7      A.     I can't recall.
 8      Q.     Was it more than a month?
 9      A.     Yes.
10      Q.     Was it more than two months?
11      A.     Yes.
12      Q.     More than three months?
13      A.     Yes.
14      Q.     More than six months?
15      A.     Somewhere around there.
16      Q.     When you left that company, what
17  was the reason why you left that company?
18      A.     Verbal abuse.
19      Q.     Verbal abuse by who?
20      A.     I don't remember the name of the
21  foreman.
22          MR. RICHMAN:  If I leave a space
23      in the record, can you provide the
24      name?  If we leave a space in the
25      transcript, can you provide the name
```

Page 27

                    S. Espinoza

1         of the foreman that you say you

2         received verbal abuse from?

3              MR. TURCO:  He testified he

4         doesn't remember; right?

5              MR. RICHMAN:  I am asking if we

6         leave a space and if you can provide

7         the name, provide it.

8              MR. TURCO:  You can leave a

9         space if he remembers, sure.

10   (Insert)

11   _____

12        Q.    In connection with your

13   employment for approximately six months

14   with this company when you came to the

15   United States, did you take any safety

16   courses?

17              THE INTERPRETER:  Any what?

18              MR. RICHMAN:  Safety courses.

19        A.    Not at that time.

20        Q.    Were you working under a work

21   visa?

22        A.    No.

23        Q.    Did you file tax returns for

24   2018?

```
 1              S. Espinoza
 2      A.    Yes.
 3              MR. RICHMAN:  I am going to ask
 4      for a copy of those tax returns and
 5      I'll send a separate D&I.
 6              MR. TURCO:  Taken under
 7      advisement.
 8      Q.    When you were verbally abused by
 9  your supervisor, did you file a complaint
10  against him or her with anyone?
11      A.    No.
12      Q.    Before you came to the United
13  States and you were living in Ecuador, who
14  were you living with?
15      A.    With my wife.
16      Q.    Are you married?
17      A.    No.
18      Q.    Are you divorced?
19      A.    Separated.
20      Q.    You are legally married but
21  physically separated?
22      A.    I am not exactly married, we
23  just live together.
24      Q.    You said before that you were
25  married in Ecuador; is that accurate?
```

```
                                          Page 29
 1              S. Espinoza
 2      A.     That is not correct.  I am not
 3  married.
 4      Q.     Do you have any children?
 5      A.     Yes, I have a daughter.
 6      Q.     How old is your daughter?
 7      A.     Three and a half years.
 8      Q.     Where does your daughter live?
 9      A.     Ecuador.
10      Q.     Does she live with her mother?
11      A.     Yes.
12             MR. TURCO:  Danny, I need you to
13      try and translate my objection so the
14      client hears it.
15             Can you hear me, Danny?  When I
16      object I need you to translate my
17      objection.
18             Objection to the form of the
19      question.
20      Q.     When you were living in Ecuador,
21  were you living with your daughter and her
22  mother?
23      A.     Yes.
24      Q.     For how long?
25      A.     With the mother?
```

```
                                          Page 30
 1                  S. Espinoza
 2      Q.     With the mother, yes.
 3      A.     Three to four years.
 4      Q.     You were living with your
 5   daughter and daughter's mother since your
 6   daughter was born; is that correct?
 7      A.     In Ecuador, yes.
 8      Q.     What was the reason why you left
 9   Ecuador and came to the United States?
10      A.     I wanted to get a better future.
11      Q.     What is your date of birth?
12      A.     For who?
13      Q.     What is your date of birth?
14             MR. TURCO:  Carol, do not put it
15      on the record.
16      A.     00/00/0000.
17      Q.     Where were you born?
18      A.     Ecuador.
19      Q.     While you were living with your
20   daughter for three years, where in Ecuador
21   were you living?
22             THE INTERPRETER:  I have to ask
23      him to spell it.
24      A.     Lenta, the name of the town is
25   Lenta.
```

```
                                              Page 31
 1               S. Espinoza
 2               THE  INTERPRETER:   L-E-N-T-A.
 3      Q.    During the three years that you
 4   were living with your daughter in Ecuador,
 5   were you employed?
 6      A.    Yes.
 7      Q.    What were you doing?
 8      A.    In a restaurant.
 9      Q.    What were you doing in a
10   restaurant?
11      A.    I used to grill ribs, I used to
12   grill ribs on a grill.
13      Q.    Did you do that full time or
14   something else?
15      A.    No.
16      Q.    You did that part time?
17      A.    Yes.
18      Q.    Did you have any other jobs
19   during the last three years while you were
20   living with your daughter in Ecuador other
21   than grilling ribs?
22      A.    With my daughter I only lived
23   just for one month.
24      Q.    At the time that you left
25   Ecuador, you had employment grilling ribs;
```

```
                                              Page 32
 1                  S. Espinoza
 2   is that correct?
 3        A.    Yes.
 4        Q.    How long was that employment
 5   for?
 6        A.    Two months.
 7        Q.    Before that what did you do?
 8        A.    Construction.
 9        Q.    How long did you do construction
10   for in Ecuador?
11        A.    I don't know exactly.
12        Q.    Approximately how long?
13        A.    I don't remember.
14        Q.    Did you do construction for more
15   than a year while living in Ecuador?
16        A.    Yes.
17        Q.    Are you currently a U.S.
18   citizen?
19              MR. TURCO:  Note my objection.
20        A.    Can you repeat.
21   +    Q.    Are you currently a U.S.
22   citizen?
23              MR. TURCO:  Note my objection.
24              I don't want him to answer that.
25        He has a pending immigration case and
```

```
                                    Page 33
 1              S. Espinoza
 2      I don't want him to jeopardize that.
 3              I am going to direct him not to
 4      answer that.
 5              MR. RICHMAN:  Mark it for a
 6      ruling.
 7  +   Q.    Are you currently in the United
 8  States pursuant to a visa?
 9              MR. TURCO:  Note my objection
10      and don't answer the question
11      regarding his immigration status.  At
12      this time he has a pending case and I
13      don't want him to testify to anything
14      that would jeopardize his case.
15              MR. RICHMAN:  You know I am
16      entitled to know the answer to these
17      questions.
18              MR. TURCO:  You can mark it.
19              MR. RICHMAN:  Mark it for a
20      ruling.
21      Q.    Do you currently have a Social
22  Security number?
23      A.    Where?  Where?  Can you please
24  repeat the question.
25      Q.    Do you currently have a Social
```

Page 34

```
 1              S. Espinoza
 2  Security number?
 3      A.     Yes.
 4      Q.     What is that number?
 5             MR. RICHMAN:  You can put the
 6      last four digits on.
 7             MR. TURCO:  Please make sure
 8      it's only the last four.
 9      A.     I don't have it in hand.
10             MR. RICHMAN:  I'll leave a space
11      in the record.
12  (Insert)
13  _____
14             MR. TURCO:  Off the record.
15             [Discussion held off the
16      record.]
17      Q.     What is your highest level of
18  education?
19      A.     I finished third grade or third
20  course.
21      Q.     Is that equivalent to the third
22  grade in the United States, if you know?
23      A.     I have no idea.
24      Q.     Do you know what a high school
25  is?
```

1                    S. Espinoza

2       A.      Yes.

3       Q.      Did you graduate from high

4    school?

5       A.      I have been approved up to

6    ninth.   I was approved all the way up to

7    the ninth.

8              MR. RICHMAN:  Say it again,

9       Danny.

10             THE INTERPRETER:  I was approved

11      all the way up to the ninth.

12      Q.      You graduated from ninth grade,

13   is that what you are saying?

14      A.      Ninth grade, the following grade

15   is the first class or first year of high

16   school.

17      Q.      Was the last year that you

18   finished school in Ecuador ninth grade?

19      A.      I finalized the ninth grade.

20      Q.      To have graduated from high

21   school you would have had to finish tenth,

22   eleventh, and twelfth grade; is that

23   correct?

24             MR. RICHMAN:  I had to tell him

25      in a different way.  He is not

```
                                    Page 36
 1              S. Espinoza
 2      understanding.  Over there, I'll make
 3      a clarification for the record, in
 4      different countries like the Dominican
 5      Republic, Ecuador, they use high
 6      school as first, second, third, and
 7      fourth grades for high school.
 8      Q.    Is high school in Ecuador
 9  attending the first, second, third, and
10  fourth grade in high school?
11      A.    In Ecuador it's first year of
12  high school, second year of high school,
13  and third year of high school you are
14  ending.
15      Q.    Did you attend first year of
16  high school?
17      A.    I started but I didn't finish.
18      Q.    You did not go to the second
19  year of high school; correct?
20      A.    No.
21      Q.    You did not attend the third
22  year of high school; correct?
23      A.    Correct.
24      Q.    What was the reason why you
25  didn't finish the first year of high
```

```
                                        Page 37
 1              S. Espinoza
 2   school?
 3       A.    Money problems.
 4       Q.    The high school in Ecuador
 5   required you or your family to pay money
 6   to the high school to attend?
 7       A.    The economy wasn't enough or the
 8   finances were not enough.
 9       Q.    Is it correct that you had to
10   stop attending high school in the first
11   year because you needed to be employed and
12   make money?
13       A.    Correct.
14       Q.    At that time that you were
15   attending the first year of high school,
16   who were you living with?
17       A.    Can you please repeat because I
18   got confused.
19       Q.    During the first year that you
20   attended high school, who were you living
21   with?
22       A.    With my mother and my father.
23       Q.    How old were you when you
24   stopped going to the first year of high
25   school?
```

```
                                                    Page 38
 1                    S. Espinoza
 2        A.      Eighteen.
 3        Q.      What was your first employment
 4   in Ecuador after you stopped going to the
 5   high school?
 6        A.      In mining.
 7        Q.      Mining?
 8                THE INTERPRETER:  Mining, yes,
 9        correct.
10        Q.      How long were you mining for?
11        A.      I used to go and come.  I don't
12   know exactly.
13        Q.      Was it more or less than six
14   months?
15        A.      Yes.
16        Q.      What did you do in connection
17   with mining?
18        A.      Take out or looking for gold,
19   mining for gold.
20                MR. RICHMAN:  What, Danny?
21                THE INTERPRETER:  Mining for
22        gold.
23        Q.      In connection with that job, did
24   you take any safety courses?
25        A.      Yes.
```

Responses Bates Stamp No 182

```
                                            Page 39
 1              S. Espinoza
 2      Q.     Describe them to me.
 3      A.     You get a helmet, goggles,
 4   gloves.
 5              THE INTERPRETER:  He said
 6      something I couldn't hear.  I have to
 7      ask him.
 8      A.     Gloves, helmet, a lantern or
 9   flashlight, masks, protective boots, a
10   reflective vest.
11      Q.     Anything else?
12              MR. TURCO:  You are asking for
13      the gear of mining?
14              MR. RICHMAN:  Yes.
15      Q.     Were you ever injured on the
16   job?
17      A.     No.
18      Q.     What was the reason you left
19   that employment?
20      A.     I had a limited contract.
21      Q.     What was your next job?
22      A.     I used to work in a
23   hydroelectric.
24      Q.     What did you do there?
25      A.     Sweeping.
```

Page 40

```
 1              S. Espinoza
 2              THE INTERPRETER:  He was going
 3       to say something.
 4              MR. RICHMAN:  Sorry, go ahead.
 5       A.    Shining floors.
 6       Q.    Did you wear any safety items?
 7       A.    All the time.
 8       Q.    Excuse me?
 9       A.    All of the time.
10       Q.    What did you wear or and/or use?
11       A.    Harness, reflective vest,
12   goggles.
13       Q.    Did you wear a helmet?
14              MR. TURCO:  I missed a question
15       before that, what was he describing?
16              MR. RICHMAN:  He was describing
17       his safety apparel or equipment while
18       he worked at the hydroelectric.
19       Q.    Anything else?
20              THE INTERPRETER:  I am not
21       hearing what he is saying.
22       A.    I was also directing traffic in
23   the same hydroelectric or guiding traffic.
24       Q.    What kind of harness were you
25   wearing?
```

```
                                         Page 41
 1                S. Espinoza
 2      A.    3 M.
 3      Q.    What was the reason, what was
 4  the purpose of wearing this harness?
 5      A.    The security guards all of them
 6  were required for us to wear it.  They
 7  won't allow us to work if we didn't have
 8  it.
 9      Q.    Was that a harness that had
10  reflective material on it?
11      A.    Yes.
12      Q.    How long did you work in this
13  company for?
14      A.    One year.
15      Q.    What was the reason why you left
16  this company?
17            THE INTERPRETER:  I am having
18      difficulty with his audio.
19      A.    Because I did not like the food.
20      Q.    What was your next job?
21      A.    Tractor helper.
22      Q.    Tractor helper, what kind of
23  tractor?
24      A.    Aruga [phonetically].
25            THE INTERPRETER:  I don't know
```

```
                                        Page 42
 1              S. Espinoza
 2      what that means.  I have to ask him
 3      the definition of what that means.
 4              I am going to ask him if it is a
 5      tractor-trailer or a tractor for the
 6      farming industry.
 7              Is that okay with you?
 8              MR. RICHARD:  Thanks, Danny.
 9      A.    A tractor to do transportation,
10  deliveries.
11              MR. TURCO:  Everyone, when Danny
12      has to leave at 2:30, do you want to
13      do a window there for lunch or food?
14              Off the record.
15              [Discussion held off the
16      record.]
17      Q.    When you were a helper, what
18  exactly did you do?
19      A.    I used to carry the fuel.  I
20  used to grease up the truck.
21      Q.    How long did you do this job
22  for?
23      A.    Three months.
24      Q.    What was the reason you left
25  this job?
```

```
                                            Page 43

 1                   S. Espinoza

 2        A.      The reason was that I had a

 3   limited contract.

