Page 1

1

2   SUPREME COURT OF THE STATE OF NEW YORK
    COUNTY OF KINGS
3   -------------------------------------------X
    STALIN RODRIGO REYES ESPINOZA,
4
                    PLAINTIFF,
5
          -against-
6                        Index No.:  515197/2019
7   DAVS PARTNERS LLC AND KALNITECH
    CONSTRUCTION COMPANY,
8
                    DEFENDANTS.
9   -------------------------------------------X
10
    COURT OF THE STATE OF NEW YORK
11  COUNTY OF KINGS
    -------------------------------------------X
12  STALIN RODRIGO REYES ESPINOZA,
13                PLAINTIFF,
14        -against-
15  ASK ELECTRICAL CONTRACTING CORP.,
16                DEFENDANTS.
    -------------------------------------------X
17
18                    DATE:  April 5, 2023
19                    TIME:  10:05 A.M.
20
21        (DEPOSITION OF DAVID KLEEMAN)
22
23
24
25

Page 2

1

2                           DATE:   April 5, 2023

3                           TIME:   10:05 A.M.

4

5

6                    VIRTUAL ZOOM EXAMINATION BEFORE

7       TRIAL of the Defendant, DAVS PARTNERS LLC,

8       by DAVID KLEEMAN, taken by the Respective

9       Parties, pursuant to an Order, held

10      remotely at the date and time above, before

11      May Jean Wu, a Court Reporter and Notary

12      Public of the State of New York.

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2    A P P E A R A N C E S:
3

     GORAYEB & ASSOCIATES, P.C.
4         Attorneys for Plaintiff(s)
          STALIN RODRIGO REYES ESPINOZA
5         100 William Street  Suite 1900
        New York, New York 10038
6         BY:  GREGORY GASTMAN, ESQ.
7
8    GALLO VITUCCI KLAR LLP
          Attorneys for Defendant(s)
9         DAVS PARTNERS LLC
          1 Bridge Street  Suite 140
10       Irvington, New York 10533
          BY:  JOSEPH J. RAVA, ESQ.
11
12

     MARSHALL CONWAY BRADLEY GOLLUB & WEISSMAN,
13   P.C.
          Attorneys for Defendant(s)
14        KALNITECH CONSTRUCTION COMPANY
          45 Broadway
15       New York, New York 10006
          BY:  MAURICE RECCHIA, ESQ.
16
17

     LAW OFFICE OF KEVIN P. WESTERMAN
18        Attorneys for Defendant(s)
          ASK ELECTRICAL CONTRACTING CORP.
19        990 Stewart Avenue  Suite 400
        Garden City, New York 11530
20        BY:  GEORGIA ALIKAKOS, ESQ.
21
22        *        *         *
23
24
25

1
2          **221. UNIFORM RULES FOR THE**
                **CONDUCT OF DEPOSITIONS**
3     221.1 Objections at Depositions
      (a) Objections in general. No objections
4     shall be made at a deposition except those
      which, pursuant to subdivision (b), (c) or
5     (d) of Rule 3115 of the Civil Practice Law
      and Rules, would be waived if not
6     interposed, and except in compliance with
      subdivision (e) of such rule.   All
7     objections made at a deposition shall be
      noted by the officer before whom the
8     deposition is taken, and the answer shall
      be given and the deposition shall proceed
9     subject to the objections and to the right
      of a person to apply for appropriate relief
10    pursuant to Article 31 of the CPLR.
      (b) Speaking objections restricted. Every
11    objection raised during a deposition shall
      be stated succinctly and framed so as not
12    to suggest an answer to the deponent and,
      at the request of the questioning attorney,
13    shall include a clear statement as to any
      defect in form or other basis of error or
14    irregularity.   Except to the extent
      permitted by CPLR Rule 3115 or by this
15    rule, during the course of the examination
      persons in attendance shall not make
16    statements or comments that interfere with
      the questioning.
17    221.2 Refusal to answer when objection is
      made. A deponent shall answer all questions
18    at a deposition, except (i) to preserve a
      privilege or right of confidentiality, (ii)
19    to enforce a limitation set forth in an
      order of the court, or (iii) when the
20    question is plainly improper and would, if
      answered, cause significant prejudice to
21    any person.   An attorney shall not direct
      a deponent not to answer except as provided
22    in CPLR Rule 3115 or this subdivision.
      Any refusal to answer or direction not to
23    answer shall be accompanied by a succinct
      and clear statement of the basis therefor.
24    If the deponent does not answer a question,
      the examining party shall have the right to
25    complete the remainder of the deposition.

1
2                **221. UNIFORM RULES FOR THE**
                  **CONDUCT OF DEPOSITIONS**
3
      **221.3 Communication with the deponent**
4           An attorney shall not interrupt the
      deposition for the purpose of communicating
5     with the deponent unless all parties
      consent or the communication is made for
6     the purpose of determining whether the
      question should not be answered on the
7     grounds set forth in section 221.2 of these
      rules and, in such event, the reason for
8     the communication shall be stated for the
      record succinctly and clearly.
9
10          IT IS FURTHER STIPULATED AND AGREED
      that the transcript may be signed before
11    any Notary Public with the same force and
      effect as if signed before a clerk or a
12    Judge of the court.
13
            IT IS FURTHER STIPULATED AND AGREED
14    that the examination before trial may be
      utilized for all purposes as provided by
15    the CPLR.
16
            IT IS FURTHER STIPULATED AND AGREED
17    that all rights provided to all parties by
      the CPLR cannot be deemed waived and the
18    appropriate sections of the CPLR shall be
      controlling with respect hereto.
19
20          IT IS FURTHER STIPULATED AND AGREED
      by and between the attorneys for the
21    respective parties hereto that a copy of
      this examination shall be furnished,
22    without charge, to the attorneys
      representing the witness testifying herein.
23
24
25

1

2          MS. ALIKAKOS:  Good morning.

3     My name is Georgia Alikakos.  I'm an

4     attorney from the Law Office of Kevin

5     Westerman.  I represent a party

6     identified as ASK Electrical in this

7     case.  There is a pending motion to

8     consolidate the two actions.  The

9     cases have not been consolidated.

10    However, yesterday we received the

11    first notice that the witness was

12    being produced.  To the extent that

13    the witness is asked as it relates to

14    A.S.K. Electrical, we will be

15    reserving all our rights and make any

16    legal objections as possible, but in

17    an effort to move the case along

18    since I understand that Davs' counsel

19    is required to produce this

20    particular witness at a particular

21    time, we're going to attend today's

22    deposition.  I would just note that

23    we have not had discovery in the

24    underlying case that I'm a party to

25    in order to permit us a fair

1
2          opportunity to complete the
3          deposition, so I'll just reserve my
4          rights.
5               MR. GASTMAN:  Thank you.  This
6          is plaintiff's counsel.  To
7          everybody, good morning and I hope
8          everybody's well.
9               Listen.  I'm hearing today
10         there's another action out there that
11         is in the process of being
12         consolidated with this one.  Yes, to
13         the extent it's the same party,
14         plaintiff's counsel is not
15         endeavoring to take a deposition or
16         any deposition twice, so if we get
17         the testimony today, we're probably
18         good unless some, you know, really
19         new discovery paper work or otherwise
20         comes down later, so, yes, thank you
21         for attending today and we hope to do
22         it once again unless something else
23         comes up.
24              Okay, anybody have anything
25         else?  We're good, okay.

1                         **KLEEMAN**

2     D A V I D       K L E E M A N, called as a

3     witness, having been first duly sworn by a

4     Notary Public of the State of New York, was

5     examined and testified as follows:

6     EXAMINATION BY

7     MR. GASTMAN:

8          Q.     Please state your name for the

9     record.

10         A.     David Kleeman.

11         Q.     What is your address?

12         A.     217-14 Hempstead Avenue, Queens

13     Village, New York 11429.

14         Q.     Mr. Kleeman, good morning.

15         A.     Good morning.

16         Q.     As you probably heard already,

17     my name is Gregory Gastman.  I'm with the

18     law firm of Gorayeb & Associates.  Today

19     myself and my firm by extension, we

20     represent an injured worker by the name of

21     Stalin Rodrigo Reyes Espinoza in his

22     construction accident that took place on

23     June 28 of 2019.

24              I see you're represented by

25     counsel today, is that correct?

Page 9

```
 1                    KLEEMAN
 2       A.    That is correct.
 3       Q.    Thank you.
 4             Sir, there are a few short
 5   ground rules for these types of
 6   proceedings.  Forgive me if you've already
 7   heard these things a million times before,
 8   but here they are.  Sir, we're trying to
 9   make a perfect written record today.
10   Somebody's typing all these words down that
11   we are saying, so we should try to speak
12   one person at a time today even though here
13   in New York we could have a four-way
14   conversation with nothing but hands and
15   head nods and motions like that.  We need
16   to be verbal, including me, speaking just
17   one person at a time so that we get a good
18   clean record today, so take your time,
19   okay, sir?
20       A.    (Nodding head.)
21       Q.    That's the next instruction.
22   You have to actually use your words when
23   you want to answer questions.  I'm okay if
24   you nod your head and I'm okay if you move
25   your hands around, but none of that will be
```

```
 1                      KLEEMAN
 2    visual today.  Only your spoken words are,
 3    so if I ask you a question, even something
 4    small, we have to wait until you answer and
 5    then we'll go onto the next one, okay?
 6          A.    Understood.
 7          Q.    Thank you, sir.
 8                My questions are designed to be
 9    straightforward, but if that does not work
10    out, just stop me.  Tell me you don't
11    understand.  I'm happy to rephrase anything
12    for you, okay?
13          A.    Okay.
14          Q.    Thank you.
15                I am not allowed to ask you
16    about communications and conversations you
17    had with your lawyers, so don't tell me
18    that stuff, okay?
19          A.    Okay.
20          Q.    Thank you.
21                We tell all witnesses no
22    guessing allowed, so if you hear a question
23    and you don't know the answer, the correct
24    answer is probably, "I don't know."  Fair
25    enough?
```

1                    KLEEMAN

2        A.    Fair enough.

3        Q.    Thank you.

4              Sir, sometimes witnesses wish

5    to give an answer and it's an

6    approximation.  It may not be a perfect

7    concise answer, but it's not a guess

8    either.  Sir, if any of your answers are

9    approximations, please let us know, okay?

10       A.    Okay.

11       Q.    Thank you.

12             A common example of

13   approximations in these types of sessions,

14   it might be a date, a time or a distance.

15   These are just examples, okay?

16       A.    Okay.

17       Q.    Thank you, sir.

18             Are you good to go this

19   morning?  Are you okay to answer some

20   questions at this time?

21       A.    I am.

22       Q.    Thank you, sir.

23             Oh, I'm sorry, and one or two

24   more little things, sir.  If you need a

25   break for any human reason at any time, the

```
 1                    KLEEMAN

 2   answer is, yes, of course.  Just say so and

 3   it's okay.  You'll have your break,

 4   alright?

 5        A.    Understood.

 6        Q.    Thank you.

 7              Sir, I'm going to ask you and

 8   sometimes I give little road maps.  I give

 9   you a little advance notice of where the

10   questions are going next to make things a

11   little smoother, so you can expect that

12   from time to time, okay?

13        A.    Okay.

14        Q.    Thank you.

15              Sir, my next few questions are

16   going to be about things that you might

17   have looked at or reviewed or observed, so

18   here's my first couple of questions.

19              Sir, have you reviewed any

20   documents or computer screens or printouts

21   or any paper work or anything with your

22   eyes to get ready for today's session?

23        A.    No.

24        Q.    You're coming in cold, sir?

25        A.    No, early on what I had was
```

Page 13

1                          KLEEMAN
2    another attorney before Joe represented me.
3    There was an early on deposition that was
4    sent to my office that was about this thick
5    with information.  I scanned through it.  I
6    really didn't see anything.  I was looking
7    to see what was going on, but I really
8    haven't reviewed anything for today, for
9    today's deposition (indicating).
10        Q.    Okay, so you looked at a
11   deposition transcript?  Is that about
12   right, sir?
13        A.    Yes.
14              MR. RAVA:  Not in preparation
15         for this deposition.
16        A.    Yeah, it was a long time ago,
17   yes, correct.
18        Q.    Okay, why did you read that a
19   long time ago?
20        A.    I didn't.  I said that was a
21   long time ago.  That was early on.  I said
22   I was represented by another counsel.
23        Q.    Who was represented by another
24   counsel?
25        A.    Say it again.

                        KLEEMAN

1
2           MR. GASTMAN:  I'm having a
3      little trouble hearing the witness
4      today, but I take depositions with
5      this same equipment every single day.
6      Is there any way to move the
7      microphone a little closer to this
8      witness?
9           MR. RAVA:  Okay, let me see if
10     I can do that.  How's that?
11     Q.    Okay, thank you.  Thank you.
12  We'll find out.  We'll find out.
13          MR. GASTMAN:  Madam reporter,
14     can I hear the last answer recorded,
15     please?
16          (Whereupon, the referred to
17     record was read back by the court
18     reporter.)
19          MR. GASTMAN:  Okay, thank you.
20     If I have any open question, please
21     withdraw it.
22     Q.    Sir, which person or which
23  party was that transcript of?
24          MR. RECCHIA:  I'll just note
25     for the record that the witness is

1                    KLEEMAN

2        conferring with his attorney.

3             MR. GASTMAN:  Yes, I'm not

4        objecting.

5        A.    The transcript, I skimmed

6    through it.  That was it.

7             MR. RAVA:  Greg, I'm sorry.  Do

8        you want to know the name of the

9        attorney or do you want to know who

10       the transcript was of?

11            MR. GASTMAN:  Actually one by

12       one, I'm going to ask all of that

13       stuff just to figure out what's going

14       on.

15       Q.    Sir, the deposition, the thing

16   you read, whose testimony was that?

17            MR. RAVA:  Who was the witness?

18            THE WITNESS:  Who was the

19       witness?  I didn't read that.  Like I

20       said, it came in the mail.  I skimmed

21       through it and I didn't even get

22       involved with it to answer your

23       question.

24       Q.    Mr. Kleeman, you skimmed

25   through a deposition transcript?  Yes or

```
                                                    Page 16

1                        KLEEMAN

2    no?

3              MR. RAVA:  Did you read it?

4              THE WITNESS:  No.

5              MR. RECCHIA:  I'm just going to

6         note my objection again to Mr.

7         Kleeman's attorney interjecting and

8         helping him answer questions.  I want

9         to note that on the record.

10             MR. GASTMAN:  Plaintiff's

11        counsel has no objection.  He merely

12        is trying to be helpful.  He's really

13        trying to help everybody.  I have no

14        objection.

15        Q.    Mr. Kleeman, I'm not here to

16   fight you and, you know, we could be here

17   all day, but I hope not.  Sir, I'm simply

18   trying to find out when you skimmed through

19   that transcript, whose testimony was it

20   when you skimmed through it?

21        A.    I didn't.  I didn't.

22             MR. RAVA:  Answer that

23        question.

24        A.    I didn't read it.

25             MR. RAVA:  Answer the question.
```

1                        KLEEMAN

2        Q.    I know you skimmed it, sir.  I

3   heard you loud and clear, Mr. Kleeman.  You

4   said it three times.  Please tell us whose

5   testimony was it that you skimmed through?

6        A.    I didn't read it.  Do you know

7   what I mean?

8              MR. RAVA:  Do you know?

9              THE WITNESS:  No, no, that's

10        the point I'm trying to make here.

11        It was this thick.  I put it back in

12        the envelope and I sent it to my

13        secretary.  That's it.  That came in

14        the mail.  I didn't read any other

15        documents that came in the mail

16        (indicating).

17        Q.    Mr. Kleeman, are you here to

18   tell us today you have no idea whose

19   transcript you skimmed through?  You have

20   no idea, sir?  Is that your testimony?

21        A.    Yeah, maybe I said it wrong.

22   No, again I'm going to say it again.  I did

23   not read it.  I took it out of the

24   envelope.  I saw the contents and how big

25   it was.  I put it back in and I did not

```
  1                      KLEEMAN
  2    read it.  That's all I'm trying to say.
  3         Q.    Sir, maybe I misunderstood.
  4              MR. RAVA:  Have I told you
  5         anything else?
  6              THE WITNESS:  No.
  7              MR. RAVA:  Okay.
  8              MR. RECCHIA:  I'm sorry, Mr.
  9         Gastman.  I just got to put this in
 10         the record.
 11              Yes, I want to note for the
 12         record again that Mr. Rava is again
 13         interjecting and apparently helping
 14         his client answer questions.
 15              MR. RAVA:  I just wanted to
 16         make sure.
 17              MR. GASTMAN:  Plaintiff's
 18         counsel has no objection to Mr. Rava
 19         trying to assist.
 20              MR. RAVA:  All I'm trying to do
 21         is --
 22              MR. GASTMAN:  I'm going move
 23         forward, guys.  I've got other stuff
 24         to do, okay?  I've got other stuff to
 25         do.
```

```
 1                    KLEEMAN
 2        Q.     Mr. Kleeman, are you
 3   represented by someone, an attorney, where
 4   you were involved in some kind of case?
 5        A.     Davs, yeah, yes.
 6        Q.     Which case was that, sir?
 7        A.     Davs, aren't we here for Davs
 8   Partners?
 9        Q.     Sir, Davs Partners is indeed a
10   defendant in this case that we're here for
11   today.  This is correct, sir.
12        A.     Okay.
13        Q.     Is that the lawsuit you're
14   talking about, the lawsuit that we're here
15   for today, because you seem to be talking
16   about something else.  Maybe I
17   misunderstood you.
18             MR. RAVA:  Correct.
19        A.     Again there's a lot of --
20   there's a lot of lawsuits going on and I'd
21   be lying to you if I told you I knew which
22   one was which, okay?  Outside of the
23   attorneys, I don't even know which one is
24   which, so at this stage of the game today
25   we're representing Davs Partners.  That's
```

```
                                         Page 20

 1                    KLEEMAN

 2   what I'm here for today.

 3              MR. RAVA:  Off the record.

 4              (Whereupon, an off-the-record

 5         discussion was held.)

 6         Q.    Mr. Kleeman, I'm going to ask

 7   you a few questions about your work history

 8   and your work background next, okay?

 9         A.    (Nodding head.)

10         Q.    You have to answer.

11         A.    Sure.

12         Q.    Mr. Kleeman, generally

13   speaking, what type of work do you do?

14   What type of work?

15         A.    I'm an electrician.

16              MR. GASTMAN:  I'm really having

17         trouble hearing you.

18              (Whereupon, the referred to

19         record was read back by the court

20         reporter.)

21         Q.    Sir, are you a master licensed

22   electrician?

23         A.    I am.

24         Q.    Thank you.

25              What state or states, please?
```

1                    KLEEMAN

2        A.      New York City and Suffolk

3   County.

4        Q.      Thank you, sir.

5                Can you tell us, please,

6   approximately, just approximately, how long

7   have you been licensed like that

8   approximately?  Twenty-four years or

9   twenty-five years just approximately?

10       A.      Twenty plus years.

11       Q.      Thank you.

12               Sir, presently do you work for

13   a company?  Do you own a company?  I'm

14   talking about electrical.

15       A.      I work for a company.

16       Q.      Okay, what's the name of the

17   company that you work for?

18       A.      A.S.K. Electrical Corp.

19       Q.      Thank you.

20               How long have you been working

21   for that company, sir, approximately, just

22   approximately?

23               MR. RAVA:  How long?

24               THE WITNESS:  I'm trying to

25         remember, 2015.  I don't know

Page 22

KLEEMAN

1    exactly.

2            MR. GASTMAN:   What did he say?

3            (Whereupon, the referred to

4        record was read back by the court

5        reporter.)

6        Q.    Mr. Kleeman, just think to

7    yourself and then answer the question.

8    Just approximately how long have you been

9    with the company as an employee

10   approximately?

11       A.    Twenty-five years.

12       Q.    Okay, thank you, sir.

13       A.    Twenty years.

14       Q.    Where is that company located

15   now, sir?

16       A.    217-14 Hempstead Avenue.

17       Q.    Is that in Queens or Long

18   Island?

19       A.    That's Queens.

20       Q.    Thank you.

21           Can you tell us approximately,

22   just approximately, how long has the

23   company been located at that place?

24       A.    Three years.

```
                                           Page 23
 1                    KLEEMAN
 2        Q.     Thank you.
 3               Before that, sir, could you
 4   tell us what part of the world was the
 5   company located?
 6        A.     We rented a building in
 7   Woodside.
 8        Q.     Thank you.
 9               Sir, for people unfamiliar with
10   the building at 217-14 Hempstead Avenue,
11   can you give us just a brief description,
12   sir, is it a high-rise, a low rise, is it a
13   house or is it a building?  What does it
14   look like?
15        A.     It's just an inline one single
16   floor inline building.
17        Q.     Alright, is it commercial, is
18   it residential or is it mixed?
19        A.     It's commercial.
20        Q.     Thank you, sir.
21               Sir, I apologize if you
22   answered this already.  How many floors is
23   it?
24        A.     It's one floor with a partial
25   basement.
```

Page 24

1                          KLEEMAN

2          Q.    Thank you.

3                Sir, the accident we're here

4    about occurred on June 28, 2019.  Sir, at

5    that time on that date, was A.S.K.

6    Electrical Company, were they in Woodside

7    or were they at this Hempstead Avenue

8    address or something else?

9          A.    We were still working out of

10   Woodside.

11         Q.    Okay.

12         A.    The other building was under

13   construction.

14         Q.    Okay, sir, the building under

15   construction, that's the 217-14 Hempstead

16   Avenue building, yes?

17         A.    That's correct.

18         Q.    Thank you.

19                Sir, when you say "under

20   construction", was this a renovation of a

21   building already there or this was from the

22   ground up from the ground to a new building

23   or something else?

24         A.    It was a renovation of a

25   building that was already there.

Page 25

1                        KLEEMAN

2         Q.     Thank you.

3                Sir, with people unfamiliar

4    with the renovation, is that project done

5    now?

6         A.     Yes.

7         Q.     Thank you.

8                Sir, I'm going to ask you for

9    dates.  These are just approximations.  I'm

10   not holding you to exactly.  Can you tell

11   us just approximately when did the

12   construction take place?  From when to when

13   approximately?

14        A.     I don't recall.  I don't recall

15   the actual dates.

16        Q.     Okay, did A.S.K. Electrical

17   Company move into that new space after the

18   construction was done?

19        A.     Yes.

20        Q.     Great.  Can you tell me

21   approximately when did A.S.K. Electrical

22   begin occupying the new space on Hempstead

23   Avenue just approximately?  About three

24   years?

25        A.     What was that?

1                    KLEEMAN

2        Q.    You tell me, sir.

3    Approximately how long?  When did you move

4    into the space approximately?

5        A.    Yeah, when the construction was

6    completed and I don't recall when that was.

7        Q.    Okay, alright, do you believe,

8    sir, the construction was still underway on

9    the date of the accident, June 28, 2019?

10        A.    Yes.

11        Q.    Okay, thank you.

12             Sir, did A.S.K. Electrical get

13    the new space by signing a lease or did

14    they buy the property or something else?

15        A.    They signed a lease.

16        Q.    Okay, thanks.

17             Is the lease between A.S.K.

18    Electrical and some other company or

19    entity?

20        A.    Yes.

21             MR. GASTMAN:  Off the record.

22             (Whereupon, an off-the-record

23        discussion was held.)

24        Q.    Sir, we've been talking about

25    the electrical company?

Page 27

1                    KLEEMAN

2       A.    Yes.

3       Q.    I apologize.  There was some

4   audio delay for which I apologize.

5             Sir, we've been talking about

6   A.S.K. Electrical, the company that you've

7   been working with or for.  That's A.S.K.

8   Electrical Contracting Corporation, is that

9   correct?

10      A.    Yes, at that time that is

11  correct at that time.

12      Q.    Okay, there have been some name

13  changes?

14      A.    Correct.

15      Q.    Okay, is there a newer version

16  of that?  Is there a newer name or newer

17  version or is that the name?

18      A.    Yes, it's the A.S.K. Electrical

19  Corp., which was the latest one that I

20  stated that was the current.

21      Q.    Okay, thanks.

22            Do you remember what was the

23  name of the company before that?

24      A.    A.S.K. Electrical Contracting

25  Corp.

Page 28

1                      KLEEMAN

2          Q.      Forgive me, sir, but the new

3     name is what?

4          A.      A.S.K. Electrical Corp., we

5     dropped the "Contracting".

6          Q.      Thank you.

7                  It's just the word

8     "Contracting"?

9          A.      Yes.

10         Q.      Thank you.

11                 Sir, so the lease is between

12    A.S.K. and who?  Who's the owner or the

13    landlord?

14         A.      That would be Davs Partners

15    over here for today.

16         Q.      Okay, thank you.

17                 Sir, back to the electrical

18    company for a couple of moments, I'm going

19    to ask you about employees, ownership and

20    things like that.  Sir, do you have any

21    ownership interest in the electrical

22    company, A.S.K.?

23         A.      I do.

24         Q.      Okay, and you're the full

25    owner?  You're a partial owner?  Who are

```
                                              Page 29

 1                         KLEEMAN

 2   you?

 3         A.    I'm a partial owner.

 4         Q.    Okay, who are the other owners?

 5         A.    My daughter.

 6               MR. GASTMAN:  Off the record.

 7               (Whereupon, an off-the-record

 8          discussion was held.)

 9         Q.    Mr. Kleeman, we'll just put the

10   initials on the record for now.  I

11   understand A.S.K. is not a party to this

12   case yet, but what's her first name,

13   please?

14         A.    S.

15         Q.    I'm sorry.  What was that?

16         A.    S.

17         Q.    S., thank you.

18               MR. GASTMAN:  Okay, let's just

19          put the initial in there, S., okay?

20          Thank you.  She's not yet a party to

21          this case.  Thank you.

22               Off the record.

23               (Whereupon, an off-the-record

24          discussion was held.)

25         Q.    Mr. Kleeman, that daughter, the
```

Page 30

```
 1                        KLEEMAN
 2   one you just mentioned, does she have a
 3   background in electrical work or none?
 4        A.    She does.  She's actually going
 5   for her master electrician's license and
 6   she's going to eventually take over the
 7   company so I can get out of here.
 8        Q.    You're a happy guy, good for
 9   you.
10        A.    No kidding.
11        Q.    Okay, any other owners or
12   shareholders or those are the two?
13        A.    No, just the two of us.
14        Q.    Okay, thank you.
15              Sir, do you have any ownership
16   interest with that other entity, Davs
17   Partners?
18        A.    I do.
19        Q.    Sir, just briefly what is that
20   relationship?  Like you're one of the
21   owners or something else?
22        A.    With what?  The company?
23        Q.    Yes, sir, Davs Partners, yes.
24        A.    I'm one of the owners of, yes,
25   of that company.
```

                         KLEEMAN

1

2       Q.      Thank you.

3               Is there another owner or

4    partial owner of that company with the

5    first name of V.?

6       A.      There is.  Yes, that would be

7    my wife.  That's my spouse.

8       Q.      Okay, thank you.

9               MR. GASTMAN:  Why don't we put

10       a "V." for that?  Thank you.

11              Off the record.

12              (Whereupon, an off-the-record

13       discussion was held.)

14      Q.      Sir, at some point did Davs

15   Partners, did they become the owner of that

16   property, 217-14 Hempstead Avenue?

17      A.      Yes, they were the owner.  We

18   purchased the property.

19      Q.      Thank you.

20              Sir, just tell us

21   approximately, just approximately, when was

22   that company or when was that property

23   purchased by that company?

24      A.      What was that?  In 2018, 2019,

25   around there.

Page 32

1                          KLEEMAN

2          Q.     Okay, soon after the

3    construction started?

4          A.     Correct.

5          Q.     Okay, thank you.

6                 Sir, was there a general

7    contractor?

8                 MR. GASTMAN:  Off the record.

9                 (Whereupon, an off-the-record

10          discussion was held.)

11         Q.     Back on the record, sir, was

12   there a general contractor hired to assist

13   on this project?

14         A.     Yes.

15         Q.     Who was the general contractor

16   company, please, for this project?

17         A.     Kalnitech.

18         Q.     Sir, was there a written

19   agreement or a contract for Kalnitech to

20   come in as the general contractor?

21         A.     Yes.

22         Q.     Thank you.

23                Sir, do you know who prepared

24   the contract?  Did Kalnitech prepare it and

25   hand it to A.S.K. or did A.S.K. prepare it

1                         KLEEMAN

2    and hand it to Kalnitech or maybe something

3    else happened?

4         A.    I don't recall.

5         Q.    Okay, sir, do you have any

6    ownership interest in Kalnitech, the GC

7    company?

8         A.    No.

9         Q.    Sir, and I ask respectfully,

10   are you related by blood or marriage to

11   anybody in Kalnitech, the general

12   contractor?

13        A.    No.

14        Q.    Okay, thank you.  Okay, thank

15   you.

16              Sir, before Kalnitech was hired

17   for this project, had they ever been hired

18   before for other projects?

19        A.    No.

20        Q.    Okay, sir, do you happen to

21   know, sir, how did Kalnitech come to be

22   hired?  Who knew them?  Can you tell me the

23   process?