 4        Q.      What was your next job?

 5        A.      I used to be a waiter and a

 6   helper at kitchen.

 7        Q.      In a restaurant?

 8        A.      A fast-food restaurant.

 9        Q.      How long did you do that for?

10        A.      About a year and a half.

11        Q.      What was the reason for leaving

12   that?

13        A.      I did not understand.

14        Q.      Why did you leave that job as a

15   waiter/helper in the fast-food restaurant?

16        A.      I got engaged.

17        Q.      What was the name of the person

18   you were engaged to?

19        A.      Yes.

20        Q.      What is her name?

21        A.      Jessica Maribel Pasatos Pizarro.

22        Q.      Did you ever marry Jessica?

23        A.      No.

24        Q.      Is that who you had why you

25   child with?
```

```
                                        Page 44
 1                 S. Espinoza
 2        A.    Yes.
 3        Q.    What was your next job after
 4   working at the fast-food restaurant?
 5        A.    Construction again.
 6        Q.    How long did you have that job?
 7        A.    Two months.
 8        Q.    What kind of construction did
 9   you personally do?
10        A.    I used to mix the sand, cleaning
11   the corners.
12        Q.    Anything else?
13        A.    Pick up material, sand.
14        Q.    Did you wear any safety
15   equipment?
16        A.    Yes.
17        Q.    Describe it.
18        A.    Helmet, gloves.
19        Q.    Did you use a ladder in
20   connection with that job?
21        A.    The stairs of the building.
22        Q.    Did you ever use a ladder in
23   connection with performing your
24   construction duties?
25                MR. TURCO:  Ever before this --
```

Page 45

1              S. Espinoza
2              MR. RICHMAN:  During this job
3        for two months.
4              THE INTERPRETER:  I have an
5        interpreter that will not be able to
6        come in until 2:30.  She can't come in
7        at 2:15.
8              MR. RICHMAN:  When do you end,
9        2:30?
10             THE INTERPRETER:  I can end at
11       2:30.
12             MR. RICHMAN:  You want her to
13       come in at 2:45?
14             Off the record.
15             [A discussion was held off the
16       record.
17             MR. RICHMAN:  Please read back
18       the answer.
19             [The requested portion of the
20       record was read.]
21             MR. RICHMAN:  I just wanted it
22       for clarity.
23       Q.    Did you ever use a ladder in
24  connection with your duties?
25       A.    I would use the ladder to be

```
                                           Page 46
 1               S. Espinoza
 2   able to go up with the sand and the sand I
 3   would bring it up in a bag.
 4       Q.    Did you use an A-frame ladder or
 5   straight ladder?
 6       A.    It was as a staircase, it's a
 7   concrete staircase.
 8       Q.    Do you know what a ladder is?
 9       A.    Can you please specify.
10       Q.    In connection with this incident
11   involving this lawsuit, did you fall from
12   a ladder?
13       A.    Could you be more specific
14   because I did not understand.
15       Q.    Were you involved in an incident
16   on June 28, 2019?
17       A.    Yes.
18       Q.    Is that the reason why you
19   commenced this lawsuit?
20       A.    Yes.
21       Q.    At the time of that incident on
22   June 28, 2019, were you using a ladder?
23       A.    Yes.
24       Q.    Was the ladder aluminum?
25       A.    It was fiberglass.
```

1           S. Espinoza

2      Q.     Were the outside rails of the

3  ladder green?

4           MR. TURCO:  I object to the

5      question.  Go ahead.

6      A.     Yes.

7      Q.     Was the ladder involved in the

8  incident on June 28, 2019 an A-frame

9  ladder or something else?

10     A.     No.

11     Q.     It was a straight ladder?

12     A.     The ones that you open.

13     Q.     It opens on two sides and looks

14  like an A when it opens; is that correct?

15     A.     Yes.

16          MR. TURCO:  You can probably ask

17     him again the A-frame question.

18          MR. RICHMAN:  I'll get back to

19     it.

20     Q.     Did you ever use that type of

21  ladder before the incident on June 28,

22  2019?

23     A.     Yes.

24     Q.     Did you use that A-frame type of

25  ladder in connection with the construction

Page 48

```
1              S. Espinoza
2    job that you had for two months in Ecuador
3    that we were just talking about?
4        A.    I didn't have any idea that that
5    type of ladder existed.
6        Q.    The first time that you used the
7    ladder that was green in parts was on June
8    28, 2019?
9              MR. TURCO:  Note my objection.
10             THE INTERPRETER:  Can I
11        translate?  Can he answer?
12             MR. RICHMAN:  Yes, go ahead.
13       A.    Yes.
14       Q.    After this construction job that
15   you had for two months in Ecuador, what
16   was the reason why you left that job?
17       A.    My wife was having symptoms of
18   pregnancy and I had to stop working there.
19       Q.    What was your next job?
20       A.    I did not work for various
21   months.
22       Q.    Did you ever obtain employment
23   after this construction job that you
24   worked for two months while you were
25   living in Ecuador?
```

```
                                        Page 49
 1                  S. Espinoza
 2       A.     After that I didn't get -- I
 3   couldn't find more work.
 4       Q.     The answer to that question is
 5   no?
 6       A.     No.
 7              MR. TURCO:  Just answer just
 8        what he is asking.  If you can
 9        estimate, great.  You can answer yes
10        or no.  Listen to the very specific
11        question, please.
12       Q.     At the time that you left
13   Ecuador, you were not employed for some
14   period of time before you left; correct?
15       A.     I didn't have more work.
16       Q.     How long a period of time would
17   you approximate you were not working
18   before you left Ecuador?
19       A.     I don't remember exactly.
20       Q.     Was it more than six months?
21       A.     It's been a long time ago.
22       Q.     Can you give me an approximate
23   period of time?
24       A.     No.
25              MR. TURCO:  Do you understand
```

Responses Bates Stamp No 193

```
                                          Page 50
 1                S. Espinoza
 2      the question?
 3              THE WITNESS:  No.
 4              MR. TURCO:  Before you left
 5      Ecuador, when was last time you were
 6      employed?
 7              THE WITNESS:  About a year.
 8      Q.    What did you do during that
 9  year?
10      A.    Take care of the family.
11      Q.    Who were you living with during
12  that one year?
13      A.    With Jessica Maribel Pasatos.
14      Q.    Are you currently taking any
15  medication?
16      A.    Yes.
17      Q.    Have you taken any medication
18  within the last twenty-four hours?
19      A.    No.
20      Q.    When is the last time you took
21  any medication?
22      A.    Yesterday.
23      Q.    What did you take yesterday?
24      A.    Yesterday I took two pills at
25  six p.m.
```

```
                                            Page 51
  1                    S. Espinoza
  2        Q.     What kind of pills?
  3        A.     I don't remember the name.
  4        Q.     Was it prescribed to you by a
  5    doctor?
  6        A.     Yes.
  7        Q.     What is the name of the doctor?
  8        A.     I don't remember.
  9        Q.     What were the pills for?
 10        A.     For the pain.
 11        Q.     Say is again.  What?
 12               THE INTERPRETER:  For the pain.
 13        Q.     Pain where?
 14        A.     Lower back to the left.
 15        Q.     Describe the pain.
 16        A.     I have pain on my lower back, my
 17    buttocks area, my legs on the sides and
 18    down to my feet.
 19        Q.     This pain you have just
 20    described, are you claiming that is the
 21    result of your incident on June 28, 2019?
 22        A.     Yes.
 23        Q.     Have you ever been convicted of
 24    a crime?
 25        A.     No.
```

```
                                              Page 52
 1                    S. Espinoza
 2       Q.     Have you ever filed for
 3   bankruptcy?
 4       A.     No.
 5       Q.     Are you aware of any judgments
 6   or liens against you?
 7       A.     No.
 8       Q.     With the exception of this
 9   current lawsuit, have you ever been a
10   plaintiff or a defendant in a lawsuit?
11       A.     No.
12       Q.     Have you ever attended any
13   vocational or trade schools?
14       A.     Do you mean OSHA classes?
15       Q.     Anything.
16              MR. TURCO:  Any additional
17         training classes, any additional
18         higher education.
19       A.     The classes of OSHA only.
20       Q.     When did you attend OSHA
21   classes?
22       A.     What do you mean?
23       Q.     You just said you attended OSHA
24   classes.  When did you attend OSHA
25   classes?
```

```
                                            Page 53
 1                 S. Espinoza
 2       A.     Okay, approximately April of
 3   2019, approximately April of 2019.
 4       Q.     April of 2019?
 5       A.     Yes.
 6       Q.     Let's go back.  You said earlier
 7   your first employment in the United States
 8   started October 4, 2018 and you worked in
 9   construction as a laborer for
10   approximately six months.
11              MR. TURCO:  Note my objection.
12              You can answer.
13       A.     I didn't understand.
14       Q.     Do you remember testifying
15   earlier today that you told me that your
16   first job in the United States started
17   October 4, 2018?
18       A.     Yes.
19       Q.     And that you worked there for
20   approximately six months and you left
21   because you claim you were verbally
22   abused; correct?
23       A.     Yes.
24       Q.     What was your next job after
25   that job?
```

Page 54

1                    S. Espinoza
2       A.      Putting metals in the same area
3    of construction.
4                MR. RICHMAN:  Say it again,
5          Danny.
6       A.      Putting metals in the same area
7    of construction.
8                MR. RICHMAN:  Putting metals in
9          the same area of construction, is that
10         what he said?
11               THE INTERPRETER:  That is what
12         he said.
13               MR. TURCO:  Did you understand
14         the question?
15      Q.      Do you understand my question?
16   I am asking you what your next job was
17   after the first job in the U.S.
18               THE INTERPRETER:  He answered
19         working in construction putting
20         metals.
21               MR. TURCO:  Danny, when you
22         interpreted that, I didn't hear
23         working in construction putting metals
24         in.
25               THE INTERPRETER:  In the same

Responses Bates Stamp No 198

```
                                    Page 55
 1              S. Espinoza
 2      area of construction.
 3      Q.    When did you start this job, do
 4   you know?
 5      A.    After I stopped working at that
 6   other job, around January.
 7      Q.    January of 2019?
 8      A.    Yes.
 9      Q.    What was the name of the person
10   or company you worked for?
11      A.    It was an odd job.
12      Q.    How long did you work at this
13   odd job putting metals?
14      A.    About two months more or less or
15   something like that.
16      Q.    Can you describe for me what you
17   mean by putting metals, what that means.
18      A.    Okay.  The metals that go behind
19   this.
20            (Indicating)
21            MR. TURCO:  Indicating the wall.
22      Q.    You are talking about the
23   installing metal columns that hold
24   interior walls?
25      A.    Yes.
```

```
 1              S. Espinoza
 2      Q.     Were you working for a company
 3   or a person or something else?
 4      A.     It was for a person.
 5      Q.     Do you know the name of that
 6   person?
 7      A.     No.
 8      Q.     Were you wearing any safety
 9   equipment in connection with that job?
10      A.     Goggles, gloves, only.
11      Q.     Did you use any ladders like you
12   had used in connection with the incident
13   on June 28, 2019, in connection with that
14   job?
15      A.     The majority of the work or the
16   jobs were on the ground.  They were not
17   high.
18      Q.     Did you use any kind of ladder
19   in connection with that job?
20      A.     Yes, I used.
21      Q.     What kind of ladder?
22      A.     Type A.
23      Q.     When you are talking about type
24   A, are you referring to the same type of
25   ladder that was involved in the incident
```

```
                                              Page 57
 1              S. Espinoza
 2   on June 28, 2019?
 3        A.    Yes.
 4        Q.    What was the reason why you left
 5   this job?
 6        A.    It was too scarce of work, not
 7   that much work, I stayed home too much.
 8              MR. RICHMAN:  You want to stop
 9        here, Danny?  I know you have to leave
10        at 2:30.
11              [At this time Nora Youmans,
12        Spanish interpreter, entered the Zoom
13        meeting.]
14              We are going to take a half hour
15        break for lunch.
16              MS. YOUMANS:  No problem.
17              MR. TURCO:  We wanted to see
18        that you are on board.  We are going
19        to convene at three o'clock and go to
20        about 4:20 today and break.
21              [Whereupon, after a luncheon
22        recess was taken, the following was
23        had:]
24     A F T E R N O O N   S E S S I O N
25   BY MR. RICHMAN:
```

```
                                          Page 58
 1                  S. Espinoza
 2       Q.     Prior to lunch, we were talking
 3   about your second job while you were
 4   living in the United States of putting
 5   metals or columns for interior walls.
 6             You said you started in or about
 7   January of 2019 and worked there for two
 8   months; correct?
 9       A.     Yes.
10       Q.     What was the reason you left
11   that job?
12       A.     Because they didn't have any
13   jobs.
14       Q.     What was your next job?
15       A.     Working with this gentleman.
16       Q.     Working with what gentleman?
17       A.     With the company.  The company.
18       Q.     We are talking about Jim
19   Associates?
20       A.     Yes.
21       Q.     When did you start working for
22   Jim Associates, what month?
23       A.     Approximately in May.
24       Q.     Of what year?
25       A.     2019.
```

Page 59

1                 S. Espinoza

2      Q.     How did you get that job?

3      A.     From a friend.

4      Q.     Did you do an interview with a

5   person at Jim Associates in connection

6   with getting that job?

7      A.     No.

8      Q.     Did you submit any paperwork

9   through them in connection with getting

10   that job?

11      A.     No.

12      Q.     Did you have any conversations

13   with anyone about getting that job?

14      A.     Yes, I was unemployed and I was

15   looking for a job.

16      Q.     Who did you speak to first at

17   Jim Associates in connection with getting

18   that job?

19      A.     His name is Jorge.

20      Q.     Is his last name Moscoso,

21   M-O-S-C-O-S-O?

22      A.     I don't know his last name.

23      Q.     Was Jorge the owner, as far as

24   you know, from Jim Associates?

25      A.     I didn't know.