24        A.    Okay, I know the owner of

25   Kalnitech.  He used to work for another GC

```
 1                    KLEEMAN
 2   that we used to do a lot of work for.  He
 3   branched out and was leaving them and went
 4   out on his own.  I believe this was the
 5   first job he did.
 6        Q.    Thank you.
 7              Well, was that Majestic?  I
 8   think I heard the name at some point, but I
 9   don't recall, the other prior contractor
10   company.
11        A.    The company that he worked for?
12        Q.    Yes, yes.
13        A.    Masterpiece.
14        Q.    Masterpiece, thank you.
15              Sir, I'm going to ask you a
16   questions about who hired who next.  Sir,
17   was Kalnitech hired by A.S.K. to do the
18   work?
19        A.    Yes.
20        Q.    Okay, thanks.
21              Did A.S.K. hire any other
22   contractors or subcontractors to assist on
23   the project?
24              MR. RAVA:  Greg, can you repeat
25         that question?  Could you ask it
```

```
 1                       KLEEMAN
 2         again?  You were breaking up.
 3               MR. GASTMAN:  Oh, yes, sure,
 4         sorry about that.  I'm going to
 5         repeat the question.
 6         Q.    In addition to hiring
 7    Kalnitech, did A.S.K. hire any other
 8    contractors or subcontractors for this
 9    project?
10         A.    Yes.
11         Q.    Thank you.
12               Sir, to the best as you recall,
13    who else did A.S.K. hire for this project?
14         A.    Who else did A.S.K. hire for
15    this project?  I'm trying to remember that.
16    It's been such a long time.
17         Q.    Yes.
18         A.    And I want to be accurate.
19         Q.    If you don't recall, you could
20    say you don't recall.  We will do our best
21    to refresh your recollection, sir.
22         A.    Yeah, I don't want to guess.  I
23    don't want to guess without having anything
24    in front of me.
25         Q.    That's okay.  Sir, I have some
```

```
 1                      KLEEMAN
 2    company names here.  I'll give them to you
 3    one by one.  Let's see if anything clicks
 4    here.
 5         A.    Okay.
 6         Q.    Sir, was one of the companies
 7    you hired JM Associates?  That's J-M
 8    Associates.  Was that one of the other
 9    ones?
10         A.    That is correct.  That's
11    correct.
12         Q.    Thank you.
13               Sir, for people not familiar,
14    did they have a particular specialty, JM,
15    or were they like the plumbers or the
16    carpenters?
17         A.    They did the cabinets.  They
18    did the finishing work.
19         Q.    JM did the finishing work, is
20    that right?
21         A.    Correct, they came in to do the
22    finishing work.
23         Q.    When you say "finishing", sir,
24    do you mean things like painting and
25    plastering or do you mean something else?
```

                         KLEEMAN

1

2       A.    Like I said, painting,

3   moldings, you know, the flooring.

4       Q.    Thank you.

5             Sir, did A.S.K. hire any other

6   companies or was it just those two,

7   Kalnitech and JM Associates?

8       A.    There were other companies

9   there.  There were a couple.  You know,

10  because we were in construction, I know

11  other contractors in the business, so there

12  might have been.  There was a fence company

13  that was brought in early/early on that

14  A.S.K. brought in directly, but that was

15  like just to fence off the property prior

16  to the construction.

17      Q.    Any other companies, sir, that

18  were working on this project?

19      A.    Not that I recall.

20      Q.    By A.S.K.?

21      A.    Not that I recall.

22      Q.    Okay, and, sir, for people not

23  familiar with the scope of the work, could

24  you tell us, please, what was the scope of

25  the work for this renovation project?  What

```
                                              Page 38

 1                      KLEEMAN
 2    was going to be done?
 3         A.    It was a fit-out of an empty
 4    building, offices.  You know, electrical
 5    contractor's offices basically was exactly
 6    what it is.
 7         Q.    Thank you.
 8               Also a shop or just offices?
 9         A.    There was a shop.  Yeah, it was
10    decided into some office space and some
11    shop space and some storage space.
12         Q.    Okay, thank you.
13               Sir, this renovation project,
14    was the building built up or out or the
15    footprint of the building remained the
16    same?
17         A.    The footprint of the building
18    remained the same.  As I mentioned earlier,
19    it was a fit-out of the first floor.
20         Q.    Okay.
21         A.    And the basement.
22         Q.    Thank you.
23               Sometimes fit-outs include some
24    other things.  I'm just asking.
25               Sir, were there any
```

1                         KLEEMAN

2    architectural diagrams prepared by anybody

3    for this project?

4         A.    Yes.

5         Q.    Okay, and those were provided

6    to the general contractor, I imagine, to

7    help them with their work?

8         A.    A set of drawings, correct.

9         Q.    Thank you.

10              Sir, in addition to the

11   contractors and subcontractors we already

12   mentioned, was there any safety company

13   hired by anybody to have additional eyes

14   and ears watching the workers?

15        A.    That would be the general

16   contractor's responsibility.

17        Q.    Well, okay, did they hire a

18   safety company?

19        A.    Not to my knowledge.

20        Q.    Okay, sir, my next several

21   questions will be about equipment and gear

22   that the owner of the property or A.S.K.

23   might have provided.  I'm giving you a

24   little road map of the questions.  Here

25   they come.

```
 1                      KLEEMAN
 2           Sir, did the owner of the
 3   property, Davs Partners, did that company
 4   give any safety equipment to the hands-on
 5   construction workers for this project?
 6        A.    No.
 7        Q.    How about A.S.K. Electrical?
 8   Did that company give any safety equipment
 9   or safety gear to the --
10        A.    Yes, it was provided.
11        Q.    I apologize, sir.  My question
12   didn't get completed and the record will
13   get a little muddy.  I apologize, sir.  I'm
14   going to withdraw that question and ask you
15   again.
16           Sir, did A.S.K. Electrical, did
17   that company give any safety gear to the
18   hands-on workers doing that fit-out
19   renovation project?
20        A.    Well, A.S.K. gave safety gear
21   to their workers that were present onsite
22   doing the electrical work.
23        Q.    Okay, I'm going to repeat that
24   to make sure I'm following you, sir.  Stop
25   me if I'm wrong.  A.S.K. gave safety gear
```

```
                                              Page 41
 1                      KLEEMAN
 2    to A.S.K.'s workers that were doing the
 3    electrical portion of this job, is that
 4    correct, sir?
 5          A.    Correct, that was it.
 6          Q.    Thank you.
 7          A.    That's what we did.
 8          Q.    Okay, thank you.
 9                Did A.S.K. provide any safety
10    gears to any of the other companies that
11    were working on the project?
12          A.    That's normally the
13    responsibility of the other companies in
14    this project.
15          Q.    Yes, sir, but my question is
16    did A.S.K. give safety gears to the other
17    companies or not?
18          A.    It's not their responsibility.
19          Q.    Is that a no, sir?
20                MR. RAVA:  Just answer "yes" or
21           "no".
22          A.    No.
23          Q.    Thank you, sir.
24                Sir, this project, it went on
25    for months at least, yes?
```

1                     KLEEMAN

2          A.     Yes.

3          Q.     Okay, sir, tell me who was your

4    go to guy at Kalnitech for this project?

5    If you had a question or a concern, who

6    would you be reaching out to?

7          A.     Gus.

8          Q.     Thank you.

9                 Sir, with JM, they came towards

10   the end of the job?  Would that be fair to

11   say?  They were doing additional work

12   towards the end of the job, is that right?

13         A.     Yes.

14         Q.     Okay, thank you.

15                Sir, do you know, if you know,

16   approximately how long was JM, the company,

17   on the job doing their part of the work?

18   Was it days, weeks or months?  Can you give

19   us an approximation?

20         A.     A week or two.

21         Q.     Thank you.

22                Sir, during that period of time

23   when JM Associates was onsite doing their

24   finishing work, sir, were you stopping by

25   the shop all the time or sometimes or

```
                                          Page 43

 1                    KLEEMAN
 2    never?  You tell me.
 3         A.    I would stop by periodically to
 4    meet with Gus to review the progress of the
 5    job.  I would also stop by to see my
 6    foreman to review the progress of the
 7    electrical.
 8         Q.    Thank you.
 9               Sir, I'm not holding you to an
10    exact formula or schedule at all, but
11    generally speaking, sir, when you said you
12    stopped by periodically, was this once an
13    hour, once a day or once a month?  I'm just
14    looking for an approximation.
15         A.    A couple of times a week for no
16    more than an hour a day because I had my
17    other jobsites that I would visit as well.
18         Q.    Yes, sir, A.S.K. had their own
19    jobs going on throughout the city, yes?
20         A.    Correct.
21         Q.    Okay, sir, the project manager,
22    I think that might have been the phrase to
23    use.  Who were you meeting with, sir?  Who
24    was that?
25         A.    From what company?
```

1                    KLEEMAN

2        Q.    I apologize, sir.  I'm trying

3    to follow from what you said recently.  You

4    said that you would meet with your project

5    manager or somebody.  Maybe I didn't hear

6    it.

7        A.    That was Gus, the owner.  The

8    GC was Gus, to meet with him about project

9    management.  That's what I said.

10        Q.    Okay.

11        A.    He would meet with my foreman

12    to review the progress of his work.

13        Q.    Thank you.

14             This is the foreman from

15    A.S.K.?

16        A.    Correct.

17        Q.    Okay, thank you.

18             What is that person's first

19    name?

20        A.    Dwayne at the time.

21        Q.    Was that Mr. Hudson?  Is that

22    the same gentleman?

23        A.    Yeah, Dwayne, Dwayne Hudson,

24    that was the foreman.

25        Q.    Thank you.

```
                                              Page 45
  1                    KLEEMAN
  2              Dwayne was your foreman.  Was
  3      he an A.S.K. employees or Davs or something
  4      else?
  5           A.    He was an A.S.K. employee.
  6           Q.    Okay, thank you.
  7              Does he have an electrical
  8      background also or is his background in
  9      something else?
 10           A.    Yes, he's an electrician as
 11      well.
 12           Q.    Okay, thank you.
 13              Sir, back to Gus and Kalnitech
 14      for a couple of moments, sir, do you know
 15      one way or the other did Kalnitech stay on
 16      the job during those weeks or whatever when
 17      JM Associates was doing the finishing work
 18      part of the project?
 19           A.    Yes, Kalnitech also had their
 20      workers on the job besides JM, yes.
 21           Q.    Okay, thank you.
 22              MS. ALIKAKOS:  I'm sorry.  I'm
 23       sorry for interrupting you guys.
 24              Madam court reporter, can you
 25       just read back the last question and
```

```
                                              Page 46

  1                      KLEEMAN
  2         answer?
  3              (Whereupon, the referred to
  4         record was read back by the court
  5         reporter.)
  6              MS. ALIKAKOS:  Okay, thank you
  7         so much.
  8         Q.    Sir, with regard to Gus,
  9    Kalnitech, sir, if you know, was Gus there
 10    day to day or did he stop in from time to
 11    time, if you know?
 12         A.    Everyday.
 13         Q.    What was his schedule on the
 14    project?
 15         A.    He was there everyday.  That
 16    was what he was getting paid to do.
 17         Q.    Okay, the expectation was Gus
 18    himself, he would be there pretty much
 19    everyday other than a sick day or a
 20    vacation day, et cetera?
 21         A.    Correct.
 22         Q.    Okay, sir, my next few
 23    questions will be about paper work that may
 24    or may not have been generated for the
 25    project.  That's a little road map.
```

```
 1                      KLEEMAN
 2              Sir, Kalnitech, were they doing
 3      any sort of daily logs with some basic
 4      information about the work that would be
 5      written down?
 6          A.     Not to my knowledge.
 7          Q.     Okay, you never saw anything
 8      like that?
 9          A.     No.
10          Q.     Okay, thank you.
11              Sir, was there anybody else
12      that you know of doing any sort of daily
13      log, either your guys or Davs Partners or
14      anyone or anybody doing a daily log for
15      this project?
16          A.     Not that I know of other than
17      my guys doing their weekly toolbox talks
18      and what, you know, what we do on every
19      other jobsite, not that I know of.
20          Q.     Now, sir, the toolbox talks
21      that you were referring to, were these just
22      for the A.S.K. workers on the project or
23      was that open and all the contractors were
24      going to that?
25          A.     Yeah, no, that was just for the
```

1                    KLEEMAN

2    A.S.K. workers.  That's how.  All the

3    companies conducted their own toolbox

4    talks.

5         Q.    Sir, I'm going to switch gears

6    a little bit and I'm going to ask you a few

7    questions about the accident of the worker

8    we're here for, okay?

9         A.    Sure.

10        Q.    Okay?

11        A.    Yes.

12        Q.    Thank you.

13              Sir, if I say again the

14   accident date was June 28, 2019, sir, were

15   you at the worksite that day, 217-14

16   Hempstead Avenue?

17        A.    I was not.

18        Q.    Okay, sir, I realize time has

19   gone by, but the best you can recall, sir,

20   how did you first find out about this

21   accident or incident?  How did you hear

22   about this?

23              MR. RAVA:  Greg, I'm sorry, but

24        I missed part of your question.

25              MR. GASTMAN:  Sure, I'll happy

```
                                              Page 49

 1                      KLEEMAN
 2          to just withdraw it and rephrase it.
 3          I'm happy to.
 4               MR. RAVA:  Thank you.
 5               MR. GASTMAN:  It's okay.  It's
 6          okay.  Can you hear me okay?
 7               MR. RAVA:  Yes.
 8               MR. GASTMAN:  Okay.
 9          Q.    Sir, how did you first hear
10     about this accident?  Who told you?
11          A.    I got a phone call from my
12     foreman, Dwayne Hudson, that afternoon
13     saying that someone got hurt and fell.  He
14     fell.
15          Q.    Okay, was that a ladder
16     accident?  Is that what he told you?
17          A.    Yes, someone fell off a ladder,
18     correct.
19          Q.    Okay, and is it your
20     understanding, sir, it was one of the JM
21     workers, it was one of the A.S.K. workers
22     or somebody else?
23          A.    It was one of the JM workers.
24          Q.    Okay, alright, did Dwayne tell
25     you he saw it?  He saw the accident?
```

```
                                            Page 50
  1                    KLEEMAN
  2        A.    He actually said he didn't see
  3   it from what he told me.
  4        Q.    That's what he told you?
  5        A.    Yes.
  6        Q.    Okay.
  7        A.    He said he was standing in
  8   front of the panel that was just behind
  9   him.  That was just behind him when the
 10   incident took place.  He was no more than a
 11   couple of feet away, but he was facing the
 12   other direction.
 13        Q.    Oh, okay, okay, okay.
 14        A.    That's what I remember him
 15   saying.
 16        Q.    Okay, he was close by but maybe
 17   looking the other way?  That's your
 18   recollection?
 19        A.    Well, he was working on a panel
 20   that was in the opposite direction of where
 21   the accident actually supposedly happened.
 22        Q.    Wait a minute.  Supposedly
 23   happened?  Didn't Dwayne tell you that the
 24   accident happened?
 25        A.    The accident, I can't speak.  I
```

1                    **KLEEMAN**

2    wasn't there.

3        Q.    No, but your foreman was there?

4        A.    Correct.

5        Q.    Yes, Dwayne told you there was

6    an accident, right?

7        A.    Correct.

8        Q.    Okay, okay, sir, did you ever

9    speak to anybody else, anybody else, at the

10   scene who might have seen something?  Did

11   you speak to anybody else there?

12       A.    No.

13       Q.    Okay, and, sir, who else was

14   there that day from A.S.K.?  The foreman

15   was there, so I guess there were workers.

16   Who was there?

17            MS. ALIKAKOS:  Note my

18        objection.  I'm sorry.  Can you just

19        note my objection to the form, an

20        assumption?

21       A.    We had a helper there with him.

22       Q.    You had a foreman there just to

23   supervise a helper, is that right?

24       A.    An apprentice, we call helpers

25   apprentices.  He had an apprentice with

```
                                              Page 52

 1                    KLEEMAN
 2     him.
 3          Q.     Okay.
 4          A.     You're asking about A.S.K.,
 5     correct?
 6          Q.     Yes, I did.
 7          A.     Yes, he had his apprentice with
 8     him.
 9          Q.     Okay, so your foreman, Dwayne,
10     he was doing hands-on electric work at that
11     time, is that correct, sir?
12          A.     Correct, he was a working
13     foreman.
14          Q.     Okay, thank you.
15                 Was he supervising any of the
16     other trades or just the A.S.K. trades?
17          A.     He was supposed to be just
18     supervising A.S.K.'s trades.  That's what
19     he's there to do.
20          Q.     Okay, thank you.
21                 Did the apprentice say anything
22     about the accident?
23          A.     That I don't know.  I never
24     asked him.
25          Q.     Okay, did he ever tell you
```

Page 53

1                    KLEEMAN

2  anything?

3        A.    I never discussed this case

4  with him.

5        Q.    Did he ever tell you anything

6  or he never told you anything?

7        A.    I didn't discuss the accident

8  with him.

9        Q.    Okay.

10       A.    I never discussed anything with

11  him.

12       Q.    I understand there was no

13  discussion.  That would be a back and forth

14  kind of thing.  I was asking you if he told

15  you anything.

16       A.    No.

17       Q.    Okay, thank you.

18             Is he still with the company?

19       A.    No.

20       Q.    What happened?

21       A.    He moved onto bigger and better

22  things.

23       Q.    He's with a competitor?

24       A.    He's with a competitor, yes.

25       Q.    Okay, thanks.

1                        KLEEMAN

2                Do you run into him from time

3    to time on these jobs or no?

4         A.    Who are you talking about?

5    Dwayne or the apprentice?

6         Q.    I apologize, the apprentice,

7    the guy who is no longer with you.

8         A.    No.

9         Q.    Okay, and Mr. Hudson, did he

10   move on or is he with the company?

11        A.    He did.  He moved on as well.

12        Q.    Okay, thank you.

13                Did he leave on good terms with

14   the company, Dwayne?

15        A.    Absolutely.

16        Q.    Okay.

17        A.    I talk to Dwayne every once in

18   a while.

19        Q.    Okay, sir, putting aside lawyer

20   communications, I don't want to know about

21   that.  Is there anything more you know

22   about the ladder accident that we've been

23   talking about or that's it?

24        A.    You're caught up to speed from

25   what I know about it.

Page 55

KLEEMAN

1

2          MR. GASTMAN:  Okay, and, sir, I

3     thank you for your time.  I don't

4     think I have any more questions today

5     although I see there are other people

6     with us.  Maybe they have some

7     questions and sometimes when I hear

8     that I think of something, but in the

9     meantime I want to thank you for

10     coming, sir.

11          MS. ALIKAKOS:  Off the record.

12          (Whereupon, an off-the-record

13     discussion was held.)

14          MR. GASTMAN:  Plaintiff's

15     counsel wishes to leave a trail of

16     breadcrumbs for the summary judgment

17     writers and other readers of this

18     record.  We have received in ordinary

19     discovery many of the usual documents

20     we would expect to see in these kinds

21     of cases and we got paper discovery

22     from Davs Partners.  It's their

23     Response to Combined Demands.  That

24     response was dated January 3, 2022

25     and in there, in addition to other

Page 56

```
 1                    KLEEMAN
 2          things, there were three agreements.
 3          I'm going to mention them just for
 4          the readers of the records.  There
 5          were two A.S.K. Electrical Master/
 6          Subcontract Agreements, one with
 7          Kalnitech and the other one with JIM
 8          Associates.  They were under A.S.K.'s
 9          letterhead on top.  Those are Mr.
10          Kleeman signed for A.S.K. and Gus
11          signed for Kalnitech and somebody
12          with the initials of JIM signed for
13          JIM and we have a third agreement
14          here and it says on top "Short Form
15          Prime Contract Between Owner and
16          Contractor" and on its face in
17          writing it's between A.S.K. and Davs
18          Partners for the construction
19          project.  Thank you.  I just wanted
20          to leave that trail of breadcrumbs.
21               MR. RECCHIA:  Off the record.
22               (Whereupon, an off-the-record
23          discussion was held.)
24     EXAMINATION BY
25     MR. RECCHIA:
```

```
 1                    KLEEMAN
 2         Q.    Good morning, Mr. Kleeman.
 3         A.    Good morning.
 4         Q.    My name is Maurice Recchia.  I
 5   am an attorney.  I represent Kalnitech
 6   Construction Company in this case.
 7              I'm going to ask you some
 8   further questions today about this case and
 9   about the nature of any agreement or any
10   contract or any relationship between DAVS
11   Partners LLC and Kalnitech.  If you don't
12   understand any question that I ask you,
13   please let me know and I will be happy to
14   try to repeat it or rephrase it.  As you've
15   already heard, it's important that you
16   answer with words that come out of your
17   mouth and not with any gestures.  Also
18   while we're together here, you can take a
19   break at any time for any reason, sir,
20   including to speak with your attorney.
21   However, what I ask that you do is you
22   answer any question that I've posed to you
23   or which is pending before you request to
24   take a break for any reason or that you
25   request to speak to your attorney.  Is that
```

Page 58

```
 1                    KLEEMAN
 2   okay?  Is that fair enough, sir?
 3        A.    Yes.
 4             MR. RECCHIA:  Okay, alright,
 5         MJ, would you put the first contract
 6         up and we're marking that as
 7         Defendant's Exhibit A.
 8             (Whereupon, the Short Form
 9         Contract Between Owner & Contractor
10         was deemed marked as Defendant's
11         Exhibit A for identification as of
12         this date by the court reporter and
13         was put up on the screen for the
14         parties to share.)
15        Q.    Okay, sir, we put a document up
16   on the screen that we're marking as
17   Defendant's Exhibit A today.  Can you see
18   it?
19        A.    Yes.
20        Q.    Okay, and I'll just read it.
21   The top of it says "Short Form Prime
22   Contract Between Owner and Contractor" and
23   then it says, "This agreement is made this
24   11th day of March, 2019," and the number
25   "11th" and the word "March" is handwritten
```

```
 1                        KLEEMAN
 2    and then it says the contract is "between
 3    A.S.K. Electrical Corp. (contractor) and
 4    Davs Partners LLC (owner)".  Do you see
 5    that, sir?
 6          A.    Yes.
 7          Q.    Have you ever seen this
 8    document before today?
 9          A.    Yes.
10          Q.    Okay, do you know whose
11    handwriting it is up there that wrote in
12    "11th" and the word "March"?
13          A.    My office administrator.
14          Q.    Who is that, sir?
15          A.    Kavita, K-A-V-I-T-A.
16                MR. RECCHIA:  Okay, alright,
17           and now, MJ, would you please go to
18           the bottom of the document.  There's
19           the signature page.
20                (Whereupon, the document was
21           put up on the screen for the parties
22           to share.)
23          Q.    Okay, sir, can you see the
24    signature area of this document?
25          A.    Yes, I can.
```

```
 1                        KLEEMAN
 2          Q.     Okay, do you see on the left
 3    side there's a signature block and it says
 4    "owner, Davs Partners LLC" and it looks to
 5    be a signature of a person named "Vanessa
 6    Kleeman" and then handwritten it says
 7    "Vanessa Kleeman".  Do you see that?
 8          A.     Yes, I do.
 9          Q.     Ms. Kleeman, if I recall from
10    your testimony earlier today, Ms. Kleeman
11    is your wife, correct?
12          A.     That is correct.
13          Q.     If I recall your testimony, Ms.
14    Kleeman is also co-owner with you of Davs
15    Partners LLC, is that correct?
16          A.     Yes.
17               THE COURT REPORTER:  Off the
18          record.
19               (Whereupon, an off-the-record
20          discussion was held.)
21               MR. RECCHIA:  I would like to
22          put "Vanessa".  She's a legal person
23          listed on the LLC agreement, which
24          are multiple.
25          Q.     Okay, and, sir, let's take a
```

1                    KLEEMAN

2    look at the right side signature block.  It

3    looks like there's a name, "David Kleeman"

4    and a signature and there's a title,

5    "president", and it looks like there's a

6    signature.  Is that your signature, sir?

7          A.    Yes.

8          Q.    Did you sign this document on

9    or about March 11, 2019?

10         A.    Yes.

11         Q.    Okay, do you know who drew up

12    this contract, sir?  Did you do it?  Did

13    Ms. Vanessa Kleeman do it, did Kavita do it

14    or did someone else do it?

15         A.    That was a standard contract

16    that was given to me by one of my brokers.

17         Q.    When you say "standard

18    contract", it was blank until you or Kavita

19    or someone else filled out the various

20    parts of it?

21         A.    Correct.

22         Q.    At the top where it says

23    "owner" and "contractor" referring to Davs

24    as the owner and A.S.K. as the contractor,

25    was that something that your broker typed

Page 62

```
 1                    KLEEMAN
 2   in or was that something that your office
 3   typed in or something else?
 4        A.    Yeah, well, could you repeat
 5   that?
 6             MR. RECCHIA:  Sure, you can
 7         read it back.
 8             (Whereupon, the referred to
 9         record was read back by the court
10         reporter.)
11        Q.    That's the question, sir.
12        A.    I believe my office typed this
13   in.  It is a standard contract that we use
14   and I believe Kavita typed that in.
15        Q.    Okay, and when you signed it,
16   you were signing as the president of A.S.K.
17   Electrical Corp., is that correct?
18        A.    Yes, at that time.
19        Q.    Okay, and when you signed this
20   document, was it your understanding that
21   A.S.K. Electrical Corp. was the general
22   contractor pursuant to this contract?
23        A.    No, this is just the contract.
24   You have to understand we're the owner of
25   the building, you know.  Davs is the owner
```

```
 1                    KLEEMAN
 2    of the building.  A.S.K. is in the
 3    deposition here because I'm involved with
 4    both, but this contract was put together
 5    because it wasn't going to go through
 6    Kalnitech.  We were going to pay.  This was
 7    the company, Kalnitech, and A.S.K. with
 8    each other because A.S.K. was not being
 9    listed as the contractor.  I'm my own
10    contractor, so we put a contract together
11    between A.S.K. and Davs as the contract.
12         Q.    Right, when your office drafted
13    this contract and you signed it, did you
14    sign it with the intention of having A.S.K.
15    be the general contractor for this job?
16         A.    No, no.
17         Q.    Okay.
18         A.    They were the subcontractor.
19         Q.    Does the word "subcontractor"
20    appear anywhere on this document, sir?
21              MR. RAVA:  Objection.  The
22          document will speak for itself.  You
23          can ask him questions.  Go ahead.
24              MS. ALIKAKOS:  Objection.
25         Q.    Sir, please take your time sir.
```

```
                              KLEEMAN
1
2    Can you show me anywhere on this contract
3    that we have here on the screen marked as
4    Exhibit A where it refers to A.S.K.
5    Electrical as a subcontractor, sir?
6              MR. RAVA:  If you want to point
7         to specific sections of the contract
8         and ask him about that, that's fine,
9         but I'm not going to have him search
10        through the document.
11             MR. RECCHIA:  Sure, MJ, can you
12        scroll down maybe half a page?
13             (Whereupon, the document was
14        scrolled on the screen for the
15        parties to share.)
16        Q.    Sir, we have four paragraphs on
17   the screen denominated as section two,
18   section three and section four.  Do you see
19   the word "subcontract" or "subcontractor"
20   on any of these paragraphs?
21        A.    First I have to hear the whole
22   question.  You broke up.
23             MR. RECCHIA:  Sure, MJ, if you
24        heard it, please read it back.  If
25        not, I will repeat it.
```

```
 1                      KLEEMAN
 2           I'm just going to note for the
 3      record that there appears to be a
 4      conversation between the witness and
 5      his attorney and I please ask on the
 6      record not to have that occur.
 7           (Whereupon, the referred to
 8      record was read back by the court
 9      reporter.)
10      A.    Yes.
11      Q.    Okay, can you tell me is it in
12 section two, section three or section four?
13      A.    It's in all three sections, all
14 four sections, all three sections.
15           MR. RECCHIA:  Okay, alright,
16      MJ, would you scroll down to the next
17      set of paragraphs, please.  Yes, do
18      five and six and see if you can get
19      the rest of six.  Alright, actually
20      we're going to have to do it by five.
21      Q.    Sir, looking at what's on the
22 screen as section five, do you see the word
23 "subcontract" or "subcontractor" anywhere
24 on section five?
25           MS. ALIKAKOS:  Objection.
```

                            KLEEMAN

1

2       A.      No.

3               MR. RECCHIA:  Okay, could you

4           please scroll down, MJ, just to show

5           section six?

6               (Whereupon, the document was

7           scrolled on the screen for the

8           parties to share.)

9               MR. RECCHIA:  Thank you.  There

10          we go.

11      Q.      Sir, do you see the word

12  "subcontract" or "subcontractor" anywhere

13  on section six of this contract?

14      A.      No.

15              MR. RECCHIA:  Okay, scroll

16          down, please, MJ.

17              I'm going to note again for the

18          record that it appears that Mr.