```
                                         Page 60
 1                S. Espinoza
 2      Q.    Did you know who the owner of
 3   Jim Associates was?
 4             THE INTERPRETER:  One second.
 5       He said something else after his
 6       answer.
 7      A.    At the beginning I didn't know.
 8   Then I heard that he was like the owner or
 9   a partner.  I don't know exactly.
10      Q.    Before the lunch break, you
11   talked about you took some OSHA classes,
12   do you recall?
13      A.    Yes.
14      Q.    Were you employed by anyone at
15   the time you took these OSHA classes?
16      A.    I was unemployed.
17      Q.    What was the reason you took the
18   OSHA classes?
19             MR. TURCO:  Did he say he was
20       unemployed?
21             MR. RICHMAN:  He said he was
22       unemployed.
23             MR. TURCO:  Thank you.
24      A.    They asked for this.  It was a
25   requirement in order to get a job.
```

```
                                      Page 61
 1              S. Espinoza
 2      Q.    Who is the they that asked for
 3   this?
 4      A.    In the places I was like are
 5   looking for a job.
 6      Q.    Was taking an OSHA class a
 7   requirement when you were working at the
 8   job before Jim Associates?
 9      A.    No, after I left that job.
10      Q.    After you left that job where
11   you were putting metals on interior walls,
12   you were looking for employment at other
13   prospective employers wanted you had to
14   take OSHA classes; is that correct?
15      A.    Yeah, at that time I wasn't
16   working.
17      Q.    How many OSHA classes did you
18   take?
19      A.    All the classes, thirty hours.
20      Q.    Did you get a certificate that
21   you completed the OSHA classes?
22      A.    Yes.
23      Q.    Do you have at a certificate?
24      A.    I have the card.
25            MR. RICHMAN:  I am going to ask
```

```
                                        Page 62
 1              S. Espinoza
 2       for the production.  I'll send you a
 3       separate D & I.
 4       Q.    When did you take the thirty
 5   hours of OSHA classes?
 6              MR. TURCO:  It was OSHA 30 he
 7       said?
 8              MR. RICHMAN:  Yes.
 9              THE INTERPRETER:  Can you repeat
10       the question.
11       Q.    When did you take the thirty
12   hours of OSHA classes?
13       A.    I don't remember the date
14   exactly.
15       Q.    Although you don't remember the
16   date, it was sometime prior to working at
17   Jim Associates and after working at the
18   prior job where you were putting the
19   metals on the interior walls; correct?
20       A.    Something like that, yes.
21       Q.    Where did you attend these
22   classes?
23       A.    In Queens.
24       Q.    Do you know where?
25       A.    The address I don't know.  I
```

```
                                          Page 63
 1              S. Espinoza
 2   don't know the address exactly.
 3       Q.    Were the OSHA classes live,
 4   in-person?
 5       A.    Yes.
 6       Q.    Did you take any other classes
 7   other than the thirty hours of OSHA
 8   classes?
 9       A.    No.
10       Q.    Do you have a driver's license?
11       A.    No, I haven't done that.
12       Q.    Do you drive a car?
13       A.    Not at this moment.
14       Q.    Did you drive a vehicle when you
15   were employed at Jim Associates?
16       A.    Sometimes I will park, just
17   that.
18       Q.    Did you ever have a driver's
19   license, New York State driver's license?
20            MR. TURCO:  Note my objection.
21            This is sort of irrelevant.
22            MR. RICHMAN:  I am not going any
23       further.  That is the last question.
24       Q.    Did you ever have a driver's
25   license, New York State driver's license?
```

```
                                      Page 64

 1                 S. Espinoza
 2       A.     In Ecuador.
 3       Q.     But not in New York State;
 4    correct?
 5       A.     No, not from New York.
 6       Q.     Did you file a Workers'
 7    Compensation claim as a result of this
 8    incident?
 9       A.     I don't know exactly what you
10    are referring to.
11       Q.     Do you know what a Workers'
12    Compensation claim is?
13       A.     If you are referring to the
14    Compensation?
15       Q.     Yes.
16       A.     Yes.
17       Q.     Are you represented by an
18    attorney in the Workers' Compensation
19    claim?
20       A.     Yes.
21       Q.     Can you tell me his or her name?
22       A.     I don't remember.
23              MR. RICHMAN:  Will you supply
24       his contact information?
25              MR. TURCO:  I can give you the
```

```
                                      Page 65
 1            S. Espinoza
 2      name now.
 3            By counsel, it's Fogelgaren,
 4      Forman & Bergman.
 5      Q.    Sir, have you ever been in an
 6  auto accident?
 7      A.    No.
 8      Q.    Have you ever been in any
 9  accident other than this incident that
10  took place on June 28, 2019?
11      A.    No.
12      Q.    What is your current height and
13  weight?
14      A.    Approximately five-seven and my
15  weight approximately two hundred ten
16  pounds.
17      Q.    Did you gain or lose any weight
18  since the incident?
19      A.    I gained weight.
20      Q.    How much did you gain?
21      A.    Before this my weight was one
22  hundred sixty-five pounds approximately.
23      Q.    You gained approximately
24  forty-five pounds since the incident?
25      A.    Yes.
```

```
                                    Page 66
 1                  S. Espinoza
 2        Q.    Are you left-handed or
 3   right-handed?
 4        A.    Right-handed.
 5        Q.    Do you wear glasses at all,
 6   prescription glasses or contact lenses?
 7        A.    Only to drive but lately I
 8   haven't been using them at all.
 9        Q.    Are those prescription glasses
10   you need to drive?
11        A.    For the sun.
12        Q.    You mean sunglasses?
13        A.    Yes.
14        Q.    You don't use glasses to see
15   things either close or faraway; right?
16        A.    No, I don't need.
17        Q.    Are you currently employed?
18        A.    No.
19        Q.    When is the last time you were
20   employed?
21        A.    Before the accident.
22        Q.    Since the accident on June 28,
23   2019, to-date, you have never had any
24   employment; is that correct?
25        A.    Yes.
```

Page 67

1                    S. Espinoza

2       Q.      Are you currently enrolled in

3    any school or vocation?

4       A.      English school.

5       Q.      Are you presently attending

6    school to learn English?

7       A.      Yes.

8       Q.      What school, where?

9       A.      It's a school that belongs to

10   the government.  It's close to my house.

11      Q.      Do you know the name of the

12   school?

13      A.      No.

14      Q.      How long have you been attending

15   this school?

16      A.      Approximately two or three

17   weeks.

18      Q.      Are the classes live?

19      A.      Yes.

20      Q.      How long are the classes in a

21   particular day?

22      A.      Six to 8:30 Mondays -- Tuesdays,

23   Wednesdays, and Thursdays.

24      Q.      What hours?

25      A.      Six to 8:30.

Page 68

1          S. Espinoza

2      Q.    When you started working at Jim

3  Associates, did you have an agreement with

4  them as to what your salary would be?

5      A.    He told me that I was going to

6  get paid according to my improvement.

7      Q.    When you started at Jim

8  Associates, how much did you get paid?

9      A.    Somewhere around six hundred.

10     Q.    $600 per week?

11     A.    Yes, something like that.

12     Q.    What were your hours?

13     A.    It wasn't like regular, there

14  were no regular hours.

15     Q.    When you started work at Jim

16  Associates, what were your average number

17  of hours per day or per week?

18     A.    Sometimes I would get there at 6

19  a.m. or 7 a.m. and from there, we will

20  count eight hours.

21     Q.    Eight hours per day?

22     A.    Yes.

23     Q.    You said before that you started

24  in May 2019.

25          Approximately when did you start

```
 1              S. Espinoza
 2    in May?  Was it the beginning of May, the
 3    end of May, something else?
 4        A.     The exact day I don't know.
 5        Q.     For how many weeks did you work
 6    for Jim Associates before the incident
 7    happened?
 8        A.     I usually don't count the time
 9    when I am working.
10              MR. BRIGANTIC:  It was not
11        responsive.
12        Q.     Did you work for Jim Associates
13    about four to six weeks before the
14    incident happened or something else?
15        A.     Yeah, probably it could be
16    something like that.  I don't count the
17    time.  I only count the checks in the
18    weekends.
19        Q.     Did you work for Jim Associates
20    at least four weeks before the incident
21    happened?
22        A.     I don't remember.  I don't know
23    exactly the number of weeks.
24        Q.     Was your paycheck always the
25    same every week?
```

Page 70

1               S. Espinoza

2       A.      Sometimes a little more.

3       Q.      How much is a little more?

4       A.      When I work Saturdays, it will

5   be seven hundred.

6       Q.      If you work more than forty

7   hours, did you receive overtime pay?

8       A.      Well, it was just a little more,

9   like three or four or five more dollars.

10      Q.      Three, four, $5 more per hour?

11      A.      Yes.

12      Q.      Did you file tax returns for

13  2019?

14      A.      I would have to check.

15          MR. RICHMAN:  I think I had

16      called for the production of 2018 tax

17      returns, I am going to call for the

18      production of the 2019 tax returns,

19      and I'll send it in a separate D & I.

20          MR. BRIGANTIC:  I looked back

21      during lunch at my Combined Demands to

22      the plaintiff and I already asked for

23      tax returns and was told the plaintiff

24      didn't have them.

25          MR. TURCO:  Taken under

```
                                          Page 71
 1              S. Espinoza
 2      advisement.  He was not self-employed.
 3      It is our position, you are not
 4      entitled to the tax returns and there
 5      is case law that supports this.
 6              We did, however, provide you
 7      with his Workers' Compensation Board
 8      authorizations and we also provided
 9      you with his employment
10      authorizations, which contains his
11      rate of pay and everything having to
12      do with his lost wage claim.
13              However, if you want to send the
14      request, we will take it under
15      advisement.
16              MR. BRIGANTIC:  What I am
17      saying --
18              MR. RICHMAN:  Bob, Bob, it's my
19      deposition.
20              MR. BRIGANTIC:  I know.
21              MR. RICHMAN:  You can do yours.
22              MR. BRIGANTIC:  All I said was I
23      already sent it.  Go ahead.
24              MR. TURCO:  That's fine.
25      Q.     When you started at Jim
```

```
 1              S. Espinoza
 2    Associates, what was your job position?
 3    Did it have a name to it?
 4         A.    I didn't have like a name or
 5    anything.  I was doing like everything
 6    they asked me to.  I was like a helper.
 7         Q.    You considered yourself while
 8    employed at Jim Associates a helper; is
 9    that correct?
10              MR. TURCO:  Note my objection.
11              Asked and answered.  He said HE
12         did a little bit of everything.
13              MR. RICHMAN:  That is not my
14         question though.
15         A.    Can you repeat the question.
16         Q.    Did you consider yourself a
17    helper as an employee working for Jim
18    Associates?
19         A.    I cannot answer to that.
20         Q.    Did you consider yourself a
21    laborer while you were employed at Jim
22    Associates?
23         A.    I could do like whatever job
24    they asked me to like in general.
25         Q.    Did you consider yourself a
```