19          Kleeman's counsel is speaking to Mr.

20          Kleeman.

21              I'll ask you not to.

22              MR. RAVA:  I have not said a

23          word to Mr. Kleeman, so I resent that

24          and I respectfully request can you

25          stop making statements on the record

```
                                              Page 67

 1                         KLEEMAN
 2          that are not accurate?
 3               MR. RECCHIA:  Well, I
 4          apologize, but I heard something.
 5               MR. RAVA:  I did not say a word
 6          and you can move on right now.
 7               MR. RECCHIA:  I guess it was
 8          Mr. Kleeman speaking out loud, so I
 9          apologize if that's all that it was.
10               MR. RAVA:  You should apologize
11          and you should move on.
12               MR. RECCHIA:  Alright, MJ, can
13          you please scroll so that we see
14          section seven, if it's possible, and
15          if not, we'll just take it section by
16          section.  Alright, that's fine.
17               (Whereupon, the document was
18          scrolled on the screen for the
19          parties to share.)
20          Q.    Sir, can you see section seven
21     here displayed on the screen?
22          A.    Yes.
23          Q.    Okay, do you see the word
24     "subcontract" or the word "subcontractor"
25     anywhere on section seven of this contract?
```

```
                                          Page 68

 1                       KLEEMAN
 2        A.     No.
 3               MR. RECCHIA:  Okay, MJ, would
 4          you please scroll to Section 8, oh,
 5          good and maybe now you can go to a
 6          slightly large size, if you don't
 7          mind.
 8               (Whereupon, the document was
 9          scrolled on the screen for the
10          parties to share.)
11        Q.     Sir, do you see sections eight,
12     nine and ten of this contract?
13        A.     Yeah, yes.
14        Q.     Thank you.
15               Okay, and do you see the word
16     "subcontract" or the word "subcontractor"
17     in section 8, section nine or section ten?
18        A.     No.
19               MR. RECCHIA:  Okay, see what we
20          can look at, MJ, eleven, and see what
21          else is there.
22               (Whereupon, the document was
23          scrolled on the screen for the
24          parties to share.)
25               MR. RECCHIA:  Thank you.
```

```
1                    KLEEMAN
2       Q.    Alright, do you see section
3    eleven, sir?
4       A.    Yes.
5       Q.    Do you see the word
6    "subcontract" or "subcontractor" anywhere
7    on section eleven?
8       A.    No.
9             MR. RECCHIA:  Okay, see if we
10        can show section twelve, please.
11            (Whereupon, the document was
12         scrolled on the screen for the
13         parties to share.)
14            MR. RECCHIA:  Okay, good.
15      Q.    Sir, do you see section twelve
16   displayed on the screen on this contract
17   that we've been talking about?
18      A.    Yes.
19      Q.    Do you see the word
20   "subcontract" or "subcontractor" anywhere
21   on section twelve?
22      A.    No.
23            MR. RECCHIA:  Okay, MJ, please,
24        let's see what section you can show.
25            MS. ALIKAKOS:  I'm just going
```

```
                                      Page 70

 1                      KLEEMAN
 2          to object --
 3               MR. RECCHIA:  Sure.
 4               MS. ALIKAKOS:   (Continuing) to
 5          the extent that that document speaks
 6          for itself and the words, whatever
 7          words are contained therein.
 8               MR. RECCHIA:  Noted, counsel,
 9          noted, counsel, thank you.
10               Go back up, please, MJ, I'm
11          sorry, so section thirteen, oh, yes.
12               (Whereupon, the document was
13          put up on the screen for the parties
14          to share.)
15     Q.    Sir, do you see section
16  thirteen?  Twelve is not all displayed.
17  Yes, alright, sir, do you see section
18  thirteen?  Can you see it?
19     A.    Yes.
20     Q.    Okay, do you see the word
21  "subcontractor" anywhere on this section?
22     A.    No.
23               MR. RECCHIA:  Okay, let's
24          scroll down, please.
25               (Whereupon, the document was
```

Page 71

```
 1                         KLEEMAN
 2          put up on the screen for the parties
 3          to share.)
 4               MR. RECCHIA:  We'll skip
 5          section fourteen unless anybody has
 6          any objection.
 7               Alright, stop there, please,
 8          and see if you can make that larger.
 9               MR. GASTMAN:  Yes, I have an
10          objection.  The document speaks for
11          itself.  Is there other stuff you
12          have to ask this guy?
13               MR. RECCHIA:  Well, you can't.
14          It's not your witness.  Are you
15          directing him not to answer?  What
16          are you saying?
17               MR. GASTMAN:  Of course not,
18          I'm saying objection and the document
19          speaks for itself.  I'm not getting
20          paid by the hour.
21               MR. RECCHIA:  That's fine.
22          That's fine.
23       Q.    Sir, do you see section
24    fifteen?
25               (Whereupon, the document was
```

```
 1                    KLEEMAN
 2        scrolled on the screen for the
 3         parties to share.)
 4        A.    Yes.
 5        Q.    Okay, and are you able to see
 6   section sixteen as well?
 7             MR. RECCHIA:  Yes, we'll have
 8         to do it separately.  I'm sorry.
 9             (Whereupon, the document was
10         scrolled on the screen for the
11         parties to share.)
12        Q.    Can you see section sixteen
13   that we have on the screen, sir?
14        A.    Yes.
15        Q.    Okay, does the word
16   "subcontract" or "subcontractor" appear
17   anywhere on section sixteen?
18        A.    Not that I see.
19             MR. RECCHIA:  Okay, alright,
20         thank you, MJ.  Can you please put up
21         the next document that has "A.S.K."
22         on the upper left corner, please?
23         This will be Exhibit B.  Please mark
24         that as Exhibit B.
25             (Whereupon, the A.S.K.
```

```
                                        Page 73
 1                   KLEEMAN
 2        Electrical Contracting Corp. Master
 3        Subcontract Agreement was deemed
 4        marked as Defendant's Exhibit B for
 5        identification as of this date by the
 6        court reporter and was put up on the
 7        screen for the parties to share.)
 8        Q.    Sir, can you see this document
 9   that we marked as Exhibit B?
10        A.    I see the first paragraph of
11   it.
12        Q.    Okay, on the upper left,
13   there's a logo that appears to say "A.S.K.
14   Electrical Contracting".  Do you see that?
15        A.    Yes.
16        Q.    Alright, and on the top middle
17   it says "A.S.K. Electrical Contracting
18   Corp."  Do you see that?
19        A.    Yes.
20        Q.    Okay, and in the first
21   paragraph it says, "This Master Subcontract
22   Agreement (subcontract) made this 12th,
23   March, 2019 by and between A.S.K.
24   Electrical Contracting Corp. (hereinafter
25   contractor) with an office and principal
```

Page 74

```
 1                  KLEEMAN
 2   place of business at 26-60 BQE West, unit
 3   2, Woodside, New York 11377 and Kalnitech
 4   (hereinafter subcontractor)."  Do you see
 5   that?
 6        A.    Yes.
 7        Q.    Have you ever seen this
 8   document before today?
 9        A.    Yes.
10        Q.    Okay, do you know who drew up
11   this contract?
12        A.    Again that's a standard
13   subcontract, a standard subcontract
14   document, that we use for business.  It's a
15   standard agreement.
16        Q.    Well, what I want to know is
17   did someone in your office write the things
18   that are written here by handwriting as
19   "12th, March" and the year "2019" and the
20   word "Kalnitech"?  Did somebody in your
21   office write that?
22        A.    Yes, my office administrator,
23   Kavita.
24        Q.    Okay, did Kavita or anyone else
25   in your office type up the document before
```

```
                                                    Page 75

 1                        KLEEMAN

 2    the handwritten things were placed there?

 3         A.    No, as I mentioned before, it's

 4    a standard agreement that we use.

 5         Q.    A standard agreement between a

 6    contractor and a subcontractor?

 7              MS. ALIKAKOS:  Objection.

 8              MR. RAVA:  Objection.

 9         Q.    You can answer, sir.

10         A.    I'm not sure which documents

11    she uses, so I'm going to say I'm not sure

12    right now.

13              MR. RECCHIA:  Okay, MJ, would

14         you mind scrolling down to where

15         there are some signatures on the

16         bottom here of this document.

17              (Whereupon, the document was

18         scrolled on the screen for the

19         parties to share.)

20              MR. RECCHIA:  Great, there it

21         is.

22         Q.    Sir, I'm showing you now what

23    appears to be a signature page on this

24    document that's marked as Exhibit B.  Again

25    there's an "A.S.K." logo on the upper left.
```

Page 76

1                        KLEEMAN
2      Do you see that?
3            A.    Yes.
4            Q.    In the center of the page, it's
5      also typed "A.S.K. Electrical Contracting
6      Corp."  Do you see that?
7            A.    Yes.
8            Q.    Alright, and there are some
9      signature blocks.  Do you see them?
10           A.    Yes.
11           Q.    On the left side, there is in
12     all capitals with a colon the word
13     "subcontractor".  Do you see that?
14           A.    Yes.
15           Q.    Then there's the name typed in,
16     "Gus Stoupakis, president".  Do you see
17     that?
18           A.    Yes.
19           Q.    Is this the Gus that you were
20     referring to today earlier in your
21     testimony?
22           A.    Yes.
23           Q.    Earlier today, I believe you
24     testified that Gus was the general
25     contractor for the job, is that correct?

```
                                        Page 77

 1                    KLEEMAN

 2        A.    Correct.

 3        Q.    Alright, take a look at the

 4   right-hand side signature block.  Do you

 5   see that?

 6        A.    Yes.

 7        Q.    Again there's a word that's

 8   typed in all capitals.  It's the word

 9   "contractor" and then there's a colon and

10   then there are the words typed, "A.S.K.

11   Electrical Contracting Corp."  Do you see

12   that?

13        A.    Yes.

14        Q.    Okay, and then there's a

15   signature there and then there is typed the

16   name "David Kleeman" and "title,

17   president".  Do you see that?

18        A.    Yes.

19        Q.    Is that your signature on this

20   document, sir?

21        A.    Yes.

22        Q.    Did you sign the document on

23   March 12, 2019?

24        A.    Yes.

25        Q.    When you signed this document
```

```
 1                    KLEEMAN
 2   as the president of A.S.K. Electrical
 3   Contracting Corp., did you sign it with the
 4   understanding that A.S.K. Electrical
 5   Contracting Corp. was the contractor and
 6   Gus Stoupakis was the subcontractor?
 7            MS. ALIKAKOS:  Objection.
 8        A.    No.
 9            MR. RECCHIA:  Okay, thank you,
10        MJ.  Let's put up the other two
11        documents we have, please.
12            (Whereupon, the Department of
13        State Division of Corporations Entity
14        Information for A.S.K. Electrical
15        Corp. was deemed marked as
16        Defendant's Exhibit C for
17        identification as of this date by the
18        court reporter and was put up on the
19        screen for the parties to share.)
20        Q.    Sir, we have on the screen a
21   printout from the New York State Department
22   of State Division of Corporations.  Do you
23   see that?  On the top it says "Department
24   of State Division of Corporations"?
25        A.    Correct, yes.
```

```
 1                    KLEEMAN
 2         Q.    Okay, and over on the left
 3    side, it says "entity name" and then it
 4    says "A.S.K. Electrical Corp."  Do you see
 5    that?
 6         A.    Yes, "A.S.K. Electrical Corp.",
 7    correct.
 8         Q.    Alright, and do you see the
 9    date of filing?  It looks like August 26,
10    2010.
11         A.    Yes, yes.
12         Q.    Do you see that?
13         A.    Yes.
14         Q.    Okay, has A.S.K. Electrical
15    Corp. changed its name from A.S.K.
16    Electrical Corp. to any other name since
17    August 26, 2010?
18         A.    Okay, we had a name change.  We
19    did have a name change.  I'm not exactly
20    sure of the date, but it used to be
21    "Contracting" like I mentioned earlier.
22    This name --
23         Q.    I'm sorry.  I didn't mean to
24    cut you off.
25         A.    This name is a newer entity,
```

Page 80

1                          KLEEMAN

2    okay?  In relation to this deposition, I

3    believe it's Contracting Corp., so do we

4    have the right thing up?

5          Q.    My question simply is, sir,

6    since August 26, 2010, as far as you know,

7    has A.S.K. Electrical filed any other name

8    change with the New York State Division of

9    Corporations?

10          A.    Not that I remember.

11          Q.    Okay.

12          A.    I don't know.  I would have to

13    check the dates.  I don't recall dates very

14    well.

15          Q.    When this document was filed on

16    or about August 26, 2010, did an attorney

17    do that for your office?

18          A.    I don't recall.

19               MR. RECCHIA:  Okay, would you

20          please scroll down a little bit, MJ?

21               (Whereupon, the document was

22          scrolled on the screen for the

23          parties to share.)

24               MR. RECCHIA:  Alright, hold it

25          right there.  Thank you.

```
 1                        KLEEMAN
 2          Q.    Sir, about the middle of the
 3    page it's a little bit faint, but it says
 4    "chief executive officer's name and
 5    address".  Do you see that?
 6          A.    Yes.
 7          Q.    It says "Shainah Kleeman".  I
 8    believe you referred to this earlier and
 9    that's your daughter, correct?
10          A.    Yes.
11          Q.    Is Ms. Kleeman still the chief
12    executive officer of A.S.K. Electrical
13    Corp.?
14          A.    She is.
15          Q.    Are you also an officer of that
16    corporation?
17          A.    I am.
18          Q.    What is your title in the
19    corporation, sir?
20          A.    Vice president.
21          MR. RECCHIA:  Okay, alright,
22          thank you, MJ.  Let's go to the next
23          one.  This will be marked as Exhibit
24          D, please.
25                (Whereupon, the Department of
```

```
                                        Page 82
 1                    KLEEMAN
 2          State Division of Corporations Entity
 3          Information of Davs Partners LLC was
 4          deemed marked as Defendant's Exhibit
 5          D for identification as of this date
 6          by the court reporter and was put up
 7          on the screen for the parties to
 8          share.)
 9          Q.    Okay, sir, do you see this
10   document that we've marked as Exhibit D?
11   It says "Department of State Division of
12   Corporations" at the top.
13          A.    Yes.
14          Q.    Again over on the left it says
15   "entity name" and then it says "Davs
16   Partners LLC".  Do you see that?
17          A.    Yes.
18          Q.    Okay, and it looks like this
19   was filed on December 4 of 2018.  Do you
20   see that?
21          A.    Yes.
22          Q.    Okay, do you know if an
23   attorney filed this for your company or
24   someone else?
25          A.    I don't recall.
```

```
                                              Page 83

  1                     KLEEMAN
  2        Q.    Okay, would you have any kind
  3   of documents somewhere in your office that
  4   would indicate who filed this for your
  5   office, whether Kavita or yourself or your
  6   wife or anyone else?  Would you have any
  7   documents that would reflect who had filed
  8   this on behalf of Davs?
  9              MR. RAVA:  Objection.  It's not
 10         relevant.  Move on.
 11              MR. RECCHIA:  Counselor, are
 12         you directing the witness not to
 13         answer?
 14              MR. RAVA:  Yes, I am.  Move on.
 15              MR. RECCHIA:  Number one,
 16         relevance is not an objection.
 17              MR. RAVA:  Mark it for a
 18         ruling.
 19              MR. RECCHIA:  It's not an
 20         objection.  Relevancy is not a proper
 21         objection.
 22              MR. RAVA:  Move on.  It's
 23         totally irrelevant to this action.
 24         It's totally irrelevant to this
 25         action.
```

1                      KLEEMAN

2           MR. RECCHIA:  Are you directing

3      the witness not to answer?

4           MR. RAVA:  I am.  I've been

5      clear about that, yes.

6           MR. RECCHIA:  Could I have the

7      question?  May I have that question,

8      please, MJ?

9           (Whereupon, the referred to

10     record was read back by the court

11     reporter.)

12          MR. RECCHIA:  Okay, thank you.

13          You're directing your witness

14     not to answer that question?

15          MR. RAVA:  I am objecting and

16     he is not answering.  Move on.

17          MR. RECCHIA:  Well, with

18     respect to that, you can't tell me to

19     move on.

20          MR. RAVA:  On the record, move

21     on.

22          MR. RECCHIA:  I would just like

23     to note so you are directing the

24     witness not to answer, is that

25     correct?

Page 85

1                    KLEEMAN
2          MR. RAVA:  This is wholly
3      irrelevant to this action.
4          MR. RECCHIA:  I will just note
5      for the record --
6          MR. RAVA:  It's a valid
7      objection.  Sir, you can note
8      whatever you want.  Move on.
9          MR. RECCHIA:  I will just note
10     for the record I'm sure Mr. Rava is
11     aware that pursuant to the Rules 22
12     NYCRR Section 221.1, "Objections at
13     depositions.  Objections in general.
14     No objections shall be made at a
15     deposition except those which,
16     pursuant to subdivision (b), (c) or
17     (d) of Rule 3115 of the CPLR, would
18     be waived if not interposed, and
19     except in compliance with subdivision
20     (c) of such rule.  All objections
21     made at a deposition shall be noted
22     by the officer before whom the
23     deposition is taken, and the answer
24     shall be given and the deposition
25     shall proceed subject to the

```
                                          Page 86
 1                    KLEEMAN
 2       objections and to the right of a
 3       person to apply for appropriate
 4       relief pursuant to Article 31 of the
 5       CPLR."  In light of that rule, sir,
 6       are you still directing your witness
 7       not to answer?
 8            MR. RAVA:  Move on.  I'm
 9       objecting.
10            MR. RECCHIA:  I'll take that
11       answer as a yes.
12            MJ, please mark that for a
13       ruling.
14            Would you please scroll down
15       just a little bit more on this
16       document, Exhibit D.
17            (Whereupon, the document was
18       scrolled on the screen for the
19       parties to share.)
20            MR. RECCHIA:  Thank you.
21       That's good.  That's good.
22       Q.    Interesting, alright, sir, do
23   you see here it says in gray it says
24   "entity display" and then it says "service
25   of process on the Secretary of State as
```

Page 87

1                     KLEEMAN
2    agent".  Do you see that?
3         A.    Yes.
4         Q.    Do you see that the person to
5    whom service and process will be directed
6    for this corporation is Vanessa Kleeman at
7    Maple Drive, Saint James, New York?
8         A.    Yes.
9         Q.    I believe you testified that
10   Vanessa Kleeman is your wife, correct, sir?
11        A.    Yes.
12        Q.    Okay, and are you also an
13   officer in Davs LLC?
14        A.    Yes.
15        Q.    What is your position with
16   Davs, sir?
17        A.    I'm an officer of the company.
18        Q.    Are you vice president,
19   president or something else?
20        A.    Vice president, I believe.
21        Q.    Alright, okay, I believe you
22   testified earlier that you would visit this
23   site that we're talking about at 217-14
24   Hempstead Avenue, Queens Village, New York
25   approximately twice a week.  Did I hear you

```
                                        Page 88

 1                    KLEEMAN
 2    correctly?
 3         A.    Yes.
 4         Q.    Okay.
 5         A.    I would visit it a couple of
 6    times.
 7         Q.    Okay, alright, did you ever
 8    sequence any of the workers who were
 9    responsible for any of the work being
10    sequenced at the jobsite?
11         A.    Can you be more specific when
12    you say "sequence"?
13         Q.    Sure, and when I refer to the
14    jobsite, you understand that I'm talking
15    about the 217-14 site, right?
16         A.    Yes.
17         Q.    Did you set any deadlines or
18    schedules for any of the phases of the work
19    to be completed at this jobsite?
20         A.    That was coordinated with Gus
21    through Kalnitech.
22         Q.    Right, what I want to know is
23    did you set the schedules, did Gus set the
24    schedules, did both of you do it together
25    or something else?
```

1                    KLEEMAN

2       A.    Well, there were different

3  contractors and subcontractors, so, yes,

4  Gus would set the schedules of the

5  contractors.

6       Q.    Did you have any input into

7  setting the schedules or the deadlines for

8  the various work to be performed at the

9  jobsite?

10      A.    For my electricians, yes.

11      Q.    Did you have to set any

12  deadlines for any of the other work done by

13  any of the other subcontractors, et cetera?

14      A.    That was again coordinated

15  through Gus.

16      Q.    Is it your testimony that you

17  did not set any deadlines or schedules for

18  this jobsite except for the A.S.K.

19  Electrical workers?

20           MS. ALIKAKOS:  Objection.

21       Asked and answered.  Objection.

22           MR. RAVA:  Objection.  Asked

23        and answered.

24           Go ahead.  You can answer.

25      A.    I didn't hear the question.

1                    **KLEEMAN**

2              MR. RAVA:  Repeat it.

3        Q.    Did you, Mr. Kleeman, hire any

4    kind of expediter to move any paper work to

5    the New York City Department of Buildings

6    for any work done at this jobsite?

7        A.    Yes, that was part of the

8    expediters on the job.  Correct, the

9    architects who designed the drawings were

10   the actual expediters for the job as well.

11       Q.    Okay, alright, so the

12   architects were also the expediters, is

13   that correct?

14       A.    Correct, that firm used their

15   expediters to expedite the project,

16   correct.

17       Q.    Alright, who were the

18   architects for the job, sir?

19       A.    Built-In is the name of the

20   company.

21       Q.    Okay, would that be B-U-I-L-T -

22   In or something else?

23       A.    B-U-I-L-T, Built-In, B-U-I-L-T.

24       Q.    "Built-In", okay, is that one

25   word?

```
                                              Page 91
 1                        KLEEMAN
 2        A.     I think there's a hyphen in
 3   between.
 4        Q.     Alright, and where did Built-In
 5   have their offices back in 2019, if you
 6   know?
 7        A.     In Manhattan.
 8        Q.     Okay.
 9        A.     I don't know the exact address,
10   but I've been there.
11        Q.     Alright, and did you, David
12   Kleeman, as a representative of Davs sign
13   any contract with Built-In?
14        A.     Not as Davs, no.
15        Q.     Did you, David Kleeman, as a
16   representative of A.S.K. sign any contract
17   with Built-In?
18        A.     Yes.
19             MR. RECCHIA:  Okay, of course,
20        I will follow up in writing and make
21        a demand for any contract between
22        A.S.K. or Mr. Kleeman and Built-In.
23             MR. RAVA:  I'm going to object
24        to your request for documents with
25        respect to A.S.K.  I'm objecting to
```

```
                                        Page 92
 1                   KLEEMAN
 2        any request for documents from A.S.K.
 3   _____
 4        Q.    Sir, did you keep a project
 5   file for this project?
 6        A.    I kept some records, yes, paper
 7   work, if that's what you call a project
 8   file.
 9        Q.    Alright, when you say you kept
10   paper work, did you keep that in the
11   offices of A.S.K. Electrical or something
12   else?
13        A.    Yes, it was kept with A.S.K.
14   Electrical.
15        Q.    Okay, when you would visit the
16   jobsite roughly two times a week, did you
17   ever give any direction to any of the
18   subcontractors working at the site besides
19   A.S.K. Electrical's workers?
20              MR. RAVA:  Objection to the
21         form.
22              You can answer over the
23         objection.
24        A.    No, unless there was a
25   contractor that I brought in but for the
```

Page 93

1                        KLEEMAN
2    most part, no.
3         Q.    Dwayne Hudson was your foreman,
4    that is, the foreman for A.S.K. Electrical
5    at the site, correct?
6         A.    Yes.
7         Q.    Okay, do you know if Dwayne
8    Hudson ever kept any daily work logs at the
9    site?
10        A.    Not to my knowledge other than,
11   like I mentioned earlier, in his toolbox
12   talks and whatever he was required to keep.
13        Q.    Okay, did he record those, you
14   know, on any type of log sheet, these
15   toolbox talks?
16        A.    I would have to look into that
17   to see if they're still around on top of a
18   gangbox somewhere.
19        Q.    Okay, would you have kept any
20   of those toolbox talk records in the
21   project file that you maintained for this
22   project?
23        A.    I didn't say I maintained a
24   project file.  I just had some papers.
25        Q.    Alright, would you have

1                    **KLEEMAN**

2    maintained any of those toolbox talk logs

3    or records or sheets in the paper work you

4    kept in this file?

5         A.    Again that would be something

6    that I would need to check out with my

7    superintendent and my office that we would

8    normally turn them into and see if we still

9    have it if we have them.

10        Q.    Alright, who was your

11   superintendent at the time back in June of

12   2019?

13        A.    Asif Jumedeen, Asif, A-S-I-F,

14   Jumedeen, J-U-M-E-D-E-E-N.

15        Q.    Did Mr. Jumedeen work in the

16   office of A.S.K., did he ever go to the

17   site, some combination of those --

18        A.    No.

19        Q.    (Continuing) or something else?

20        A.    No, he was on the project,

21   never visited the site.

22        Q.    He only worked --

23        A.    Oh, I shouldn't say that.  No,

24   strike that.  I mean he had visited the

25   site.  He did visit the site and see

                                                    **Page 95**

1                          **KLEEMAN**

2    Dwayne, correct.

3         Q.    Alright, did he do that just

4    one time or did he do that, you know,

5    periodically or something else?

6         A.    Probably once a week.

7         Q.    Okay.

8         A.    If that.

9         Q.    I'm sorry?

10        A.    I said probably once a week, if

11   that, but it was a slow project that he was

12   involved with.

13        Q.    Alright, did you ever give any

14   instructions to Mr. Jumedeen to convey to

15   Mr. Hudson about the project and the work

16   in progress?

17        A.    Yes, Mr. Jumedeen worked on the

18   project and early on he did the electrical

19   service physically himself.

20        Q.    Okay, so he's an electrician as

21   well?

22        A.    Yeah, yes, he's the

23   superintendent.

24        Q.    Okay, do you know if Mr.

25   Jumedeen kept any records of the progress

Page 96

1                          KLEEMAN
2    of the work at the site?
3          A.    No, he did not.
4          Q.    Okay, alright, do you know did
5    you, Mr. Jumedeen, Mr. Hudson or anyone
6    else maintain any progress photos of the
7    work in progress from the jobsite?
8          A.    I would have to say that is a
9    question that I can't answer for them.  I
10   have some pictures that I've taken, you
11   know, along the way.
12         Q.    So the answer is, yes, you did
13   take some progress photos of the project?
14         A.    No, I said I did.  I don't know
15   about them, but I said I did.
16         Q.    I'm asking you.  I'm sorry, so
17   let me rephrase it.  I apologize.
18               Did you take any progress
19   photos of the work on the site of this
20   project?
21         A.    Yes.
22         Q.    Okay, where are those photos
23   now, sir?
24         A.    Probably in my phone.
25         Q.    Alright, I'm going to ask that

Page 97

1                         KLEEMAN
2    you please preserve them.
3                 MR. RECCHIA:  We will make a
4          demand in writing and we'll follow
5          that up and ask for any photos,
6          progress photos, from the site of
7          this accident up until the date of
8          the accident taken by Mr. Kleeman.
9    _____
10        Q.    Was there any separate security
11   company that was on the site that was hired
12   by you for the site?
13        A.    No.
14        Q.    How was the site secured in the
15   hours when work wasn't being done?  Do you
16   know?
17        A.    I think Gus would just secure
18   the site at the end of the day.
19        Q.    How would that happen?
20        A.    He had the keys and he locked
21   up.
22        Q.    Okay, you mean the building
23   itself?
24        A.    Yes.
25        Q.    Okay, did A.S.K. Electrical

```
 1                     KLEEMAN
 2   provide a gangbox that was located on the
 3   site?
 4            MR. RAVA:  I couldn't hear the
 5        full question.  May Jean, can you
 6        read it back?
 7            (Whereupon, the referred to
 8        record was read back by the court
 9        reporter.)
10        A.    Yes.
11        Q.    Okay, and was that gangbox for
12   the use of A.S.K. Electrical's workers, was
13   it for the use of other contractors on the
14   site or something else?
15        A.    A.S.K. solely for A.S.K.'s
16   workers.
17        Q.    Okay, what kind of equipment
18   was kept in the gangbox?
19        A.    Men's hand tools, personal
20   tools, men's personal tools.
21        Q.    Men's?  You mean workers'
22   personal tools?
23        A.    Yeah, yeah, yeah, workers'
24   personal tools, the guys' personal tools,
25   tool bags.
```

```
                                        Page 99
 1                      KLEEMAN
 2        Q.     Okay, tool bags, hand tools and
 3    any kind of hand-powered tools and things
 4    like that?
 5        A.     Correct.
 6        Q.     Was there any kind of safety
 7    equipment that was kept in that gangbox
 8    that was used by any other contractors on
 9    the site?
10        A.     Not to my knowledge.
11        Q.     Okay, who actually placed the
12    gangbox on the site?  Was it an A.S.K.
13    Electrical worker or someone else?
14        A.     It had to be an A.S.K.
15    Electrical worker.  Who else was going to
16    bring it to the site?
17        Q.     Yes, but do you know?
18        A.     Do I know who it was personally
19    who brought the box to the site?
20        Q.     Yes.
21        A.     In 2019, no.
22        Q.     Okay, were there blueprints on
23    the site that other trades were able to
24    look at as they performed work on the site?
25        A.     Every trade was provided with a
```