```
                                    Page 73
 1              S. Espinoza
 2   carpenter while you were employed at Jim
 3   Associates?
 4              MR. TURCO:  Note my objection.
 5              You can answer.
 6       A.    Yes.
 7       Q.    When you were working at Jim
 8   Associates, did you have a direct
 9   supervisor, a person who told you what to
10   do?
11       A.    No.  They will only indicate me
12   what to do.
13       Q.    Say is again.
14       A.    They will only indicate me what
15   to do.
16       Q.    Can you tell me the name of the
17   person that would tell you what to do?
18       A.    Jorge and sometimes we will work
19   together.
20       Q.    Jorge would tell you what to do
21   when you were working on a particular job
22   site; correct?
23       A.    Yes.
24       Q.    When you were working at Jim
25   Associates before this incident, before
```

```
 1                S. Espinoza
 2   the incident happened --
 3                MR. RICHMAN:  Withdrawn.
 4       Q.    Did you work on numerous job
 5   sites before this incident happened all
 6   while you were employed at Jim Associates?
 7                MR. TURCO:  Objection to form.
 8                You can answer.
 9       A.    Yes.
10       Q.    Tell me how you would get to
11   work, get to a particular job site?
12       A.    I would take the train to the
13   office and then this man would take me to
14   the job site.
15       Q.    You would leave your home and
16   you would take a train to the offices of
17   Jim Associates each morning that you were
18   working; correct?
19       A.    Yes.
20       Q.    Then you would go in a car or a
21   van to the job site with Jorge; correct?
22       A.    In a van.
23       Q.    Would you go with other people
24   that were working at Jim Associates other
25   than you and Jorge?
```

```
                                        Page 75

 1                  S. Espinoza
 2       A.     Most the time I will work with
 3   Jorge.
 4       Q.     Were there job sites that you
 5   were working on with people in addition to
 6   you and Jorge before the incident?
 7       A.     Yes, more people.
 8              MR. BRIGANTIC:  Was there any
 9       answer to whether there were other
10       people that were in the van when he
11       went to work?
12              THE INTERPRETER:  The answer to
13       that was sometimes I would --
14              MR. TURCO:  Sometimes.
15              THE INTERPRETER:  No.  Most of
16       the time I work with Jorge.  That was
17       his answer.
18              MR. BRIGANTIC:  The answer
19       doesn't go with the question.
20       Q.     Sometimes you would be in the
21   van with other people that were employees
22   of Jim Associates; correct?
23              MR. TURCO:  Objection to form.
24              You can answer.
25       A.     I prefer not to answer.
```

```
                                            Page 76
 1                 S. Espinoza
 2        Q.    No, no, no, you have to answer.
 3              MR. TURCO:  If you can rephrase
 4        the question, was there anyone else in
 5        the van.
 6              MR. RICHMAN:  I'll rephrase it.
 7        Q.    When you went to a job site
 8   with Jorge, first of all, all the jobs
 9   sites you went to while you were working
10   at Jim Associates, was Jorge always with
11   you?
12        A.    Most of the jobs sites, yes.
13        Q.    Did you ever go to any job sites
14   alone?
15        A.    Yes.
16        Q.    Did you ever go to job sites
17   with people in addition to Jorge?
18        A.    Yes.
19        Q.    Were those other people
20   employees of Jim Associates?
21        A.    It was a brother and another
22   employee.
23        Q.    It was Jorge's brother?
24        A.    Yes.
25        Q.    Do you know his name?
```

```
                                            Page 77
 1              S. Espinoza
 2      A.    No.
 3      Q.    Do you know the names of any
 4   other employees that you went to any job
 5   sites with before this incident happened?
 6           MR. TURCO:  Note my objection.
 7      A.    No.
 8      Q.    No, you don't know their names
 9   or no, you don't want to tell me their
10   names?
11      A.    I usually don't learn the other
12   people's names.
13           MR. BRIGANTIC:  It's
14      nonresponsive.
15      Q.    Did you know the names of these
16   other people that you went on different
17   job sites at the time that you went on
18   these job sites with these other people
19   other than you and Jorge?
20           MR. TURCO:  Note my objection.
21           Asked and answered.  You can
22      answer again.
23           MR. RICHMAN:  He didn't answer
24      it.
25      A.    I usually don't remember the
```

```
                                        Page 78
 1              S. Espinoza
 2  names.
 3      Q.    Do you remember their names
 4  today; yes or no?
 5              MR. TURCO:  Note my objection.
 6              Nora, are you translating my
 7      objections?
 8              THE INTERPRETER:  Yes, I said
 9      objection but you can answer.
10      A.    No, the only thing I know, one
11  was a brother and the other one was a
12  clerk.
13      Q.    The clerk is the one that went
14  in the van to job sites with you at times?
15      A.    Yes.  I don't understand.
16      Q.    You just said the clerk would go
17  with you and Jorge or go with you
18  sometimes at various job sites.
19              When you said the clerk, what do
20  you mean by a clerk?
21      A.    The name of this person, I don't
22  remember at this moment, maybe later.
23      Q.    Is the name of this person
24  Clerk?
25      A.    No, I don't think so.
```

1            S. Espinoza

2      Q.     What did you mean when you just

3  said clerk, what do you mean by that?

4      A.     Yeah, it's a person that does

5  the checks.

6      Q.     The person that does the checks

7  sometimes went to the job site with you

8  and Jorge?

9      A.     Yes, sometimes.

10     Q.     How many projects, how many job

11 sites, different job sites did you go to

12 before the incident took place on June 28,

13 2019?

14            MR. TURCO:  Objection to form.

15            He can answer.

16     A.     Around three or four job sites.

17     Q.     The first job site that you went

18 to when you started working at Jim

19 Associates, do you recall where that job

20 site was?

21     A.     One was in Brooklyn, the other

22 one in the Bronx, and the other one in

23 Queens or Long Island, somewhere there.

24     Q.     Was the first job in Brooklyn?

25     A.     No.

```
                                            Page 80
 1              S. Espinoza
 2      Q.     Where was the first job?
 3      A.     I think somewhere in Queens.  I
 4  don't remember.
 5              MR. TURCO:  Don't guess.
 6              If you don't know for sure, let
 7      them know you don't know for sure.
 8              THE WITNESS:  Okay.
 9      Q.     You are not sure where the first
10  job site was; correct?
11      A.     I don't know.
12      Q.     Do you recall what work was
13  being done at that job site, the first job
14  site you did while working at Jim
15  Associates?
16      A.     They were building bathrooms,
17  they were building apartments, working in
18  the bathrooms.
19      Q.     What did you do at that first
20  job site?
21      A.     Sheetrock, plywood on the
22  ground, and prepare the walls.
23      Q.     Who supervised your work on that
24  first project?
25      A.     There is another person there.
```

```
                                                Page 81
 1                    S. Espinoza
 2        Q.     What is his or her name?
 3        A.     I don't remember the name.
 4        Q.     Was Jorge there on that first
 5   job?
 6        A.     Yes, he will get there to the
 7   job site.
 8        Q.     Did he tell you what to do at
 9   the job site, Jorge?
10        A.     Yes.
11        Q.     When you were first started
12   working at Jim Associates, were you given
13   any safety equipment?
14        A.     What kind of safety?
15        Q.     You tell me.
16               MR. TURCO:  Note my objection.
17               If you want to break it down.
18        Q.     Did Jim Associates provide you
19   with any safety goggles?
20        A.     One moment, let me remember.
21               MR. TURCO:  Do you need to
22        stand?  Your back?
23               MR. RICHMAN:  He said helmet.
24        A.     Goggles and a hardhat.
25        Q.     Goggles and a hardhat.  Anything
```

Page 82

1                S. Espinoza

2    else?

3         A.    Gloves.  That is all.

4         Q.    Did you use your safety goggles,

5    hardhat, and gloves on the first job site

6    while you were working at Jim Associates?

7         A.    Yes.

8         Q.    Did you wear then all the time

9    that you were working?

10        A.    Most time I would use gloves and

11   a hardhat.

12        Q.    What about safety goggles?

13        A.    Only when I was going to cut

14   wood or some metal.

15        Q.    Do you remember where the second

16   job site was while you were working at Jim

17   Associates?

18        A.    It was in Brooklyn.  It was a

19   demolition.

20        Q.    What did you do at that job

21   site?

22        A.    Demolish a wall and also the

23   roofs.

24        Q.    Were you wearing safety

25   equipment during that project?

Page 83

1              S. Espinoza

2      A.     Yes.

3              MR. TURCO:  Hold on.  I got to

4      take this, my wife.

5              There is no, there is no

6      question pending; right?

7              MR. RICHMAN:  No.

8              [A pause in the proceedings.]

9              MR. RICHMAN:  Please read back

10     the last question and answer.

11             [The requested portion of the

12     record was read.]

13     Q.     Describe the safety equipment

14   that you had or were wearing or using?

15     A.     Hardhat and gloves.

16     Q.     Did Jim ever provide you with a

17   safety harness on any projects that you

18   worked on?

19     A.     I don't remember.

20     Q.     What was the third job site that

21   you were working on for Jim Associates?

22             MR. TURCO:  Prior to the subject

23     site?

24             MR. RICHMAN:  Yes.

25     A.     I think it was a house in

```
                                    Page 84
 1              S. Espinoza
 2  Brooklyn.  We went to paint something.  I
 3  don't know exactly.
 4      Q.    What did you do there?
 5      A.    We painted the apartment.
 6      Q.    Was there a fourth job site
 7  before the incident happened or was that
 8  when the incident happened, the fourth job
 9  site?
10      A.    Let me remember.  I think it was
11  a house that we were paint something
12  there.  I think it was in Queens or Long
13  Island, somewhere there.
14      Q.    What did you do, painting?
15      A.    We wash the ground and then we
16  paint the outside or the house.
17      Q.    What was the next job site,
18  which would be the fifth job site, where
19  was that?
20      A.    The accident would be.
21          MR. TURCO:  Counsel for Davs
22      Partners has to attend a Court
23      Conference at 4:30.  He requested that
24      the deposition end today now.
25          We consent to the ending of the
```

Page 85

```
 1              S. Espinoza
 2     deposition at this time.  However, we
 3     are going to produce my client for one
 4     more day of deposition, as the day is
 5     probably four hours of actual
 6     testimony, to the extent that counsel
 7     for Davs Partners and Kalnitech have
 8     to expedite their question asking so
 9     we do not have to produce our client
10     again for a third time.
11          MR. BRIGANTIC:  I am not
12     consenting to have my questioning
13     limited by someone else's duration.
14     I'll follow up and I am not going to
15     redo stuff but I am not going to agree
16     that I can't question somebody if the
17     whole time is exceeded.
18          MR. TURCO:  No one is telling
19     you are not allowed to question him.
20     I think we can expedite it.  Today was
21     choppy.  I think Keith would agree we
22     can get through liability and damages
23     in one more full day.
24          MR. RICHMAN:  I don't see why
25     not.
```

Page 86