Page 100

1                    KLEEMAN
2    set of blueprints.
3         Q.    Right, okay, and who provided
4    the blueprints?
5         A.    It depends on who you're
6    asking.  Gus provided them for the
7    contractors that he needed them for and I
8    provided them to my guys.
9         Q.    Well, who provided the
10   blueprints to Gus?
11        A.    We're a contracting business.
12   I have a machine that prints them out, so
13   there were ones that Gus printed it on his
14   own and there were some that were printed
15   out by the architects.
16        Q.    When you say that Gus printed
17   it out on his own, where did they come
18   from?  Did they come from a computer that
19   A.S.K. Electrical kept, did they come from
20   the architects' office or someplace else?
21        A.    They came from the architects'
22   office.  There are e-mails, I guess, that
23   were sent out from the architects' office,
24   absolutely.
25        Q.    Okay, did you ever provide any

```
                                          Page 101
 1                      KLEEMAN
 2    blueprints  to  any  of  the  other
 3    subcontractors  on  the  site?
 4         A.     I  provided  them  for  my  guys,
 5    A.S.K.  Electrical.
 6         Q.     Did  you  provide  blueprints  to
 7    any  of  the  other  subcontractors  working  on
 8    the  site?
 9         A.     Again  I  printed  out  drawings
10    and  gave  them  to  Gus  from  Kalnitech.
11         Q.     Right,  and  forgive  me  if  I
12    didn't  hear  your  answer.   What  I'm  asking
13    is  did  you  yourself  or  did  A.S.K.
14    Electrical  provide  blueprints  to  any  of  the
15    other  subcontractors  on  the  site?
16         A.     No,  there  was  a  set  of  drawings
17    that  was  onsite  that  everybody  used  just
18    for  the  record.
19         Q.     Okay,  who  brought  that  set  of
20    drawings  to  the  site?
21         A.     Me.
22         Q.     Okay.
23         A.     Again  I  told  you  I  have  a
24    printer.   We  printed  them  out.
25         Q.     You  got  the  blueprints  from  the
```

```
 1                    KLEEMAN
 2   architects, you printed them out in your
 3   office and then took them over to the site,
 4   correct?
 5        A.    And then put them on the
 6   jobsite and then there was a set of
 7   drawings on the jobsite that Gus
 8   maintained, correct.
 9        Q.    The blueprints that you
10   provided to the site, were they kept in the
11   gangbox or were they kept in another place
12   or something else?
13        A.    They were kept out for everyone
14   to use.
15        Q.    Okay, was there an office
16   onsite that all the contractors could use,
17   you know, to look at the blueprints or do
18   anything else they might need to do?
19        A.    No, but there was an area where
20   there was a big table that they kept the
21   blueprints on and everybody addressed them
22   as needed.
23        Q.    Who brought that table to the
24   site?
25        A.    That I don't know.
```

```
                                           Page 103

 1                       KLEEMAN
 2        Q.     Okay, was that table left out
 3    in the open at the end of work at the end
 4    of the day or was it placed inside
 5    somewhere or something else?
 6        A.     Again I wasn't there everyday,
 7    so I can't answer that question because
 8    every time I came there the table was in a
 9    different place.
10        Q.     Okay, alright, now if I heard
11    you correctly -- and correct me if I'm
12    wrong -- you hired some of the
13    subcontractors for the site, is that
14    correct, or no?
15        A.     Yes.
16        Q.     Okay, alright, did you hire any
17    mechanical subcontractors for the site?
18             MR. RAVA:  Note my objection to
19        the term "you".
20             Go ahead.  You can answer.
21        A.     There was a plumber.  Again you
22    have to remember in the industry, you know,
23    we work with other contractors, so, yes, I
24    had brought in a couple of contractors.
25        Q.     Okay, and I'm trying to find
```

```
 1                   KLEEMAN
 2    out specifically what were the other
 3    subcontractors that you brought in, and
 4    when I'm referring to "you", I'm referring
 5    either to you as David Kleeman or David
 6    Kleeman as, I believe, the president of
 7    A.S.K. Electrical.  Fair enough?
 8         A.    Yes.
 9         Q.    Alright, so I'm going to ask
10    you again in your capacity as the president
11    of A.S.K. Electrical bring in or hire any
12    mechanical contractors or subcontractors
13    for the site?
14              MR. RAVA:  Note my objection.
15              You can answer.
16         A.    Yes.
17         Q.    Alright, and the same question,
18    did you or did A.S.K. Electrical hire any
19    HVAC contractors or subcontractors for the
20    site?
21              MR. RAVA:  Just note my
22         objection.
23              You can answer.
24         A.    Yes.
25         Q.    Okay, did you or did you in
```

```
 1                    KLEEMAN
 2    your capacity as the president of A.S.K.
 3    Electrical hire any plumbers for the site?
 4              MR. RAVA:  Objection.  Asked
 5         and answered.
 6              Go ahead.
 7         A.    Yes.
 8         Q.    Okay, did you or you in your
 9    capacity as the president of A.S.K.
10    Electrical hire any masons for the site?
11              MR. RAVA:  Objection.
12         A.    No, Kalnitech brought in the
13    masons.
14         Q.    Okay, did you hire any other
15    subcontractors besides mechanical, HVAC or
16    plumbers?
17         A.    A roofing contractor.
18         Q.    Okay, now when you hired any of
19    these subcontractors, mechanical, HVAC,
20    plumbers or roofing, did you or in your
21    capacity as the president of A.S.K. sign
22    any contracts with any of these
23    subcontractors?
24              MR. RAVA:  Objection.
25              You can answer.
```

1                    KLEEMAN

2        A.    I've got to check.

3        Q.    Okay, is it possible that you

4    signed some contracts with these

5    subcontractors?

6        A.    I would have to check.

7    Honestly I don't recall.

8            MR. RECCHIA:  Okay, alright,

9        I'll just make a note that we'll make

10       a demand in writing.  Of course,

11       we'll follow up.

12   _____

13       Q.    Was there someone in your

14   office who was responsible for drawing up

15   any contracts that may have been drawn up

16   between A.S.K. Electrical and any of the

17   subcontractors?

18            MR. RAVA:  Objection.

19            You can answer over my

20        objection.

21       A.    I would have to check.

22       Q.    Okay, alright, now let's talk

23   about JIM.

24            MR. RECCHIA:  Off the record.

25            (Whereupon, an off-the-record

```
 1                    KLEEMAN
 2        discussion was held.)
 3        Q.    Let's talk about JIM.  I think
 4   before we were calling it JM, but I think
 5   the company is JIM Associates, am I right,
 6   sir, or correct me if I'm wrong.
 7        A.    JIM Associates, I believe.
 8        Q.    Right, and JIM Associates was
 9   also a subcontractor at this jobsite,
10   weren't they?
11        A.    Correct.
12        Q.    Okay, did you hire JIM
13   Associates, did Gus hire them or something
14   else for the jobsite?
15        A.    Well, Gus had a relationship
16   with them prior.  He brought them in and
17   they worked in terms of the contract.  Gus
18   just said, you know, pay them directly.
19   Towards the end of the job, they were doing
20   all the finish work.  Gus just said, you
21   know, pay them directly.
22        Q.    Well, as you said, Gus said to
23   pay them directly.  Does that mean that JIM
24   Associates received payment from A.S.K.
25   Electrical or from some other entity?
```

1                    KLEEMAN

2       A.    From A.S.K. Electrical.

3             MR. RAVA:  Off the record.

4             (Whereupon, an off-the-record

5         discussion was held.)

6             MR. RECCHIA:  Can I have the

7         last question and answer, please?

8             (Whereupon, the referred to

9         record was read back by the court

10        reporter.)

11      Q.    Did A.S.K. Electrical sign a

12  contract or enter into a contract with JIM

13  Associates for this job?

14      A.    Yes.

15      Q.    Okay, did you sign that

16  contract on behalf of A.S.K.?

17      A.    I believe so.

18            MR. RECCHIA:  Okay, alright,

19        again to the extent that it hasn't

20        already been provided, which I don't

21        think it has, I will call for a copy

22        of the contract between A.S.K. and

23        JIM.  Of course, we'll put it in

24        writing.

25            MR. RAVA:  I'm objecting to any

Page 109

1                        **KLEEMAN**

2          request for documents.

3    ——————————————————————————————————————————

4          Q.    Sir, earlier in the deposition,

5    actually close to the beginning, I believe

6    you testified when Mr. Gastman was asking

7    you questions that you reviewed a

8    deposition transcript sometime in the past.

9    Do you remember that?

10         A.    Yes.

11         Q.    Am I characterizing your

12   testimony accurately?

13              MR. RAVA:  I object to the

14          characterization of his response, but

15          what was your question?

16         Q.    Did you testify earlier today

17   that you had read a transcript of testimony

18   from this case at some point in the past?

19         A.    I did not read it.  I opened

20   the mail and I did not read it.  I saw the

21   size of it and put it back in the folder.

22   I did not read it at all (indicating).

23         Q.    Did you ever read the

24   transcript of the testimony of Dwayne

25   Hudson in this case?

```
                                              Page 110

 1                        KLEEMAN

 2        A.     No.

 3        Q.     Did you ever learn about any of

 4   the substance of Dwayne Hudson's testimony

 5   in this case?

 6             MR. RAVA:  Objection.

 7        A.     No.

 8        Q.     Alright, did anybody ever tell

 9   you anything about the substance of Dwayne

10   Hudson's testimony in this case?

11             MR. RAVA:  Objection.

12        A.     No.

13        Q.     Okay, did you ever sign a

14   waiver of lien with JIM Associates Corp.

15   whereby JIM Associates released Davs from a

16   lien in the amount of $62,891.00?

17             MR. RAVA:  Do you have the

18        waiver of lien that you're referring

19        to that you can show us?

20             MR. RECCHIA:  Are you directing

21        the witness not to answer the

22        question, counsel?

23             MR. RAVA:  I'm asking you can

24        you show him the document that you

25        seem to be reading from and it would
```

```
                        KLEEMAN
 1
 2      only be common courtesy for you to
 3      supply us with a copy of the document
 4      that you're referencing.
 5            MR. RECCHIA:  Counsel, are you
 6      directing the witness not to answer
 7      the question?
 8            MR. RAVA:  I'm asking you to
 9      supply us with the document that
10      you're referencing.  If you're going
11      to ask my client about a document
12      that you are acting as though you
13      have, you should show it to him.
14            MR. RECCHIA:  Counsel, I don't
15      have the document, but I am referring
16      to testimony, so if you wait a
17      second, I'll be happy to provide it.
18            MR. RAVA:  Does the document
19      exist?
20            MR. RECCHIA:  Are you directing
21      the witness not to answer the
22      question?  Are you directing the
23      witness not to answer, counsel?
24            MR. RAVA:  I want to know if
25      you have the document.
```

1          KLEEMAN

2              MR. RECCHIA:  I don't have the

3          waiver, but I have testimony about

4          the waiver, but I don't need to tell

5          you about that, but that's alright.

6          Are you directing the witness not to

7          answer?  I will find the testimony.

8              MR. RAVA:  I want to see the

9          document that you're referencing.

10             MR. RECCHIA:  I just told you I

11         don't have it, but I have testimony.

12             MR. RAVA:  Well, what's your

13         question, Mr. Recchia?

14             MR. RECCHIA:  Can you please

15         read back the question, MJ?

16             (Whereupon, the referred to

17         record was read back by the court

18         reporter.)

19     Q.    That was the question.  Would

20   you answer that question, sir.

21             MR. RAVA:  You can answer.

22     A.    I don't recall.  I would have

23   to see the document to see if my

24   signature's on it.  I don't recall.

25             Q.    Alright, I'm going to read some

1                    KLEEMAN

2    testimony into the record because I do not

3    have the lien itself.  I am going to be

4    reading and then I will be asking you some

5    further questions.  I will be reading the

6    testimony of Dwayne Hudson.  The testimony

7    was taken on April 11, 2022.  Present at

8    that deposition was Kenneth Klein from

9    Gorayeb, present at the deposition was

10   Keith Richman from Richman & Levine

11   representing Davs Partners and at the time

12   Robert Brigantic for the offices of Michael

13   Swimmer representing Kalnitech

14   Construction, so I'm going to be reading

15   from that deposition.  I'll try to be clear

16   about the pages I'm reading from.  Again

17   this was the deposition from Hudson.  I

18   will begin reading.  I will start reading

19   from page 103.

20             MS. ALIKAKOS:  Let me just put

21        my objection on the record.  I'm

22        certainly not directing anything, but

23        let me make clear that we're

24        objecting to any testimony read in at

25        a deposition of a witness to the

1                    KLEEMAN

2          extent that you are asking this

3          witness on behalf of A.S.K.

4          Electrical whether any of this

5          deposition testimony, which he wasn't

6          a party to and/or reviewed, to the

7          extent that they're asking any

8          questions about that.  It's whatever

9          his knowledge is.

10              MR. RECCHIA:  This goes to --

11              MS. ALIKAKOS:  It's outside the

12          scope.  Okay, I just need to protect

13          my interest.  To the extent that

14          you're asking the witness with

15          respect to any testimony that a prior

16          deponent made to which A.S.K.

17          Electrical was not a party to the

18          lawsuit and/or reading it as a fact,

19          I'll object to that and mark that and

20          call it improper and that's all.

21              MR. RECCHIA:  Okay.

22      Q.    Alright, so starting at page

23   103 of Dwayne Hudson, "Question.  Have you

24   ever seen a waiver of lien?"  "Answer," by

25   Mr. Hudson, "No, never seen.  "Question.

1                    KLEEMAN

2    Have you ever signed one?  Answer.  No."

3    By Mr. Brigantic, "I am going to show you

4    Defendant's Exhibit C.  Did you see what I

5    put up on the screen?  "Answer," by Mr.

6    Hudson, "Yes.  Question.  Can you read off

7    the very top line which is the title of the

8    document?  Answer.  Final combined waiver

9    of lien and general release.  Question.

10   You never seen this document before?

11   Answer.  No.  Question.  This refers to JIM

12   Associates Corp. having been employed by

13   A.S.K. Electrical Corp. to furnish labor

14   and/or materials for the building at 217-14

15   Hempstead Avenue, Queens.  Do you see that

16   in the first paragraph?  Answer," by Mr.

17   Hudson, "Yes, I just read it.  Question.

18   Does this refresh any recollection you

19   might have whether it was A.S.K. Electrical

20   that hired JIM Associates?  Answer.  No, in

21   terms of the paper work I never seen the

22   paper work that dealt with the project.

23   Only paper work I deal with the prints that

24   they gave me to proceed with the build out

25   for the electric.  Question.  There is a

1          KLEEMAN

2   paragraph that starts now, do you see that

3   paragraph? Answer. Yes. Question. The

4   next paragraph after that is whereas. Do

5   you see that? Answer. Yes. Can you read

6   for me what the first sentence in that

7   whereas paragraph?" That's what it says,

8   so that's sic. "Can you read what the

9   first sentence in the first paragraph?"

10  That's the question. "Answer. Whereas JIM

11  Associates Corp., the undermined, as

12  releasor, successors and assigns, in

13  consideration of $62,891 total cumulative

14  dollars and other goods and valuable

15  consideration, has released and does

16  release and forever discharge Davs

17  Partners, the owner, and A.S.K. Electrical

18  Corp., general contractor, collectively

19  referred to herein as the releases and each

20  of the respective releases, shareholders,

21  officers, directors, employees, agents,

22  representatives, successors and assigns

23  from all actions, causes of action, sums of

24  money, or any other liability arising out

25  of or in connection with the project and

```
                                      Page 117
 1                    KLEEMAN
 2    work contracted for and demands whatsoever,
 3    in law, admiralty or equity, which against
 4    either or both of the releasees.  Question.
 5    That's the first sentence.  You can stop
 6    there."
 7              MR. GASTMAN:  I'm sorry.  Is
 8         there a question there somewhere?  I
 9         think we have to call you as a
10         witness.
11              MS. ALIKAKOS:  I'm going to
12         renew my objection.
13              MR. RAVA:  Objection.
14              MR. GASTMAN:  I want to know if
15         there was a question.  Was that a
16         question?
17         Q.    Sir, after having read or heard
18    me read and review the testimony from your
19    foreman, Mr. Hudson, does that in any way
20    refresh your recollection that Davs or
21    A.S.K. ever signed a waiver of lien to JIM
22    Associates?
23              MR. RAVA:  Objection.  I'm
24         objecting to the question and the
25         form of the question because what
```

1                    KLEEMAN
2          you're asking him to comment upon is
3          not Mr. Hudson's testimony but on
4          information that was read by a
5          questioner into the record just so
6          that we're clear, so I'm objecting to
7          that on both bases.
8                 MR. RECCHIA:  Are you directing
9          the witness not to answer?
10                 MR. RAVA:  Over my objection,
11        he can answer.
12                 MR. RECCHIA:  Okay, thank you.
13      Q.    You can answer, sir.
14      A.    I don't even understand the
15  question.
16      Q.    Okay, does what I just read
17  about the waiver of lien in any way refresh
18  your recollection that you signed any kind
19  of waiver with respect to JIM Associates?
20                 MR. RAVA:  Objection.
21                 You can answer.
22      A.    No.
23      Q.    Okay, alright, would you have
24  any such waiver of lien in any of the paper
25  work that you may have kept for this

```
                                        Page 119

 1                    KLEEMAN

 2   project in your office?

 3              MR. RAVA:  Objection.  Please

 4         ask the question in a different way.

 5              MR. RECCHIA:  Are you directing

 6         your witness not to answer?

 7              MR. RAVA:  I'm objecting to the

 8         form of the question because I think

 9         it's misleading and I'm asking you to

10         seek another way to ask the question.

11              MR. RECCHIA:  Can I hear the

12         question back, please, MJ?

13              (Whereupon, the referred to

14         record was read back by the court

15         reporter.)

16              MR. RECCHIA:  That's the

17         question.

18              MR. RAVA:  Again I'm objecting

19         because it assumes that one exists.

20         If you want to ask the question, ask

21         the question.  Ask the right

22         question.

23              MR. RECCHIA:  Are you directing

24         the witness not to answer?

25              MR. RAVA:  You are putting
```

```
                                        Page 120

 1                    KLEEMAN

 2         testimony in your question that may

 3         not be true, so please ask the proper

 4         question.

 5              MR. RECCHIA:  I'm asking.  I'll

 6         mark this for a ruling and I'll try

 7         to do it a different way.

 8              MR. RAVA:  I'm telling you

 9         there is a way to get the information

10         if you ask the proper question, but

11         I'm not going to allow a question

12         that assumes facts that may not be

13         true.

14              MR. RECCHIA:  Again mark it for

15         a ruling.

16              MR. GASTMAN:  Off the record.

17              (Whereupon, an off-the-record

18         discussion was held.)

19              MR. RAVA:  For the record, my

20         firm does not have a copy of the

21         documents that counsel is

22         referencing.  They are documents that

23         apparently were in the possession of

24         his client and his client's prior

25         counsel.  To the extent that they
```

1                    KLEEMAN

2          were used previously as a part of the

3          record, I need copies of that and my

4          client should be allowed to see them

5          before questions are asked about

6          them.

7                  MR. GASTMAN:  Plaintiff's

8          counsel joins in and wishes to add to

9          this that in this case the lawyers

10         for Kalnitech have shown up with

11         documents that, one, they're not

12         under a caption, but they're marked

13         at a deposition and then have never

14         been exchanged.  Defense counsel for,

15         I believe, Kalnitech is saying, "I

16         don't have them.  I don't have them,"

17         but it's Kalnitech who marked these

18         things back on April 11, 2022.  Of

19         this lien thing, if it's the same

20         lien thing, it was marked as

21         Defendant's Exhibit C like "Charlie".

22         Plaintiff's counsel is entitled to

23         these documents.  We should have

24         gotten them in the ordinary discovery

25         under the caption and we should have

Page 122

1                    KLEEMAN

2        gotten them again after they were

3        marked as exhibits.  Please send

4        them.  Thank you

5            MR. RECCHIA:  I will note for

6        the record that before today's

7        deposition I reviewed the file that

8        we have and I looked for this waiver

9        of lien.  If I found it, I would have

10       been happy to bring it to this

11       proceeding and exchange it.  I will

12       review our file again and I will see

13       if we can locate this document.

14           MR. GASTMAN:  Okay, thank you

15       because it sounds like you reviewed

16       the file and you determined that

17       Kalnitech marked these things and you

18       even read part of that into the

19       record, so if you are aware of them,

20       please go find them and send them.

21       Thank you.

22           MR. RECCHIA:  Of course, and I

23       did note for the record that I

24       believe I said at the beginning of

25       this session of the deposition that I

```
                                              Page 123

 1                        KLEEMAN

 2         did not have the document, but I did

 3         refer to the fact that it was

 4         referred to in the deposition of Mr.

 5         Hudson and that's what I said.  I did

 6         review my file.  I will look again.

 7         If I locate this document, this

 8         waiver that was marked as Exhibit C

 9         at Mr. Hudson's deposition, I will,

10         of course, exchange it.  I don't have

11         it today.  I tried to find it

12         yesterday, so let's go back.

13  ———————————————————————————————————————————

14              MR. RECCHIA:  MJ, may I please

15         have the last question on the record?

16              MR. RAVA:  I request all prior

17         exhibits marked by counsel's client's

18         former firm at the deposition of

19         Dwayne Hudson and any other documents

20         that they may have related to this

21         project.

22  ———————————————————————————————————————————

23              MR. RECCHIA:  Can I have the

24         last question read back, MJ, that I

25         asked.  Thank you.
```

```
 1                   KLEEMAN
 2           (Whereupon, the referred to
 3       record was read back by the court
 4       reporter.)
 5           MR. RECCHIA:  Alright, let's
 6       mark that for a ruling based on
 7       defense counsel's objection.
 8           MR. RAVA:  Ask the proper
 9       question.  Go ahead.
10    Q.    Sir, if you or A.S.K. or Davs
11  signed or executed a waiver of lien, would
12  that be kept anywhere in your office?
13           MR. RAVA:  Objection.
14           You can answer over my
15       objection.
16    A.    Yes.
17    Q.    Okay, have you ever seen the
18  waiver of lien in favor of JIM for
19  $62,891.00 before today?
20           MR. RAVA:  Objection.
21           You can answer.
22    A.    Not since I supposedly signed
23  it.
24    Q.    Okay, again as we've been
25  talking about it now and hearing all the
```

Page 125

```
 1                        KLEEMAN
 2    objections of counsel about this document,
 3    is your recollection at all refreshed about
 4    any such waiver of lien that JIM Associates
 5    gave to Davs or A.S.K.?
 6         A.    I signed twelve waiver of liens
 7    a day.
 8              THE COURT REPORTER:  Off the
 9         record.
10              (Whereupon, an off-the-record
11         discussion was held.)
12         Q.    Do you want to repeat your
13    answer?
14         A.    Yeah, I signed a lot of lien
15    waivers everyday.  I signed quite a bit, so
16    to say one specific lien stands out, I
17    can't answer that question.
18         Q.    What you said and I'll be happy
19    to be corrected, but what I believe what
20    you actually said was, "I signed twelve
21    waivers of lien a day"?
22         A.    Yeah, I used a figure of speech
23    about the number twelve, but I retract that
24    and say I signed many.
25         Q.    Okay, Mr. Kleeman, did you ever
```

1                    KLEEMAN

2    give specific instructions to Gus about any

3    of the work you wanted him to perform at

4    the jobsite?

5            MR. RAVA:  Objection to the

6         form of the question.  What do you

7         mean by "specific instructions"?

8            MR. RECCHIA:  Any directions

9         for any particular work to be done,

10        "I want a mailbox installed here,"

11        or, "I want tiling installed there,"

12        for example.

13           MR. RAVA:  Note my objection.

14           You can answer over my

15        objection.

16      A.    Yes.

17      Q.    Okay, and did you do that in

18   face-to-face meetings with Gus at the

19   jobsite, did you do it over the phone, by

20   e-mail or something else?

21      A.    All of the above.

22      Q.    Pardon me?

23           (Whereupon, the referred to

24        record was read back by the court

25        reporter.)

1                        KLEEMAN

2                MR. RECCHIA:  Thank you.

3      Q.    Alright, did you yourself ever

4   supervise JIM Associates at the jobsite?

5                MR. RAVA:  Objection to the

6        question.

7                You can answer.

8      A.    Did I supervise JIM?  Did I

9   ever supervise JIM?

10     Q.    Yes, did you ever supervise JIM

11  at the jobsite?

12     A.    I discussed their work with

13  them if you want to call that supervising,

14  but did I discuss their work?  Yes, with

15  Gus, yes, I have.

16                MR. RECCHIA:  Counselor, I wish

17       you would let the witness answer and

18       not interrupt.

19                MR. RAVA:  He answered the

20       question.

21     Q.    Could you please finish your

22  answer, sir, if you did not finish?

23     A.    I'm finished.

24                MR. RECCHIA:  I'll just note

25       for the record that counsel

```
 1              KLEEMAN
 2      interrupted the witness in the middle
 3       of his testimony and now the witness
 4        has ended his statement.
 5      Q.    You testified that you did
 6  discuss work with JIM, is that correct,
 7  sir?
 8      A.    Yes.
 9      Q.    Okay, and when you discussed
10  work to be done by JIM, sir, did you
11  discuss it with JIM at the site or
12  someplace else?
13      A.    Yes, we would have meetings on
14  the site with JIM and Gus and Kalnitech.
15      Q.    Okay, when you say "we", who's
16  the "we" you're referring to besides
17  Kalnitech?
18      A.    JIM.
19      Q.    Did anyone ever tell you, Mr.
20  Kleeman, that Dwayne Hudson testified that
21  you were responsible for the scheduling of
22  the work on the site?
23              MR. RAVA:  Objection.
24              You can answer over my
25        objection.
```

Page 129

1                    KLEEMAN

2        A.    No.

3        Q.    Alright, did you ever learn

4    that Dwayne Hudson testified that you were

5    responsible for scheduling the work on the

6    site?

7              MR. RAVA:  Objection.

8              You can answer.

9        A.    The electrical work I would

10   schedule, yes.

11       Q.    Did you ever schedule any of

12   the other work by any of the other

13   subcontractors on the site?

14             MR. RAVA:  Objection.

15             You can answer.

16       A.    Depending on the subcontractor.

17       Q.    Is that a yes for some

18   subcontractors?

19             MS. ALIKAKOS:  Objection to the

20        form.

21       A.    Yes.

22       Q.    Okay, can you tell us what

23   other subcontractors you would schedule

24   some work for or the work for?

25       A.    I scheduled the fence guy to

1                    KLEEMAN

2    come in early on in the job.

3         Q.    Okay, with any other

4    subcontractors besides the fence guy?

5         A.    No.

6         Q.    Okay, did you ever schedule any

7    work for the mechanical contractors?

8         A.    All work was scheduled through

9    Gus and Kalnitech because he was running

10   the project.

11        Q.    Okay, did you ever schedule any

12   of the work done by any of the HVAC

13   subcontractors?

14        A.    Again everything was scheduled

15   through Gus in coordination.

16        Q.    Okay, did you ever file any

17   documents, you as the president of A.S.K.

18   or as a vice president of Davs ever file

19   any documents, with the New York City

20   Department of Buildings listing A.S.K. as

21   the GC for the project?

22             MR. RAVA:  Can I hear the full

23        question back?  I couldn't hear the

24        beginning part of the question.

25             (Whereupon, the referred to

```
                                              Page 131

 1                        KLEEMAN

 2         record was read back by the court

 3         reporter.)

 4              MR. RAVA:  Objection.

 5              You can answer over my

 6         objection.

 7         A.    No, the permit was pulled by

 8    Kalnitech for the construction.  The only

 9    DOB permit that I pulled was for my

10    electrical work.

11         Q.    Okay, when you say you pulled

12    the permit for the electrical work, was

13    that on behalf of A.S.K.?

14         A.    Yes.

15         Q.    Mr. Kleeman, before coming here

16    today, did you review any other documents,

17    any photographs or anything like that?

18              MR. RAVA:  Objection to the

19         question.

20              You can answer over my

21         objection.

22         A.    No.

23         Q.    Okay, did anyone ever inform

24    you that the waiver of lien between A.S.K.

25    and JIM indicated that A.S.K. was the
```

Page 132

KLEEMAN

1    general contractor for the job?
2                    MR. RAVA:  Objection to the
3        question.
4                    You can answer.
5                    MS. ALIKAKOS:  Objection.
6        A.    No.
7        Q.    Okay, besides the permit for
8    the electrical work, did either Davs or
9    A.S.K. Electrical have any other permits
10   for any of the work on the site?
11       A.    No.
12       Q.    Did the architects, Built-In,
13   ever apply for any permits for any of the
14   work being performed on the site?
15       A.    I believe they did the
16   expediting for the close-outs, but all the
17   permits were pulled by Kalnitech for the
18   construction.
19       Q.    So the answer is, no, the
20   architects didn't apply for any permits
21   relating to the site?
22                   MR. RAVA:  I'm not sure that's
23       his answer.
24       A.    Yeah, I don't know that answer.

```
                                        Page 133

 1                    KLEEMAN
 2   The expediter closed out the job, so if
 3   there were permits, to answer what permits,
 4   I don't know.
 5            MR. RAVA:  Note my objection to
 6       the form.
 7       Q.    I'm just about finished.
 8            Did you ever see any documents
 9   issued by the New York City Department of
10   Buildings which listed A.S.K. as the
11   general contractor for the site?
12            MS. ALIKAKOS:  Objection.
13        Asked and answered.
14            MR. RAVA:  Objection.
15       A.    No.
16       Q.    Okay, did you ever review the
17   transcript of any other witness that
18   testified in this case before today?
19            MR. RAVA:  Objection.  You're
20       assuming.  Your question assumes that
21       he reviewed the testimony of another
22       witness and he never testified to
23       that.  I will allow him to answer
24       over my objection.
25            MR. RECCHIA:  Yes, I just don't
```

                          KLEEMAN

1

2      think the question assumed that.  I

3      asked did he ever.

4            MR. RAVA:  It absolutely did.

5      You asked him if he reviewed the

6      testimony of any other witness, so it

7      clearly assumed that he reviewed

8      other testimony.  You've done that

9      multiple times during the course of

10     this deposition.

11           MR. RECCHIA:  Can I hear the

12     question back, please, MJ?