```
 1              S. Espinoza
 2          MR. BRIGANTIC:  Me neither if we
 3      start early.
 4          MR. TURCO:  We will have our
 5      respective offices coordinate the next
 6      date.
 7              [TIME NOTED:  4:17 p.m.
 8
 9          _____
10          STALIN RODRIGO REYES ESPINOZA
11
12
13      _____
14
15      Subscribed and sworn to
16
17      before me this _____
18
19      day of _____ 2021.
20
21      _____
22          Notary Public
23
24
25
```

Page 87

1

2                      **I N D E X**

3

4

5    **WITNESS        EXAMINATION BY        PAGE**

6

    **S. Espinoza        Mr. Richman        5**

7

8

                         **INSERTIONS**

9

             **Page                    Line**

10

                 **27**                    **12**

11

                 **34**                    **13**

12

13                       **REQUESTS**

14           **Page                    Line**

15              **28**                    **3**

16              **61**                    **25**

17              **70**                    **15**

18

                         **RULINGS**

19

                 **32**                    **21**

20

                 **33**                     **7**

21

22

23

24

25

Responses Bates Stamp No 231

Page 88

1

2                    CERTIFICATION

3

4        I, Carol Ellinghaus, a Notary Public

5    for and within the State of New York, do

6    hereby certify:

7        That the witness whose testimony as

8    herein set forth, was duly sworn by me;

9    and that the within transcript is a true

10   record of the testimony given by said

11   witness.

12       I further certify that I am not

13   related to any of the parties to this

14   action by blood or marriage, and that I am

15   in no way interested in the outcome of

16   this matter.

17       IN WITNESS WHEREOF, I have hereunto

18   set my hand this 30th day of November,

19   2021.

20

21                *Carol Ellinghaus*

22             CAROL ELLINGHAUS

23

24              *       *       *

25

Page 89

1
2                              ERRATA SHEET
                   VERITEXT/NEW YORK REPORTING, LLC
3
       CASE NAME:   ESPINOZA V. DAVS PARTNERS
4      DATE OF DEPOSITION:   11/17/21
       WITNESS' NAME:   STALIN ESPINOZA
5      PAGE/LINE[S]/      CHANGE        REASON
       ----/-------/------------------/-------
6      ----/-------/------------------/-------
       ----/-------/------------------/-------
7      ----/-------/------------------/-------
       ----/-------/------------------/-------
8      ----/-------/------------------/-------
       ----/-------/------------------/-------
9      ----/-------/------------------/-------
       ----/-------/------------------/-------
10     ----/-------/------------------/-------
       ----/-------/------------------/-------
11     ----/-------/------------------/-------
       ----/-------/------------------/-------
12     ----/-------/------------------/-------
       ----/-------/------------------/-------
13     ----/-------/------------------/-------
       ----/-------/------------------/-------
14     ----/-------/------------------/-------
       ----/-------/------------------/-------
15     ----/-------/------------------/-------
       ----/-------/------------------/-------
16     ----/-------/------------------/-------
       ----/-------/------------------/-------
17     ----/-------/------------------/-------
       ----/-------/------------------/-------
18     ----/-------/------------------/-------
       ----/-------/------------------/-------
19     ----/-------/------------------/-------
20                 --------------------------
                   STALIN RODRIGO REYES ESPINOZA
21     SUBSCRIBED AND SWORN TO
       BEFORE ME THIS_____DAY
22     OF_____, 2021.
23     _____
             NOTARY PUBLIC
24
       MY COMMISSION EXPIRES_____
25

| & | | |
|---|---|---|

**&**   2:3,7 62:3 65:4
70:19

**0**

**00/00/0000**   30:16

**1**

**10**   7:2
**100**   2:4
**10039**   2:4
**10158**   2:14
**11/17/21**   89:4
**11204**   14:19
**11530**   2:9
**12**   87:10
**12:11**   1:13
**13**   87:11
**15**   87:17
**151**   14:18 17:7
**17**   1:12
**1900**   2:4

**2**

**2018**   18:25 20:5
22:21 25:24 26:4
27:25 53:8,17
70:16
**2019**   12:2 46:16,22
47:8,22 48:8
51:21 53:3,3,4
55:7 56:13 57:2
58:7,25 65:10
66:23 68:24 70:13
70:18 79:13
**2021**   1:12 7:2,4
86:19 88:19 89:22
**21**   87:19
**221**   3:7
**25**   87:16
**27**   87:10
**28**   7:4 46:16,22
47:8,21 48:8

51:21 56:13 57:2
65:10 66:22 79:12
87:15
**2:15**   45:7
**2:30**   42:12 45:6,9
45:11 57:10
**2:45**   45:13

**3**

**3**   41:2 87:15
**30**   20:5 62:6
**30th**   18:25 88:18
**3116**   3:25
**32**   87:19
**33**   87:20
**34**   87:11
**3841**   88:21
**3:30**   8:4,11
**3rd**   2:13

**4**

**4**   22:21 26:4 53:8
53:17
**4:17**   86:7
**4:20**   57:20
**4:30**   84:23
**4th**   22:19

**5**

**5**   70:10 87:6

**6**

**6**   68:18
**600**   23:21 68:10
**605**   2:13
**61**   87:16
**666**   2:8

**7**

**7**   68:19 87:20
**70**   87:17

**8**

**8:30**   67:22,25

**9**

**9th**   2:13

**a**

**a.m.**   68:19,19
**a.s.k.**   5:13,19,20
5:23 9:11,17,20,23
**ability**   5:20 14:6
**able**   7:15 8:6 45:5
46:2
**absolutely**   13:23
**abuse**   26:18,19
27:3
**abused**   28:8 53:22
**acceptable**   16:6
**accident**   6:18 65:6
65:9 66:21,22
84:20
**accurate**   28:25
**action**   1:17 3:17
88:14
**actual**   85:5
**addition**   3:12
12:14 75:5 76:17
**additional**   52:16
52:17
**address**   17:6
62:25 63:2
**adequately**   9:4
**adjourned**   6:13
**adjournments**
12:15
**advised**   12:16
**advisement**   28:7
71:2,15
**afternoon**   8:4,4,11
10:25 15:4
**ago**   20:22 49:21

**agree**   6:5 16:7
85:15,21
**agreed**   13:13
**agreeing**   7:11
**agreement**   68:3
**ahead**   40:4 47:5
48:12 71:23
**allow**   41:7
**allowed**   85:19
**aluminum**   46:24
**answer**   16:10,21
18:16 32:24 33:4
33:10,16 45:18
48:11 49:4,7,9
53:12 60:6 72:19
73:5 74:8 75:9,12
75:17,18,24,25
76:2 77:22,23
78:9 79:15 83:10
**answered**   54:18
72:11 77:21
**answers**   16:5,19
**apartment**   14:18
17:7,12,13,14 18:6
20:15 84:5
**apartments**   80:17
**apparel**   40:17
**apparently**   5:22
**appearances**   2:2
**appropriate**   10:13
11:5
**approved**   35:5,6
35:10
**approximate**
49:17,22
**approximately**
17:10 20:25 26:6
27:14 32:12 53:2
53:3,10,20 58:23
65:14,15,22,23
67:16 68:25

**approximations** 16:19
**april** 53:2,3,4
**area** 51:17 54:2,6 54:9 55:2
**arranged** 22:6
**arrive** 20:13
**arrived** 18:2,3 20:10,16 21:14 22:4,8,18
**aruga** 41:24
**asked** 8:16 9:25 16:18 60:24 61:2 70:22 72:6,11,24 77:21
**asking** 16:2 24:3 27:6 39:12 49:8 54:16 85:8
**asks** 16:9
**associates** 2:3 9:15 58:19,22 59:5,17 59:24 60:3 61:8 62:17 63:15 68:3 68:8,16 69:6,12,19 72:2,8,18,22 73:3 73:8,25 74:6,17,24 75:22 76:10,20 79:19 80:15 81:12 81:18 82:6,17 83:21
**assuming** 14:24
**attempt** 8:20
**attempting** 7:19
**attend** 36:15,21 37:6 52:20,24 62:21 84:22
**attended** 37:20 52:12,23
**attending** 36:9 37:10,15 67:5,14

**attorney** 4:7 6:22 6:23 15:5 64:18
**attorneys** 2:3,7,12 3:4
**audio** 41:18
**authority** 8:17
**authorizations** 6:16 11:25 71:8 71:10
**auto** 65:6
**avenue** 2:13 14:18 17:7 20:25
**average** 68:16
**aware** 52:5

**b**

**b3** 14:18 17:7
**back** 13:14 14:21 14:22 15:13 18:12 18:15 21:8 45:17 47:18 51:14,16 53:6 70:20 81:22 83:9
**bag** 46:3
**bankruptcy** 52:3
**bar** 3:15
**based** 5:17
**bathrooms** 80:16 80:18
**beginning** 60:7 69:2
**begun** 3:21
**behalf** 5:13
**belongs** 67:9
**bergman** 65:4
**best** 14:6
**better** 30:10
**biforate** 8:21
**birth** 30:11,13
**bit** 72:12
**blood** 88:14

**board** 57:18 71:7
**bob** 71:18,18
**boots** 39:9
**born** 30:6,17
**break** 57:15,20 60:10 81:17
**brigantic** 2:15 7:10 11:9,14 13:11,23 14:20 18:8,11 19:12 25:17,21 69:10 70:20 71:16,20,22 75:8,18 77:13 85:11 86:2
**brigantic's** 11:7
**bring** 5:18,21 13:14 46:3
**bronx** 79:22
**brooklyn** 14:19 17:8 79:21,24 82:18 84:2
**brother** 17:20,25 20:11,13,14,16,19 20:20 21:12,13,19 21:22 76:21,23 78:11
**brother's** 17:22
**brothers** 17:16
**brought** 14:21,22
**building** 17:12,14 44:21 80:16,17
**burseio** 18:13
**buttocks** 51:17

**c**

**c** 59:21
**c.p.l.r.** 3:6,25
**call** 7:12 11:10 18:9,12,14 70:17
**called** 70:16
**car** 63:12 74:20

**card** 61:24
**care** 50:10
**carol** 1:18 30:14 88:4,22
**carpenter** 73:2
**carry** 42:19
**case** 5:25 9:7 32:25 33:12,14 71:5 89:3
**cash** 25:11
**certificate** 61:20 61:23
**certification** 88:2
**certify** 88:6,12
**change** 89:5
**charge** 4:8
**check** 25:12,13 70:14
**checks** 69:17 79:5 79:6
**child** 43:25
**children** 29:4
**choppy** 85:21
**citizen** 32:18,22
**city** 2:9
**claim** 25:18 53:21 64:7,12,19 71:12
**claiming** 51:20
**clarification** 36:3
**clarify** 17:18
**clarity** 45:22
**class** 35:15 61:6
**classes** 52:14,17 52:19,21,24,25 60:11,15,18 61:14 61:17,19,21 62:5 62:12,22 63:3,6,8 67:18,20
**cleaning** 44:10
**clerk** 7:18 18:12 78:12,13,16,19,20

Responses Bates Stamp No 235

[clerk - deposition]                                                                    Page 3

78:24 79:3
**client** 6:6 7:9 9:12
  10:3 12:20 13:2
  15:6 29:14 85:3,9
**client's** 6:11,13
  12:15 13:4
**close** 22:19 66:15
  67:10
**columns** 55:23
  58:5
**combined** 7:3
  70:21
**come** 19:3,9,17,20
  19:25 20:6,9,19,20
  38:11 45:6,6,13