13           MR. GASTMAN:  Maurice, Joe's

14     right, but if you want to hear it

15     again, go ahead.

16           MR. RECCHIA:  Yes.

17           (Whereupon, the referred to

18     record was read back by the court

19     reporter.)

20           MR. RECCHIA:  I apologize.  I

21     agree.  I will withdraw that

22     question.

23      Q.    Sir, did you review the

24   testimony of any witness before today in

25   this case?

```
                                          Page 135

 1                      KLEEMAN

 2              MR. RAVA:  Objection.

 3              You can answer.

 4       A.    No.

 5       Q.    Okay, did anyone ever tell you

 6  that Kalnitech testified in this case

 7  before today and that a representative of

 8  Kalnitech, that is, Gus testified in this

 9  case before today?

10              MR. RAVA:  Objection.

11              You can answer over my

12        objection.

13       A.    No.

14       Q.    Okay, did you ever have any

15  conversations with Dwayne Hudson before Mr.

16  Hudson testified in April of 2022?

17              MR. RAVA:  I'm going to object

18        because that's very broad.  At any

19        time before that date is incredibly

20        broad, so I don't know what your

21        question is asking, so I'm sure he

22        probably spoke to him before that

23        date because he worked for him, so

24        you might want to narrow down your

25        question.
```

```
                                      Page 136

 1                    KLEEMAN
 2            MR. RECCHIA:  Can I hear the
 3        question back, please, MJ?
 4            (Whereupon, the referred to
 5        record was read back by the court
 6        reporter.)
 7            MR. RECCHIA:  Okay, I will
 8        rephrase it.
 9        Q.    Did you ever have any
10    conversations with Dwayne Hudson about the
11    nature of his testimony or about what he
12    was going to testify about before Mr.
13    Hudson testified on April, I believe, April
14    11, 2022?
15            MR. RAVA:  Objection to the
16        question.
17            You can answer over my
18        objection.
19        A.    No.
20        Q.    Okay, did you ever instruct Mr.
21    Hudson to testify that Kalnitech was the GC
22    for the project?
23            MR. RAVA:  Objection.
24            MS. ALIKAKOS:  Objection.
25        Asked and answered.
```

1                  KLEEMAN

2           MR. RAVA:  You can answer.

3    A.    No.

4           MR. RECCHIA:  Alright, thank

5       you.  I don't have any further

6       questions.

7           MR. GASTMAN:  I hope everybody

8       is going to have an excellent holiday

9       season, whichever holiday you

10      celebrate.

11          MS. ALIKAKOS:  Wait.  Wait.

12      Wait.  Before you give your farewell

13      speech, I'm a party to this case.

14      I'm been a party to the companion

15      action.  I have some questions unless

16      Mr. Rava is going to direct his

17      witness not to answer, but given that

18      the witness was asked extensively

19      about questions with respect to my

20      client, A.S.K. Electrical, I believe

21      I have the right to ask him

22      questions, so I'm going to ask some.

23          MR. GASTMAN:  I'm okay with

24      that so long as we're good with using

25      this record for all purposes for all

1                    KLEEMAN

2        these consolidated cases.  I'm good

3        with that if you're good with that.

4            MS. ALIKAKOS:  Well, is it that

5        you're not going to take my client

6        A.S.K. Electrical's deposition in the

7        companion case that you move to

8        consolidate?

9            MR. GASTMAN:  You mean Mr.

10       Kleeman or somebody else?

11           MS. ALIKAKOS:  Mr. Kleeman.

12           MR. GASTMAN:  I don't think

13       we're going to ask the same guy the

14       same questions about the same case as

15       long as you're okay that we can use

16       this transcript for all purposes.

17       However, if you decide now or later

18       that, oh, no, no, no, you can't use

19       the transcript in action one and

20       action two, yes, then we'll do it all

21       over again, but you don't have to

22       answer now.  I'm just telling you how

23       we're going to proceed.

24           MS. ALIKAKOS:  Okay, I'm going

25       to ask my questions and then we can

```
                                          Page 139
 1              KLEEMAN
 2         do what we were paid as lawyers to do
 3         and follow the long litigated path.
 4         It doesn't matter.
 5              MR. GASTMAN:  It's okay with
 6         me.
 7  EXAMINATION BY
 8  MS. ALIKAKOS:
 9         Q.    Good afternoon, Mr. Kleeman.
10  I'm not going to keep you here very long.
11  I just want to clarify certain things
12  because it was my understanding that you
13  were produced today per Court Order on
14  behalf of Davs Partners, so I just want to
15  clarify some testimony and some questions
16  for you.
17              If at any time -- the same
18  instructions apply -- if you don't
19  understand my question, I ask that you ask
20  me to repeat it.  Wait until I finish the
21  question and then give me a response to
22  that question, so I just want to clarify a
23  few points.
24              Mr. Kleeman, was A.S.K.
25  Electrical Contracting or A.S.K. Electrical
```

```
 1                    KLEEMAN
 2   ever the general contractor on this
 3   project?  Yes or no?
 4              MR. RECCHIA:  Just note my
 5         objection.
 6        Q.    You can answer, sir.
 7        A.    No.
 8        Q.    Was Davs, D-A-V-S, ever the
 9   general contractor on this project?  Yes or
10   no, sir?
11        A.    No.
12        Q.    Did any of the documents that
13   you were shown by counsel for Kalnitech,
14   did any of those documents change your
15   testimony that either A.S.K. Electrical or
16   Davs was the general contractor on this
17   project?
18        A.    Restate that again.
19        Q.    Let me restate it.  It sounded
20   better in my head than it did when it came
21   out.
22              You were shown documents by
23   counsel for Kalnitech, correct?
24        A.    Yes.
25        Q.    Okay, do any of those documents
```

1                    KLEEMAN

2    change your testimony as to who the general

3    contractor was on this project?

4         A.    No.

5         Q.    Okay, and it's your testimony

6    that the general contractor on this project

7    was Kalnitech?

8         A.    Yes.

9               MR. RECCHIA:  Just note my

10          objection.

11        Q.    It's your testimony that A.S.K.

12   Electrical never acted as a general

13   contractor on this project, is that

14   correct, sir?

15        A.    Yes.

16        Q.    You would agree with me, sir,

17   that you're a part owner in A.S.K.

18   Electrical, correct?

19        A.    Yes.

20        Q.    Whether A.S.K. Electrical was

21   the general contractor or not, it's

22   something that you as an owner of A.S.K.

23   Electrical would be privied to, is that

24   correct, sir?

25               MR. RECCHIA:  Just note my

```
 1                       KLEEMAN
 2        objection.
 3        A.    Yes.
 4        Q.    Let's talk about Mr. Hudson.
 5   Mr. Hudson was the working foreman on the
 6   project, correct?
 7        A.    Yes.
 8        Q.    Mr. Hudson was not an officer
 9   of A.S.K. Electrical on this project,
10   correct?
11        A.    No.
12        Q.    Mr. Hudson, you would agree
13   with me that Mr. Hudson did not participate
14   in any of the negotiations of the contracts
15   on this project?  Is that fair, sir?
16        A.    Yes.
17        Q.    Yes, he did not participate,
18   correct?
19        A.    He did not.
20        Q.    Okay.
21        A.    He did not.
22        Q.    Okay, and Mr. Hudson also did
23   not have any authority to enter into any
24   contracts or any agreements on behalf of
25   A.S.K. Electrical?  That's correct, isn't
```

1                    KLEEMAN

2    it?

3        A.    Correct, he did not.

4        Q.    When you and Gus of Kalnitech

5    discussed this project before work began,

6    was Mr. Hudson part of those discussions?

7        A.    No.

8        Q.    Alright, and was Mr. Hudson

9    part of any discussions with JIM in

10   connection with its work on this project?

11       A.    No.

12       Q.    Did Mr. Hudson participate in

13   any contract negotiations whatsoever or

14   agreements between A.S.K. Electrical and

15   JIM on this project?

16       A.    No, just as foreman.

17       Q.    Did Mr. Hudson have the

18   authority to bind A.S.K. Electrical in

19   connection with any contractual agreements

20   for work on this project?  Yes or no?

21       A.    Not at all, no.

22       Q.    Did Mr. Hudson have any

23   participation in the drafting of any of the

24   documents that were marked here today by

25   the defense for Kalnitech's counsel that

1                    KLEEMAN

2    you reviewed?

3         A.    No.

4         Q.    Any participation in that?

5         A.    None.

6         Q.    Davs was the owner of the

7    property, correct?

8         A.    Correct.

9         Q.    A.S.K. Electrical, they were

10    the tenant for the property, correct?

11         A.    That is correct.

12         Q.    A.S.K. Electrical also did the

13    electrical work for the property for which

14    it was the tenant, correct?

15         A.    That is correct.

16         Q.    Would you agree with me that

17    that was the role of A.S.K. Electrical, to

18    serve as the tenant and the electrical

19    contractor for the work in the building

20    that it was going to have its offices in,

21    is that correct, sir?

22              MR. RECCHIA:  Just note my

23         objection to the form.

24              MS. ALIKAKOS:  Okay.

25         Q.    Is that correct, sir?

Page 145

1                          KLEEMAN

2          A.     That's correct, yes.

3          Q.     The work that A.S.K. Electrical

4     performed, was that physically, the work on

5     this project, was that limited to the

6     electrical work provided by A.S.K.

7     Electrical's electricians?

8          A.     Correct.

9          Q.     Was it Gus of Kalnitech, was it

10    your testimony that Gus of Kalnitech asked

11    you to just pay JIM directly, is that

12    correct, sir?

13         A.     Yes.

14         Q.     Would JIM have just issued you

15    an invoice after Gus asked you to pay them

16    directly?

17               MR. RECCHIA:  Just note my

18          objection.

19         A.     Yes.

20         Q.     I'm sorry, sir?

21         A.     Gus just said to deal with JIM

22    directly for the finishing, for the

23    finishing of the job.

24         Q.     Okay, and during that two-week

25    span when JIM was working on the project,

```
 1                    KLEEMAN
 2   was it your testimony that Gus of Kalnitech
 3   was still involved with working on this
 4   project?
 5             MR. RECCHIA:  Note my
 6        objection.
 7        A.    Yes, he was here.  He was still
 8   here everyday.
 9        Q.    Do you know if Gus ever
10   supervised the work of the JIM employees?
11        A.    Gus supervised the work of all
12   trades except for my electricians.
13        Q.    The JIM employees, I know you
14   said that was finishing work.  Just explain
15   that to me.  What did that finishing work
16   entail?
17        A.    Painting, molding, tile,
18   flooring.
19        Q.    Not the electrical work,
20   correct?
21        A.    No.
22        Q.    Did Dwayne Hudson ever issue
23   any payments or submit any payment
24   requisitions or anything like that in
25   connection with this project?
```

```
                                                Page 147
 1                    KLEEMAN
 2        A.     No.
 3        Q.     Okay, because that was outside
 4    the scope of his job as a working foreman,
 5    correct?
 6              MR. RECCHIA:  Just note my
 7          objection.
 8        A.     He was the foreman on the job.
 9        Q.     Right, and again he was a
10    working foreman solely for the electrical
11    work that A.S.K. Electrical was performing
12    on this project, correct?
13        A.     Correct.
14              MS. ALIKAKOS:  Okay, counsel,
15          if you could just e-mail me a copy of
16          those documents because I don't have
17          them when you have the opportunity.
18              MR. RECCHIA:  Yes.
19              MS. ALIKAKOS:  Thank you.
20          They're not E-filed also, counsel.  I
21          looked.
22              MR. RECCHIA:  No, I'll be happy
23          to send them to you.
24              MS. ALIKAKOS:  Okay, thank you.
25              MR. RECCHIA:  I have one or two
```

```
                                              Page 148

 1                         KLEEMAN

 2         unless Mr. Gastman wants to ask any.

 3              MR. GASTMAN:  No, we've had

 4         enough testimony for one day.

 5              MR. RECCHIA:  Alright.

 6  EXAMINATION BY

 7  MR. RECCHIA:

 8       Q.    Mr. Kleeman, you just testified

 9  that Gus was onsite everyday during the

10  work conducted by JIM.  Do you remember

11  that?

12       A.    Yes.

13       Q.    Okay, I'd like to ask you what

14  the basis of your knowledge of that is.

15  Did you personally see Gus?  Would there be

16  any records or logs that would reflect that

17  Gus was there everyday or something else?

18       A.    Yes, Gus was there to the end

19  until we closed the job out, till the end.

20       Q.    Is that based on your visual

21  observation of Gus being there, is it based

22  on --

23       A.    Yes.

24       Q.    (Continuing) someone telling

25  you or something else?
```

                          KLEEMAN

1

2          A.      My visual observation of

3     meeting him there.

4          Q.      Okay, alright, was Gus onsite

5     the day before this accident as far as you

6     know?

7          A.      I don't know that.  I would

8     think so, yes.  I think he was even there

9     that day.  He just wasn't there when it

10    happened.

11         Q.      Okay, do you have any basis for

12    that knowledge?  In other words, do you

13    have any records or something that somebody

14    told you or something else?

15         A.      That's through, like I said, I

16    was there myself.  I met him there.

17         Q.      You met him there?  We'll use

18    the date of the accident as June 28.  Did

19    you meet Gus on the site on June 27, 2019?

20         A.      Again for me to give you a

21    definite answer, I'm not aware of that.  I

22    would have to -- I would have to double-

23    check my e-mails.

24         Q.      Okay, would you have any

25    documents that would reflect that you were

```
1                    KLEEMAN
2    onsite on June 27, 2019?
3         A.    I would have to check.
4         Q.    Is it possible that there are
5    e-mails that would indicate you were onsite
6    on that date?
7         A.    It could be possible.
8              MR. RECCHIA:  Okay, alright,
9          what we're going to do is we're going
10         to make a demand and I will obviously
11         put it in writing, but I will be
12         requesting the attorney to provide
13         any e-mails they have or any other
14         documentation they have that would
15         indicate the basis of their knowledge
16         that Gus was onsite when JIM was on
17         the site.
18    _____
19         Q.    Sir, do you recall that you
20    were on vacation on the date this accident
21    occurred, June 28, 2019?
22         A.    I don't know, no.
23         Q.    Are you aware that Dwayne
24    Hudson testified that you were away on a
25    vacation trip on the date this accident
```

```
 1                    KLEEMAN
 2   happened?
 3             MR. RAVA:  Objection.
 4             You can answer over my
 5        objection.
 6        A.    I do not know that.  I don't
 7   know how Dwayne would know where I am.
 8             MR. RECCHIA:  Okay, alright,
 9        thank you.  Okay, I don't have
10        anything else.
11             MR. GASTMAN:  Now I just wish
12        everybody a healthy and happy set of
13        set of holidays in this lovely month
14        of April, 2023, and if any of your
15        law firms have marked exhibits,
16        please send them.  We appreciate
17        that.  Thank you.  We look forward to
18        seeing all of you at some exciting
19        upcoming conference or deposition or
20        something like that.
21   _____
22             MR. RAVA:  Yes, I request any
23        documents and exhibits in the
24        possession of the other firms,
25        especially anything that counsel
```

Page 152

1                    KLEEMAN

2        referenced today during his

3        questioning.

4    _____

5            THE COURT REPORTER:  Greg, you

6        get the original and two?

7            MR. GASTMAN:  Yes.

8            THE COURT REPORTER:  Maurice,

9        do you want a copy?

10           MR. RECCHIA:  Yes, I would

11       prefer only a condensed copy, please.

12           THE COURT REPORTER:  Got it.

13       Georgia?

14           MS. ALIKAKOS:  I'll take a

15       copy.  I'll take both.

16           (Whereupon, at 1:00 P.M., the

17       Examination of this witness was

18       concluded.)

19

20           °         °         °         °

21

22

23

24

25

1                          **KLEEMAN**

2                  **D E C L A R A T I O N**

3

4        I hereby certify that having been

5   first duly sworn to testify to the truth, I

6   gave the above testimony.

7

8        I FURTHER CERTIFY that the foregoing

9   transcript is a true and correct transcript

10  of the testimony given by me at the time

11  and place specified hereinbefore.

12

13

14

                 _____

15                    DAVID KLEEMAN

16

17

18  Subscribed and sworn to before me

19  this _____ day of _____ 20___.

20

21

    _____

22      NOTARY PUBLIC

23

24

25

Page 154

1                          **KLEEMAN**

2                     **E  X  H  I  B  I  T  S**

3

4    **DEFENDANT'S EXHIBITS**

5

6    **EXHIBIT    EXHIBIT                        PAGE**

7    **LETTER     DESCRIPTION**

8    Exh A       Short Form Contract

9                Between Owner &

10               Contractor                     58

11   Exh B       A.S.K. Electrical

12               Contracting Corp. Master

13               Subcontract Agreement    72

14   Exh C       Department of State

15               Division of Corporations

16               Entity Information for

17               A.S.K. Electrical Corp.   78

18   Exh D       Department of State

19               Division of Corporations

20               Entity Information of

21               Davs Partners LLC         81

22

23      (Exhibits retained by Court Reporter.)

24

25

Page 155

1                         KLEEMAN

2                    I N D E X

3

4    EXAMINATION BY                          PAGE

5    MR. GASTMAN                             8

6    MR. RECCHIA                             56

7    MS. ALIKAKOS                            139

8    MR. RECCHIA                             148

9

10

11    INFORMATION AND/OR DOCUMENTS REQUESTED

12    INFORMATION AND/OR DOCUMENTS          PAGE

13    Any contract between A.S.K. or Mr.

14    Kleeman and Built-In                   92

15    Any progress photos from the site

16    of this accident up until the date

17    of the accident taken by Mr.

18    Kleeman                                97

19    Contracts with subcontractors          106

20    To the extent that it hasn't

21    already been provided, a copy of

22    the contract between A.S.K. and

23    JIM                                     109

24

25

1                        **KLEEMAN**

2          **INFORMATION AND/OR DOCUMENTS REQUESTED**

3     INFORMATION AND/OR DOCUMENTS          PAGE

4     (Mr. Gastman) Defendant's Exhibit

5     C marked on April 11, 2022, the

6     waiver of lien                        123

7     (Mr. Rava) All prior exhibits

8     marked by counsel's client's

9     former firm at the deposition of

10    Dwayne Hudson and any other

11    documents that they may have

12    related to this project            123

13    Any e-mails or any other

14    documentation indicating the basis

15    of the knowledge that Gus was

16    onsite when JIM was onsite         150

17    (Mr. Gastman) Marked exhibits      151

18    (Mr. Rava) Any documents and

19    exhibits in the possession of

20    the other firms, especially

21    anything that counsel referenced

22    today during his questioning       152

23

24

25

1                      KLEEMAN

2           QUESTIONS MARKED FOR RULINGS

3      "Okay, would you have any kind of documents

4      somewhere in your office that would

5      indicate who filed this for your office,

6      whether Kavita or yourself or your wife or

7      anyone else?  Would you have any documents

8      that would reflect who had filed this on

9      behalf of Davs?" (Page 83/Line 2)

10     "Okay, alright, would you have any such

11     waiver of lien in any of the paper work

12     that you may have kept for this project in

13     your office?" (Page 118/Line 23)

14

15

16

17

18

19

20

21

22

23

24

25

1                           KLEEMAN

2                  C E R T I F I C A T E

3

4    STATE OF NEW YORK        )

                              :  SS.:

5    COUNTY OF NEW YORK       )

6

7           I, MAY JEAN WU, a Notary Public for

8    and within the State of New York, do hereby

9    certify:

10          That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14          I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19          IN WITNESS WHEREOF, I have hereunto

20   set my hand this 10th day of April, 2023.

21

22

                    MAY JEAN WU

23

24

25

**Page 159**

1                                    **ERRATA SHEET**
                              **VERITEXT/NEW YORK REPORTING, LLC**
2

     CASE NAME: Reyes Espinoza, Stalin Rodrigo v. DAVS Partners LLC, Et
     Al.
3        DATE OF DEPOSITION: 4/5/2023
         WITNESSES' NAME: David Kleeman
4
5        PAGE    LINE (S)        CHANGE                    REASON
     ____|_____|_____|_____
6
     ____|_____|_____|_____
7
     ____|_____|_____|_____
8
     ____|_____|_____|_____
9
     ____|_____|_____|_____
10
     ____|_____|_____|_____
11
     ____|_____|_____|_____
12
     ____|_____|_____|_____
13
     ____|_____|_____|_____
14
     ____|_____|_____|_____
15
     ____|_____|_____|_____
16
     ____|_____|_____|_____
17
     ____|_____|_____|_____
18
     ____|_____|_____|_____
19
     ____|_____|_____|_____
20
21                                          _____
                                            David Kleeman
22       SUBSCRIBED AND SWORN TO BEFORE ME
         THIS _____ DAY OF _____, 20__.
23
24

25   _____       _____
         (NOTARY PUBLIC)                    MY COMMISSION EXPIRES:

| & | | | 7 |
|---|---|---|---|

**&**   3:3,12 8:18 58:9 113:10 154:9

**152**   156:22
**1900**   3:5
**1:00**   152:16

**221.2**   4:17 5:7
**221.3**   5:3
**23**   157:13
**24589**   158:22
**26**   79:9,17 80:6 80:16
**26-60**   74:2
**27**   149:19 150:2
**28**   8:23 24:4 26:9 48:14 149:18 150:21

**72**   154:13
**78**   154:17

**1**

**2**

**8**

**1**   3:9
**100**   3:5
**10006**   3:15
**10038**   3:5
**103**   113:19 114:23
**10533**   3:10
**106**   155:19
**109**   155:23
**10:05**   1:19 2:3
**10th**   158:20
**11**   61:9 113:7 121:18 136:14 156:5
**11377**   74:3
**11429**   8:13
**11530**   3:19
**118**   157:13
**11th**   58:24,25 59:12
**12**   77:23
**123**   156:6,12
**12th**   73:22 74:19
**139**   155:7
**140**   3:9
**148**   155:8
**150**   156:16
**151**   156:17

**2**   74:3 157:9
**20**   153:19 159:22
**2010**   79:10,17 80:6,16
**2015**   21:25
**2018**   31:24 82:19
**2019**   8:23 24:4 26:9 31:24 48:14 58:24 61:9 73:23 74:19 77:23 91:5 94:12 99:21 149:19 150:2,21
**2022**   55:24 113:7 121:18 135:16 136:14 156:5
**2023**   1:18 2:2 151:14 158:20
**217-14**   8:12 22:17 23:10 24:15 31:16 48:15 87:23 88:15 115:14
**22**   85:11
**221**   4:2 5:2
**221.1**   4:3 85:12

**8**   68:4,17 155:5
**81**   154:21
**83**   157:9

**9**

**92**   155:14
**97**   155:18
**990**   3:19

**a**

**a.m.**   1:19 2:3
**a.s.k.**   6:14 21:18 24:5 25:16,21 26:12 26:17 27:6,7 27:18,24 28:4 28:12,22 29:11 32:25,25 34:17 34:21 35:7,13 35:14 37:5,14 37:20 39:22 40:7,16,20,25 41:9,16 43:18 44:15 45:3,5 47:22 48:2 49:21 51:14 52:4,16 56:5 56:10,17 59:3 61:24 62:16,21 63:2,7,8,11,14 64:4 72:21,25 73:13,17,23

**3**

**3**   55:24
**31**   4:10 86:4
**3115**   4:5,14,22 85:17

**4**

**4**   82:19
**4/5/2023**   159:3
**400**   3:19
**45**   3:14

**5**

**5**   1:18 2:2
**515197/2019**   1:6
**56**   155:6
**58**   154:10

**6**

**62,891**   116:13
**62,891.00**   110:16 124:19

[a.s.k. - alright]

| | | | |
|---|---|---|---|
| 75:25 76:5 | 98:15 | **actually** 9:22 | **agreements** |
| 77:10 78:2,4 | **able** 72:5 99:23 | 15:11 30:4 | 56:2,6 142:24 |
| 78:14 79:4,6 | **above** 2:10 | 50:2,21 65:19 | 143:14,19 |
| 79:14,15 80:7 | 126:21 153:6 | 99:11 109:5 | **ahead** 63:23 |
| 81:12 89:18 | **absolutely** | 125:20 | 89:24 103:20 |
| 91:16,22,25 | 54:15 100:24 | **add** 121:8 | 105:6 124:9 |
| 92:2,11,13,19 | 134:4 | **addition** 35:6 | 134:15 |
| 93:4 94:16 | **accident** 8:22 | 39:10 55:25 | **al** 159:2 |
| 97:25 98:12,15 | 24:3 26:9 48:7 | **additional** | **alikakos** 3:20 |
| 99:12,14 | 48:14,21 49:10 | 39:13 42:11 | 6:2,3 45:22 |
| 100:19 101:5 | 49:16,25 50:21 | **address** 8:11 | 46:6 51:17 |
| 101:13 104:7 | 50:24,25 51:6 | 24:8 81:5 91:9 | 55:11 63:24 |
| 104:11,18 | 52:22 53:7 | **addressed** | 65:25 69:25 |
| 105:2,9,21 | 54:22 97:7,8 | 102:21 | 70:4 75:7 78:7 |
| 106:16 107:24 | 149:5,18 | **administrator** | 89:20 113:20 |
| 108:2,11,16,22 | 150:20,25 | 59:13 74:22 | 114:11 117:11 |
| 114:3,16 | 155:16,17 | **admiralty** | 129:19 132:6 |
| 115:13,19 | **accompanied** | 117:3 | 133:12 136:24 |
| 116:17 117:21 | 4:23 | **advance** 12:9 | 137:11 138:4 |
| 124:10 125:5 | **accurate** 35:18 | **afternoon** | 138:11,24 |
| 130:17,20 | 67:2 | 49:12 139:9 | 139:8 144:24 |
| 131:13,24,25 | **accurately** | **agent** 87:2 | 147:14,19,24 |
| 132:10 133:10 | 109:12 | **agents** 116:21 | 152:14 155:7 |
| 137:20 138:6 | **acted** 141:12 | **ago** 13:16,19,21 | **allow** 120:11 |
| 139:24,25 | **acting** 111:12 | **agree** 134:21 | 133:23 |
| 140:15 141:11 | **action** 7:10 | 141:16 142:12 | **allowed** 10:15 |
| 141:17,20,22 | 83:23,25 85:3 | 144:16 | 10:22 121:4 |
| 142:9,25 | 116:23 137:15 | **agreed** 5:10,13 | **alright** 12:4 |
| 143:14,18 | 138:19,20 | 5:16,20 | 23:17 26:7 |
| 144:9,12,17 | 158:16 | **agreement** | 49:24 58:4 |
| 145:3,6 147:11 | **actions** 6:8 | 32:19 56:13 | 59:16 65:15,19 |
| 154:11,17 | 116:23 | 57:9 58:23 | 67:12,16 69:2 |
| 155:13,22 | **actual** 25:15 | 60:23 73:3,22 | 70:17 71:7 |
| **a.s.k.'s** 41:2 | 90:10 | 74:15 75:4,5 | 72:19 73:16 |
| 52:18 56:8 | | 154:13 | 76:8 77:3 79:8 |

[alright - asking]

| | | | |
|---|---|---|---|
| 80:24 81:21 | 104:23 105:25 | 110:8 | 43:14 |
| 86:22 87:21 | 106:19 108:7 | **apologize** 23:21 | **approximatio...** |
| 88:7 90:11,17 | 110:21 111:6 | 27:3,4 40:11 | 11:9,13 25:9 |
| 91:4,11 92:9 | 111:21,23 | 40:13 44:2 | **april** 1:18 2:2 |
| 93:25 94:10 | 112:7,20,21 | 54:6 67:4,9,10 | 113:7 121:18 |
| 95:3,13 96:4 | 114:24 115:2,5 | 96:17 134:20 | 135:16 136:13 |
| 96:25 103:10 | 115:8,11,16,20 | **apparently** | 136:13 151:14 |
| 103:16 104:9 | 116:3,5,10 | 18:13 120:23 | 156:5 158:20 |
| 104:17 106:8 | 118:9,11,13,21 | **appear** 63:20 | **architects** 90:9 |
| 106:22 108:18 | 119:6,24 | 72:16 | 90:12,18 |
| 110:8 112:5,25 | 124:14,21 | **appears** 65:3 | 100:15,20,21 |
| 114:22 118:23 | 125:13,17 | 66:18 73:13 | 100:23 102:2 |
| 124:5 127:3 | 126:14 127:7 | 75:23 | 132:13,21 |
| 129:3 137:4 | 127:17,22 | **apply** 4:9 86:3 | **architectural** |
| 143:8 148:5 | 128:24 129:8 | 132:14,21 | 39:2 |
| 149:4 150:8 | 129:15 131:5 | 139:18 | **area** 59:24 |
| 151:8 157:10 | 131:20 132:5 | **appreciate** | 102:19 |
| **amount** 110:16 | 132:20,24,25 | 151:16 | **arising** 116:24 |
| **answer** 4:8,12 | 133:3,23 135:3 | **apprentice** | **article** 4:10 |
| 4:17,17,21,22 | 135:11 136:17 | 51:24,25 52:7 | 86:4 |
| 4:23,24 9:23 | 137:2,17 | 52:21 54:5,6 | **aside** 54:19 |
| 10:4,23,24 | 138:22 140:6 | **apprentices** | **asif** 94:13,13 |
| 11:5,7,19 12:2 | 149:21 151:4 | 51:25 | **asked** 6:13 |
| 14:14 15:22 | **answered** 4:20 | **appropriate** | 52:24 89:21,22 |
| 16:8,22,25 | 5:6 23:22 | 4:9 5:18 86:3 | 105:4 121:5 |
| 18:14 20:10 | 89:21,23 105:5 | **approximately** | 123:25 133:13 |
| 22:8 41:20 | 127:19 133:13 | 21:6,6,8,9,21 | 134:3,5 136:25 |
| 46:2 57:16,22 | 136:25 | 21:22 22:9,11 | 137:18 145:10 |
| 71:15 75:9 | **answering** | 22:22,23 25:11 | 145:15 |
| 83:13 84:3,14 | 84:16 | 25:13,21,23 | **asking** 38:24 |
| 84:24 85:23 | **answers** 11:8 | 26:3,4 31:21 | 52:4 53:14 |
| 86:7,11 89:24 | **anybody** 7:24 | 31:21 42:16 | 96:16 100:6 |
| 92:22 96:9,12 | 33:11 39:2,13 | 87:25 | 101:12 109:6 |
| 101:12 103:7 | 47:11,14 51:9 | **approximation** | 110:23 111:8 |
| 103:20 104:15 | 51:9,11 71:5 | 11:6 42:19 | 113:4 114:2,7 |