**commenced** 46:19
**commission** 89:24
**companies** 25:8
**company** 1:8 2:13
  23:5,8,9 25:3 26:3
  26:16,17 27:15
  41:13,16 55:10
  56:2 58:17,17
**compelled** 10:6
**compensation**
  64:7,12,14,18 71:7
**complaint** 28:9
**completed** 10:22
  61:21
**compliance** 8:8,13
  11:21 12:4
**complied** 6:15,19
  7:7
**concrete** 46:7
**conduct** 3:8
**confer** 5:9
**conference** 8:13
  11:19,22 18:14
  84:23
**confused** 37:18

**connection** 27:13
  38:16,23 44:20,23
  45:24 46:10 47:25
  56:9,12,13,19 59:5
  59:9,17
**consent** 84:25
**consenting** 85:12
**consider** 5:16
  72:16,20,25
**considered** 6:3
  72:7
**construction** 1:8
  2:13 21:25 22:15
  22:24 24:8 32:8,9
  32:14 44:5,8,24
  47:25 48:14,23
  53:9 54:3,7,9,19
  54:23 55:2
**contact** 64:24 66:6
**contains** 71:10
**continuation** 5:11
**continue** 13:8
**contract** 39:20
  43:3
**controlled** 4:2
**convene** 57:19
**convenient** 6:10
**conversation** 5:3
**conversations**
  59:12
**convicted** 51:23
**coordinate** 86:5
**copies** 12:7 25:14
  25:23
**copy** 4:5 13:21
  28:4
**corners** 44:11
**correct** 10:20 15:9
  18:21 21:15,19
  29:2 30:6 32:2
  35:23 36:19,22,23

37:9,13 38:9
  47:14 49:14 53:22
  58:8 61:14 62:19
  64:4 66:24 72:9
  73:22 74:18,21
  75:22 80:10
**counsel** 1:21 3:23
  5:4,4,9,15,16 6:9
  11:11 65:3 84:21
  85:6
**counselor** 13:22
**count** 68:20 69:8
  69:16,17
**countries** 36:4
**country** 2:8
**county** 1:3
**course** 34:20
**courses** 27:17,19
  38:24
**court** 1:2 6:9,19
  6:24 7:7,13 12:10
  12:25 13:20 16:12
  18:9 84:22
**courtesy** 12:6,12
  12:13,19 13:7
**cplr** 8:14,22
**crime** 51:24
**current** 17:6 52:9
  65:12
**currently** 32:17,21
  33:7,21,25 50:14
  66:17 67:2
**cut** 82:13

**d**

**d** 14:2,2,8 62:3
  70:19 87:2
**d&i** 28:5
**daily** 24:5
**damages** 5:12 6:8
  6:11 13:14 85:22

**daniel** 2:16
**danny** 15:12 29:12
  29:15 35:9 38:20
  42:8,11 54:5,21
  57:9
**date** 6:10,19,20
  9:19,22,23 13:6
  18:23 30:11,13
  62:13,16 66:23
  86:6 89:4
**daughter** 29:5,6,8
  29:21 30:5,6,20
  31:4,20,22
**daughter's** 30:5
**davs** 1:8 2:8 6:23
  9:5 15:6,7 84:21
  85:7 89:3
**day** 13:9 18:3
  67:21 68:17,21
  69:4 85:4,4,23
  86:19 88:18 89:21
**days** 24:6
**deemed** 3:24
**default** 10:19
**defendant** 2:7,12
  5:19 15:8 52:10
**defendants** 1:9
  6:15 7:3 14:23
**definition** 42:3
**deliveries** 42:10
**demand** 8:15
**demands** 7:4
  70:21
**demolish** 82:22
**demolition** 82:19
**depose** 9:4
**deposed** 14:23
**deposition** 3:18,23
  4:4 5:7,12 6:7,11
  6:13,20 7:12,17
  8:15,21 9:16,19

Responses Bates Stamp No 236

Case 1:22-cv-01473-KAM-PK　Document 53-13　Filed 05/30/23　Page 243 of 254 PageID #: 954

10:7 12:16 13:4
　13:13 71:19 84:24
　85:2,4 89:4
**depositions** 3:8
　13:2,7
**describe** 24:11
　39:2 44:17 51:15
　55:16 83:13
**described** 51:20
**describing** 40:15
　40:16
**despite** 6:24 12:24
**different** 35:25
　36:4 77:16 79:11
**difficulty** 41:18
**digits** 34:6
**direct** 33:3 73:8
**directed** 7:2
**directing** 40:22
**directly** 12:8,18
**discovery** 6:22
　10:20,22 12:4
**discussion** 34:15
　42:15 45:15
**divorced** 28:18
**doctor** 51:5,7
**documents** 5:14
　8:3,10 9:3,9,17,21
　9:25 10:4,12,15,15
　10:17,25 12:10
**doing** 8:17 11:2,3
　31:7,9 72:5
**dollars** 70:9
**dominican** 36:4
**drive** 63:12,14
　66:7,10
**driver's** 63:10,18
　63:19,24,25
**duly** 14:3,11 88:8
**duration** 85:13

**duties** 44:24 45:24

### e

**e** 14:2,2,8,8,9 31:2
　57:24,24 87:2
**earlier** 53:6,15
**early** 86:3
**economy** 37:7
**ecuador** 18:4,20
　28:13,25 29:9,20
　30:7,9,18,20 31:4
　31:20,25 32:10,15
　35:18 36:5,8,11
　37:4 38:4 48:2,15
　48:25 49:13,18
　50:5 64:2
**education** 34:18
　52:18
**eight** 24:5 68:20
　68:21
**eighteen** 38:2
**either** 6:22 66:15
**electric** 5:13,19,21
　5:24 9:11,18,21,24
**eleventh** 35:22
**ellinghaus** 1:19
　88:4,22
**else's** 85:13
**employed** 20:2
　21:22 22:17,25
　23:3 31:5 37:11
　49:13 50:6 60:14
　63:15 66:17,20
　71:2 72:8,21 73:2
　74:6
**employee** 72:17
　76:22
**employees** 75:21
　76:20 77:4
**employer** 9:14
　10:16

**employers** 61:13
**employment** 22:5
　22:6,23 23:14,17
　27:14 31:25 32:4
　38:3 39:19 48:22
　53:7 61:12 66:24
　71:9
**engaged** 43:16,18
**english** 14:5,6 16:2
　67:4,6
**enrolled** 67:2
**entered** 57:12
**entirety** 13:4
**entitled** 1:17 33:16
　71:4
**equipment** 40:17
　44:15 56:9 81:13
　82:25 83:13
**equivalent** 34:21
**errata** 89:2
**espinoza** 1:5,16
　14:1,16 15:1 16:1
　17:1,2,23 18:1
　19:1 20:1 21:1
　22:1 23:1 24:1
　25:1 26:1 27:1
　28:1 29:1 30:1
　31:1 32:1 33:1
　34:1 35:1 36:1
　37:1 38:1 39:1
　40:1 41:1 42:1
　43:1 44:1 45:1
　46:1 47:1 48:1
　49:1 50:1 51:1
　52:1 53:1 54:1
　55:1 56:1 57:1
　58:1 59:1 60:1
　61:1 62:1 63:1
　64:1 65:1 66:1
　67:1 68:1 69:1
　70:1 71:1 72:1

73:1 74:1 75:1
　76:1 77:1 78:1
　79:1 80:1 81:1
　82:1 83:1 84:1
　85:1 86:1,10 87:6
　89:3,4,20
**esq** 2:5,10,15
**establishing** 5:10
**estimate** 49:9
**euclides** 17:23
**exact** 23:4 69:4
**exactly** 21:2 23:7
　23:24 24:11 26:5
　28:22 32:11 38:12
　42:18 49:19 60:9
　62:14 63:2 64:9
　69:23 84:3
**examination** 1:15
　3:11,14,21 4:6
　14:13 87:5
**examined** 3:19 4:7
　14:12
**exceeded** 85:17
**exception** 52:8
**exchange** 12:11
**excuse** 40:8
**exist** 8:18
**existed** 48:5
**existing** 10:10
**expedite** 85:8,20
**expires** 89:24
**explain** 7:20
**extent** 85:6

### f

**f** 57:24
**fact** 7:24 10:21
**failure** 3:12,22
**fall** 46:11
**family** 37:5 50:10
**far** 10:14 59:23

Responses Bates Stamp No 237

**faraway** 66:15
**farming** 42:6
**fast** 43:8,15 44:4
**father** 37:22
**feet** 51:18
**fiberglass** 46:25
**fifth** 84:18
**file** 27:24 28:9 64:6 70:12
**filed** 52:2
**filing** 4:3
**final** 11:24
**finalized** 35:19
**finances** 37:8
**find** 49:3
**fine** 71:24
**finish** 35:21 36:17 36:25
**finished** 34:19 35:18
**first** 14:3,10 15:17 19:8,16,24 20:23 21:4,17,21 22:4,16 22:23 23:17 35:15 35:15 36:6,9,11,15 36:25 37:10,15,19 37:24 38:3 48:6 53:7,16 54:17 59:16 76:8 79:17 79:24 80:2,9,13,19 80:24 81:4,11 82:5
**five** 24:7 65:14,22 65:24 70:9
**flashlight** 39:9
**floor** 2:13
**floors** 40:5
**fogelgaren** 65:3
**follow** 85:14
**following** 35:14 57:22

**follows** 14:7,12
**food** 24:19 41:19 42:13 43:8,15 44:4
**foreman** 24:18 26:21 27:2
**form** 3:10 29:18 74:7 75:23 79:14
**forman** 65:4
**forth** 88:8
**forty** 23:25 65:24 70:6
**forward** 7:11,22 8:23 10:7 13:16 13:19
**forwarded** 12:6
**found** 21:11
**four** 12:14 30:3 34:6,8 50:18 69:13,20 70:9,10 79:16 85:5
**fourth** 36:7,10 84:6,8
**frame** 46:4 47:8 47:17,24
**friend** 59:3
**fuel** 42:19
**full** 12:3 16:25 31:13 85:23
**furnished** 4:6
**further** 4:5 12:13 20:22 63:23 88:12
**future** 30:10

**g**

**g** 14:8
**gain** 65:17,20
**gained** 65:19,23
**garden** 2:9
**gc** 10:9
**gear** 39:13

**general** 72:24
**gentleman** 58:15 58:16
**gestures** 16:13
**getting** 59:6,9,13 59:17
**give** 5:20 16:4,19 49:22 64:25
**given** 81:12 88:10
**glasses** 66:5,6,9,14
**gloves** 39:4,8 44:18 56:10 82:3 82:5,10 83:15
**go** 7:11 8:23 10:6 23:11 24:18 36:18 38:11 40:4 46:2 47:5 48:12 53:6 55:18 57:19 71:23 74:20,23 75:19 76:13,16 78:16,17 79:11
**goggles** 39:3 40:12 56:10 81:19,24,25 82:4,12
**going** 7:22 13:16 15:25 16:4 28:3 33:3 37:24 38:4 40:2 42:4 57:14 57:18 61:25 63:22 68:5 70:17 82:13 85:3,14,15
**gold** 38:18,19,22
**good** 15:4
**gorayeb** 2:3
**government** 67:10
**grade** 34:19,22 35:12,14,14,18,19 35:22 36:10
**grades** 36:7
**graduate** 35:3

**graduated** 35:12 35:20
**grease** 42:20
**great** 49:9
**green** 47:3 48:7
**grill** 31:11,12,12
**grilling** 31:21,25
**ground** 56:16 80:22 84:15
**guards** 41:5
**guess** 16:18 80:5
**guiding** 40:23

**h**

**half** 29:7 43:10 57:14
**hand** 16:13 34:9 88:18
**handed** 66:2,3,4
**happened** 69:7,14 69:21 74:2,5 77:5 84:7,8
**hardhat** 81:24,25 82:5,11 83:15
**harness** 40:11,24 41:4,9 83:17
**head** 16:14
**hear** 7:15 29:15 39:6 54:22
**heard** 60:8
**hearing** 40:21
**hears** 29:14
**height** 65:12
**held** 1:17 34:15 42:15 45:15
**helmet** 39:3,8 40:13 44:18 81:23
**helper** 41:21,22 42:17 43:6,15 72:6,8,17
**helping** 24:18

Responses Bates Stamp No 238

**hereto**  3:5
**hereunto**  88:17
**high**  34:24 35:3,15
  35:20 36:5,7,8,10
  36:12,12,13,16,19
  36:22,25 37:4,6,10
  37:15,20,24 38:5
  56:17
**higher**  52:18
**highest**  34:17
**hold**  55:23 83:3
**home**  57:7 74:15
**hour**  57:14 70:10
**hours**  23:23,25
  24:5 50:18 61:19
  62:5,12 63:7
  67:24 68:12,14,17
  68:20,21 70:7
  85:5
**house**  17:13 67:10
  83:25 84:11,16
**hundred**  8:3 23:20
  65:15,22 68:9
  70:5
**hydroelectric**
  39:23 40:18,23

**i**

**idea**  22:3 34:23
  48:4
**immigration**
  32:25 33:11
**improvement**  68:6
**inaccurate**  12:5,25
**inadequacies**  11:8
**inappropriate**
  11:11
**incident**  46:10,15
  46:21 47:8,21
  51:21 56:12,25
  64:8 65:9,18,24
  69:6,14,20 73:25

74:2,5 75:6 77:5
  79:12 84:7,8
**including**  3:8
**indicate**  9:8 73:11
  73:14
**indicating**  25:7
  55:20,21
**individual**  23:6
**individuals**  25:8
**industry**  42:6
**information**  64:24
**injured**  39:15
**insert**  27:11 34:12
**insertions**  87:8
**installing**  55:23
**insult**  11:9
**interest**  9:10 10:9
**interested**  88:15
**interior**  55:24
  58:5 61:11 62:19
**interpret**  16:3
**interpreted**  14:4
  54:22
**interpreter**  2:16
  2:17 14:3 15:19
  16:3,9,11 17:17
  24:3 27:18 30:22
  31:2 35:10 38:8
  38:21 39:5 40:2
  40:20 41:17,25
  45:4,5,10 48:10
  51:12 54:11,18,25
  57:12 60:4 62:9
  75:12,15 78:8
**interruption**  18:7
**intervention**  7:13
  7:21