114:14 118:2
119:9 120:5
135:21
**assigns** 116:12
116:22
**assist** 18:19
32:12 34:22
**associates** 3:3
8:18 36:7,8
37:7 42:23
45:17 56:8
107:5,7,8,13,24
108:13 110:14
110:15 115:12
115:20 116:11
117:22 118:19
125:4 127:4
**assumed** 134:2
134:7
**assumes** 119:19
120:12 133:20
**assuming**
133:20
**assumption**
51:20
**attend** 6:21
**attendance**
4:15
**attending** 7:21
**attorney** 4:12
4:21 5:4 6:4
13:2 15:2,9
16:7 19:3 57:5
57:20,25 65:5
80:16 82:23

150:12
**attorneys** 3:4,8
3:13,18 5:20
5:22 19:23
**audio** 27:4
**august** 79:9,17
80:6,16
**authority**
142:23 143:18
**avenue** 3:19
8:12 22:17
23:10 24:7,16
25:23 31:16
48:16 87:24
115:15
**aware** 85:11
122:19 149:21
150:23

**b**

**b** 4:4,10 72:23
72:24 73:4,9
75:24 85:16
90:21,23,23
154:2,11
**back** 14:17
17:11,25 20:19
22:5 28:17
32:11 45:13,25
46:4 53:13
62:7,9 64:24
65:8 70:10
84:10 91:5
94:11 98:6,8
108:9 109:21
112:15,17

119:12,14
121:18 123:12
123:24 124:3
126:24 130:23
131:2 134:12
134:18 136:3,5
**background**
20:8 30:3 45:8
45:8
**bags** 98:25 99:2
**based** 124:6
148:20,21
**basement**
23:25 38:21
**bases** 118:7
**basic** 47:3
**basically** 38:5
**basis** 4:13,23
148:14 149:11
150:15 156:14
**began** 143:5
**beginning**
109:5 122:24
130:24
**behalf** 83:8
108:16 114:3
131:13 139:14
142:24 157:9
**believe** 26:7
34:4 62:12,14
76:23 80:3
81:8 87:9,20
87:21 104:6
107:7 108:17
109:5 121:15

122:24 125:19
132:16 136:13
137:20
**best** 35:12,20
48:19
**better** 53:21
140:20
**big** 17:24
102:20
**bigger** 53:21
**bind** 143:18
**bit** 48:6 80:20
81:3 86:15
125:15
**blank** 61:18
**block** 60:3 61:2
77:4
**blocks** 76:9
**blood** 33:10
158:16
**blueprints**
99:22 100:2,4
100:10 101:2,6
101:14,25
102:9,17,21
**bottom** 59:18
75:16
**box** 99:19
**bqe** 74:2
**bradley** 3:12
**branched** 34:3
**breadcrumbs**
55:16 56:20
**break** 11:25
12:3 57:19,24

[breaking - come]

**breaking** 35:2
**bridge** 3:9
**brief** 23:11
**briefly** 30:19
**brigantic** 113:12 115:3
**bring** 99:16 104:11 122:10
**broad** 135:18 135:20
**broadway** 3:14
**broke** 64:22
**broker** 61:25
**brokers** 61:16
**brought** 37:13 37:14 92:25 99:19 101:19 102:23 103:24 104:3 105:12 107:16
**build** 115:24
**building** 23:6 23:10,13,16 24:12,14,16,21 24:22,25 38:4 38:14,15,17 62:25 63:2 97:22 115:14 144:19
**buildings** 90:5 130:20 133:10
**built** 38:14 90:19,23,24 91:4,13,17,22 132:13 155:14

**business** 37:11 74:2,14 100:11
**buy** 26:14

**c**

**c** 3:2 4:4 78:16 85:16,20 115:4 121:21 123:8 153:2 154:14 156:5 158:2,2
**cabinets** 36:17
**call** 49:11 51:24 92:7 108:21 114:20 117:9 127:13
**called** 8:2
**calling** 107:4
**capacity** 104:10 105:2,9 105:21
**capitals** 76:12 77:8
**caption** 121:12 121:25
**carpenters** 36:16
**case** 6:7,17,24 19:4,6,10 29:12,21 53:3 57:6,8 109:18 109:25 110:5 110:10 121:9 133:18 134:25 135:6,9 137:13 138:7,14 159:2

**cases** 6:9 55:21 138:2
**caught** 54:24
**cause** 4:20
**causes** 116:23
**celebrate** 137:10
**center** 76:4
**certain** 139:11
**certainly** 113:22
**certify** 153:4,8 158:9,14
**cetera** 46:20 89:13
**change** 79:18 79:19 80:8 140:14 141:2 159:5
**changed** 79:15
**changes** 27:13
**characterizati...** 109:14
**characterizing** 109:11
**charge** 5:22
**charlie** 121:21
**check** 80:13 94:6 106:2,6 106:21 149:23 150:3
**chief** 81:4,11
**city** 3:19 21:2 43:19 90:5 130:19 133:9

**civil** 4:5
**clarify** 139:11 139:15,22
**clean** 9:18
**clear** 4:13,23 17:3 84:5 113:15,23 118:6
**clearly** 5:8 134:7
**clerk** 5:11
**clicks** 36:3
**client** 18:14 111:11 120:24 121:4 137:20 138:5
**client's** 120:24 123:17 156:8
**close** 50:16 109:5 132:17
**closed** 133:2 148:19
**closer** 14:7
**cold** 12:24
**collectively** 116:18
**colon** 76:12 77:9
**combination** 94:17
**combined** 55:23 115:8
**come** 32:20 33:21 39:25 57:16 100:17

[come - contractors]

100:18,19
130:2
**comes** 7:20,23
**coming** 12:24
55:10 131:15
**comment** 118:2
**comments** 4:16
**commercial**
23:17,19
**commission**
159:25
**common** 11:12
111:2
**communicating**
5:4
**communication**
5:3,5,8
**communicati...**
10:16 54:20
**companies** 36:6
37:6,8,17
41:10,13,17
48:3
**companion**
137:14 138:7
**company** 1:7
3:14 21:13,13
21:15,17,21
22:10,15,24
23:5 24:6
25:17 26:18,25
27:6,23 28:18
28:22 30:7,22
30:25 31:4,22
31:23 32:16

33:7 34:10,11
36:2 37:12
39:12,18 40:3
40:8,17 42:16
43:25 53:18
54:10,14 57:6
63:7 82:23
87:17 90:20
97:11 107:5
**competitor**
53:23,24
**complete** 4:25
7:2
**completed** 26:6
40:12 88:19
**compliance** 4:6
85:19
**computer**
12:20 100:18
**concern** 42:5
**concise** 11:7
**concluded**
152:18
**condensed**
152:11
**conduct** 4:2 5:2
**conducted** 48:3
148:10
**conference**
151:19
**conferring** 15:2
**confidentiality**
4:18
**connection**
116:25 143:10

143:19 146:25
**consent** 5:5
**consideration**
116:13,15
**consolidate** 6:8
138:8
**consolidated**
6:9 7:12 138:2
**construction**
1:7 3:14 8:22
24:13,15,20
25:12,18 26:5
26:8 32:3
37:10,16 40:5
56:18 57:6
113:14 131:8
132:19
**contained** 70:7
**contents** 17:24
**continuing**
70:4 94:19
148:24
**contract** 32:19
32:24 56:15
57:10 58:5,9
58:22 59:2
61:12,15,18
62:13,22,23
63:4,10,11,13
64:2,7 66:13
67:25 68:12
69:16 74:11
91:13,16,21
107:17 108:12
108:12,16,22

143:13 154:8
155:13,22
**contracted**
117:2
**contracting**
1:15 3:18 27:8
27:24 28:5,8
73:2,14,17,24
76:5 77:11
78:3,5 79:21
80:3 100:11
139:25 154:12
**contractor** 32:7
32:12,15,20
33:12 34:9
39:6 56:16
58:9,22 59:3
61:23,24 62:22
63:9,10,15
73:25 75:6
76:25 77:9
78:5 92:25
105:17 116:18
132:2 133:11
140:2,9,16
141:3,6,13,21
144:19 154:10
**contractor's**
38:5 39:16
**contractors**
34:22 35:8
37:11 39:11
47:23 89:3,5
98:13 99:8
100:7 102:16

**[contractors - cut]**

103:23,24
104:12,19
130:7
**contracts**
105:22 106:4
106:15 142:14
142:24 155:19
**contractual**
143:19
**controlling**
5:18
**conversation**
9:14 65:4
**conversations**
10:16 135:15
136:10
**convey** 95:14
**conway** 3:12
**coordinated**
88:20 89:14
**coordination**
130:15
**copies** 121:3
**copy** 5:21
108:21 111:3
120:20 147:15
152:9,11,15
155:21
**corner** 72:22
**corp** 1:15 3:18
21:18 27:19,25
28:4 59:3
62:17,21 73:2
73:18,24 76:6
77:11 78:3,5

78:15 79:4,6
79:15,16 80:3
81:13 110:14
115:12,13
116:11,18
154:12,17
**corporation**
27:8 81:16,19
87:6
**corporations**
78:13,22,24
80:9 82:2,12
154:15,19
**correct** 8:25
9:2 10:23
13:17 19:11,18
24:17 27:9,11
27:14 32:4
36:10,11,21
39:8 41:4,5
43:20 44:16
46:21 49:18
51:4,7 52:5,11
52:12 60:11,12
60:15 61:21
62:17 76:25
77:2 78:25
79:7 81:9
84:25 87:10
90:8,13,14,16
93:5 95:2 99:5
102:4,8 103:11
103:14 107:6
107:11 128:6
140:23 141:14

141:18,24
142:6,10,18,25
143:3 144:7,8
144:10,11,14
144:15,21,25
145:2,8,12
146:20 147:5
147:12,13
153:9
**corrected**
125:19
**correctly** 88:2
103:11
**counsel** 6:18
7:6,14 8:25
13:22,24 16:11
18:18 55:15
66:19 70:8,9
110:22 111:5
111:14,23
120:21,25
121:8,14,22
125:2 127:25
140:13,23
143:25 147:14
147:20 151:25
156:21
**counsel's**
123:17 124:7
156:8
**counselor**
83:11 127:16
**county** 1:2,11
21:3 158:5

**couple** 12:18
28:18 37:9
43:15 45:14
50:11 88:5
103:24
**course** 4:15
12:2 71:17
91:19 106:10
108:23 122:22
123:10 134:9
**court** 1:2,10
2:11 4:19 5:12
14:17 20:19
22:5 45:24
46:4 58:12
60:17 62:9
65:8 73:6
78:18 82:6
84:10 98:8
108:9 112:17
119:14 124:3
125:8 126:24
131:2 134:18
136:5 139:13
152:5,8,12
154:23
**courtesy** 111:2
**cplr** 4:10,14,22
5:15,17,18
85:17 86:5
**cumulative**
116:13
**current** 27:20
**cut** 79:24

| d | | | |
|---|---|---|---|
| **d** 4:5 8:2,2 81:24 82:5,10 85:17 86:16 94:14 140:8 153:2 154:18 155:2 | 56:17 57:10 59:4 60:4,14 61:23 62:25 63:11 82:3,15 83:8 87:13,16 91:12,14 110:15 113:11 116:16 117:20 124:10 125:5 130:18 132:9 139:14 140:8 140:16 144:6 154:21 157:9 159:2 | 78:15 82:4 **defect** 4:13 **defendant** 2:7 3:8,13,18 19:10 **defendant's** 58:7,10,17 73:4 78:16 82:4 115:4 121:21 154:4 156:4 | 5:5 114:16 **deposition** 1:21 4:4,7,8,8,11,18 4:25 5:4 6:22 7:3,15,16 13:3 13:9,11,15 15:15,25 63:3 80:2 85:15,21 85:23,24 109:4 109:8 113:8,9 113:15,17,25 114:5 121:13 122:7,25 123:4 123:9,18 134:10 138:6 151:19 156:9 159:3 |
| **daily** 47:3,12 47:14 93:8 | | **defendants** 1:8 1:16 | |
| **date** 1:18 2:2 2:10 11:14 24:5 26:9 48:14 58:12 73:5 78:17 79:9,20 82:5 97:7 135:19,23 149:18 150:6 150:20,25 155:16 159:3 | | **defense** 121:14 124:7 143:25 | |
| | | **definite** 149:21 | |
| | | **delay** 27:4 | |
| | **day** 14:5 16:17 43:13,16 46:10 46:10,19,20 48:15 51:14 58:24 97:18 103:4 125:7,21 148:4 149:5,9 153:19 158:20 159:22 | **demand** 91:21 97:4 106:10 150:10 | **depositions** 4:2 4:3 5:2 14:4 85:13 |
| | | **demands** 55:23 117:2 | **description** 23:11 154:7 |
| | | | **designed** 10:8 90:9 |
| **dated** 55:24 | **days** 42:18 | **denominated** 64:17 | **determined** 122:16 |
| **dates** 25:9,15 80:13,13 | **deadlines** 88:17 89:7,12,17 | **department** 78:12,21,23 81:25 82:11 90:5 130:20 133:9 154:14 154:18 | **determining** 5:6 |
| **daughter** 29:5 29:25 81:9 | **deal** 115:23 145:21 | | **diagrams** 39:2 |
| **david** 1:21 2:8 8:10 61:3 77:16 91:11,15 104:5,5 153:15 159:3,21 | **dealt** 115:22 | | **different** 89:2 103:9 119:4 120:7 |
| | **december** 82:19 | **depending** 129:16 | |
| | **decide** 138:17 | **depends** 100:5 | **direct** 4:21 137:16 |
| **davs** 1:7 2:7 3:9 6:18 19:5,7,7,9 19:25 28:14 30:16,23 31:14 40:3 45:3 47:13 55:22 | **decided** 38:10 | **deponent** 4:12 4:17,21,24 5:3 | |
| | **deemed** 5:17 58:10 73:3 | | |

**directed**  87:5
**directing**  71:15
  83:12 84:2,13
  84:23 86:6
  110:20 111:6
  111:20,22
  112:6 113:22
  118:8 119:5,23
**direction**  4:22
  50:12,20 92:17
**directions**
  126:8
**directly**  37:14
  107:18,21,23
  145:11,16,22
**directors**
  116:21
**discharge**
  116:16
**discovery**  6:23
  7:19 55:19,21
  121:24
**discuss**  53:7
  127:14 128:6
  128:11
**discussed**  53:3
  53:10 127:12
  128:9 143:5
**discussion**  20:5
  26:23 29:8,24
  31:13 32:10
  53:13 55:13
  56:23 60:20
  107:2 108:5
  120:18 125:11

**discussions**
  143:6,9
**display**  86:24
**displayed**
  67:21 69:16
  70:16
**distance**  11:14
**division**  78:13
  78:22,24 80:8
  82:2,11 154:15
  154:19
**dob**  131:9
**document**
  58:15 59:8,18
  59:20,24 61:8
  62:20 63:20,22
  64:10,13 66:6
  67:17 68:8,22
  69:11 70:5,12
  70:25 71:10,18
  71:25 72:9,21
  73:8 74:8,14
  74:25 75:16,17
  75:24 77:20,22
  77:25 80:15,21
  82:10 86:16,17
  110:24 111:3,9
  111:11,15,18
  111:25 112:9
  112:23 115:8
  115:10 122:13
  123:2,7 125:2
**documentation**
  150:14 156:14

**documents**
  12:20 17:15
  55:19 75:10
  78:11 83:3,7
  91:24 92:2
  109:2 120:21
  120:22 121:11
  121:23 123:19
  130:17,19
  131:16 133:8
  140:12,14,22
  140:25 143:24
  147:16 149:25
  151:23 155:11
  155:12 156:2,3
  156:11,18
  157:3,7
**doing**  40:18,22
  41:2 42:11,17
  42:23 45:17
  47:2,12,14,17
  52:10 107:19
**dollars**  116:14
**double**  149:22
**drafted**  63:12
**drafting**  143:23
**drawing**
  106:14
**drawings**  39:8
  90:9 101:9,16
  101:20 102:7
**drawn**  106:15
**drew**  61:11
  74:10

**drive**  87:7
**dropped**  28:5
**duly**  8:3 153:5
  158:11
**dwayne**  44:20
  44:23,23 45:2
  49:12,24 50:23
  51:5 52:9 54:5
  54:14,17 93:3
  93:7 95:2
  109:24 110:4,9
  113:6 114:23
  123:19 128:20
  129:4 135:15
  136:10 146:22
  150:23 151:7
  156:10

|  | e |  |
|---|---|---|

**e**  3:2,2 4:6 8:2,2
  94:14,14,14
  100:22 126:20
  147:15,20
  149:23 150:5
  150:13 153:2
  154:2 155:2
  156:13 158:2,2
**earlier**  38:18
  60:10 76:20,23
  79:21 81:8
  87:22 93:11
  109:4,16
**early**  12:25
  13:3,21 37:13
  37:13 95:18
  130:2

ears 39:14
effect 5:11
effort 6:17
eight 68:11
either 11:8
47:13 104:5
117:4 132:9
140:15
electric 52:10
115:25
electrical 1:15
3:18 6:6,14
21:14,18 24:6
25:16,21 26:12
26:18,25 27:6
27:8,18,24
28:4,17,21
30:3 38:4 40:7
40:16,22 41:3
43:7 45:7 56:5
59:3 62:17,21
64:5 73:2,14
73:17,24 76:5
77:11 78:2,4
78:14 79:4,6
79:14,16 80:7
81:12 89:19
92:11,14 93:4
95:18 97:25
99:13,15
100:19 101:5
101:14 104:7
104:11,18
105:3,10
106:16 107:25

108:2,11 114:4
114:17 115:13
115:19 116:17
129:9 131:10
131:12 132:9
132:10 137:20
139:25,25
140:15 141:12
141:18,20,23
142:9,25
143:14,18
144:9,12,13,17
144:18 145:3,6
146:19 147:10
147:11 154:11
154:17
electrical's
92:19 98:12
138:6 145:7
electrician
20:15,22 45:10
95:20
electrician's
30:5
electricians
89:10 145:7
146:12
eleven 68:20
69:3,7
employed
115:12
employee 22:10
45:5
employees
28:19 45:3

116:21 146:10
146:13
empty 38:3
endeavoring
7:15
ended 128:4
enforce 4:19
entail 146:16
enter 108:12
142:23
entitled 121:22
entity 26:19
30:16 78:13
79:3,25 82:2
82:15 86:24
107:25 154:16
154:20
envelope 17:12
17:24
equipment
14:5 39:21
40:4,8 98:17
99:7
equity 117:3
errata 159:1
error 4:13
especially
151:25 156:20
espinoza 1:3,12
3:4 8:21 159:2
esq 3:6,10,15
3:20
et 46:20 89:13
159:2

event 5:7
eventually 30:6
everybody 7:7
16:13 101:17
102:21 137:7
151:12
everybody's
7:8
everyday 46:12
46:15,19 103:6
125:15 146:8
148:9,17
exact 43:10
91:9
exactly 22:2
25:10 38:5
79:19
examination
2:6 4:15 5:14
5:21 8:6 56:24
139:7 148:6
152:17 155:4
158:10,12
examined 8:5
examining 4:24
example 11:12
126:12
examples 11:15
excellent 137:8
except 4:4,6,14
4:18,21 85:15
85:19 89:18
146:12
exchange
122:11 123:10

**exchanged**
121:14
**exciting** 151:18
**executed**
124:11
**executive** 81:4
81:12
**exh** 154:8,11,14
154:18
**exhibit** 58:7,11
58:17 64:4
72:23,24 73:4
73:9 75:24
78:16 81:23
82:4,10 86:16
115:4 121:21
123:8 154:6,6
156:4
**exhibits** 122:3
123:17 151:15
151:23 154:4
154:23 156:7
156:17,19
**exist** 111:19
**exists** 119:19
**expect** 12:11
55:20
**expectation**
46:17
**expedite** 90:15
**expediter** 90:4
133:2
**expediters** 90:8
90:10,12,15

**expediting**
132:17
**expires** 159:25
**explain** 146:14
**extension** 8:19
**extensively**
137:18
**extent** 4:14
6:12 7:13 70:5
108:19 114:2,7
114:13 120:25
155:20
**eyes** 12:22
39:13

**f**

**f** 94:13 158:2
**face** 56:16
126:18,18
**facing** 50:11
**fact** 114:18
123:3
**facts** 120:12
**faint** 81:3
**fair** 6:25 10:24
11:2 42:10
58:2 104:7
142:15
**familiar** 36:13
37:23
**far** 80:6 149:5
**farewell** 137:12
**favor** 124:18
**feet** 50:11
**fell** 49:13,14,17

**fence** 37:12,15
129:25 130:4
**fifteen** 71:24
**fight** 16:16
**figure** 15:13
125:22
**file** 92:5,8
93:21,24 94:4
122:7,12,16
123:6 130:16
130:18
**filed** 80:7,15
82:19,23 83:4
83:7 147:20
157:5,8
**filing** 79:9
**filled** 61:19
**final** 115:8
**find** 14:12,12
16:18 48:20
103:25 112:7
122:20 123:11
**fine** 64:8 67:16
71:21,22
**finish** 107:20
127:21,22
139:20
**finished** 127:23
133:7
**finishing** 36:18
36:19,22,23
42:24 45:17
145:22,23
146:14,15

**firm** 8:18,19
90:14 120:20
123:18 156:9
**firms** 151:15,24
156:20
**first** 6:11 8:3
12:18 29:12
31:5 34:5
38:19 44:18
48:20 49:9
58:5 64:21
73:10,20
115:16 116:6,9
116:9 117:5
153:5
**fit** 38:3,19,23
40:18
**five** 21:9 22:12
65:18,20,22,24
**floor** 23:16,24
38:19
**flooring** 37:3
146:18
**floors** 23:22
**folder** 109:21
**follow** 44:3
91:20 97:4
106:11 139:3
**following** 40:24
**follows** 8:5
**footprint** 38:15
38:17
**force** 5:11
**foregoing**
153:8

**foreman** 43:6
44:11,14,24
45:2 49:12
51:3,14,22
52:9,13 93:3,4
117:19 142:5
143:16 147:4,8
147:10
**forever** 116:16
**forgive** 9:6 28:2
101:11
**form** 4:13
51:19 56:14
58:8,21 92:21
117:25 119:8
126:6 129:20
133:6 144:23
154:8
**former** 123:18
156:9
**formula** 43:10
**forth** 4:19 5:7
53:13 158:11
**forward** 18:23
151:17
**found** 122:9
**four** 9:13 21:8
64:16,18 65:12
65:14
**fourteen** 71:5
**framed** 4:11
**front** 35:24
50:8
**full** 28:24 98:5
130:22

**furnish** 115:13
**furnished** 5:21
**further** 5:10,13
5:16,20 57:8
113:5 137:5
153:8 158:14

---

**g**

**gallo** 3:8
**game** 19:24
**gangbox** 93:18
98:2,11,18
99:7,12 102:11
**garden** 3:19
**gastman** 3:6
7:5 8:7,17 14:2
14:13,19 15:3
15:11 16:10
18:9,17,22
20:16 22:3
26:21 29:6,18
31:9 32:8 35:3
48:25 49:5,8
55:2,14 71:9
71:17 109:6
117:7,14
120:16 121:7
122:14 134:13
137:7,23 138:9
138:12 139:5
148:2,3 151:11
152:7 155:5
156:4,17
**gc** 33:6,25 44:8
130:21 136:21

**gear** 39:21 40:9
40:17,20,25
**gears** 41:10,16
48:5
**general** 4:3
32:6,12,15,20
33:11 39:6,15
62:21 63:15
76:24 85:13
115:9 116:18
132:2 133:11
140:2,9,16
141:2,6,12,21
**generally** 20:12
43:11
**generated**
46:24
**gentleman**
44:22
**georgia** 3:20
6:3 152:13
**gestures** 57:17
**getting** 46:16
71:19
**give** 11:5 12:8,8
23:11 36:2
40:4,8,17
41:16 42:18
92:17 95:13
126:2 137:12
139:21 149:20
**given** 4:8 61:16
85:24 137:17
153:10 158:13

**giving** 39:23
**go** 10:5 11:18
42:4 59:17
63:5,23 66:10
68:5 70:10
81:22 89:24
94:16 103:20
105:6 122:20
123:12 124:9
134:15
**goes** 114:10
**going** 6:21 12:7
12:10,16 13:7
15:12,13 16:5
17:22 18:22
19:20 20:6
25:8 28:18
30:4,6 34:15
35:4 38:2
40:14,23 43:19
47:24 48:5,6
56:3 57:7 63:5
63:6 64:9 65:2
65:20 66:17
69:25 75:11
91:23 96:25
99:15 104:9
111:10 112:25
113:3,14 115:3
117:11 120:11
135:17 136:12
137:8,16,22
138:5,13,23,24
139:10 144:20
150:9,9

[gollub - hire]

Page 13

gollub 3:12
good 6:2 7:7,18
7:25 8:14,15
9:17 11:18
30:8 54:13
57:2,3 68:5
69:14 86:21,21
137:24 138:2,3
139:9
goods 116:14
gorayeb 3:3
8:18 113:9
gotten 121:24
122:2
gray 86:23
great 25:20
75:20
greg 15:7 34:24
48:23 152:5
gregory 3:6
8:17
ground 9:5
24:22,22
grounds 5:7
guess 11:7
35:22,23 51:15
67:7 100:22
guessing 10:22
gus 42:7 43:4
44:7,8 45:13
46:8,9,17
56:10 76:16,19
76:24 78:6
88:20,23 89:4
89:15 97:17

100:6,10,13,16
101:10 102:7
107:13,15,17
107:20,22
126:2,18
127:15 128:14
130:9,15 135:8
143:4 145:9,10
145:15,21
146:2,9,11
148:9,15,17,18
148:21 149:4
149:19 150:16
156:15
guy 30:8 42:4
54:7 71:12
129:25 130:4
138:13
guys 18:23
45:23 47:13,17
98:24 100:8
101:4

**h**

h 154:2
half 64:12
hand 32:25
33:2 77:4
98:19 99:2,3
158:20
hands 9:14,25
40:4,18 52:10
handwriting
59:11 74:18
handwritten
58:25 60:6

75:2
happen 33:20
97:19
happened 33:3
50:21,23,24
53:20 149:10
151:2
happy 10:11
30:8 48:25
49:3 57:13
111:17 122:10
125:18 147:22
151:12
head 9:15,20
9:24 20:9
140:20
healthy 151:12
hear 10:22
14:14 44:5
48:21 49:6,9
55:7 64:21
87:25 89:25
98:4 101:12
119:11 130:22
130:23 134:11
134:14 136:2
heard 8:16 9:7
17:3 34:8
57:15 64:24
67:4 103:10
117:17
hearing 7:9
14:3 20:17
124:25

held 2:9 20:5
26:23 29:8,24
31:13 32:10
55:13 56:23
60:20 107:2
108:5 120:18
125:11
help 16:13 39:7
helper 51:21,23
helpers 51:24
helpful 16:12
helping 16:8
18:13
hempstead
8:12 22:17
23:10 24:7,15
25:22 31:16
48:16 87:24
115:15
hereinafter
73:24 74:4
hereinbefore
153:11 158:11
hereto 5:18,21
hereunto
158:19
high 23:12
hire 34:21 35:7
35:13,14 37:5
39:17 90:3
103:16 104:11
104:18 105:3
105:10,14
107:12,13

**hired** 32:12
  33:16,17,22
  34:16,17 36:7
  39:13 97:11
  103:12 105:18
  115:20
**hiring** 35:6
**history** 20:7
**hold** 80:24
**holding** 25:10
  43:9
**holiday** 137:8,9
**holidays**
  151:13
**honestly** 106:7
**hope** 7:7,21
  16:17 137:7
**hour** 43:13,16
  71:20
**hours** 97:15
**house** 23:13
**how's** 14:10
**hudson** 44:21
  44:23 49:12
  54:9 93:3,8
  95:15 96:5
  109:25 113:6
  113:17 114:23
  114:25 115:6
  115:17 117:19
  123:5,19
  128:20 129:4
  135:15,16
  136:10,13,21
  142:4,5,8,12,13