**interview**  59:4
**involved**  46:15
  47:7 56:25

**involving**  46:11
**irrelevant**  63:21
**island**  79:23 84:13
**issue**  5:8 7:20
  12:21
**issues**  6:2 8:16
**itemize**  24:14
**items**  40:6

**j**

**january**  55:6,7
  58:7
**jared**  2:5
**jeopardize**  33:2,14
**jessica**  43:21,22
  50:13
**jim**  5:22 9:14
  58:18,22 59:5,17
  59:24 60:3 61:8
  62:17 63:15 68:2
  68:7,15 69:6,12,19
  71:25 72:8,17,21
  73:2,7,24 74:6,17
  74:24 75:22 76:10
  76:20 79:18 80:14
  81:12,18 82:6,16
  83:16,21
**job**  38:23 39:16,21
  41:20 42:21,25
  43:4,14 44:3,6,20
  45:2 48:2,14,16,19
  48:23 53:16,24,25
  54:16,17 55:3,6,11
  55:13 56:9,14,19
  57:5 58:3,11,14
  59:2,6,10,13,15,18
  60:25 61:5,8,9,10
  62:18 72:2,23
  73:21 74:4,11,14
  74:21 75:4 76:7
  76:13,16 77:4,17
  77:18 78:14,18

79:7,10,11,16,17
  79:19,24 80:2,10
  80:13,13,20 81:5,7
  81:9 82:5,16,20
  83:20 84:6,8,17,18
**jobs**  31:18 56:16
  58:13 76:8,12
**jorge**  59:19,23
  73:18,20 74:21,25
  75:3,6,16 76:8,10
  76:17 77:19 78:17
  79:8 81:4,9
**jorge's**  76:23
**judge**  7:14,18,19
**judgments**  52:5
**judicial**  7:13,21
**july**  18:25 20:5
**june**  46:16,22 47:8
  47:21 48:7 51:21
  56:13 57:2 65:10
  66:22 79:12

**k**

**kalnitech**  1:8 2:13
  5:4 6:24 9:13 85:7
**kalnitech's**  5:15
**keith**  14:25 15:5
  85:21
**keth**  2:10
**kind**  22:13 23:7
  24:8,12 40:24
  41:22 44:8 51:2
  56:18,21 81:14
**kings**  1:3
**kitchen**  43:6
**know**  15:22 16:21
  16:22 17:21 22:12
  23:4,7,9,12,24
  24:2,25 25:4
  32:11 33:15,16
  34:22,24 38:12
  41:25 46:8 55:4

56:5 57:9 59:22
59:24,25 60:2,7,9
62:24,25 63:2
64:9,11 67:11
69:4,22 71:20
76:25 77:3,8,15
78:10 80:6,7,7,11
84:3
**known** 17:3

**l**

**l** 14:2,8 31:2
**labor** 9:7
**laborer** 24:10,12
25:3 53:9 72:21
**ladder** 44:19,22
45:23,25 46:4,5,8
46:12,22,24 47:3,7
47:9,11,21,25 48:5
48:7 56:18,21,25
**ladders** 56:11
**landicino** 7:14,19
**landicino's** 7:18
**lantern** 39:8
**late** 10:25
**lately** 66:7
**law** 2:12 7:18 9:7
18:12 71:5
**lawsuit** 15:8 46:11
46:19 52:9,10
**learn** 67:6 77:11
**leave** 26:22,24
27:7,9 34:10
42:12 43:14 57:9
74:15
**leaving** 43:11
**left** 26:16,17 30:8
31:24 39:18 41:15
42:24 48:16 49:12
49:14,18 50:4
51:14 53:20 57:4
58:10 61:9,10

66:2
**legally** 28:20
**legs** 51:17
**lenses** 66:6
**lenta** 30:24,25
**level** 34:17
**levine** 2:7
**liability** 5:8 12:22
13:12,15 85:22
**license** 63:10,19
63:19,25,25
**liens** 52:6
**limit** 8:20
**limited** 39:20 43:3
85:13
**line** 87:9,14 89:5
**listen** 49:10
**litigation** 6:2 9:11
**little** 70:2,3,8
72:12
**live** 17:15 20:24
21:3,12 28:23
29:8,10 63:3
67:18
**lived** 17:9 31:22
**lives** 20:17
**living** 17:24 18:5
18:20 20:14 21:16
28:13,14 29:20,21
30:4,19,21 31:4,20
32:15 37:16,20
48:25 50:11 58:4
**llc** 1:8 2:8 15:6,7
89:2
**located** 23:10
**long** 17:9,24 24:23
26:2,6 29:24 32:4
32:9,12 38:10
41:12 42:21 43:9
44:6 49:16,21
55:12 67:14,20

79:23 84:12
**look** 22:10,13
**looked** 22:8 70:20
**looking** 38:18
59:15 61:5,12
**looks** 47:13
**lose** 65:17
**lost** 25:18 71:12
**louder** 24:4
**lower** 51:14,16
**lunch** 42:13 57:15
58:2 60:10 70:21
**luncheon** 57:21

**m**

**m** 41:2 59:21
**majority** 56:15
**making** 11:16
**man** 74:13
**manuel** 17:23
**maribel** 43:21
50:13
**mark** 33:5,18,19
**marriage** 88:14
**married** 28:16,20
28:22,25 29:3
**marry** 43:22
**masks** 39:9
**material** 41:10
44:13
**matter** 88:16
**mean** 24:15 52:14
52:22 55:17 66:12
78:20 79:2,3
**means** 42:2,3
55:17
**medical** 6:16
11:25 12:7,13,17
**medication** 50:15
50:17,21
**meeting** 57:13

**metal** 55:23 82:14
**metals** 54:2,6,8,20
54:23 55:13,17,18
58:5 61:11 62:19
**michael** 2:12
**mining** 38:6,7,8,10
38:17,19,21 39:13
**misrepresentatio...**
11:17
**missed** 40:14
**mix** 44:10
**moment** 63:13
78:22 81:20
**mondays** 67:22
**money** 23:13 37:3
37:5,12
**month** 26:8 31:23
58:22
**months** 26:10,12
26:14 27:14 32:6
38:14 42:23 44:7
45:3 48:2,15,21,24
49:20 53:10,20
55:14 58:8
**morning** 74:17
**moscoso** 59:20
**mother** 29:10,22
29:25 30:2,5
37:22
**motion** 3:15
**move** 3:10,13
13:18
**moved** 18:23
21:18
**mutually** 6:10

**n**

**n** 14:2,8,9 31:2
57:24,24,24 87:2
**name** 14:15 15:4
16:25 17:22 23:4
26:20,24,25 27:8

[name - plaintiff]                                                      Page 8

30:24 43:17,20
51:3,7 55:9 56:5
59:19,20,22 64:21
65:2 67:11 72:3,4
73:16 76:25 78:21
78:23 81:2,3 89:3
89:4
**names**  11:10 17:4
24:25 25:7 77:3,8
77:10,12,15 78:2,3
**need**  9:3 18:8
25:23 29:12,16
66:10,16 81:21
**needed**  37:11
**neither**  86:2
**never**  66:23
**new**  1:2,20 2:4,4,9
2:14,14 14:19
17:8 63:19,25
64:3,5 88:5 89:2
**ninth**  35:6,7,11,12
35:14,18,19
**nods**  16:13
**nonresponsive**
77:14
**nora**  2:17 57:11
78:6
**notary**  1:19 3:19
3:20 14:4,11
86:22 88:4 89:23
**note**  32:19,23 33:9
48:9 53:11 63:20
72:10 73:4 77:6
77:20 78:5 81:16
**noted**  86:7
**november**  1:12
88:18
**number**  33:22
34:2,4 68:16
69:23

**numerous**  74:4

## o

**o**  14:2,8,8,9,18
17:7 57:24,24,24
59:21,21,21
**o'clock**  57:19
**object**  3:9,12 7:24
29:16 47:4
**objection**  7:23
8:25 11:3 13:17
29:13,17,18 32:19
32:23 33:9 48:9
53:11 63:20 72:10
73:4 74:7 75:23
77:6,20 78:5,9
79:14 81:16
**objections**  78:7
**obligations**  10:20
**obtain**  19:4 48:22
**october**  7:4 22:19
22:21 26:4 53:8
53:17
**odd**  55:11,13
**office**  2:12 8:5,19
10:5,18 11:21,23
12:2,12 74:13
**offices**  74:16 86:5
**okay**  15:23 42:7
53:2 55:18 80:8
**old**  2:8 29:6 37:23
**once**  12:20
**ones**  17:21 47:12
**open**  47:12
**opens**  47:13,14
**order**  1:20 8:9,13
9:4 11:19,22 15:2
60:25
**ordered**  12:11
13:2
**orders**  6:19,25 7:7
8:22

**original**  3:22 4:3
**osha**  52:14,19,20
52:23,24 60:11,15
60:18 61:6,14,17
61:21 62:5,6,12
63:3,7
**outcome**  88:15
**outside**  47:2 84:16
**overtime**  70:7
**owner**  9:6 10:11
59:23 60:2,8

## p

**p**  14:9
**p.m.**  1:13 50:25
86:7
**page**  87:5,9,14
89:5
**pages**  8:3
**paid**  23:13,16
25:11 68:6,8
**pain**  51:10,12,13
51:15,16,19
**paint**  84:2,11,16
**painted**  84:5
**painting**  84:14
**paperwork**  59:8
**park**  63:16
**part**  3:7 17:13
31:16
**partially**  8:15
**particular**  67:21
73:21 74:11
**parties**  3:4 88:13
**partner**  60:9
**partners**  1:8 2:8
6:23 9:5 15:6,7
84:22 85:7 89:3
**parts**  48:7
**party**  5:18,21 9:9
9:10 10:8

**pasatos**  43:21
50:13
**passed**  9:23
**pause**  18:10 83:8
**pay**  37:5 70:7
71:11
**paycheck**  69:24
**paychecks**  25:15
25:24
**pc**  2:3,7
**pending**  32:25
33:12 83:6
**people**  22:11 25:2
74:23 75:5,7,10,21
76:17,19 77:16,18
**people's**  77:12
**performing**  44:23
**period**  26:2 49:14
49:16,23
**permits**  8:14
**permitted**  8:22
**person**  25:3 26:3
43:17 55:9 56:3,4
56:6 59:5 63:4
73:9,17 78:21,23
79:4,6 80:25
**personally**  44:9
**phonetically**  18:13
41:24
**physically**  28:21
**pick**  24:18 44:13
**piece**  6:21
**pills**  50:24 51:2,9
**pizarro**  43:21
**place**  1:18 24:21
65:10 79:12
**places**  61:4
**plaintiff**  1:6,16 2:3
5:5,6 8:2,7,14
10:8,24 14:21
15:9 52:10 70:22

Responses Bates Stamp No 241

70:23
**plaintiff's** 5:11,16
8:19 9:14 10:16
10:18
**please** 15:13,22
16:8,10,18,20,21
18:15 19:22 21:5
21:7 23:2 33:23
34:7 37:17 45:17
46:9 49:11 83:9
**plural** 17:19
**plywood** 80:21
**point** 9:2
**portion** 12:5 13:16
15:14 18:17 21:9
45:19 83:11
**position** 71:3 72:2
**pounds** 65:16,22
65:24
**preconference**
11:24
**prefer** 75:25
**pregnancy** 48:18
**preliminary** 11:19
**prepare** 80:22
**prescribed** 51:4
**prescription** 66:6
66:9
**present** 2:16
**presently** 67:5
**prior** 7:25 9:16
58:2 62:16,18
83:22
**probably** 47:16
69:15 85:5
**problem** 57:16
**problems** 37:3
**procedure** 8:12
**proceed** 7:9 13:3
**proceedings** 18:10
83:8

**produce** 5:14 6:5
12:19,21 13:5
14:25 25:7 85:3,9
**produced** 5:6 8:2
8:10 9:7,24 10:24
**production** 5:18
10:2,12,14 62:2
70:16,18
**project** 9:6 10:11
80:24 82:25
**projects** 79:10
83:17
**proper** 10:13
**properly** 5:25
**property** 9:6
**prospective** 61:13
**protective** 39:9
**provide** 10:17
11:25 26:23,25
27:7,8 71:6 81:18
83:16
**provided** 3:6,24
9:22 12:12 71:8
**providers** 12:9,18
**providing** 6:16
**public** 1:19 3:20
3:20 14:4,11
86:22 88:4 89:23
**purpose** 41:4
**pursuant** 1:20
33:8
**put** 12:22 30:14
34:5
**putting** 54:2,6,8
54:19,23 55:13,17
58:4 61:11 62:18

**q**

**queens** 62:23
79:23 80:3 84:12
**question** 3:9,13
15:12 16:9,17,23

18:16 19:7,15
20:18 29:19 33:10
33:24 40:14 47:5
47:17 49:4,11
50:2 54:14,15
62:10 63:23 72:14
72:15 75:19 76:4
83:6,10 85:8,16,19
**questioning** 85:12
**questions** 16:2,11
16:20 33:17

**r**

**r** 14:2,2,8,8,8
57:24
**rails** 47:2
**rate** 71:11
**read** 15:13,15
18:15,18 21:7,10
45:17,20 83:9,12
**ready** 7:9
**real** 9:9 10:8
**reason** 26:17 30:8
36:24 39:18 41:3
41:15 42:24 43:2
43:11 46:18 48:16
57:4 58:10 60:17
89:5
**reasons** 13:17
**recall** 26:7 60:12
79:19 80:12
**receive** 70:7
**received** 6:21 7:5
8:18 11:18,20,23
12:8 27:3
**recess** 57:22
**record** 11:6,17
12:5,23 15:15
18:18 21:10 26:23
30:15 34:11,14,16
36:3 42:14,16
45:14,16,20 83:12

88:10
**records** 12:7,13,18
25:6
**redo** 85:15
**referring** 56:24
64:10,13
**reflect** 11:7
**reflective** 39:10
40:11 41:10
**regard** 6:7
**regarding** 6:18
33:11
**regards** 6:17
**regular** 68:13,14
**related** 88:13
**relationship** 10:10
**release** 12:10
**relief** 11:4
**remember** 21:2
26:5,20 27:5
32:13 49:19 51:3
51:8 53:14 62:13
62:15 64:22 69:22
77:25 78:3,22
80:4 81:3,20