142:22 143:6,8
  143:12,17,22
  146:22 150:24
  156:10
**hudson's** 110:4
  110:10 118:3
  123:9
**human** 11:25
**hurt** 49:13
**hvac** 104:19
  105:15,19
  130:12
**hyphen** 91:2

**i**

**idea** 17:18,20
**identification**
  58:11 73:5
  78:17 82:5
**identified** 6:6
**ii** 4:18
**iii** 4:19
**imagine** 39:6
**important**
  57:15
**improper** 4:20
  114:20
**incident** 48:21
  50:10
**include** 4:13
  38:23
**including** 9:16
  57:20
**incredibly**
  135:19

**index** 1:6
**indicate** 83:4
  150:5,15 157:5
**indicated**
  131:25
**indicating** 13:9
  17:16 109:22
  156:14
**industry**
  103:22
**inform** 131:23
**information**
  13:5 47:4
  78:14 82:3
  118:4 120:9
  154:16,20
  155:11,12
  156:2,3
**initial** 29:19
**initials** 29:10
  56:12
**injured** 8:20
**inline** 23:15,16
**input** 89:6
**inside** 103:4
**installed**
  126:10,11
**instruct** 136:20
**instruction**
  9:21
**instructions**
  95:14 126:2,7
  139:18
**intention** 63:14

**interest** 28:21
  30:16 33:6
  114:13
**interested**
  158:17
**interesting**
  86:22
**interfere** 4:16
**interjecting**
  16:7 18:13
**interposed** 4:6
  85:18
**interrupt** 5:4
  127:18
**interrupted**
  128:2
**interrupting**
  45:23
**invoice** 145:15
**involved** 15:22
  19:4 63:3
  95:12 146:3
**irregularity**
  4:14
**irrelevant**
  83:23,24 85:3
**irvington** 3:10
**island** 22:19
**issue** 146:22
**issued** 133:9
  145:14

**j**

**j** 3:10 36:7
  94:14

**james** 87:7
**january** 55:24
**jean** 2:11 98:5
 158:7,22
**jim** 56:7,12,13
 106:23 107:3,5
 107:7,8,12,23
 108:12,23
 110:14,15
 115:11,20
 116:10 117:21
 118:19 124:18
 125:4 127:4,8
 127:9,10 128:6
 128:10,11,14
 128:18 131:25
 143:9,15
 145:11,14,21
 145:25 146:10
 146:13 148:10
 150:16 155:23
 156:16
**jm** 36:7,14,19
 37:7 42:9,16
 42:23 45:17,20
 49:20,23 107:4
**job** 34:5 41:3
 42:10,12,17
 43:5 45:16,20
 63:15 76:25
 90:8,10,18
 107:19 108:13
 130:2 132:2
 133:2 145:23
 147:4,8 148:19

**jobs** 43:19 54:3
**jobsite** 47:19
 88:10,14,19
 89:9,18 90:6
 92:16 96:7
 102:6,7 107:9
 107:14 126:4
 126:19 127:4
 127:11
**jobsites** 43:17
**joe** 13:2
**joe's** 134:13
**joins** 121:8
**joseph** 3:10
**judge** 5:12
**judgment**
 55:16
**jumedeen**
 94:13,14,15
 95:14,17,25
 96:5
**june** 8:23 24:4
 26:9 48:14
 94:11 149:18
 149:19 150:2
 150:21

**k**

**k** 8:2 59:15
**kalnitech** 1:7
 3:14 32:17,19
 32:24 33:2,6
 33:11,16,21,25
 34:17 35:7
 37:7 42:4
 45:13,15,19

46:9 47:2 56:7
56:11 57:5,11
63:6,7 74:3,20
88:21 101:10
105:12 113:13
121:10,15,17
122:17 128:14
128:17 130:9
131:8 132:18
135:6,8 136:21
140:13,23
141:7 143:4
145:9,10 146:2
**kalnitech's**
143:25
**kavita** 59:15
61:13,18 62:14
74:23,24 83:5
157:6
**keep** 92:4,10
93:12 139:10
**keith** 113:10
**kenneth** 113:8
**kept** 92:6,9,13
93:8,19 94:4
95:25 98:18
99:7 100:19
102:10,11,13
102:20 118:25
124:12 157:12
**kevin** 3:17 6:4
**keys** 97:20
**kidding** 30:10
**kind** 19:4 53:14
83:2 90:4

98:17 99:3,6
 118:18 157:3
**kinds** 55:20
**kings** 1:2,11
**klar** 3:8
**kleeman** 1:21
 2:8 8:1,10,14
 9:1 10:1 11:1
 12:1 13:1 14:1
 15:1,24 16:1
 16:15 17:1,3
 17:17 18:1
 19:1,2 20:1,6
 20:12 21:1
 22:1,7 23:1
 24:1 25:1 26:1
 27:1 28:1 29:1
 29:9,25 30:1
 31:1 32:1 33:1
 34:1 35:1 36:1
 37:1 38:1 39:1
 40:1 41:1 42:1
 43:1 44:1 45:1
 46:1 47:1 48:1
 49:1 50:1 51:1
 52:1 53:1 54:1
 55:1 56:1,10
 57:1,2 58:1
 59:1 60:1,6,7,9
 60:10,14 61:1
 61:3,13 62:1
 63:1 64:1 65:1
 66:1,20,23
 67:1,8 68:1
 69:1 70:1 71:1

**[kleeman - line]**

72:1 73:1 74:1
75:1 76:1 77:1
77:16 78:1
79:1 80:1 81:1
81:7,11 82:1
83:1 84:1 85:1
86:1 87:1,6,10
88:1 89:1 90:1
90:3 91:1,12
91:15,22 92:1
93:1 94:1 95:1
96:1 97:1,8
98:1 99:1
100:1 101:1
102:1 103:1
104:1,5,6
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1,25 126:1
127:1 128:1,20
129:1 130:1
131:1,15 132:1
133:1 134:1
135:1 136:1
137:1 138:1,10
138:11 139:1,9
139:24 140:1

141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1,8
149:1 150:1
151:1 152:1
153:1,15 154:1
155:1,14,18
156:1 157:1
158:1 159:3,21
**kleeman's** 16:7
66:19
**klein** 113:8
**knew** 19:21
33:22
**know** 7:18
10:23,24 11:9
15:8,9 16:16
17:2,6,8 19:23
21:25 32:23
33:21,24 37:3
37:9,10 38:4
42:15,15 45:14
46:9,11 47:12
47:16,18,19
52:23 54:20,21
54:25 57:13
59:10 61:11
62:25 74:10,16
80:6,12 82:22
88:22 91:6,9
93:7,14 95:4
95:24 96:4,11
96:14 97:16
99:17,18

102:17,25
103:22 107:18
107:21 111:24
117:14 132:25
133:4 135:20
146:9,13 149:6
149:7 150:22
151:6,7,7
**knowledge**
39:19 47:6
93:10 99:10
114:9 148:14
149:12 150:15
156:15

**l**

**l** 8:2 90:21,23
90:23 153:2
**labor** 115:13
**ladder** 49:15,17
54:22
**landlord** 28:13
**large** 68:6
**larger** 71:8
**latest** 27:19
**law** 3:17 4:5
6:4 8:18 117:3
151:15
**lawsuit** 19:13
19:14 114:18
**lawsuits** 19:20
**lawyer** 54:19
**lawyers** 10:17
121:9 139:2
**learn** 110:3
129:3

**lease** 26:13,15
26:17 28:11
**leave** 54:13
55:15 56:20
**leaving** 34:3
**left** 60:2 72:22
73:12 75:25
76:11 79:2
82:14 103:2
**legal** 6:16
60:22
**letter** 154:7
**letterhead** 56:9
**levine** 113:10
**liability** 116:24
**license** 30:5
**licensed** 20:21
21:7
**lien** 110:14,16
110:18 113:3
114:24 115:9
117:21 118:17
118:24 121:19
121:20 122:9
124:11,18
125:4,14,16,21
131:24 156:6
157:11
**liens** 125:6
**light** 86:5
**limitation** 4:19
**limited** 145:5
**line** 115:7
157:9,13 159:5

**[listed - mean]**

**listed**  60:23 63:9 133:10
**listen**  7:9
**listing**  130:20
**litigated**  139:3
**little**  11:24 12:8 12:9,11 14:3,7 39:24 40:13 46:25 48:6 80:20 81:3 86:15
**llc**  1:7 2:7 3:9 57:11 59:4 60:4,15,23 82:3,16 87:13 154:21 159:1,2
**llp**  3:8
**locate**  122:13 123:7
**located**  22:15 22:24 23:5 98:2
**locked**  97:20
**log**  47:13,14 93:14
**logo**  73:13 75:25
**logs**  47:3 93:8 94:2 148:16
**long**  13:16,19 13:21 21:6,20 21:23 22:9,18 22:23 26:3 35:16 42:16 137:24 138:15

139:3,10
**longer**  54:7
**look**  23:14 61:2 68:20 77:3 93:16 99:24 102:17 123:6 151:17
**looked**  12:17 13:10 122:8 147:21
**looking**  13:6 43:14 50:17 65:21
**looks**  60:4 61:3 61:5 79:9 82:18
**lot**  19:19,20 34:2 125:14
**loud**  17:3 67:8
**lovely**  151:13
**low**  23:12
**lying**  19:21

---
**m**
---

**m**  8:2 36:7 94:14
**machine**  100:12
**madam**  14:13 45:24
**made**  4:4,7,17 5:5 58:23 73:22 85:14,21 114:16
**mail**  15:20 17:14,15

109:20 126:20 147:15
**mailbox**  126:10
**mails**  100:22 149:23 150:5 150:13 156:13
**maintain**  96:6
**maintained**  93:21,23 94:2 102:8
**majestic**  34:7
**make**  4:15 6:15 9:9 12:10 17:10 18:16 40:24 71:8 91:20 97:3 106:9,9 113:23 150:10
**making**  66:25
**management**  44:9
**manager**  43:21 44:5
**manhattan**  91:7
**map**  39:24 46:25
**maple**  87:7
**maps**  12:8
**march**  58:24,25 59:12 61:9 73:23 74:19 77:23
**mark**  72:23 83:17 86:12

114:19 120:6 120:14 124:6
**marked**  58:10 64:3 73:4,9 75:24 78:15 81:23 82:4,10 121:12,17,20 122:3,17 123:8 123:17 143:24 151:15 156:5,8 156:17 157:2
**marking**  58:6 58:16
**marriage**  33:10 158:16
**marshall**  3:12
**masons**  105:10 105:13
**master**  20:21 30:5 56:5 73:2 73:21 154:12
**masterpiece**  34:13,14
**materials**  115:14
**matter**  139:4 158:18
**maurice**  3:15 57:4 134:13 152:8
**mean**  17:7 36:24,25 79:23 94:24 97:22 98:21 107:23 126:7 138:9

| | | | |
|---|---|---|---|
| **mechanical** 103:17 104:12 105:15,19 130:7 | **mj** 58:5 59:17 64:11,23 65:16 66:4,16 67:12 68:3,20 69:23 | **moved** 53:21 54:11 | **never** 43:2 47:7 52:23 53:3,6 53:10 94:21 |
| **meet** 43:4 44:4 44:8,11 149:19 | 70:10 72:20 75:13 78:10 | **muddy** 40:13 | 114:25 115:10 115:21 121:13 133:22 141:12 |
| **meeting** 43:23 149:3 | 80:20 81:22 84:8 86:12 | **multiple** 60:24 134:9 | **new** 1:2,10 2:12 3:5,5,10,15,15 |
| **meetings** 126:18 128:13 | 112:15 119:12 123:14,24 | **n** | 3:19 7:19 8:4 8:13 9:13 21:2 |
| **men's** 98:19,20 98:21 | 134:12 136:3 | **n** 3:2 8:2 94:14 153:2 155:2 | 24:22 25:17,22 26:13 28:2 |

| | | | |
|---|---|---|---|
| **mention** 56:3 | **molding** 146:17 | **name** 6:3 8:8 | 74:3 78:21 |
| **mentioned** 30:2 38:18 39:12 75:3 79:21 93:11 | **moldings** 37:3 **moments** 28:18 45:14 | 8:17,20 15:8 21:16 27:12,16 27:17,23 28:3 29:12 31:5 | 80:8 87:7,24 90:5 130:19 133:9 158:4,5 158:8 159:1 |
| **merely** 16:11 | **money** 116:24 **month** 43:13 | 34:8 44:19 57:4 61:3 | **newer** 27:15,16 27:16 79:25 |
| **met** 149:16,17 | 151:13 | 76:15 77:16 | **nine** 68:12,17 |
| **michael** 113:12 | **months** 41:25 | 79:3,15,16,18 | **nod** 9:24 |
| **microphone** 14:7 | 42:18 **morning** 6:2 | 79:19,22,25 80:7 81:4 | **nodding** 9:20 20:9 |
| **middle** 73:16 81:2 128:2 | 7:7 8:14,15 11:19 57:2,3 | 82:15 90:19 159:2,3 | **nods** 9:15 |
| **million** 9:7 | **motion** 6:7 | **named** 60:5 | **normally** 41:12 94:8 |
| **mind** 68:7 75:14 | **motions** 9:15 **mouth** 57:17 | **names** 36:2 **narrow** 135:24 | **notary** 2:11 5:11 8:4 |
| **minute** 50:22 | **move** 6:17 9:24 | **nature** 57:9 136:11 | 153:22 158:7 159:25 |
| **misleading** 119:9 | 14:6 18:22 25:17 26:3 | **need** 9:15 11:24 94:6 102:18 | **note** 6:22 14:24 16:6,9 18:11 |
| **missed** 48:24 | 54:10 67:6,11 | 112:4 114:12 | 51:17,19 65:2 |
| **misunderstood** 18:3 19:17 | 83:10,14,22 84:16,19,20 | 121:3 **needed** 100:7 | 66:17 84:23 85:4,7,9 |
| **mixed** 23:18 | 85:8 86:8 90:4 138:7 | 102:22 **negotiations** 142:14 143:13 | |

103:18 104:14
104:21 106:9
122:5,23
126:13 127:24
133:5 140:4
141:9,25
144:22 145:17
146:5 147:6
**noted**  4:7 70:8
70:9 85:21
**notice**  6:11
12:9
**number**  58:24
83:15 125:23
**nycrr**  85:12

**o**

**o**  153:2
**object**  70:2
91:23 109:13
114:19 135:17
**objecting**  15:4
84:15 86:9
91:25 108:25
113:24 117:24
118:6 119:7,18
**objection**  4:11
4:17 16:6,11
16:14 18:18
51:18,19 63:21
63:24 65:25
71:6,10,18
75:7,8 78:7
83:9,16,20,21
85:7 89:20,21
89:22 92:20,23

103:18 104:14
104:22 105:4
105:11,24
106:18,20
110:6,11
113:21 117:12
117:13,23
118:10,20
119:3 124:7,13
124:15,20
126:5,13,15
127:5 128:23
128:25 129:7
129:14,19
131:4,6,18,21
132:3,6 133:5
133:12,14,19
133:24 135:2
135:10,12
136:15,18,23
136:24 140:5
141:10 142:2
144:23 145:18
146:6 147:7
151:3,5
**objections**  4:3
4:3,3,7,9,10
6:16 85:12,13
85:14,20 86:2
125:2
**observation**
148:21 149:2
**observed**  12:17
**obviously**
150:10

**occupying**
25:22
**occur**  65:6
**occurred**  24:4
150:21
**office**  3:17 6:4
13:4 38:10
59:13 62:2,12
63:12 73:25
74:17,21,22,25
80:17 83:3,5
94:7,16 100:20
100:22,23
102:3,15
106:14 119:2
124:12 157:4,5
157:13
**officer**  4:7
81:12,15 85:22
87:13,17 142:8
**officer's**  81:4
**officers**  116:21
**offices**  38:4,5,8
91:5 92:11
113:12 144:20
**oh**  11:23 35:3
50:13 68:4
70:11 94:23
138:18
**okay**  7:24,25
9:19,23,24
10:5,12,13,18
10:19 11:9,10
11:15,16,19
12:3,12,13

13:10,18 14:9
14:11,19 18:7
18:24 19:12,22
20:8 21:16
22:13 24:11,14
25:16 26:7,11
26:16 27:12,15
27:21 28:16,24
29:4,18,19
30:11,14 31:8
32:2,5 33:5,14
33:14,20,24
34:20 35:25
36:5 37:22
38:12,20 39:5
39:17,20 40:23
41:8 42:3,14
43:21 44:10,17
45:6,12,21
46:6,17,22
47:7,10 48:8
48:10,18 49:5
49:6,6,8,15,19
49:24 50:6,13
50:13,13,16
51:8,8,13 52:3
52:9,14,20,25
53:9,17,25
54:9,12,16,19
55:2 58:2,4,15
58:20 59:10,16
59:23 60:2,25
61:11 62:15,19
63:17 65:11,15
66:3,15 67:23

**[okay - participate]**

| | | | |
|---|---|---|---|
| 68:3,15,19 | 131:11,23 | **original** 152:6 | 156:3 157:9,13 |
| 69:9,14,23 | 132:8 133:16 | **outcome** | 159:5 |
| 70:20,23 72:5 | 135:5,14 136:7 | 158:17 | **pages** 113:16 |
| 72:15,19 73:12 | 136:20 137:23 | **outs** 38:23 | **paid** 46:16 |
| 73:20 74:10,24 | 138:15,24 | 132:17 | 71:20 139:2 |
| 75:13 77:14 | 139:5 140:25 | **outside** 19:22 | **painting** 36:24 |
| 78:9 79:2,14 | 141:5 142:20 | 114:11 147:3 | 37:2 146:17 |
| 79:18 80:2,11 | 142:22 144:24 | **own** 21:13 34:4 | **panel** 50:8,19 |
| 80:19 81:21 | 145:24 147:3 | 43:18 48:3 | **paper** 7:19 |
| 82:9,18,22 | 147:14,24 | 63:9 100:14,17 | 12:21 46:23 |
| 83:2 84:12 | 148:13 149:4 | **owner** 28:12,25 | 55:21 90:4 |
| 87:12,21 88:4 | 149:11,24 | 28:25 29:3 | 92:6,10 94:3 |
| 88:7 90:11,21 | 150:8 151:8,9 | 31:3,4,15,17 | 115:21,22,23 |
| 90:24 91:8,19 | 157:3,10 | 33:24 39:22 | 118:24 157:11 |
| 92:15 93:7,13 | **once** 7:22 43:12 | 40:2 44:7 | **papers** 93:24 |
| 93:19 95:7,20 | 43:13,13 54:17 | 56:15 58:9,22 | **paragraph** |
| 95:24 96:4,22 | 95:6,10 | 59:4 60:4,14 | 73:10,21 |
| 97:22,25 98:11 | **ones** 36:9 | 61:23,24 62:24 | 115:16 116:2,3 |
| 98:17 99:2,11 | 100:13 | 62:25 116:17 | 116:4,7,9 |
| 99:22 100:3,25 | **onsite** 40:21 | 141:17,22 | **paragraphs** |
| 101:19,22 | 42:23 101:17 | 144:6 154:9 | 64:16,20 65:17 |
| 102:15 103:2 | 102:16 148:9 | **owners** 29:4 | **pardon** 126:22 |
| 103:10,16,25 | 149:4 150:2,5 | 30:11,21,24 | **part** 23:4 42:17 |
| 104:25 105:8 | 150:16 156:16 | **ownership** | 45:18 48:24 |
| 105:14,18 | 156:16 | 28:19,21 30:15 | 90:7 93:2 |
| 106:3,8,22 | **open** 14:20 | 33:6 | 121:2 122:18 |
| 107:12 108:15 | 47:23 103:3 | | 130:24 141:17 |
| 108:18 110:13 | **opened** 109:19 | **p** | 143:6,9 |
| 114:12,21 | **opportunity** | **p** 3:2,2,17 | **partial** 23:24 |
| 118:12,16,23 | 7:2 147:17 | **p.c.** 3:3,13 | 28:25 29:3 |
| 122:14 124:17 | **opposite** 50:20 | **p.m.** 152:16 | 31:4 |
| 124:24 125:25 | **order** 2:9 4:19 | **page** 59:19 | **participate** |
| 126:17 128:9 | 6:25 139:13 | 64:12 75:23 | 142:13,17 |
| 128:15 129:22 | **ordinary** 55:18 | 76:4 81:3 | 143:12 |
| 130:3,6,11,16 | 121:24 | 113:19 114:22 | |
| | | 154:6 155:4,12 | |

**participation**
143:23 144:4
**particular** 6:20
6:20 36:14
126:9
**parties** 2:9 5:5
5:17,21 58:14
59:21 64:15
66:8 67:19
68:10,24 69:13
70:13 71:2
72:3,11 73:7
75:19 78:19
80:23 82:7
86:19 158:15
**partners** 1:7
2:7 3:9 19:8,9
19:25 28:14
30:17,23 31:15
40:3 47:13
55:22 56:18
57:11 59:4
60:4,15 82:3
82:16 113:11
116:17 139:14
154:21 159:2
**parts** 61:20
**party** 4:24 6:5
6:24 7:13
14:23 29:11,20
114:6,17
137:13,14
**past** 109:8,18
**path** 139:3

**pay** 63:6
107:18,21,23
145:11,15
**payment**
107:24 146:23
**payments**
146:23
**pending** 6:7
57:23
**people** 23:9
25:3 36:13
37:22 55:5
**perfect** 9:9 11:6
**perform** 126:3
**performed** 89:8
99:24 132:15
145:4
**performing**
147:11
**period** 42:22
**periodically**
43:3,12 95:5
**permit** 6:25
131:7,9,12
132:8
**permits** 132:10
132:14,18,21
133:3,3
**permitted** 4:14
**person** 4:9,21
9:12,17 14:22
60:5,22 86:3
87:4
**person's** 44:18

**personal** 98:19
98:20,22,24,24
**personally**
99:18 148:15
**persons** 4:15
**phases** 88:18
**phone** 49:11
96:24 126:19
**photographs**
131:17
**photos** 96:6,13
96:19,22 97:5
97:6 155:15
**phrase** 43:22
**physically**
95:19 145:4
**pictures** 96:10
**place** 8:22
22:24 25:12
50:10 74:2
102:11 103:9
153:11
**placed** 75:2
99:11 103:4
**plainly** 4:20
**plaintiff** 1:4,13
3:4
**plaintiff's** 7:6
7:14 16:10
18:17 55:14
121:7,22
**plastering**
36:25
**please** 8:8 11:9
14:15,20 17:4

**personal** 20:25 21:5
29:13 32:16
37:24 57:13
59:17 63:25
64:24 65:5,17
66:4,16 67:13
68:4 69:10,23
70:10,24 71:7
72:20,22,23
78:11 80:20
81:24 84:8
86:12,14 97:2
108:7 112:14
119:3,12 120:3
122:3,20
123:14 127:21
134:12 136:3
151:16 152:11
**plumber**
103:21
**plumbers**
36:15 105:3,16
105:20
**plus** 21:10
**point** 17:10
31:14 34:8
64:6 109:18
**points** 139:23
**portion** 41:3
**posed** 57:22
**position** 87:15
**possession**
120:23 151:24
156:19

**[possible - putting]**                                                    Page 22

| | | | |
|---|---|---|---|
| **possible** 6:16 67:14 106:3 150:4,7 | **printer** 101:24 | 35:15 37:18,25 | **provided** 4:21 |
| **powered** 99:3 | **printout** 78:21 | 38:13 39:3 | 5:14,17 39:5 |
| **practice** 4:5 | **printouts** 12:20 | 40:5,19 41:11 | 39:23 40:10 |
| **prefer** 152:11 | **prints** 100:12 | 41:14,24 42:4 | 99:25 100:3,6 |
| **prejudice** 4:20 | 115:23 | 43:21 44:4,8 | 100:8,9 101:4 |
| **preparation** | **prior** 34:9 | 45:18 46:14,25 | 102:10 108:20 |
| 13:14 | 37:15 107:16 | 47:15,22 56:19 | 145:6 155:21 |
| **prepare** 32:24 | 114:15 120:24 | 90:15 92:4,5,7 | **public** 2:12 |
| 32:25 | 123:16 156:7 | 93:21,22,24 | 5:11 8:4 |
| **prepared** 32:23 | **privied** 141:23 | 94:20 95:11,15 | 153:22 158:7 |
| 39:2 | **privilege** 4:18 | 95:18 96:13,20 | 159:25 |
| **present** 40:21 | **probably** 7:17 | 115:22 116:25 | **pulled** 131:7,9 |
| 113:7,9 | 8:16 10:24 | 119:2 123:21 | 131:11 132:18 |
| **presently** 21:12 | 95:6,10 96:24 | 130:10,21 | **purchased** |
| **preserve** 4:18 | 135:22 | 136:22 140:3,9 | 31:18,23 |
| 97:2 | **proceed** 4:8 | 140:17 141:3,6 | **purpose** 5:4,6 |
| **president** 61:5 | 85:25 115:24 | 141:13 142:6,9 | **purposes** 5:14 |
| 62:16 76:16 | 138:23 | 142:15 143:5 | 137:25 138:16 |
| 77:17 78:2 | **proceeding** | 143:10,15,20 | **pursuant** 2:9 |
| 81:20 87:18,19 | 122:11 | 145:5,25 146:4 | 4:4,10 62:22 |
| 87:20 104:6,10 | **proceedings** | 146:25 147:12 | 85:11,16 86:4 |
| 105:2,9,21 | 9:6 | 156:12 157:12 | **put** 17:11,25 |
| 130:17,18 | **process** 7:11 | **projects** 33:18 | 18:9 29:9,19 |
| **pretty** 46:18 | 33:23 86:25 | **proper** 83:20 | 31:9 58:5,13 |
| **previously** | 87:5 | 120:3,10 124:8 | 58:15 59:21 |
| 121:2 | **produce** 6:19 | **property** 26:14 | 60:22 63:4,10 |
| **prime** 56:15 | **produced** 6:12 | 31:16,18,22 | 70:13 71:2 |
| 58:21 | 139:13 | 37:15 39:22 | 72:20 73:6 |
| **principal** 73:25 | **progress** 43:4,6 | 40:3 144:7,10 | 78:10,18 82:6 |
| **printed** 100:13 | 44:12 95:16,25 | 144:13 | 102:5 108:23 |
| 100:14,16 | 96:6,7,13,18 | **protect** 114:12 | 109:21 113:20 |
| 101:9,24 102:2 | 97:6 155:15 | **provide** 41:9 | 115:5 150:11 |
| | **project** 25:4 | 98:2 100:25 | **putting** 54:19 |
| | 32:13,16 33:17 | 101:6,14 | 119:25 |
| | 34:23 35:9,13 | 111:17 150:12 | |

[queens - really]                                                    Page 23

| q | | | |
|---|---|---|---|
| **queens** 8:12 | 131:19 132:4 | 19:18 20:3 | 137:16 151:3 |
| 22:18,20 87:24 | 133:20 134:2 | 21:23 34:24 | 151:22 156:7 |
| 115:15 | 134:12,22 | 41:20 48:23 | 156:18 |
| **question** 4:20 | 135:21,25 | 49:4,7 63:21 | **reaching** 42:6 |
| 4:24 5:6 10:3 | 136:3,16 | 64:6 66:22 | **read** 13:18 |
| 10:22 14:20 | 139:19,21,22 | 67:5,10 75:8 | 14:17 15:16,19 |
| 15:23 16:23,25 | **questioner** | 83:9,14,17,22 | 16:3,24 17:6 |
| 22:8 34:25 | 118:5 | 84:4,15,20 | 17:14,23 18:2 |
| 35:5 40:11,14 | **questioning** | 85:2,6,10 86:8 | 20:19 22:5 |
| 41:15 42:5 | 4:12,16 152:3 | 89:22 90:2 | 45:25 46:4 |
| 45:25 48:24 | 156:22 | 91:23 92:20 | 58:20 62:7,9 |
| 57:12,22 62:11 | **questions** 4:17 | 98:4 103:18 | 64:24 65:8 |
| 64:22 80:5 | 9:23 10:8 | 104:14,21 | 84:10 98:6,8 |
| 84:7,7,14 | 11:20 12:10,15 | 105:4,11,24 | 108:9 109:17 |
| 89:25 96:9 | 12:18 16:8 | 106:18 108:3 | 109:19,20,22 |
| 98:5 103:7 | 18:14 20:7 | 108:25 109:13 | 109:23 112:15 |
| 104:17 108:7 | 34:16 39:21,24 | 110:6,11,17,23 | 112:17,25 |
| 109:15 110:22 | 46:23 48:7 | 111:8,18,24 | 113:24 115:6 |
| 111:7,22 | 55:4,7 57:8 | 112:8,12,21 | 115:17 116:5,8 |
| 112:13,15,19 | 63:23 109:7 | 117:13,23 | 117:17,18 |
| 112:20 114:23 | 113:5 114:8 | 118:10,20 | 118:4,16 |
| 114:25 115:6,9 | 121:5 137:6,15 | 119:3,7,18,25 | 119:14 122:18 |
| 115:11,17,25 | 137:19,22 | 120:8,19 | 123:24 124:3 |
| 116:3,10 117:4 | 138:14,25 | 123:16 124:8 | 126:24 131:2 |
| 117:8,15,16,24 | 139:15 157:2 | 124:13,20 | 134:18 136:5 |
| 117:25 118:15 | **quite** 125:15 | 126:5,13 127:5 | **readers** 55:17 |
| 119:4,8,10,12 | | 127:19 128:23 | 56:4 |
| 119:17,20,21 | r | 129:7,14 | **reading** 110:25 |
| 119:22 120:2,4 | **r** 3:2 153:2 | 130:22 131:4 | 113:4,5,14,16 |
| 120:10,11 | 158:2 | 131:18 132:3 | 113:18,18 |
| 123:15,24 | **raised** 4:11 | 132:23 133:5 | 114:18 |
| 124:9 125:17 | **rava** 3:10 13:14 | 133:14,19 | **ready** 12:22 |
| 126:6 127:6,20 | 14:9 15:7,17 | 134:4 135:2,10 | **realize** 48:18 |
| 130:23,24 | 16:3,22,25 | 135:17 136:15 | **really** 7:18 13:6 |
| | 17:8 18:4,7,12 | 136:23 137:2 | 13:7 16:12 |
| | 18:15,18,20 | | |