82:15 83:19 84:10
**remembers** 27:10
**repeat** 15:11 19:23
21:5 23:2 24:4
32:20 33:24 37:17
62:9 72:15
**rephrase** 76:3,6
**reporter** 13:20
16:12
**reporting** 89:2
**representations**
12:24
**represented** 64:17
**represents** 9:20
**republic** 36:5

Responses Bates Stamp No 242

**request** 6:14 71:14
**requested** 15:14
  18:17 21:9 45:19
  83:11 84:23
**requests** 87:13
**required** 37:5 41:6
**requirement**
  60:25 61:7
**reserved** 3:11,16
**reserving** 11:4
**reside** 14:17
**resolved** 6:4
**respect** 9:3
**respective** 3:4
  86:5
**respond** 7:3 16:21
**responding** 15:10
**response** 8:18
  11:18,20,23
**responsive** 19:13
  69:11
**restaurant** 31:8,10
  43:7,8,15 44:4
**result** 51:21 64:7
**resulted** 7:14
**resulting** 10:11
**return** 3:22 9:19
  9:22,23
**returns** 27:24 28:4
  70:12,17,18,23
  71:4
**review** 8:6 10:5
**reyes** 1:5,16 14:16
  17:2 86:10 89:20
**ribs** 31:11,12,21
  31:25
**richard** 42:8
**richman** 2:7,10
  5:2 9:20 13:18
  14:14 15:3,5,11,17
  15:25 16:8,17

18:15 21:7 24:24
  25:20,25 26:22
  27:6,19 28:3 33:5
  33:15,19 34:5,10
  35:8,24 38:20
  39:14 40:4,16
  45:2,8,12,17,21
  47:18 48:12 54:4
  54:8 57:8,25
  60:21 61:25 62:8
  63:22 64:23 70:15
  71:18,21 72:13
  74:3 76:6 77:23
  81:23 83:7,9,24
  85:24 87:6
**richmond's** 10:5
**right** 3:9 11:4 15:3
  27:5 66:3,4,15
  83:6
**rights** 3:6,24
**ripe** 11:8
**road** 2:8
**robert** 2:15
**rodrigo** 1:5,16
  14:16 17:2 86:10
  89:20
**rodriguez** 2:16
**roofs** 82:23
**rule** 3:25
**rules** 3:7
**ruling** 33:6,20
**rulings** 87:18

**s**

**s** 14:1,8,8,9 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  22:1 23:1 24:1
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1 32:1 33:1
  34:1 35:1 36:1

37:1 38:1 39:1
  40:1 41:1 42:1
  43:1 44:1 45:1
  46:1 47:1 48:1
  49:1 50:1 51:1
  52:1 53:1 54:1
  55:1 56:1 57:1,24
  57:24,24 58:1
  59:1,21,21 60:1
  61:1 62:1 63:1
  64:1 65:1 66:1
  67:1 68:1 69:1
  70:1 71:1 72:1
  73:1 74:1 75:1
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1 83:1 84:1
  85:1 86:1 87:6
  89:5
**safety** 27:16,19
  38:24 40:6,17
  44:14 56:8 81:13
  81:14,19 82:4,12
  82:24 83:13,17
**salary** 23:16 68:4
**sand** 44:10,13 46:2
  46:2
**saturdays** 70:4
**saying** 16:22 35:13
  40:21 71:17
**says** 8:8
**scarce** 57:6
**school** 34:24 35:4
  35:16,18,21 36:6,7
  36:8,10,12,12,13
  36:16,19,22 37:2,4
  37:6,10,15,20,25
  38:5 67:3,4,6,8,9
  67:12,15
**schools** 52:13

**second** 36:6,9,12
  36:18 58:3 60:4
  82:15
**security** 33:22
  34:2 41:5
**see** 8:23 57:17
  66:14 85:24
**seek** 11:4 22:5
**self** 71:2
**send** 28:5 62:2
  70:19 71:13
**sent** 71:23
**separate** 13:6,7
  28:5 62:3 70:19
**separated** 28:19
  28:21
**september** 6:25
**set** 18:14 88:8,18
**seven** 65:14 70:5
**sheet** 89:2
**sheetrock** 24:17
  80:21
**sheetrocks** 24:22
**shining** 40:5
**sic** 24:22
**sides** 10:23 47:13
  51:17
**signature** 88:21
**simply** 8:24
**singular** 17:18
**sir** 15:17 18:19
  65:5
**site** 73:22 74:11,14
  74:21 76:7 79:7
  79:17,20 80:10,13
  80:14,20 81:7,9
  82:5,16,21 83:20
  83:23 84:6,9,17,18
**sites** 74:5 75:4
  76:9,12,13,16 77:5
  77:17,18 78:14,18

Responses Bates Stamp No 243

79:11,11,16
**six** 23:20 26:14
  27:14 38:13 49:20
  50:25 53:10,20
  67:22,25 68:9
  69:13
**sixty** 65:22
**social** 33:21,25
**solely** 12:21
**soliloquy** 11:8
**somebody** 85:16
**sorry** 25:22 40:4
**sort** 63:21
**space** 26:22,24
  27:7,10 34:10
**spanish** 2:16,17
  14:5,5 16:4,5
  57:12
**speak** 24:4 59:16
**specific** 46:13
  49:10
**specify** 46:9
**spell** 30:23
**staircase** 46:6,7
**stairs** 44:21
**stalin** 1:5,15 14:16
  17:2 86:10 89:4
  89:20
**stand** 81:22
**start** 55:3 58:21
  68:25 86:3
**started** 7:17 36:17
  53:8,16 58:6 68:2
  68:7,15,23 71:25
  79:18 81:11
**state** 1:2,19 6:12
  63:19,25 64:3
  88:5
**stated** 13:17
**states** 18:20,24
  19:3,9,17,25 20:5

20:9,10,11,24 21:4
  21:14,15,18,22
  22:7,17 27:16
  28:13 30:9 33:8
  34:22 53:7,16
  58:4
**stating** 13:15
**status** 10:2 33:11
**stayed** 21:12 57:7
**ste** 2:4
**steven** 18:12
**stipulated** 3:3 4:5
  5:5 13:12
**stipulations** 1:21
  3:2
**stop** 37:10 48:18
  57:8
**stopped** 37:24
  38:4 55:5
**straight** 46:5
  47:11
**street** 2:4
**strike** 3:10,13
**stuff** 85:15
**subcontracted**
  9:12,13
**subcontractor**
  5:23,23
**subject** 5:25 83:22
**submit** 59:8
**subpoenaed** 5:14
  9:17 10:15
**subscribed** 86:15
  89:21
**subsequent** 6:6
**sun** 66:11
**sunglasses** 66:12
**supervised** 80:23
**supervisor** 28:9
  73:9

**supplemental** 6:7
**supplied** 10:4
**supply** 64:23
**supports** 71:5
**supreme** 1:2
**sure** 15:18 27:10
  34:7 80:6,7,9
**sweep** 24:16
**sweeping** 39:25
**swimmer** 2:12
**sworn** 3:18 14:4
  14:11 86:15 88:8
  89:21
**symptoms** 48:17

**t**

**t** 14:8 31:2 57:24
**take** 16:12 18:8
  24:16 27:16 38:18
  38:24 50:10,23
  57:14 61:14,18
  62:4,11 63:6
  71:14 74:12,13,16
  83:4
**taken** 1:18 23:11
  28:6 50:17 57:22
  70:25
**talked** 60:11
**talking** 48:3 55:22
  56:23 58:2,18
**tax** 27:24 28:4
  70:12,16,18,23
  71:4
**telephone** 18:7
**tell** 35:24 64:21
  73:16,17,20 74:10
  77:9 81:8,15
**telling** 85:18
**ten** 65:15
**tenth** 35:21
**testified** 14:12
  27:4

**testify** 33:13
**testifying** 53:14
**testimony** 3:11,14
  85:6 88:7,10
**thank** 25:21 60:23
**thanks** 42:8
**thing** 78:10
**things** 66:15
**think** 70:15 78:25
  80:3 83:25 84:10
  84:12 85:20,21
**third** 5:21 34:19
  34:19,21 36:6,9,13
  36:21 83:20 85:10
**thirty** 61:19 62:4
  62:11 63:7
**thought** 21:13
**three** 6:14 12:14
  17:11 26:12 29:7
  30:3,20 31:3,19
  42:23 57:19 67:16
  70:9,10 79:16
**thursdays** 67:23
**time** 1:18 7:17
  13:9 20:9,22
  22:16 25:9 26:2
  27:20 31:13,16,24
  33:12 37:14 40:7
  40:9 46:21 48:6
  49:12,14,16,21,23
  50:5,20 57:11
  60:15 61:15 66:19
  69:8,17 75:2,16
  77:17 82:8,10
  85:2,10,17 86:7
**times** 6:14 78:14
**today** 5:7 7:22,25
  12:23 13:5 15:21
  53:15 57:20 78:4
  84:24 85:20

Responses Bates Stamp No 244

**told** 9:18 10:3 53:15 68:5 70:23 73:9
**ton** 10:24
**town** 30:24
**tractor** 41:21,22 41:23 42:5,5,9
**trade** 52:13
**traffic** 40:22,23
**trailer** 42:5
**train** 74:12,16
**training** 52:17
**transcript** 13:21 26:25 88:9
**translate** 29:13,16 48:11
**translating** 78:6
**translation** 15:20 15:21
**transportation** 42:9
**treatment** 6:17 12:2
**trial** 1:15 3:16
**trouble** 15:20
**truck** 24:17 42:20
**true** 88:9
**try** 29:13
**tuesdays** 67:22
**turco** 2:5 6:5 11:6 11:12,16 14:24 15:13 19:14,20 20:18 25:19,23 27:4,9 28:6 29:12 30:14 32:19,23 33:9,18 34:7,14 39:12 40:14 42:11 44:25 47:4,16 48:9 49:7,25 50:4 52:16 53:11 54:13 54:21 55:21 57:17

60:19,23 62:6 63:20 64:25 70:25 71:24 72:10 73:4 74:7 75:14,23 76:3 77:6,20 78:5 79:14 80:5 81:16 81:21 83:3,22 84:21 85:18 86:4
**twelfth** 35:22
**twenty** 50:18
**two** 13:7 17:10 26:10 32:6 44:7 45:3 47:13 48:2 48:15,24 50:24 55:14 58:7 65:15 67:16
**type** 47:20,24 48:5 56:22,23,24

**u**
**u** 14:2 20:25
**u.s.** 32:17,21 54:17
**understand** 15:19 15:24 16:15,16,23 16:24 19:14 21:6 23:15 43:13 46:14 49:25 53:13 54:13 54:15 78:15
**understanding** 5:3 7:16 15:21 19:6 36:2
**unemployed** 59:14 60:16,20,22
**uniform** 3:7
**united** 18:20,24 19:2,9,17,25 20:4 20:8,10,11,24 21:4 21:14,15,18,22 22:7,17 27:16 28:12 30:9 33:7 34:22 53:7,16 58:4

**use** 36:5 40:10 44:19,22 45:23,25 46:4 47:20,24 56:11,18 66:14 82:4,10
**usually** 69:8 77:11 77:25

**v**
**v** 89:3
**van** 74:21,22 75:10,21 76:5 78:14
**various** 48:20 78:18
**vehicle** 63:14
**verbal** 26:18,19 27:3
**verbally** 16:11 28:8 53:21
**veritext** 1:11 89:2
**vest** 39:10 40:11
**virtual** 1:11
**visa** 19:4 27:22 33:8
**visitor** 19:3,9,18
**vocation** 67:3
**vocational** 52:13

**w**
**wage** 25:18 71:12
**wait** 16:8
**waiter** 43:5,15
**waived** 4:4
**waiver** 3:15,24
**wall** 55:21 82:22
**walls** 55:24 58:5 61:11 62:19 80:22
**want** 13:6 14:25 15:18 32:24 33:2 33:13 42:12 45:12 57:8 71:13 77:9

81:17
**wanted** 30:10 45:21 57:17 61:13
**wants** 18:13
**wash** 84:15
**way** 35:6,11,25 88:15
**wear** 40:6,10,13 41:6 44:14 66:5 82:8
**wearing** 40:25 41:4 56:8 82:24 83:14
**wednesdays** 67:23
**week** 23:21 24:2,6 68:10,17 69:25
**weekends** 69:18
**weeks** 67:17 69:5 69:13,20,23
**weight** 65:13,15 65:17,19,21
**went** 9:23 75:11 76:7,9 77:4,16,17 78:13 79:7,17 84:2
**whereof** 88:17
**wife** 28:15 48:17 83:4
**william** 2:4
**window** 42:13
**withdrawn** 24:24 74:3
**witness** 3:19 4:7 8:24 9:5 14:10 15:10,16,24 16:7 16:16,24 19:19,22 20:21 50:3,7 80:8 87:5 88:7,11,17 89:4
**wood** 82:14

**work** 6:9 19:4,21
20:3 22:2,9,10,13
23:12,23 24:8,12
25:2 26:3 27:21
39:22 41:7,12
48:20 49:3,15
55:12 56:15 57:6
57:7 68:15 69:5
69:12,19 70:4,6
73:18 74:4,11
75:2,11,16 80:12
80:23
**worked** 25:9 40:18
48:24 53:8,19
55:10 58:7 83:18
**workers** 64:6,11
64:18 71:7
**working** 23:17
27:21 44:4 48:18
49:17 54:19,23
55:5 56:2 58:15
58:16,21 61:7,16
62:16,17 68:2
69:9 72:17 73:7
73:21,24 74:18,24
75:5 76:9 79:18
80:14,17 81:12
82:6,9,16 83:21
**written** 10:21

**x**

**x** 1:4,10 87:2

**y**

**y** 14:8
**yeah** 61:15 69:15
79:4
**year** 32:15 35:15
35:17 36:11,12,13
36:15,19,22,25
37:11,15,19,24
41:14 43:10 50:7

50:9,12 58:24
**years** 17:11 29:7
30:3,20 31:3,19
**yelling** 11:12,15
**yesterday** 7:25 8:3
8:10 9:25 10:25
12:9 50:22,23,24
**york** 1:2,20 2:4,4
2:9,14,14 14:19
17:8 63:19,25
64:3,5 88:5 89:2
**youmans** 2:17
57:11,16

**z**

**z** 14:2,9
**zoom** 57:12

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.