[really - released]                                           Page 24

20:16
**reason** 5:7
  11:25 57:19,24
  159:5
**recall** 25:14,14
  26:6 33:4 34:9
  35:12,19,20
  37:19,21 48:19
  60:9,13 80:13
  80:18 82:25
  106:7 112:22
  112:24 150:19
**recchia** 3:15
  14:24 16:5
  18:8 56:21,25
  57:4 58:4
  59:16 60:21
  62:6 64:11,23
  65:15 66:3,9
  66:15 67:3,7
  67:12 68:3,19
  68:25 69:9,14
  69:23 70:3,8
  70:23 71:4,13
  71:21 72:7,19
  75:13,20 78:9
  80:19,24 81:21
  83:11,15,19
  84:2,6,12,17,22
  85:4,9 86:10
  86:20 91:19
  97:3 106:8,24
  108:6,18
  110:20 111:5
  111:14,20

112:2,10,13,14
114:10,21
118:8,12 119:5
119:11,16,23
120:5,14 122:5
122:22 123:14
123:23 124:5
126:8 127:2,16
127:24 133:25
134:11,16,20
136:2,7 137:4
140:4 141:9,25
144:22 145:17
146:5 147:6,18
147:22,25
148:5,7 150:8
151:8 152:10
155:6,8
**received** 6:10
  55:18 107:24
**recently** 44:3
**recollection**
  35:21 50:18
  115:18 117:20
  118:18 125:3
**record** 5:8 8:9
  9:9,18 14:17
  14:25 16:9
  18:10,12 20:3
  20:4,19 22:5
  26:21,22 29:6
  29:7,10,22,23
  31:11,12 32:8
  32:9,11 40:12
  46:4 55:11,12

55:18 56:21,22
60:18,19 62:9
65:3,6,8 66:18
66:25 84:10,20
85:5,10 93:13
98:8 101:18
106:24,25
108:3,4,9
112:17 113:2
113:21 118:5
119:14 120:16
120:17,19
121:3 122:6,19
122:23 123:15
124:3 125:9,10
126:24 127:25
131:2 134:18
136:5 137:25
158:12
**recorded** 14:14
**records** 56:4
  92:6 93:20
  94:3 95:25
  148:16 149:13
**refer** 88:13
  123:3
**referenced**
  152:2 156:21
**referencing**
  111:4,10 112:9
  120:22
**referred** 14:16
  20:18 22:4
  46:3 62:8 65:7
  81:8 84:9 98:7

108:8 112:16
116:19 119:13
123:4 124:2
126:23 130:25
134:17 136:4
**referring** 47:21
  61:23 76:20
  104:4,4 110:18
  111:15 128:16
**refers** 64:4
  115:11
**reflect** 83:7
  148:16 149:25
  157:8
**refresh** 35:21
  115:18 117:20
  118:17
**refreshed**
  125:3
**refusal** 4:17,22
**regard** 46:8
**related** 33:10
  123:20 156:12
  158:15
**relates** 6:13
**relating** 132:22
**relation** 80:2
**relationship**
  30:20 57:10
  107:15
**release** 115:9
  116:16
**released** 110:15
  116:15

**releasees** 117:4
**releases** 116:19
  116:20
**releasor** 116:12
**relevance**
  83:16
**relevancy**
  83:20
**relevant** 83:10
**relief** 4:9 86:4
**remainder** 4:25
**remained** 38:15
  38:18
**remember**
  21:25 27:22
  35:15 50:14
  80:10 103:22
  109:9 148:10
**remotely** 2:10
**renew** 117:12
**renovation**
  24:20,24 25:4
  37:25 38:13
  40:19
**rented** 23:6
**repeat** 34:24
  35:5 40:23
  57:14 62:4
  64:25 90:2
  125:12 139:20
**rephrase** 10:11
  49:2 57:14
  96:17 136:8
**reporter** 2:11
  14:13,18 20:20

22:6 45:24
46:5 58:12
60:17 62:10
65:9 73:6
78:18 82:6
84:11 98:9
108:10 112:18
119:15 124:4
125:8 126:25
131:3 134:19
136:6 152:5,8
152:12 154:23
**reporting**
  159:1
**represent** 6:5
  8:20 57:5
**representative**
  91:12,16 135:7
**representatives**
  116:22
**represented**
  8:24 13:2,22
  13:23 19:3
**representing**
  5:22 19:25
  113:11,13
**request** 4:12
  57:23,25 66:24
  91:24 92:2
  109:2 123:16
  151:22
**requested**
  155:11 156:2
**requesting**
  150:12

**required** 6:19
  93:12
**requisitions**
  146:24
**resent** 66:23
**reserve** 7:3
**reserving** 6:15
**residential**
  23:18
**respect** 5:18
  84:18 91:25
  114:15 118:19
  137:19
**respectfully**
  33:9 66:24
**respective** 2:8
  5:21 116:20
**response** 55:23
  55:24 109:14
  139:21
**responsibility**
  39:16 41:13,18
**responsible**
  88:9 106:14
  128:21 129:5
**rest** 65:19
**restate** 140:18
  140:19
**restricted** 4:10
**retained**
  154:23
**retract** 125:23
**review** 43:4,6
  44:12 117:18
  122:12 123:6

131:16 133:16
134:23
**reviewed** 12:17
  12:19 13:8
  109:7 114:6
  122:7,15
  133:21 134:5,7
  144:2
**reyes** 1:3,12 3:4
  8:21 159:2
**richman**
  113:10,10
**right** 4:9,18,24
  13:12 36:20
  42:12 51:6,23
  61:2 63:12
  67:6 75:12
  77:4 80:4,25
  86:2 88:15,22
  100:3 101:11
  107:5,8 119:21
  134:14 137:21
  147:9
**rights** 5:17
  6:15 7:4
**rise** 23:12,12
**road** 12:8
  39:24 46:25
**robert** 113:12
**rodrigo** 1:3,12
  3:4 8:21 159:2
**role** 144:17
**roofing** 105:17
  105:20

**roughly** 92:16
**rule** 4:5,6,14,15
4:22 85:17,20
86:5
**rules** 4:2,5 5:2
5:7 9:5 85:11
**ruling** 83:18
86:13 120:6,15
124:6
**rulings** 157:2
**run** 54:2
**running** 130:9

**s**

**s** 3:2,4,8,13,18
29:14,16,17,19
94:13 140:8
154:2 159:5
**safety** 39:12,18
40:4,8,9,17,20
40:25 41:9,16
99:6
**saint** 87:7
**saw** 17:24 47:7
49:25,25
109:20
**saying** 9:11
49:13 50:15
71:16,18
121:15
**says** 56:14
58:21,23 59:2
60:3,6 61:22
73:17,21 78:23
79:3,4 81:3,7
82:11,14,15

86:23,23,24
116:7
**scanned** 13:5
**scene** 51:10
**schedule** 43:10
46:13 129:10
129:11,23
130:6,11
**scheduled**
129:25 130:8
130:14
**schedules**
88:18,23,24
89:4,7,17
**scheduling**
128:21 129:5
**scope** 37:23,24
114:12 147:4
**screen** 58:13,16
59:21 64:3,14
64:17 65:22
66:7 67:18,21
68:9,23 69:12
69:16 70:13
71:2 72:2,10
72:13 73:7
75:18 78:19,20
80:22 82:7
86:18 115:5
**screens** 12:20
**scroll** 64:12
65:16 66:4,15
67:13 68:4
70:24 80:20
86:14

**scrolled** 64:14
66:7 67:18
68:9,23 69:12
72:2,10 75:18
80:22 86:18
**scrolling** 75:14
**search** 64:9
**season** 137:9
**second** 111:17
**secretary** 17:13
86:25
**section** 5:7
64:17,18,18
65:12,12,12,22
65:24 66:5,13
67:14,15,16,20
67:25 68:4,17
68:17,17 69:2
69:7,10,15,21
69:24 70:11,15
70:17,21 71:5
71:23 72:6,12
72:17 85:12
**sections** 5:18
64:7 65:13,14
65:14 68:11
**secure** 97:17
**secured** 97:14
**security** 97:10
**see** 8:24 13:6,7
14:9 36:3 43:5
50:2 55:5,20
58:17 59:4,23
60:2,7 64:18
65:18,22 66:11

67:13,20,23
68:11,15,19,20
69:2,5,9,15,19
69:24 70:15,17
70:18,20 71:8
71:23 72:5,12
72:18 73:8,10
73:14,18 74:4
76:2,6,9,13,16
77:5,11,17
78:23 79:4,8
79:12 81:5
82:9,16,20
86:23 87:2,4
93:17 94:8,25
112:8,23,23
115:4,15 116:2
116:5 121:4
122:12 133:8
148:15
**seeing** 151:18
**seek** 119:10
**seem** 19:15
110:25
**seen** 51:10 59:7
74:7 114:24,25
115:10,21
124:17
**send** 122:3,20
147:23 151:16
**sent** 13:4 17:12
100:23
**sentence** 116:6
116:9 117:5

separate 97:10
separately 72:8
sequence 88:8
  88:12
sequenced
  88:10
serve 144:18
service 86:24
  87:5 95:19
session 12:22
  122:25
sessions 11:13
set 4:19 5:7
  39:8 65:17
  88:17,23,23
  89:4,11,17
  100:2 101:16
  101:19 102:6
  151:12,13
  158:11,20
setting 89:7
seven 67:14,20
  67:25
several 39:20
shainah 81:7
share 58:14
  59:22 64:15
  66:8 67:19
  68:10,24 69:13
  70:14 71:3
  72:3,11 73:7
  75:19 78:19
  80:23 82:8
  86:19

shareholders
  30:12 116:20
sheet 93:14
  159:1
sheets 94:3
shop 38:8,9,11
  42:25
short 9:4 56:14
  58:8,21 154:8
show 64:2 66:4
  69:10,24
  110:19,24
  111:13 115:3
showing 75:22
shown 121:10
  140:13,22
sic 116:8
sick 46:19
side 60:3 61:2
  76:11 77:4
  79:3
sign 61:8 63:14
  77:22 78:3
  91:12,16
  105:21 108:11
  108:15 110:13
signature 59:19
  59:24 60:3,5
  61:2,4,6,6
  75:23 76:9
  77:4,15,19
  158:22
signature's
  112:24

signatures
  75:15
signed 5:10,11
  26:15 56:10,11
  56:12 62:15,19
  63:13 77:25
  106:4 115:2
  117:21 118:18
  124:11,22
  125:6,14,15,20
  125:24
significant 4:20
signing 26:13
  62:16
simply 16:17
  80:5
single 14:5
  23:15
sir 9:4,8,19
  10:7 11:4,8,17
  11:22,24 12:7
  12:15,19,24
  13:12 14:22
  15:15 16:17
  17:2,20 18:3
  19:6,9,11
  20:21 21:4,12
  21:21 22:13,16
  23:3,9,12,20,21
  24:3,4,14,19
  25:3,8 26:2,8
  26:12,24 27:5
  28:2,11,17,20
  30:15,19,23
  31:14,20 32:6

32:11,18,23
33:5,9,16,20,21
34:15,16 35:12
35:21,25 36:6
36:13,23 37:5
37:17,22 38:13
38:25 39:10,20
40:2,11,13,16
40:24 41:4,15
41:19,23,24
42:3,9,15,22,24
43:9,11,18,21
43:23 44:2
45:13,14 46:8
46:9,22 47:2
47:11,20 48:5
48:13,14,18,19
49:9,20 51:8
51:13 52:11
54:19 55:2,10
57:19 58:2,15
59:5,14,23
60:25 61:6,12
62:11 63:20,25
63:25 64:5,16
65:21 66:11
67:20 68:11
69:3,15 70:15
70:17 71:23
72:13 73:8
75:9,22 77:20
78:20 80:5
81:2,19 82:9
85:7 86:5,22
87:10,16 90:18

92:4 96:23
107:6 109:4
112:20 117:17
118:13 124:10
127:22 128:7
128:10 134:23
140:6,10
141:14,16,24
142:15 144:21
144:25 145:12
145:20 150:19
**site** 87:23 88:15
92:18 93:5,9
94:17,21,25,25
96:2,19 97:6
97:11,12,14,18
98:3,14 99:9
99:12,16,19,23
99:24 101:3,8
101:15,20
102:3,10,24
103:13,17
104:13,20
105:3,10
128:11,14,22
129:6,13
132:11,15,22
133:11 149:19
150:17 155:15
**six** 65:18,19
66:5,13
**sixteen** 72:6,12
72:17
**size** 68:6
109:21

**skimmed** 15:5
15:20,24 16:18
16:20 17:2,5
17:19
**skip** 71:4
**slightly** 68:6
**slow** 95:11
**small** 10:4
**smoother** 12:11
**solely** 98:15
147:10
**somebody** 44:5
49:22 56:11
74:20 138:10
149:13
**somebody's**
9:10
**someplace**
100:20 128:12
**soon** 32:2
**sorry** 11:23
15:7 18:8
29:15 35:4
45:22,23 48:23
51:18 70:11
72:8 79:23
95:9 96:16
117:7 145:20
**sort** 47:3,12
**sounded**
140:19
**sounds** 122:15
**space** 25:17,22
26:4,13 38:10
38:11,11

**span** 145:25
**speak** 9:11
50:25 51:9,11
57:20,25 63:22
**speaking** 4:10
9:16 20:13
43:11 66:19
67:8
**speaks** 70:5
71:10,19
**specialty** 36:14
**specific** 64:7
88:11 125:16
126:2,7
**specifically**
104:2
**specified**
153:11
**speech** 125:22
137:13
**speed** 54:24
**spoke** 135:22
**spoken** 10:2
**spouse** 31:7
**ss** 158:4
**stage** 19:24
**stalin** 1:3,12
3:4 8:21 159:2
**standard** 61:15
61:17 62:13
74:12,13,15
75:4,5
**standing** 50:7
**stands** 125:16

**start** 113:18
**started** 32:3
**starting** 114:22
**starts** 116:2
**state** 1:2,10
2:12 8:4,8
20:25 78:13,21
78:22,24 80:8
82:2,11 86:25
154:14,18
158:4,8
**stated** 4:11 5:8
27:20
**statement** 4:13
4:23 128:4
**statements**
4:16 66:25
**states** 20:25
**stay** 45:15
**stewart** 3:19
**stipulated** 5:10
5:13,16,20
**stop** 10:10
40:24 43:3,5
46:10 66:25
71:7 117:5
**stopped** 43:12
**stopping** 42:24
**storage** 38:11
**stoupakis**
76:16 78:6
**straightforward**
10:9
**street** 3:5,9

strike  94:24
stuff  10:18
    15:13 18:23,24
    71:11
subcontract
    56:6 64:19
    65:23 66:12
    67:24 68:16
    69:6,20 72:16
    73:3,21,22
    74:13,13
    154:13
subcontractor
    63:18,19 64:5
    64:19 65:23
    66:12 67:24
    68:16 69:6,20
    70:21 72:16
    74:4 75:6
    76:13 78:6
    107:9 129:16
subcontractors
    34:22 35:8
    39:11 89:3,13
    92:18 101:3,7
    101:15 103:13
    103:17 104:3
    104:12,19
    105:15,19,23
    106:5,17
    129:13,18,23
    130:4,13
    155:19
subdivision  4:4
    4:6,22 85:16

85:19
subject  4:9
    85:25
submit  146:23
subscribed
    153:18 159:22
substance
    110:4,9
successors
    116:12,22
succinct  4:23
succinctly  4:11
    5:8
suffolk  21:2
suggest  4:12
suite  3:5,9,19
summary  55:16
sums  116:23
superintendent
    94:7,11 95:23
supervise  51:23
    127:4,8,9,10
supervised
    146:10,11
supervising
    52:15,18
    127:13
supply  111:3,9
supposed  52:17
supposedly
    50:21,22
    124:22
supreme  1:2
sure  18:16
    20:11 35:3

40:24 48:9,25
    62:6 64:11,23
    70:3 75:10,11
    79:20 85:10
    88:13 132:23
    135:21
swimmer
    113:13
switch  48:5
sworn  8:3
    153:5,18
    158:11 159:22

**t**

t  59:15 90:21
    90:23,23 153:2
    154:2 158:2,2
table  102:20,23
    103:2,8
take  7:15 9:18
    14:4 25:12
    30:6 57:18,24
    60:25 63:25
    67:15 77:3
    86:10 96:13,18
    138:5 152:14
    152:15
taken  2:8 4:8
    85:23 96:10
    97:8 113:7
    155:17
talk  54:17
    93:20 94:2
    106:22 107:3
    142:4

talking  19:14
    19:15 21:14
    26:24 27:5
    54:4,23 69:17
    87:23 88:14
    124:25
talks  47:17,20
    48:4 93:12,15
tell  10:10,17,21
    17:4,18 21:5
    22:22 23:4
    25:10,20 26:2
    31:20 33:22
    37:24 42:3
    43:2 49:24
    50:23 52:25
    53:5 65:11
    84:18 110:8
    112:4 128:19
    129:22 135:5
telling  120:8
    138:22 148:24
ten  68:12,17
tenant  144:10
    144:14,18
term  103:19
terms  54:13
    107:17 115:21
testified  8:5
    76:24 87:9,22
    109:6 128:5,20
    129:4 133:18
    133:22 135:6,8
    135:16 136:13
    148:8 150:24

**[testify - told]**                                    Page 30

| | | | |
|---|---|---|---|
| **testify**  109:16 | 29:21 30:14 | **things**  9:7 | 55:3 57:19 |
| 136:12,21 | 31:2,8,10,19 | 11:24 12:10,16 | 62:18 63:25 |
| 153:5 | 32:5,22 33:14 | 28:20 36:24 | 94:11 95:4 |
| **testifying**  5:22 | 33:14 34:6,14 | 38:24 53:22 | 103:8 113:11 |
| **testimony**  7:17 | 35:11 36:12 | 56:2 74:17 | 135:19 139:17 |
| 15:16 16:19 | 37:4 38:7,12 | 75:2 99:3 | 153:10 |
| 17:5,20 60:10 | 38:22 39:9 | 121:18 122:17 | **times**  9:7 17:4 |
| 60:13 76:21 | 41:6,8,23 42:8 | 139:11 | 43:15 88:6 |
| 89:16 109:12 | 42:14,21 43:8 | **think**  22:7 34:8 | 92:16 134:9 |
| 109:17,24 | 44:13,17,25 | 43:22 55:4,8 | **title**  61:4 77:16 |
| 110:4,10 | 45:6,12,21 | 91:2 97:17 | 81:18 115:7 |
| 111:16 112:3,7 | 46:6 47:10 | 107:3,4 108:21 | **today**  7:9,17,21 |
| 112:11 113:2,6 | 48:12 49:4 | 117:9 119:8 | 8:18,25 9:9,12 |
| 113:6,24 114:5 | 52:14,20 53:17 | 134:2 138:12 | 9:18 10:2 13:8 |
| 114:15 117:18 | 54:12 55:3,9 | 149:8,8 | 14:4 17:18 |
| 118:3 120:2 | 56:19 66:9 | **third**  56:13 | 19:11,15,24 |
| 128:3 133:21 | 68:14,25 70:9 | **thirteen**  70:11 | 20:2 28:15 |
| 134:6,8,24 | 72:20 78:9 | 70:16,18 | 55:4 57:8 |
| 136:11 139:15 | 80:25 81:22 | **three**  17:4 | 58:17 59:8 |
| 140:15 141:2,5 | 84:12 86:20 | 22:25 25:23 | 60:10 74:8 |
| 141:11 145:10 | 118:12 122:4 | 56:2 64:18 | 76:20,23 |
| 146:2 148:4 | 122:14,21 | 65:12,13,14 | 109:16 123:11 |
| 153:6,10 | 123:25 127:2 | **tile**  146:17 | 124:19 131:16 |
| 158:13 | 137:4 147:19 | **tiling**  126:11 | 133:18 134:24 |
| **thank**  7:5,20 | 147:24 151:9 | **till**  148:19 | 135:7,9 139:13 |
| 9:3 10:7,14,20 | 151:17 | **time**  1:19 2:3 | 143:24 152:2 |
| 11:3,11,17,22 | **thanks**  26:16 | 2:10 6:21 9:12 | 156:22 |
| 12:6,14 14:11 | 27:21 34:20 | 9:17,18 11:14 | **today's**  6:21 |
| 14:11,19 20:24 | 53:25 | 11:20,25 12:12 | 12:22 13:9 |
| 21:4,11,19 | **therefor**  4:23 | 12:12 13:16,19 | 122:6 |
| 22:13,21 23:2 | **thick**  13:4 | 13:21 24:5 | **together**  57:18 |
| 23:8,20 24:2 | 17:11 | 27:10,11 35:16 | 63:4,10 88:24 |
| 24:18 25:2,7 | **thing**  15:15 | 42:22,25 44:20 | **told**  18:4 19:21 |
| 26:11 28:6,10 | 53:14 80:4 | 46:10,11 48:18 | 49:10,16 50:3 |
| 28:16 29:17,20 | 121:19,20 | 52:11 54:2,3 | 50:4 51:5 53:6 |

53:14 101:23
112:10 149:14
**took** 8:22 17:23
50:10 102:3
**tool** 98:25 99:2
**toolbox** 47:17
47:20 48:3
93:11,15,20
94:2
**tools** 98:19,20
98:20,22,24,24
99:2,3
**top** 56:9,14
58:21 61:22
73:16 78:23
82:12 93:17
115:7
**total** 116:13
**totally** 83:23,24
**towards** 42:9
42:12 107:19
**trade** 99:25
**trades** 52:16,16
52:18 99:23
146:12
**trail** 55:15
56:20
**transcript** 5:10
13:11 14:23
15:5,10,25
16:19 17:19
109:8,17,24
133:17 138:16
138:19 153:9,9

**trial** 2:7 5:14
**tried** 123:11
**trip** 150:25
**trouble** 14:3
20:17
**true** 120:3,13
153:9 158:12
**truth** 153:5
**try** 9:11 57:14
113:15 120:6
**trying** 9:8
16:12,13,18
17:10 18:2,19
18:20 21:24
35:15 44:2
103:25
**turn** 94:8
**twelve** 69:10,15
69:21 70:16
125:6,20,23
**twenty** 21:8,9
21:10 22:12,14
**twice** 7:16
87:25
**two** 6:8 11:23
30:12,13 37:6
42:20 56:5
64:17 65:12
78:10 92:16
138:20 145:24
147:25 152:6
**type** 20:13,14
74:25 93:14
**typed** 61:25
62:3,12,14

76:5,15 77:8
77:10,15
**types** 9:5 11:13
**typing** 9:10

**u**

**u** 90:21,23,23
94:14
**under** 24:12,14
24:19 56:8
121:12,25
**underlying**
6:24
**undermined**
116:11
**understand**
6:18 10:11
29:11 53:12
57:12 62:24
88:14 118:14
139:19
**understanding**
49:20 62:20
78:4 139:12
**understood**
10:6 12:5
**underway** 26:8
**unfamiliar**
23:9 25:3
**uniform** 4:2 5:2
**unit** 74:2
**upcoming**
151:19
**upper** 72:22
73:12 75:25

**use** 9:22 43:23
62:13 74:14
75:4 98:12,13
102:14,16
138:15,18
149:17
**used** 33:25 34:2
79:20 90:14
99:8 101:17
121:2 125:22
**uses** 75:11
**using** 137:24
**usual** 55:19
**utilized** 5:14

**v**

**v** 8:2 31:5,10
59:15 140:8
159:2
**vacation** 46:20
150:20,25
**valid** 85:6
**valuable**
116:14
**vanessa** 60:5,7
60:22 61:13
87:6,10
**various** 61:19
89:8
**verbal** 9:16
**veritext** 159:1
**version** 27:15
27:17
**vice** 81:20
87:18,20
130:18

**village**  8:13
  87:24
**virtual**  2:6
**visit**  43:17
  87:22 88:5
  92:15 94:25
**visited**  94:21
  94:24
**visual**  10:2
  148:20 149:2
**vitucci**  3:8

**w**

**wait**  10:4 50:22
  111:16 137:11
  137:11,12
  139:20
**waived**  4:5
  5:17 85:18
**waiver**  110:14
  110:18 112:3,4
  114:24 115:8
  117:21 118:17
  118:19,24
  122:8 123:8
  124:11,18
  125:4,6 131:24
  156:6 157:11
**waivers**  125:15
  125:21
**want**  9:23 15:8
  15:9 16:8
  18:11 35:18,22
  35:23 54:20
  55:9 64:6
  74:16 85:8

88:22 111:24
112:8 117:14
119:20 125:12
126:10,11
127:13 134:14
135:24 139:11
139:14,22
152:9
**wanted**  18:15
  56:19 126:3
**wants**  148:2
**watching**  39:14
**way**  9:13 14:6
  45:15 50:17
  96:11 117:19
  118:17 119:4
  119:10 120:7,9
  158:17
**we've**  26:24
  27:5 54:22
  69:17 82:10
  124:24 148:3
**week**  42:20
  43:15 87:25
  92:16 95:6,10
  145:24
**weekly**  47:17
**weeks**  42:18
  45:16
**weissman**  3:12
**went**  34:3
  41:24
**west**  74:2
**westerman**
  3:17 6:5

**whatsoever**
  117:2 143:13
**whereof**  158:19
**whichever**
  137:9
**wholly**  85:2
**wife**  31:7 60:11
  83:6 87:10
  157:6
**william**  3:5
**wish**  11:4
  127:16 151:11
**wishes**  55:15
  121:8
**withdraw**
  14:21 40:14
  49:2 134:21
**witness**  5:22
  6:11,13,20 8:3
  14:3,8,25
  15:17,18,19
  16:4 17:9 18:6
  21:24 65:4
  71:14 83:12
  84:3,13,24
  86:6 110:21
  111:6,21,23
  112:6 113:25
  114:3,14
  117:10 118:9
  119:6,24
  127:17 128:2,3
  133:17,22
  134:6,24
  137:17,18

152:17 158:10
158:13,19
**witnesses**  10:21
  11:4
**witnesses'**
  159:3
**woodside**  23:7
  24:6,10 74:3
**word**  28:7
  58:25 59:12
  63:19 64:19
  65:22 66:11,23
  67:5,23,24
  68:15,16 69:5
  69:19 70:20
  72:15 74:20
  76:12 77:7,8
  90:25
**words**  9:10,22
  10:2 57:16
  70:6,7 77:10
  149:12
**work**  7:19 10:9
  12:21 20:7,8
  20:13,14 21:12
  21:15,17 30:3
  33:25 34:2,18
  36:18,19,22
  37:23,25 39:7
  40:22 42:11,17
  42:24 44:12
  45:17 46:23
  47:4 52:10
  88:9,18 89:8
  89:12 90:4,6

92:7,10 93:8
94:3,15 95:15
96:2,7,19
97:15 99:24
103:3,23
107:20 115:21
115:22,23
117:2 118:25
126:3,9 127:12
127:14 128:6
128:10,22
129:5,9,12,24
129:24 130:7,8
130:12 131:10
131:12 132:9
132:11,15
143:5,10,20
144:13,19
145:3,4,6
146:10,11,14
146:15,19
147:11 148:10
157:11
**worked**  34:11
94:22 95:17
107:17 135:23
**worker**  8:20
48:7 99:13,15
**workers**  39:14
40:5,18,21
41:2 45:20
47:22 48:2
49:21,21,23
51:15 88:8
89:19 92:19

98:12,16,21,23
**working**  21:20
24:9 27:7
37:18 41:11
50:19 52:12
92:18 101:7
142:5 145:25
146:3 147:4,10
**worksite**  48:15
**world**  23:4
**write**  74:17,21
**writers**  55:17
**writing**  56:17
91:20 97:4
106:10 108:24
150:11
**written**  9:9
32:18 47:5
74:18
**wrong**  17:21
40:25 103:12
107:6
**wrote**  59:11
**wu**  2:11 158:7
158:22

**x**

**x**  1:3,9,11,16
154:2 155:2

**y**

**yeah**  13:16
17:21 19:5
26:5 35:22
38:9 44:23
47:25 62:4

68:13 95:22
98:23,23,23
125:14,22
132:25
**year**  74:19
**years**  21:8,9,10
22:12,14,25
25:24
**yesterday**  6:10
123:12
**york**  1:2,10
2:12 3:5,5,10
3:15,15,19 8:4
8:13 9:13 21:2
74:3 78:21
80:8 87:7,24
90:5 130:19
133:9 158:4,5
158:8 159:1

**z**

**zoom**  2:6

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.