Page 1

```
1
2      SUPREME COURT OF THE STATE OF NEW YORK
       COUNTY OF KINGS
3      -----------------------------------------X
       STALIN RODRIGO REYES ESPINOZA,
4
                              PLAINTIFF,
5
              -against-        Index No.:
6                             515197/19
7      DAVS PARTNERS LLC AND KALNITECH
       CONSTRUCTION COMPANY,
8
                              DEFENDANTS.
9      -----------------------------------------X
10
                       DATE: April 11, 2022
11                     TIME: 11:00 a.m.
12
13
14            EXAMINATION BEFORE TRIAL of the
15     Defendant, DAVS PARTNERS LLC, taken by the
16     respective parties, pursuant to a Court
17     Order, held at the above date and time,
18     before Aileen Koven, a Notary Public of the
19     State of New York.
20
21
22
23
24
25
```

Page 2

```
 1
 2    A P P E A R A N C E S:
 3
 4    GORAYEB & ASSOCIATES
         Attorneys for the Plaintiff
 5       100 William Street
         New York, New York 10038
 6       BY: KENNETH KLEIN, ESQ.
 7
 8    RICHMAN & LEVINE, P.C
         Attorneys for the Defendant
 9       DAVS PARTNERS LLC
         666 Old Country Road
10       Garden City, New York 11530
         BY: KEITH RICHMAN, ESQ.
11
12
      MICHAEL SWIMMER LAW OFFICES
13       Attorneys for the Defendant
         KALNITECH CONSTRUCTION COMPANY
14       605 Third Avenue
         New York, New York 10158
15       BY: ROBERT BRIGANTIC, ESQ.
16
                  *           *           *
17
18
19
20
21
22
23
24
25
```

1
2            221. UNIFORM RULES FOR THE
              CONDUCT OF DEPOSITIONS
3     221.1 Objections at Depositions
      (a) Objections in general. No objections
4     shall be made at a deposition except those
      which, pursuant to subdivision (b), (c) or
5     (d) of Rule 3115 of the Civil Practice Law
      and Rules, would be waived if not
6     interposed, and except in compliance with
      subdivision (e) of such rule.    All
7     objections made at a deposition shall be
      noted by the officer before whom the
8     deposition is taken, and the answer shall
      be given and the deposition shall proceed
9     subject to the objections and to the right
      of a person to apply for appropriate relief
10    pursuant to Article 31 of the CPLR.
      (b) Speaking objections restricted. Every
11    objection raised during a deposition shall
      be stated succinctly and framed so as not
12    to suggest an answer to the deponent and,
      at the request of the questioning attorney,
13    shall include a clear statement as to any
      defect in form or other basis of error or
14    irregularity.    Except to the extent
      permitted by CPLR Rule 3115 or by this
15    rule, during the course of the examination
      persons in attendance shall not make
16    statements or comments that interfere with
      the questioning.
17    221.2 Refusal to answer when objection is
      made. A deponent shall answer all questions
18    at a deposition, except (i) to preserve a
      privilege or right of confidentiality, (ii)
19    to enforce a limitation set forth in an
      order of the court; or (iii) when the
20    question is plainly improper and would, if
      answered, cause significant prejudice to
21    any person.    An attorney shall not direct
      a deponent not to answer except as provided
22    in CPLR Rule 3115 or this subdivision.
      Any refusal to answer or direction not to
23    answer shall be accompanied by a succinct
      and clear statement of the basis therefor.
24    If the deponent does not answer a question,
      the examining party shall have the right to
25    complete the remainder of the deposition.

```
 1
 2                221. UNIFORM RULES FOR THE
                    CONDUCT OF DEPOSITIONS
 3
    221.3 Communication with the deponent
 4              An attorney shall not interrupt the
    deposition for the purpose of communicating
 5  with the deponent unless all parties
    consent or the communication is made for
 6  the purpose of determining whether the
    question should not be answered on the
 7  grounds set forth in section 221.2 of these
    rules and, in such event, the reason for
 8  the communication shall be stated for the
    record succinctly and clearly.
 9
10              IT IS FURTHER STIPULATED AND AGREED
    that the transcript may be signed before
11  any Notary Public with the same force and
    effect as if signed before a clerk or a
12  Judge of the court.
13
                IT IS FURTHER STIPULATED AND AGREED
14  that the examination before trial may be
    utilized for all purposes as provided by
15  the CPLR.
16
                IT IS FURTHER STIPULATED AND AGREED
17  that all rights provided to all parties by
    the CPLR cannot be deemed waived and the
18  appropriate sections of the CPLR shall be
    controlling with respect hereto.
19
20              IT IS FURTHER STIPULATED AND AGREED
    by and between the attorneys for the
21  respective parties hereto that a copy of
    this examination shall be furnished,
22  without charge, to the attorneys
    representing the witness testifying herein.
23
24
25
```

1                    HUDSON

2    D W A Y N E   H U D S O N, called as a

3    witness, having been first duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MR. KLEIN:

8         Q.      Please state your name for the

9    record.

10        A.      Dwayne Hudson.

11        Q.      What is your address?

12        A.      4423 Seton Avenue, Bronx, New

13   York 10466.

14        Q.      Good morning, Mr. Hudson.

15        A.      Good morning.

16        Q.      My name is Kenneth Klein.  I am

17   with the law firm of Gorayeb & Associates

18   and we represent the Plaintiff in this

19   lawsuit.  I will be asking you some

20   questions this morning.  If you don't

21   understand my question, there is something

22   wrong with the transmission, if I am not

23   speaking loud enough, I am speaking too

24   fast, if I use a word you are not familiar

25   with, any reason at all you do not

1                    HUDSON

2    understand my question, tell me and I will

3    try to fix the problem for you.

4         A.    Okay.  Thank you.

5         Q.    The court reporter can't take

6    down nods of the head that usually comes up

7    with a yes or no answer.  So you just have

8    to verbalize all of your answers.  Okay?

9         A.    Yes.

10        Q.    Finally, anytime you want to

11   take a break, go to the bathroom, get a

12   call, make a call, just to stretch, any

13   reason at all, you need a break as long as

14   there is no open question, tell me and we

15   will accommodate you.

16        A.    Okay.

17        Q.    If there is an open question

18   you just have to answer the question before

19   you take the break.

20        A.    Yes.

21        Q.    In preparation for today's

22   deposition, did you review anything?

23        A.    I just had a meeting a few

24   minutes ago.  Just kind of jog my memory

25   about some stuff, about the dates.  That's

1                          HUDSON
2    about it.
3          Q.     Did you speak to anybody?
4          A.     Yes.  I spoke to the lawyer
5    here.
6          Q.     Other than your lawyer, did you
7    speak to anybody?
8          A.     No.
9          Q.     I saw when you were sitting in
10   the other chair you had a yellow notepad in
11   front of you, do you have notes on that
12   pad?
13         A.     Just dates.  Just some dates I
14   have there.
15         Q.     If you are going to use that to
16   testify we have to mark that as an exhibit.
17   We will make that Plaintiff's Exhibit 7.
18   Can you give that document to your attorney
19   when we're finished with the deposition
20   today.
21         A.     Yes.
22         Q.     He will make copies.
23         A.     Yes.
24         Q.     He will send copies to
25   everyone.

1                    HUDSON

2      A.    Okay.

3            MR. RICHMAN:  Will do, no

4      problem.

5            MR. KLEIN:  Thank you.

6            (Whereupon, piece of paper was

7      deemed marked as Plaintiff's Exhibit

8      7 for identification as of this date

9      by the Reporter.)

10     Q.    Are you currently employed,

11  sir?

12     A.    Yes.

13     Q.    By who?

14     A.    Employed by New York Electric.

15     Q.    When did you become employed by

16  New York Electric?

17     A.    Three weeks ago.

18     Q.    Back in June of 2019, were you

19  employed?

20     A.    Yes.

21     Q.    By who?

22     A.    A.S.K. Electric.

23     Q.    When did you first --

24           MR. BRIGANTIC:  Excuse me.

25     We're going to have an issue here.

1                    HUDSON
2    Just before you get rolling, I
3    subpoenaed documents from A.S.K.
4    Electric and because this was a
5    deposition of DAVS Partners I did not
6    make a stink about the fact that
7    A.S.K. never responded to my
8    subpoena.  If A.S.K. Electric which
9    is going to likely be a party to this
10   litigation after this deposition is
11   going to appear as the witness
12   designee for Davs, that can be an
13   issue.  Because Davs --
14        MR. RICHMAN:  We understand
15   your position.
16        MR. BRIGANTIC:  I am not
17   waiving a deposition of A.S.K.'s
18   deposition.
19        MR. RICHMAN:  No one said you
20   are waiving.  I am not taking a
21   position that you are waiving.  Right
22   now A.S.K. is not a party.  Why don't
23   you proceed.
24        MR. BRIGANTIC:  Then how is
25   this a party deposition?

1                     HUDSON

2          MR. RICHMAN:   He is here on

3     behalf of -- how is this a party

4     deposition?   Then there should be no

5     party deposition.   Because A.S.K. is

6     not a party.   Then we should cancel

7     the deposition altogether.

8          MR. BRIGANTIC:   Can you ask the

9     witness to step outside your office

10    for a minute?

11         MR. RICHMAN:   Sure.

12         MR. BRIGANTIC:   Off the record.

13         (Whereupon, a discussion was

14    held off the record.)

15         MR. BRIGANTIC:   I just want to

16    put on the record that we had a

17    conversation off the record so that

18    we didn't add up all the stuff into

19    the transcript and it was agreed that

20    by proceeding today with Mr. Hudson's

21    deposition Mr. Hudson being a former

22    employee of A.S.K. Electric that my

23    client Kainltech Construction Corp.

24    is in no way waiving a deposition of

25    A.S.K. Electric or a representative

1               HUDSON

2        of Davs Partners itself.

3             MR. RICHMAN:    That's agreed to.

4             MR. BRIGANTIC:   Thank you.   I

5        appreciate the courtesy.

6        Q.    So Mr. Hudson, you testified

7    that on June 28, 2019 you were employed by

8    A.S.K. Electric; is that correct?

9        A.    Yes.

10       Q.    When did you start with A.S.K.

11   Electric?

12       A.    I start in 2013.

13       Q.    What was your position on June

14   28, 2019?

15       A.    I was in charge of electric,

16   the foreman running the project, doing

17   electric for the new office.

18       Q.    Were you a project manager?

19       A.    Yes.

20       Q.    Your employer was A.S.K.

21   Electric; is that correct?

22       A.    Yes.

23       Q.    Then what were your duties as

24   project manager back in June 2019?

25       A.    Well, my duties like I say I am

1                    HUDSON

2    in charge of electric.  So from the demo to

3    the new buildup and the guys doing work

4    need me, also electricians.  I would be in

5    charge of them plus I also work on the

6    project myself, also.

7         Q.    Are you familiar with a company

8    known as Davs Partners?

9         A.    I only familiar with the boss.

10   I just found out about the company right

11   now.  I work for A.S.K. Electric.  I

12   believe David owns -- I'm saying I work for

13   A.S.K. Electric.  They're company Davs.

14   Davs Partners I heard is the owner that's

15   under the contract.  That's on the project,

16   the same owner.  My boss David Kleeman,

17   David Kleeman, they also own Davs Partners.

18        Q.    How do you spell Kleeman?

19        A.    K-l-e-e-m-a-n.

20        Q.    So David Kleeman is the boss of

21   A.S.K. Electric; is that correct?

22        A.    Yes.

23        Q.    To your understanding, he is

24   also a partner in Davs Partners?

25        A.    Yes.  Yes.

1                    HUDSON

2         Q.    Are you familiar with certain

3    property at 217-14 Hempstead Avenue in

4    Queens?

5         A.    Yes, that's the location of the

6    new office I was working on.

7         Q.    Do you know who the owner of

8    that property is now?

9         A.    David Kleeman.

10        Q.    Do you know when he became

11   owner of the property?

12        A.    I don't know.

13        Q.    When you say he is the owner,

14   are you saying he is the owner individually

15   or as Davs Partners LLC or you don't know?

16        A.    For me.  I don't know.  His has

17   new office and so I am saying he is the

18   owner of the new office.  I don't know

19   about the old background behind the

20   David -- the Davs Partners, that I don't

21   know.

22        Q.    Could you describe what is

23   there, what that property looks like?  In

24   other words, is it a five story building, a

25   two story building, one story building,

1                    HUDSON

2    what is there?

3         A.    It's actually one story

4    building.  Half of it, the basement and one

5    story.  Pretty long property.  So it kind

6    of almost extends the full length of the

7    property.

8         Q.    You said there is a basement

9    and a first floor?

10        A.    Yes.

11        Q.    Is that how it looked back in

12   June of 2019?

13        A.    Well, yes.  Yes.  It was under

14   construction.  So we just renovating it.

15   Everything brand new, AC, you know, brand

16   new electric.  With different designs that

17   they put based off of the plan they were

18   working on.

19        Q.    Was it a new building being

20   built or was it an existing building being

21   renovated?

22        A.    Existing building being

23   renovated.

24        Q.    When did that project start,

25   approximately?

1                    HUDSON

2        A.    Up until the incident the

3   project go on for about six months.

4        Q.    Has the project been completed?

5        A.    Yes.

6        Q.    As of when?

7        A.    Exact date, I do not know.  But

8   from the accident I think it was maybe like

9   another three months.  Everything was

10  finished and they moved in.

11       Q.    Are you familiar with the term

12  general contractor?

13       A.    Yes.

14       Q.    What is your understanding of

15  that term?

16       A.    So a general contractor is

17  hired to do a project.  So in other words,

18  the general contractor on that job was Gus.

19  He was doing the build out and then we were

20  doing the electric which I work for A.S.K.

21  Electric.  So I was doing the build out.  I

22  do not take orders from Gus.  I take it

23  from David.

24            MR. BRIGANTIC:  Move to strike

25       that.  Go ahead.

Page 16

1                          HUDSON
2          Q.      So you said that the general
3    contractor, was that a person named Gus or
4    a company named Gus?
5          A.      Well, the person named Gus.
6          Q.      Does he have a last name?
7          A.      All of that should be in the
8    notes.   I just know him as Gus.   I am
9    pretty sure in the notes the lawyer can
10   give you the exact name.   The last name.
11         Q.      I only want to know what you
12   know.   Not what your lawyer knows.
13         A.      Yes.
14         Q.      So let me finish.   We can't
15   talk over each other.   If you don't know
16   something you can say I don't know or I
17   don't remember.   That's okay.   I just don't
18   want you to guess.   You don't know Gus's
19   last name, correct?
20         A.      No.
21         Q.      Do you know, does he work for a
22   company?
23         A.      I do not know none of this
24   information from him.   I know him on the
25   project.   That he is doing that project.

1                          HUDSON
2     The office at that time.
3          Q.    Do you know if Gus was retained
4     under a contract?
5          A.    I do not know.
6          Q.    A.S.K. Electric was retained in
7     connection with this project; correct?
8          A.    Yes.
9          Q.    To do what in general?
10         A.    It was their new office.  They
11    were relocating to a new Hempstead office
12    that was being built.
13         Q.    Did you ever see the contract?
14         A.    No.
15         Q.    I am going to show it to you
16    and ask you if you ever saw this.
17                (Whereupon, the aforementioned
18          contract was marked as Plaintiff's
19          Exhibit 1 for identification as of
20          this date by the Reporter.)
21         Q.    Do you recognize any
22    signatures, sir?
23         A.    Yes.  David Kleeman.
24         Q.    He signed for A.S.K. Electric?
25         A.    Repeat the question again.

1                          HUDSON

2          Q.    Do you see on the right side

3     David Kleeman's name?

4          A.    Yes.

5          Q.    Under the portion for A.S.K.

6     Electric?

7          A.    Yes.

8          Q.    You recognize his signature,

9     right?

10         A.    Yes.

11         Q.    You never saw this contract,

12    correct?

13         A.    No.

14               MR. KLEIN:   That was Exhibit 1.

15         Q.    Sir, were subcontractors

16    retained in connection with the project?

17         A.    Yes.

18         Q.    Who retained the

19    subcontractors?

20         A.    Well, they had various, the AC

21    guys that take care of the AC and like I

22    said the construction part which Gus he

23    take care of that.   They have the exterior

24    work which is under Gus also.   So that's

25    the only thing I know.

1              HUDSON

2        Q.    Did you ever hear of a company

3   called JIM Associates Corporation?

4        A.    No.

5              (Whereupon, the aforementioned

6        proposal was marked as Plaintiff's

7        Exhibit 2 for identification as of

8        this date by the Reporter.)

9        Q.    Sir, do you see this proposal

10  dated May 27, 2019?

11       A.    Yes.

12       Q.    On the screen?

13       A.    Yes.

14       Q.    This is Exhibit 2.  Did you

15  ever see this document?

16       A.    No.

17       Q.    Do you see on the left side it

18  says Jim Associates Corporation?

19       A.    Yes.

20       Q.    It says to the right prepared

21  by Jorge Moscoso?

22       A.    Yes.

23       Q.    Do you know who Jorge Moscoso

24  is?

25       A.    That's another contractor that

1                          HUDSON

2    came in to finish up the project.

3          Q.    Is Jorge affiliated with Jim

4    Associates or is he with another company?

5          A.    That I do not know.

6          Q.    You don't known if Jorge

7    Moscoso is employed by Jim Associates; is

8    that correct?

9          A.    No.

10         Q.    You see where it says customer

11   Gus?

12         A.    Yes.

13         Q.    You don't know who Gus works

14   for; correct?

15         A.    I don't know who Gus works for.

16   I know Gus.  Gus was the general contractor

17   doing the project.

18              MR. BRIGANTIC:  Move to strike

19      that as nonresponsive.

20         Q.    Do you know if there was any

21   contract between Gus and Jim Associates

22   other than this proposal?

23         A.    No.

24         Q.    Did you ever see any other

25   proposals between Jim Associates and Gus?

Page 21

1                          HUDSON
2         A.     No.
3         Q.     Can you bring up Exhibit 3.
4                (Whereupon, the aforementioned
5         proposal dated June 12, 2019 was
6         marked as Plaintiff's Exhibit 3 for
7         identification as of this date by the
8         Reporter.)
9         Q.     Sir, you see this proposal
10   dated June 12, 2019?
11        A.     Yes.
12        Q.     It's Exhibit 3?
13        A.     Yes.
14        Q.     It's from Jim Associates
15   Corporation.  Do you see that, sir?
16        A.     Yes.
17        Q.     Can you go to the second page?
18   Can you bring up to the bottom?  Do you see
19   on this page, sir, that Jorge Moscoso
20   signed for Jim Associates?
21        A.     Yes.
22        Q.     David Kleeman signed on behalf
23   of somebody else?
24        A.     Yes, I see that.
25        Q.     Do you know if he signed for

Page 22

1                    HUDSON

2    Gus?

3         A.     No, I'm not sure.

4         Q.     Do you know if there is any

5    relationship between David Kleeman and Gus?

6         A.     The only thing I know they know

7    each other.   I think they're friends.

8    That's about it.

9         Q.     You don't know if Gus is part

10   of Davs Partners LLC, correct?

11        A.     No.

12        Q.     Just for the record Exhibit 4

13   is a proposal dated June 26, 2019 which

14   also has that general condition page which

15   I just showed the witness.   That's Exhibit

16   4.

17              (Whereupon, the aforementioned

18         proposal dated June 26, 2019 was

19         marked as Plaintiff's Exhibit 4 for

20         identification as of this date by the

21         Reporter.)

22        Q.     You never saw any of those

23   proposals before, right?

24        A.     No.

25        Q.     Were you at the project on June

Page 23

1                    HUDSON

2    28, 2019?

3          A.    Yes.

4          Q.    Why were you there?

5          A.    Same as usual.  Finishing up

6    the project.

7          Q.    What hours was the project

8    ongoing?  In other words, nine to five,

9    eight to four, what were the hours?

10         A.    From seven to 3:30.

11         Q.    Was it five days a week, six

12   days a week?

13         A.    Five days a week.

14         Q.    Monday to Friday?

15         A.    Yes.

16         Q.    What time did you arrive at

17   work that day?

18         A.    As usual.  I arrive at work

19   6:45.

20         Q.    What is the first thing you did

21   when you got to work?

22         A.    First thing I do when I get to

23   work.  The guy I am working with I give him

24   the task that he is doing.  I will also get

25   myself prepared and ready.  Gus will be

Page 24

1                          HUDSON

2    there to set his guys up.  The place will

3    be open up.  We just continue our regular

4    workday.

5         Q.    How many workers did Gus have

6    working under him?

7         A.    It's various.  There are guys

8    coming in and out.  Some days we will have

9    maybe four or five guys there.  Other times

10   just only have two guys.  Two always be

11   there.  But sometimes --

12        Q.    What type of work did Gus's

13   workers do at the project?

14        A.    They do anything from framing,

15   sheetrock work.  Guys working on the

16   exterior of the building, cement work.

17   Basically everything -- they do everything

18   except for the electric and security and AC

19   work.

20        Q.    Did Gus workers wear any

21   particular type of T shirts at the job?

22        A.    No, not really.

23        Q.    Did A.S.K. employees wear any

24   type of T-shirts at the job?

25        A.    Yes.  We always wear our

1                          HUDSON

2    T-shirt, blue that shows the company logo,

3    A.S.K. Electric.

4          Q.    So A.S.K. wore blue shirts,

5    right?

6          A.    Yes.  With the company logo.

7          Q.    Did A.S.K. provide any

8    supervision to Jim Associates?

9          A.    No.

10         Q.    Did they direct Jim Associates

11   workers?

12         A.    No.

13         Q.    Provide any ladders to Jim

14   Associates workers?

15         A.    No.

16         Q.    Any equipment or tools?

17         A.    No.

18         Q.    Do you know if Days provided

19   any such material or equipment to Jim

20   Associates?

21         A.    No.

22         Q.    No, you don't know or no, they

23   didn't?

24         A.    No, they didn't.  Jim -- they

25   have their own tools and they work with

1                    HUDSON

2    their own tools.

3         Q.    Just so I am clear, Jim

4    Associates is a different company than the

5    company that Gus was with?

6         A.    Gus -- that I don't know fully.

7    I am not going to try to answer or guess,

8    I am not really sure.

9         Q.    Do you know if Gus was employed

10   by Jim Associates?

11        A.    That I don't know.

12        Q.    How many companies were working

13   at the project on June 28, 2019?

14        A.    It was I would say three

15   companies. You got AC. You got A.S.K.

16   Electric and you got Jim. Jim and Gus guys

17   working together.

18        Q.    Did you have the authority to

19   stop working if you saw an unsafe

20   condition?

21        A.    Yes.

22        Q.    Did you have the authority to

23   stop work if there was an unsafe work

24   method being used?

25        A.    Yes.

Page 27

1                    HUDSON

2        Q.    Did that apply if you saw a Jim

3   Associates worker doing something

4   dangerous?

5        A.    Yes, I would stop it 100

6   percent.

7        Q.    Are you familiar with an

8   accident involving one of Jim Associates

9   workers?

10       A.    Yes.

11       Q.    Do you know someone by the name

12  Stalin Rodrigo Reyes Espinoza?

13       A.    That's the guy that got hurt.

14       Q.    Did you know him before he got

15  hurt?

16       A.    No, I probably saw the guy I

17  think -- we have different guys in and out.

18  I probably saw him twice on that project.

19  He is a fairly new guy that started working

20  there.

21       Q.    Did you see that person's

22  accident occur?

23       A.    I so happened to turn my head.

24  When I heard the commotion I was working

25  ten feet away. I so happened to turn and I

Page 28

1                      HUDSON

2   saw him tumbling down with a ladder.

3        Q.    I would like you to tell me

4   what caused you to look in the direction of

5   where the Plaintiff was or the worker was,

6   what brought your attention to that area?

7        A.    I heard a noise.  I was working

8   on the electrical panel which was ten feet

9   away from where I heard the commotion.  So

10  when I turn and I look towards the closet

11  and then I saw him coming down.

12       Q.    Tell me exactly what you saw.

13       A.    All right.  I saw pretty much

14  he's tumbling down like head first.  The

15  ladder and the everything.  So he fall kind

16  of head first into the corner of the closet

17  on the right-hand side.  There is an

18  opening on the left-hand side of the closet

19  that he was working above that opening.

20       Q.    Are you finished?

21       A.    No.  I am saying there is an

22  opening on the left-hand side he was

23  working.  He was working on top.  When I

24  heard the commotion and I looked he fall

25  all the way to the right-hand side.  Him

```
 1                        HUDSON
 2    and the ladder tumble down and he went down
 3    head first.
 4         Q.    Did the ladder fall over?
 5         A.    Yes.
 6         Q.    What type of ladder was it?
 7         A.    That was a regular A frame six
 8    foot ladder.
 9         Q.    Do you know whose ladder it
10    was?
11         A.    That belonged to his boss that
12    he was working for.
13         Q.    Who was that?
14         A.    I'm not 100 percent sure if it
15    was Jim or if it was Gus's ladder.  But it
16    definitely belonged to general contractor.
17         Q.    When you saw him tumbling head
18    first, was he already falling when you saw
19    him or?
20         A.    Yes.
21         Q.    So you didn't see him go onto
22    the ladder before he started to fall?
23         A.    No.
24         Q.    You saw him after you started
25    to fall?
```

1                    HUDSON

2        A.    When I heard the noise I turned

3    my head and I saw him coming down.

4        Q.    Was there anybody holding the

5    ladder at the time that you turned and saw

6    this?

7        A.    No.  He was by himself.

8        Q.    Did you ever speak to the

9    injured worker?

10       A.    No.  Prior to the incident I

11   never spoke to him.

12       Q.    How about after the incident,

13   did you speak to him?

14       A.    Yes.  I was trying to make sure

15   he was okay.  I called 911; I saw that he

16   was hurt.  So I trying to make sure he is

17   okay.

18       Q.    Did you ask him how the

19   accident happened?

20       A.    No.

21       Q.    Did he tell you how the

22   accident happened?

23       A.    He pretty much didn't -- he

24   pretty much wasn't really talking much.  He

25   was hurt.  So he wasn't really talking

```
 1                  HUDSON
 2   much.
 3        Q.    Did you do any type of accident
 4   report after this incident?
 5        A.    Yes.  I sent an accident report
 6   to my office.
 7        Q.    For A.S.K. Electric?
 8        A.    Yes.
 9             MR. BRIGANTIC:  Was that
10        produced?
11             MR. KLEIN:  I never seen it.
12             MR. BRIGANTIC:  I never seen
13        it.
14             MR. KLEIN:  But they're not a
15        party.
16             MR. BRIGANTIC:  This is not --
17        this is completely inappropriate.  I
18        subpoenaed documents.  We were told
19        there are no documents that A.S.K.
20        Electric has anyway and now in a case
21        where the Plaintiff has already been
22        deposed and this witness is appearing
23        there is an accident report we've
24        never seen.  How is that possible?
25             MR. RICHMAN:  I've never seen
```

1                    HUDSON

2       it either.  I will make an inquiry.

3            MR. BRIGANTIC:  During the next

4       break why don't you check and before

5       this witness leaves if we can get a

6       copy of the report.

7            MR. KLEIN:  Let me finish up

8       here and we can check to get it for

9       today.  I doubt it.

10       Q.    Other than yourself, do you

11  know any other witnesses?

12       A.    Of the accident?

13       Q.    Right.

14       A.    Just the guys who were working

15  there.  There was another worker I was with

16  Sayed he was working under me.  He didn't

17  see the accident.  The regular workers that

18  was there.

19       Q.    Did you personally prepare the

20  accident report?

21       A.    No.  I believe what it was I

22  told him what happened and the date and I

23  sent out a photograph but personally I

24  don't remember me actually signing it.  It

25  was more like a verbal report that I give.

1                        HUDSON

2          Q.    You never saw --

3          A.    I didn't sign any documents or

4    anything.

5          Q.    You never saw a completed --

6          A.    Yes.

7          Q.    You never saw a written

8    accident report made regarding this

9    incident?

10         A.    Yes.  I never did.

11         Q.    If there was one, do you know

12   if A.S.K. Electric gave one to Davs

13   Partners?

14         A.    No.

15         Q.    No, you don't know?

16         A.    No, I don't know.

17         Q.    How about that photo you said

18   you took, do you still have that photo?

19         A.    I do not have it.  The office

20   should have it.  I sent it.

21         Q.    What was it a photo of?

22         A.    It was a photo of the injured

23   guy on the ground.

24         Q.    Can you bring up Exhibit 5

25   please.

1                    HUDSON

2            (Whereupon, the aforementioned

3        photograph was marked as Plaintiff's

4        Exhibit 5 for identification as of

5        this date by the Reporter.)

6        Q.    Do you recognize this

7    photograph, sir?

8        A.    Yes.

9        Q.    What is it a photograph of?

10        A.    That's where the guy was

11    working.  At the time there was nothing

12    inside of it.  There is a little storage

13    section inside the closet on the left-hand

14    side.  I recognize that storage section.

15        Q.    The ladder was below that

16    opening?

17        A.    Yes.

18        Q.    Do you recall how tall the

19    ladder was?

20        A.    It was six foot A frame ladder.

21    Open fully extended to six foot to the top.

22        Q.    Could you bring up Exhibit 6?

23            (Whereupon, the aforementioned

24        photograph was marked as Plaintiff's

25        Exhibit 6 for identification as of

1                          HUDSON

2          this date by the Reporter.)

3          Q.    Do you see the photograph, sir?

4          A.    Yes.

5          Q.    Do you recognize the person in

6    the yellow shirt lying on the ground?

7          A.    Yes.    That's the guy that fell

8    at the accident.

9          Q.    Did you take this photograph?

10         A.    Yes.

11         Q.    Did you take any other

12   photographs?

13         A.    No, just the one.

14         Q.    You didn't take the one I just

15   showed you before the black and white one?

16         A.    No.

17         Q.    This is the only one you took,

18   right?

19         A.    That's the only photograph I

20   took.

21         Q.    Did other Gus employees wear

22   yellow T-shirts like this gentleman has on?

23               MR. BRIGANTIC:  Objection to

24         the form of the question.

25               MR. RICHMAN:  Objection.  You

Page 36

1                    HUDSON

2          are assuming he is an employee of

3          Gus;

4               MR. KLEIN:  Well, no.  I am

5          asking did Gus's employees wear

6          yellow T-shirts similar to the one

7          the person on the floor is wearing.

8               MR. RICHMAN:  How can he answer

9          that question if he doesn't know --

10               MR. KLEIN:  I will phrase it

11          this way.

12          Q.    Did you see any other workers

13     at the project wearing yellow T-shirts like

14     the person wearing the yellow T-shirt lying

15     on the floor has on?

16          A.    My honest opinion they were

17     various different shirts and I actually

18     don't really pay so much attention to

19     exactly what they wear, what they wear.

20          Q.    After you took this photograph,

21     did you ever see this worker again?

22          A.    Never saw him again.

23          Q.    Do you know Jorge Moscoso?

24          A.    Jorge Moscoso?

25          Q.    Yes.

1                        HUDSON

2        A.    No.

3        Q.    Do you know if he was at the

4   project on the day of the incident?

5        A.    Who is Jorge Moscoso?  I don't

6   know who that is.

7        Q.    He was on that proposal I

8   showed you Exhibit 2 that said he prepared

9   the proposal from Jim Associates.

10       A.    Okay.  That's information I do

11  not know.  I just know the two main persons

12  which are Gus and Jim.  My boss David.

13       Q.    Was there somebody named Jim?

14       A.    Jim.

15       Q.    Yes.  You said you know someone

16  named Jim and Gus.  I am asking you was

17  there a person named Jim?

18       A.    No.  George and Gus.  Jim -- I

19  know George had a brother.  It was him and

20  his brother.  They run the company.

21       Q.    Was George Jorge or you don't

22  know?

23       A.    I don't know the last names.

24       Q.    Was Gus there on the date of

25  the accident?

Page 38

1                        HUDSON
2          A.    He wasn't there when the
3    accident happened.  I called him so --
4          Q.    You called him later?
5          A.    Afterwards.
6          Q.    When he showed up afterwards,
7    did you talk to him about the accident?
8          A.    Yes.  Yes, I explained what I
9    saw, what happened.  The fact that the
10   emergency crew came in.
11         Q.    Did Gus ask you who the worker
12   worked for?
13         A.    He did after.  He knows -- they
14   know all of this information.  He didn't
15   have to ask me or question me who does he
16   work for.  They are obviously familiar with
17   whoever comes to the site.
18              MR. BRIGANTIC:  Move to strike.
19      Go ahead.
20         Q.    Did you ever ask the injured
21   worker who he worked for?
22         A.    No.
23         Q.    What was your understanding as
24   to who he worked for?
25         A.    I know he works for the general

1              HUDSON
2    contractor. If it's Gus or George, I don't
3    know exactly. I know he works for the
4    general contractor that is doing the
5    sheetrock, the general construction part of
6    the job.
7         Q.    So to your understanding, was
8    Jim Associates the general contractor?
9         A.    Up to now, Jim, I don't know if
10   he filled in. I know George and Gus.
11   Jim -- is Jim George's brother? I don't
12   know.
13              MR. BRIGANTIC: I am going to
14         move to strike that. Sir, we're not
15         here to educate you.
16              MR. RICHMAN: If you don't know
17         the answer, right, if you don't know,
18         say you don't know.
19        A.    Yes.
20              MR. KLEIN: I have nothing
21         further at this time.
22   EXAMINATION BY
23   MR. BRIGANTIC:
24        Q.    Mr. Hudson, how far did you go
25   in school?

Page 40

1                    HUDSON

2       A.    I actually finished high

3  school, just in Jamaica.  What we have is

4  CXE.  These are back in Jamaica.  These are

5  the final exams that we do that's by the

6  government.

7       Q.    So you went to school in

8  Jamaica?

9       A.    Yes, yes.  I finished high

10 school, graduated.

11      Q.    When did you come to the U.S.?

12      A.    I came to the U.S. it was in

13 2000 -- 2005 -- 2005 or so.

14      Q.    Mr. Hudson, how old were you

15 when you came to the U.S.?

16      A.    Probably around 20.  Like

17 around 20, 24.  24 or so.

18      Q.    So you were around 24 in or

19 about 2005?

20      A.    Yes.

21      Q.    Let's do this.  How old --

22 sorry --

23            MR. RICHMAN:  Ask him how old

24      he is now.

25      Q.    How old are you now?

Page 41

1                          HUDSON

2         A.    I'm 29 right now.

3         Q.    Before you came to the U.S.,

4    have you done any construction work?

5         A.    No.

6         Q.    Have you done any training with

7    respect to construction work?

8         A.    No.

9         Q.    After you got to the U.S., what

10   kind of work did you start out doing?

11        A.    I started out -- actually

12   carpentry.  I started doing carpentry.  But

13   not experienced.  Just basically assisting,

14   cleaning up, stuff like that.

15        Q.    Did that work have a title?

16        A.    Basically just helping the

17   person that was in charge.

18        Q.    Was that a carpenter

19   apprentice?

20        A.    Yes.

21        Q.    How long did you do that work?

22        A.    I did it for I would say six

23   months.  Then electrician came on the job.

24   I started learning electric.

25        Q.    Did you ever get licensed as a

Page 42

1                          HUDSON
2    carpenter?
3         A.    No.
4         Q.    Did you get licensed as an
5    electrician?
6         A.    No.
7         Q.    Are you presently licensed as
8    an electrician?
9         A.    No.
10        Q.    So after doing six months work
11   of carpentry apprentice work then you
12   started doing electric work?
13        A.    Yes.  Electrical contractor
14   that came to the job we were working and I
15   asked if he could teach me and I started
16   learning electric.
17        Q.    What was the name of that
18   company?
19        A.    It was a private guy.  He was
20   pretty much working on his own.  He didn't
21   have a licensed company or anything.  It
22   was a small contractor, starting out.
23        Q.    What was his name?
24        A.    His name was Rocky the name of
25   the guy that teach me.

1                    HUDSON

2          Q.    Is that his formal name?

3          A.    No.  We just call him Rocky.

4          Q.    What is his formal name?

5          A.    His formal name, I don't

6    remember.  It's been a long time.

7          Q.    How long did you work for him?

8          A.    I work for him around two

9    years.

10         Q.    Do you know where his business

11   was located?

12         A.    He just -- he lived in

13   Rosedale.  So he didn't have an office.  He

14   just pretty much, I meet him at the job

15   site.  He didn't have an office.  Just

16   Rosedale where he worked.

17         Q.    Now, after doing two years of

18   work for him, what was your next job?

19         A.    I continue electric.  I work

20   two years.  I always look to move on and

21   move myself up.  So I continued doing

22   electrical ever since.

23         Q.    Listen to me.  After you did

24   the two years work with Rocky, what was

25   your -- Who did you work for next?

Page 44

1                          HUDSON

2          A.      After I left Rocky I worked for

3    City-Wide.

4          Q.      City-Wide?

5          A.      Yes.

6          Q.      What kind of business is

7    City-Wide?

8          A.      Electrical company.

9          Q.      Electrical contractor?

10         A.      Yes.

11         Q.      How long did you work for them?

12         A.      I worked for them for a few

13   years.  I would say maybe six years or so.

14         Q.      You were able to do that even

15   though you weren't licensed as an

16   electrician?

17         A.      Yes.  The company has the

18   license so we work under their permit.

19         Q.      While you were working with

20   City-Wide, did you take any additional

21   training?

22         A.      No.  Just on the job training.

23         Q.      You left City-Wide at some

24   point; correct?

25         A.      Yes.

Page 45

1                              HUDSON

2          Q.      What was the next job you

3    worked at?

4          A.      A.S.K. Electric.

5          Q.      So you went from City-Wide to

6    A.S.K. Electric?

7          A.      Yes.

8          Q.      How did you come to work for

9    A.S.K. Electric?

10         A.      In City-Wide there was a worker

11   I used to work with.  His name is Chico.

12   He got fired from City-Wide and then he

13   start work for A.S.K. Electric.  So he

14   asked me, begging me to come aboard, come

15   aboard.  I waited till another two years,

16   pretty much another two years and I decided

17   to go.

18         Q.      You started work for A.S.K.

19   Electric in or about 2013?

20         A.      Yes.

21         Q.      Prior to working for A.S.K.

22   Electric, did you have any OSHA training?

23         A.      I got the -- no.  I got my OSHA

24   training while working with A.S.K.

25   Electric.

Page 46

1                          HUDSON

2          Q.    Where did you do that training?

3          A.    Long Island City.  There is a

4    training school in Long Island City.

5          Q.    When did you do it?

6          A.    The exact date, I don't

7    remember.  First there was an OSHA 30 and

8    as the year progressed we have to keep

9    updating it.

10         Q.    So you obtained an OSHA card?

11         A.    Yes.  Obtained an OSHA card.

12   Whenever that expires we have to redo it.

13         Q.    What type of training did that

14   involve?

15         A.    Safety.  All of it has to do

16   with safety on the job.  Everything with

17   safety, proper PE.

18         Q.    Did you learn about anything as

19   far as what you needed to do if there was

20   an accident at the workplace?

21         A.    Yes.  It went through all

22   examples and scenarios that happened.

23         Q.    Do you know what a controlling

24   employer is?

25         A.    Yes.

Page 47

1                      HUDSON

2        Q.     What is a controlling employer?

3        A.     Somebody -- it has to be their

4    way or the highway.  Meaning they very

5    stern behind whatever they want you to do.

6    They pretty much don't let you breathe.

7    You have to do it their way or that's it.

8        Q.     When I ask you about

9    controlling employer, does a controlling

10   employer have any specific responsibilities

11   on a job site?

12       A.     I would say they pretty much

13   responsible.  If it's their project they

14   responsible for the project.  They want it

15   to get done a certain way.  Normally like I

16   say safety is always first.  Once you

17   follow all the rules and everything then

18   the project will go through smooth.

19       Q.     With respect to the job that

20   we're talking about today, when did you

21   first start working at that job site?

22       A.     From the date of the accident

23   we started six months prior to when the

24   accident start.

25       Q.     So you personally started

Page 48

1                           HUDSON

2    working at the job site six months before

3    this accident occurred?

4         A.     Yes, approximately six months.

5    Yes.

6         Q.     When you started at the job

7    site, what was your title?

8         A.     I am there to do the electric

9    for the new office.  Taking care of the

10   electric.

11        Q.     Did you have a particular

12   title?

13        A.     Yes.  I am the foreman,

14   electrical foreman that is doing the

15   project.

16        Q.     So you were a foreman on the

17   job?

18        A.     Yes.

19        Q.     Were you also the project

20   manager?

21        A.     Not the project manager.  Just

22   for electric.

23        Q.     Didn't you testify earlier in

24   this deposition that you were the project

25   manager?

1                    HUDSON

2              MR. RICHMAN:  No, he didn't

3        testify to that.

4        A.    No, I did not testify to that.

5              MR. RICHMAN:  Just be clear,  I

6        want to make a statement for the

7        record.  Just to be clear he always

8        said he is the project manager only

9        for Electric.

10             MR. BRIGANTIC:  I move to

11       strike that.  That's your testimony.

12       That's not his.  The witness is

13       testifying.

14       Q.    Did this job site have sign in

15  sheets?

16       A.    No.

17       Q.    On the day of the accident the

18  only trades that were on the site was the

19  AC, A.S.K. Electric and Jim Associates?

20       A.    Yes.

21       Q.    Was Kalnitech Construction on

22  the job site?

23       A.    I do not know them as that

24  name.  So I -- what I told you, I don't

25  know the names behind all of these

1                         HUDSON

2      projects.  I just find out about all of

3      that stuff just now as we speak.  Like I

4      said in terms of the AC, us and Electric

5      and Gus and George, I don't know the exact

6      name and everything that they work under.

7      I just know them as they're responsible for

8      the project.

9              MR. BRIGANTIC:  Move to strike

10          that.

11         Q.    When you say that you just

12     found out about these things, what do you

13     mean by that?

14         A.    By you asking me these names

15     about the companies and everything.  That's

16     what I meant.  So you asked me about the

17     name of the company.  I don't know all of

18     these names that are associated with the

19     project.  It's not like I had -- I didn't

20     have -- I go to do the job with electrical

21     part.  I don't see all the paperwork, the

22     contracts for the projects.  That stuff.

23     That stuff.

24         Q.    The purpose of this job was to

25     renovate this building; is that correct?

Page 51

1                          HUDSON

2          A.      Yes.

3          Q.      After the job was completed,

4    what person or entity was going to occupy

5    the building?

6          A.      My boss which is David Kleeman.

7          Q.      Was it being renovated to be

8    occupied by A.S.K. Electric?

9          A.      Yes, yes.   They transferring

10   from their own location to the new office.

11         Q.      You testified that you had the

12   authority to stop work if you observed

13   unsafe activities going on at the site;

14   correct?

15         A.      Yes.   Yes.

16         Q.      Did you observe the Plaintiff

17   and how he was using the ladder prior to

18   this accident?

19         A.      I did not.   I did not see if he

20   had the ladder or anything.   When I heard

21   the commotion I turned and I looked.

22         Q.      Why did you have the authority

23   to stop work?

24         A.      I am doing the job for my boss

25   that owns the building.   I also had OSHA 62

1                    HUDSON
2    training, safety.  So if I see any
3    conditions and only based on me being a
4    responsible person.  If I see something
5    that's dangerous I am going to stop it.
6    That also protects everybody.  I like the
7    job go smooth and there is no issues.
8         Q.    So you were there as the
9    owner's representative?
10        A.    Well, yes, for Electric.  I am
11   there if anything happened to the job I
12   could pick up the phone and call my boss
13   and say listen, there is a situation here
14   and I will pass on the information.
15        Q.    Was the Plaintiff doing
16   electrical work?
17        A.    No.
18        Q.    You had the authority to issue
19   a stop work, a stop work order if you
20   observed him doing something unsafe,
21   correct?
22        A.    Yes.  I would stop a person in
23   a heartbeat.
24        Q.    You had that authority as the
25   owner's representative; correct?

1                          HUDSON

2           A.    Yes.

3           Q.    While you were on the job site,

4    you were working for A.S.K. Electric;

5    correct?

6           A.    Yes,

7           Q.    What is a prime contractor?

8           A.    A prime contract?

9           Q.    Yes.

10          A.    Well, I mean a prime contract,

11   I am just saying --

12               MR. RICHMAN:   Only if you know.

13          A.    I don't know.   I have to look

14   it up.

15          Q.    I don't want you to guess.

16   It's not a question of you looking it up.

17   I am asking you, from your --

18               MR. RICHMAN:   If you don't know

19        you don't know.

20               MR. BRIGANTIC:   Let me finish,

21        I am trying to be fair with the

22        witness.

23          Q.    What I am asking you is, you

24   worked in the construction industry now for

25   approximately 17 years?

1                    HUDSON

2        A.    Yes, approximately.

3        Q.    So what I am asking you based

4   on your past work history and your

5   experience, do you know what a prime

6   contract is?

7        A.    Yes.  It would be the

8   contractor, whoever is assigned to do the

9   project.  The contract details what the

10  project entails and what you need to get

11  done.

12       Q.    That's the prime contractor?

13       A.    Well, that's coming from my

14  perspective.

15       Q.    Do you know what a subcontract

16  is?

17       A.    Yes.

18       Q.    What is a subcontract?

19       A.    Well, a subcontract, after you

20  have the main contract it would be the

21  prime contract.  The subcontract will be

22  they pass on the work to another party to a

23  portion of it.  Like, for example, we as

24  electricians would be a subcontractor to

25  AC.  AC work would be a subcontractor of

1                    HUDSON
2    the main contract;
3         Q.    When you talk about a main
4    contract or the prime contract, who are the
5    parties to such a contract?
6         A.    I don't know.
7         Q.    Well, I am asking generally,
8    who would usually be the parties to a prime
9    contractor?
10              MR. RICHMAN:   Note my
11         objection.   You can answer the
12         question.
13        A.    It would be the person that
14   owns the project.   They would basically
15   have the main contract drawn up to get the
16   job done.   So I would say maybe in this
17   case David.
18              MR. RICHMAN:   Don't guess.
19        Q.    When the Plaintiff was injured,
20   you took the photograph of him on the
21   ground; correct?
22        A.    No.   At first I attend to him.
23   I took the photograph after I called the
24   ambulance.
25        Q.    So you called the ambulance;

1                    HUDSON

2    correct?

3         A.    Yes.  I called the ambulance,

4    911.

5         Q.    How is it that you came to call

6    the ambulance?

7         A.    Because I am the one that was

8    the closest.  I saw what happened.  I saw

9    he was injured and like with any person, it

10   doesn't matter what position, what they

11   told -- the first thing you would do is you

12   would seek medical help.  So at that time

13   if he's injured, the first thing I did

14   which I did the right thing was to call 911

15   to have them call over to assist.

16        Q.    So the first person you called

17   after the accident was 911, correct?

18        A.    Yes, because he was injured.

19   If it was something not serious I probably

20   would have maybe reached out.  I would have

21   reached out to my boss or so.  The person

22   is injured on the ground, it would be

23   selfish for me not to make emergency call.

24        Q.    Now, after you did that, did

25   you eventually call your boss?

1                          HUDSON

2          A.    That was the second phone call.

3          Q.    How soon after you called 911,

4    did you call your boss?

5          A.    Right after.

6          Q.    Your boss is David Kleeman?

7          A.    Yes.

8          Q.    David Kleeman is your boss at

9    A.S.K. Electric?

10         A.    Yes.

11         Q.    He is also the owner of this

12   property?

13         A.    Yes.

14         Q.    After the Plaintiff fell, did

15   he get up before you took the photo of him?

16         A.    He did not get up.

17         Q.    You were shown a photograph of

18   the Plaintiff laying on the ground?

19         A.    No.

20         Q.    Earlier in this deposition you

21   were shown a photograph of the Plaintiff

22   laying on the ground; correct?

23         A.    Yes.

24         Q.    Did you take that photograph?

25         A.    Yes.  I take that photograph, I

Page 58

1                          HUDSON

2     did not move him.  The guys that were

3     there, they kind of moved him out of the

4     closet.  He fell inside of the closet.  He

5     was inside the closet.  His other

6     co-workers that were there, kind of moved

7     him a little bit away from where he fell

8     and he was laying there.  Like I said after

9     I call, after I call 911 and I call David,

10    I took a picture.

11         Q.     So the photograph that you took

12    of him, did you take it with your cell

13    phone?

14         A.     No.  What I did I passed the

15    picture onto the office.  That would be

16    kept in the records.

17         Q.     When you passed it onto the

18    office, that is the office of A.S.K.

19    Electric?

20         A.     Yes.  I send it to David, to

21    David and yes, I meant to say I sent it to

22    David.  I text David a picture.

23         Q.     You texted it, correct?

24         A.     Yes.

25         Q.     You didn't e-mail?

Page 59

1                        HUDSON

2       A.      No.   I text him the picture.

3       Q.      You said that you gave him a

4   verbal report of what happened?

5       A.      Yes.   I explained the situation

6   how the accident happened and, you know,

7   the procedures after.

8       Q.      What did Mr. Kleeman say?

9       A.      He was very concerned.   The

10  ambulance.

11      Q.      Did he tell you to call anyone

12  else?

13      A.      I don't remember exactly the

14  conversation but I believe because at the

15  time Gus wasn't there.   I had Gus's number

16  so I -- he didn't tell me to call anyone to

17  be honest.   He made the phone call but with

18  me I also call Gus.   Like I have Gus

19  number.

20      Q.      Did you text Gus a picture of

21  the accident, a picture of the Plaintiff?

22      A.      Not to my knowledge.   No, I

23  don't --

24      Q.      Now, when you did your training

25  for OSHA and your safety training, did you

Page 60

1                        HUDSON
2    learn anything about whether you would need
3    to notify the local OSHA office of a work
4    site accident?
5         A.    No.
6         Q.    Did you notify that the
7    accident took place?
8         A.    No.
9         Q.    To your knowledge, did OSHA
10   know -- did anyone put OSHA on notice that
11   this accident had occurred?
12        A.    No.
13        Q.    To your knowledge, did OSHA do
14   an investigation of this accident?
15        A.    No one came to investigate --
16   OSHA didn't come to the site to
17   investigate.
18        Q.    With respect to the photograph
19   that you took of the Plaintiff as I
20   understand your testimony it does not
21   depict how he landed?
22        A.    No.  It does not depict how he
23   landed.
24        Q.    It does not depict where he
25   landed?

Page 61

1                          HUDSON

2          A.     It's very close to:  Right

3     there in the corner, the right-hand side of

4     the closet, that's where he landed.

5          Q.     It does not depict his body

6     position when he landed?

7          A.     No.  No.

8          Q.     Where did the ladder go after

9     the accident?

10         A.     The ladder was leaning back on

11    the side.  If you look on the left-hand

12    side of the picture, the ladder -- after

13    that I don't know where the ladder went but

14    the ladder was seen in the picture.

15         Q.     Did you ever see the ladder

16    again?

17         A.     No.  No.

18         Q.     After the accident, did you

19    inspect the ladder?

20         A.     Yes.  The ladder is in good

21    working condition.

22         Q.     Why did you inspect the ladder?

23         A.     Because I'm curious to see what

24    happened.  I was just curious to see what

25    could have happened, why he fell.  The

Page 62

1                          HUDSON

2     ladder was fine.   So it had to be a

3     situation where he probably had it set up

4     incorrectly.

5          Q.     To your knowledge, did Gus look

6     at the ladder?

7          A.     I do not know.

8          Q.     Prior to this accident

9     occurring you started working on the site

10    six months earlier; correct?

11         A.     Yes.

12         Q.     Was that when the project

13    started?

14         A.     No.   The project started

15    before.   They did the demolition and they

16    did some restructure and the reframing and

17    then I started once the frame was up.   I

18    started running the wires and installing

19    the panels and stuff.

20         Q.     So the sequence of the work was

21    that the demolition got done first?

22         A.     Yes.

23         Q.     Then the framing.   Then the

24    interior renovation, right?

25         A.     Yes.   Yes.

Page 63

1                      HUDSON

2          Q.     You were on the site from the

3    first time the interior renovation started,

4    right?

5          A.     After the framers finished with

6    the partition with the offices and I came

7    there when I install the electric.

8          Q.     How long did you remain on the

9    site working?

10         A.     From start to finish.  From

11   when I came.  When I started to when the

12   project was done, completed.

13         Q.     So you were there on-site for

14   the entire duration of the project while

15   the interior renovation was being done?

16         A.     Yes.  Up until the point where

17   I was 100 percent done with all the new

18   devices, the lights and then I was taken

19   off the project.  So I am assuming they

20   probably still have small other works,

21   maybe the carpenters were doing.  For me,

22   the electric, when the painting was done,

23   all the new devices, lights and I completed

24   that.  Then I was taken off the project.

25         Q.     Now, we talked about Jorge

Page 64

1                        HUDSON
2   Moscoso:   You mentioned his brother;  Who
3   is his brother?
4        A.    I don't know much about his
5   brother;  I am familiar with George and his
6   brother.  The first time I met his brother
7   when his brother came there;  I am not
8   familiar with his brother.  I am familiar
9   with George from seeing him.
10       Q.    Why did you leave A.S.K.
11  Electric?
12       A.    Me?
13       Q.    Yes.
14       A.    I just move onto another
15  opportunity;  There was no --
16       Q.    When did you last work for
17  A.S.K. Electric?
18       A.    About two months ago was the
19  last time.
20       Q.    Did you tell Mr. Kleeman you
21  were leaving?
22       A.    Well, it was with the
23  supervisor:  I had a disagreement with the
24  decision and I decided to leave.  So I
25  didn't give notice or anything;  I just the

Page 65

1                          HUDSON

2    supervisor, I am not going to do what he

3    proposed and I was going to quit.

4          Q.     Who was the supervisor?

5          A.     Wazim.

6          Q.     How do you spell that?

7          A.     W-a-z-i-m.

8          Q.     Does Wazim, is that a first

9    name or a last name?

10         A.     That's what we call him.  I

11   believe that's not his real name.  I think

12   Asad, something something.  Everyone call

13   him Wazim.  I don't know if it's actual

14   name?

15         Q.     He worked for A.S.K. Electric?

16         A.     Yes.  He is a supervisor for

17   A.S.K. Electric.

18         Q.     What did he ask you to do that

19   you refused to do?

20         A.     Well, I started a project.  It

21   was two floors.  A nice project.  I am into

22   the project probably like I would say 70

23   percent into the project.  Pretty much they

24   were having some issues with materials and

25   stuff like that.  He wanted another person

1                    HUDSON

2   to take over the job.  I should work all of

3   them.  I was too far into the project.  I

4   take my job very seriously.  The project

5   was beautiful, real nice.  To me I think

6   that was a slap in the face.  I refused to

7   do it.

8        Q.    Well, did he say that he wasn't

9   satisfied with your work on the project?

10        A.    Not a matter of -- that's the

11   thing.  It is not a matter of not

12   satisfied.  It's the case where there was

13   something that was going on in the project.

14   It started to affect in terms of my

15   materials or so.  If I am not mistaken it

16   was before Covid and then Covid came and

17   everything get all expensive.  It was a

18   matter of me ordering materials and a

19   matter of certain stuff that they didn't

20   want me to do which is not a case where

21   they kind of critique certain stuff.  If

22   they wanted me to go that direction they

23   should have mentioned to me from before and

24   the way I was doing it was nothing wrong.

25   It's just the materials were really getting

1                    HUDSON

2    to them. It's two floors -- like 300

3    circuits. I think that's what caused the

4    whole back and forth. Yes.

5          Q.   I am a little unclear. Did

6    they want you to use less material? What

7    exactly was the issue?

8          A.   No. The issue was -- it was a

9    set of pipes that we were feeding. It was

10   a set of boxes that was feeding us the

11   pipes. The pipes were taking a little

12   longer to get done and the path that was

13   chosen from in the beginning. I try to

14   choose easiest path. It's taking a little

15   longer to get the pipes done. It was a

16   case where the job was 85 percent sheetrock

17   completed, 85 percent sheetrock. So the

18   other issue with the pipe work taking a

19   longer time. Obviously like I said, the

20   materials, all the materials are actually

21   on the job. There is nobody taking nothing

22   off the job.

23         Q.   Who is Vanessa Kleeman?

24         A.   I do not know. I am

25   assuming -- I am not sure, his daughter or

Page 68

1                          HUDSON

2    wife.  I don't know.

3          Q.    I don't want you to assume.

4                MR. RICHMAN:   Don't guess.

5          Q.    I don't want you to assume.

6    Whether or not you know Mr. Kleeman's wife

7    name, did you ever speak to Mr. Kleeman's

8    wife?

9          A.    There was a company party, in a

10   brief introduction.

11         Q.    Did you ever discuss this

12   particular project that we're here for

13   today with Mrs. Kleeman?

14         A.    No.

15         Q.    As we sit here today, do you

16   know who owns this ladder?

17         A.    The general contractor, they

18   own the ladder.

19         Q.    So it was owned by A.S.K.

20   Electric?

21         A.    No.  Not A.S.K. Electric.

22   George and Gus company.  One of them owned

23   the ladder.  I don't know exactly who but

24   it wasn't A.S.K. Electric.

25         Q.    When you spoke to Mr. Kleeman

Page 69

1                            HUDSON

2    after this accident occurred, you gave him

3    a verbal report; correct?

4            A.     Yes.

5            Q.     You also texted him a

6    photograph that you took of the Plaintiff;

7    correct?

8            A.     Yes.

9            Q.     At any time did you write an

10   e-mail or some other form of report to Mr.

11   Kleeman or anybody else as an accident

12   report?

13           A.     No.  No.

14           Q.     So to your knowledge, did

15   anyone prepare an accident report?

16           A.     Not to my knowledge.  Not to my

17   knowledge.  I don't remember me signing any

18   paper.

19           Q.     After the accident you spoke to

20   the Plaintiff?

21           A.     No, I never seen him again.

22   They took him away.  I never seen him

23   again.

24           Q.     I didn't ask you that whether

25   you saw him again.  I am asking, after the

```
1                        HUDSON
2    accident did you speak to the Plaintiff?
3         A.    No.
4         Q.    He didn't tell you what
5    happened?
6         A.    No.  I didn't talk to him after
7    the accident.  More than me concerned with
8    how he was doing and he barely couldn't
9    respond.  I never really spoke.
10        Q.    Did you speak to anyone else at
11   the scene about the accident?
12        A.    Yes.  Everybody was curious as
13   to what happened.  So I went over and over
14   again what happened.
15        Q.    When you went over and over
16   again, who did you speak to?
17        A.    Well, different from the
18   workers that was there when Gus arrived.  I
19   spoke to him and I explained what happened.
20             MR. BRIGANTIC:  Strike that as
21        nonresponsive.
22        Q.    When you say you went over and
23   over things, who did you speak to that was
24   there when the accident occurred?
25        A.    Well, just the workers.  Me and
```

1                    HUDSON

2    the workers.  For example, the guy I was

3    working with say yesterday, I explained

4    what happened.  The other guys, some of

5    them was working downstairs.  When they

6    come up, I explained to them what happened.

7         Q.    But did you speak to the

8    employees who were working in or around the

9    Plaintiff?

10        A.    I spoke to the person that was

11   in the building.  I was the only one right

12   where the accident took place.  So the

13   commotion, everyone in the back, wherever

14   they come forward to see what happened.

15        Q.    When this accident occurred,

16   you were the person closest to the

17   accident?

18        A.    Yes.  I was ten feet away, this

19   was closet and two electrical panels close

20   by.  I was working on one of them.

21        Q.    Was anyone else in the

22   immediate area?

23        A.    Not to my knowledge.  No.

24   There was nobody else in the line of site

25   or close by.  Down the hall, in the

Page 72

```
1                        HUDSON
2    basement, they were working in the
3    building.
4         Q.    To your knowledge, who took the
5    photograph of the boxes?
6         A.    That I don't know.
7              MR. BRIGANTIC:  I am going to
8         mark my own copy of the contract as
9         an exhibit.  I will do a screen share
10        myself.
11             (Whereupon, the aforementioned
12        contract was marked as Defendant's
13        Exhibit A for identification as of
14        this date by the Reporter.)
15        Q.    Mr. Hudson, do you see what I
16   put up on the --
17        A.    Yes.
18        Q.    Can you read for me what the
19   title of this document is?
20        A.    Yes.  Short form prime contract
21   between owner and contractor.
22        Q.    So you see that.  You read off
23   the title of the document.
24             Now, was your testimony you
25   never seen this document before, correct?
```

Page 73

1                          HUDSON
2          A.    No, I never seen it before.
3          Q.    In the second line down it says
4    it's a -- it's between A.S.K. Electric
5    Corp. that's your employer, right?
6          A.    Yes.
7          Q.    And Davs Partners LLC; correct?
8          A.    Yes.
9          Q.    So, it's between the owner and
10   A.S.K. Electric; correct?
11         A.    Yes.
12         Q.    A.S.K. Electrical?
13         A.    Yes.
14         Q.    So we're clear, the signature.
15   You see on the left Davs Partners; it's
16   signed by Vanessa Kleeman for Davs
17   Partners; correct?
18         A.    Yes, I see that.
19         Q.    You don't know who Vanessa
20   Kleeman is?
21         A.    No.
22         Q.    On behalf of A.S.K. Electrical
23   Corp.; it was signed by David Kleeman, do
24   you see that?
25         A.    Yes.  On the right.

1                    HUDSON

2         Q.    So is there any signature here

3    of a guy by the name of Gus?

4         A.    Yes, I do not see.  The one

5    above it is not that clear.  Yes.  I don't

6    recognize no other signature by Gus.

7         Q.    So it's between Davs Partners

8    LLC and A.S.K. Electrical Corp., right?

9         A.    Yes.

10        Q.    This is the prime contract,

11   correct?

12        A.    Yes.

13        Q.    You explained earlier what a

14   prime contract is, right?

15        A.    Yes, I tried to.  Yes.

16        Q.    Doesn't this indicate to you

17   that A.S.K. Electrical was serving as the

18   general contractor?

19             MR. RICHMAN:  Objection.  You

20        are now being argumentative.  Move

21        on.

22             MR. BRIGANTIC:  Unless you are

23        instructing him not to answer.

24             MR. RICHMAN:  I am objecting to

25        the question.  You can answer if you

1                    HUDSON
2          can.   This has been asked several
3          times already.   I am not going to go
4          too much further.
5          Q.     You can answer, Mr. Hudson.
6          A.     Repeat the question.
7                 (Whereupon, the referred to
8          question was read back by the
9          Reporter.)
10         A.     I'm not sure.
11         Q.     Wouldn't it be fair to say you
12    don't know who the general contractor was
13    on this job?
14                MR. RICHMAN:  Objection.  You
15          already asked him who the general
16          contractor was.
17                MR. BRIGANTIC:  This is a
18          different question.  The objection is
19          noted.
20         Q.     You can answer, Mr. Hudson.
21                MR. BRIGANTIC:  Read that back.
22                (Whereupon, the referred to
23          question was read back by the
24          Reporter.)
25         A.     Yes.  Gus, general contractor.

1                    HUDSON

2        Q.    You just testified that you

3    don't know who the general contractor is;

4    correct?

5              MR. RICHMAN:    Objection.    He

6        did not say that.

7        A.    I did not say that.

8        Q.    What is your basis for the

9    assertion that Gus is the general

10   contractor?

11       A.    Because when I got there Gus is

12   in charge of the project.    So Gus doing

13   besides the electric; the AC and the

14   security, Gus is doing the entire project.

15   He is responsible for the project, for the

16   sheetrock, the general build out.    The

17   general renovation.

18       Q.    He was doing sheetrock?

19       A.    Well, when I say sheetrock it's

20   part of the construction.    You have floor,

21   sheetrock, you have the tiles.    So he is

22   pretty much doing everything except the

23   electric.

24       Q.    Let's just be clear.    Gus had

25   nothing to do with the air conditioning?

1                          HUDSON

2          A.     No.    It's a different crew to

3     do AC.

4          Q.     Gus had nothing to do with the

5     electrical?

6          A.     Nothing, nothing to do with

7     electrical.

8          Q.     Gus had nothing to do with the

9     security?

10         A.     No.    Nothing to do with

11    security.

12         Q.     But he had something to do with

13    other construction activities?

14         A.     Yes.    Yes.    The rest of the

15    construction.

16         Q.     What do you mean the rest of?

17    Did he do the plumbing?

18         A.     No.    No.

19         Q.     He didn't do the plumbing

20    either, right?

21         A.     No.    He didn't do the plumbing.

22         Q.     Did he do the demolition?

23         A.     That I don't know.    Because I

24    came there after the demolition was done,

25    framing was done.    That's when I came

```
1              HUDSON
2   there.  Any question about before, I don't
3   know.
4        Q.    You don't know about the
5   demolition?
6        A.    I don't know.
7        Q.    Do you know whether he did the
8   framing?
9        A.    I don't know exactly.  The
10  framing was done when I got there.  The
11  framing was done ready for us to work
12  there.
13       Q.    So you don't know whether he
14  did the framing either, right?
15       A.    No.
16       Q.    Was there any work done on the
17  roof?
18       A.    There was a unit going on the
19  roof.  There was also -- putting on a new
20  tar, top on the roof.
21       Q.    Who did the roofing?
22       A.    Well, the guys, I don't know if
23  they are connected to George.  They're
24  separate guys doing the exterior work.  Not
25  connected to George.
```

Page 79

1                      HUDSON
2       Q.    Who hired George?
3             MR. RICHMAN:  If you know.
4       Q.    Don't look at your lawyer for
5    your answer.
6             MR. RICHMAN:  I don't want him
7        to guess.  You're asking questions
8        that you already asked.
9             MR. BRIGANTIC:  It's not clear
10       to me whether I got an answer.
11      Q.    Who hired George?
12      A.    I do not know.
13      Q.    Would it surprise you to know
14   that A.S.K. Electric hired George?
15            MR. RICHMAN:  Objection.  Don't
16       answer that question.  Don't answer
17       it.  It's not a proper question.  You
18       know that.
19            MR. BRIGANTIC:  That's all
20       right.  I will show him a document in
21       a second.
22            MR. RICHMAN:  No.  Showing him
23       a document doesn't give the answer to
24       a question.  You asked the question
25       five times already.  Enough is

1                          HUDSON

2        enough.

3              MR. BRIGANTIC:   I haven't used

4        a document before nor has the

5        Plaintiff.   We're going to use the

6        document.

7              MR. RICHMAN:   Go ahead.

8        Q.    I am going to mark as Defendant

9    Kalnitech Exhibit B the subcontract between

10   A.S.K. Electric and Jim Associates.   Have

11   you ever seen this document before?

12              (Whereupon, subcontract between

13        A.S.K. Electric and Jim Associates

14        was marked as Defendant's Exhibit B

15        for identification as of this date by

16        the Reporter.)

17       A.    No.

18       Q:    Prior to my showing this to

19   you, have you ever seen A.S.K. Electrical

20   Contracting Corp. form of subcontract?

21       A.    No.

22       Q.    Are you in any way involved in

23   the sub contracts?

24       A.    No.

25       Q.    What does this say right under

Page 81

1                      HUDSON

2    A.S.K. Electrical Contracting Corp., what

3    is the title of this document?

4         A.    Master subcontract agreement.

5         Q.    I am going to scroll down and

6    you see identified as the subcontractor Jim

7    Associates?  Do you see that?

8         A.    Yes, I saw that.

9         Q.    Do you see the name under there

10   identified as president Jorge Moscoso, do

11   you see that?

12        A.    Yes.

13        Q.    The contractor is identified as

14   A.S.K. Electrical contracting Corp., right?

15   Have you ever seen this work order form for

16   this project?

17        A.    No.   None of these forms, I

18   haven't seen them.   The office deals with

19   all of this paperwork.

20        Q.    It says the contract document.

21   Underneath contract documents it's signed

22   Jorge Moscoso on behalf of Jim Associates

23   and on the other side it's signed by A.S.K.

24   Electrical Contracting Corp. by David

25   Kleeman, do you see that?

1                      HUDSON

2          A.    Yes, I see it.  I see that.

3          Q.    Do you recognize Mr. Kleeman's

4    signature?

5          A.    It looks different.  I don't

6    recognize it right here.  Based on the

7    documents you showed me before, it looks,

8    yes.  I don't see his signature there.

9          Q.    Does this document refresh your

10   recollection that you might have that it

11   was actually A.S.K. Electrical Contracting

12   Corp. --

13         A.    No.

14         Q.    You have to let me finish.  Mr.

15   Hudson, does this refresh any recollection

16   that you might have that it was A.S.K.

17   Electrical Contracting Corp. and not Gus

18   who hired Jorge Moscoso?

19         A.    No.

20         Q.    You think it was your belief

21   that Gus hired Jorge Moscoso?

22         A.    I don't know.

23         Q.    You don't know, right?

24         A.    I don't know.

25         Q.    Do you know what a toolbox

Page 83

1                           HUDSON
2      meeting is?
3           A.    Yes.   It's called toolbox
4      talks.
5           Q.    What is a toolbox meeting?
6           A.    We go over various safety, with
7      all the tools that we use.   We keep a
8      meeting, we go over and choose various
9      topics, tool safety.   Accidents that can
10     cause using a particular tool.   All to
11     prevent any such injuries from happening.
12          Q.    When you are on a job site, do
13     toolbox meetings usually get held in the
14     mornings?
15          A.    No.   We normally do it once a
16     week.   If we're in the city working once a
17     week, only for our workers, electrical.   We
18     don't do it for the rest of the
19     contractors, the rest of the workers.
20          Q.    Your answer was only with
21     respect to electrical workers?
22          A.    Yes.   Because if I am
23     responsible for the -- when I am
24     responsible for the guys working we only do
25     toolbox talks only for electric.

Page 84

1                    HUDSON

2          Q.    To your knowledge, were there

3    toolbox meetings for the other workers?

4          A.    I am not sure.  I only focus on

5    me and my -- the workers that work with.

6          Q.    Did you have workers working

7    under you?

8          A.    Yes.

9          Q.    How many workers did you have

10   working under you?

11         A.    On a regular, I had one guy.

12   Me and him during the project.

13   Occasionally maybe we get an extra person

14   or two persons to come in.  In the

15   beginning it was me and my helper and we do

16   the whole project.

17         Q.    You would report to Mr.

18   Kleeman?

19         A.    Yes.  He pretty stopped by

20   almost as much as he can.  On the way for

21   him going home he stopped by his office

22   quite often.

23         Q.    What kind of work does Mr.

24   Kleeman do other than maybe owning Davs

25   Partners?

1                    HUDSON

2        A.    I don't know.  I know he owns

3   A.S.K. Electric and I don't know what other

4   kind of work he does.

5        Q.    To your knowledge, is Mr.

6   Kleeman a licensed electrician?

7        A.    Yes.

8        Q.    He is?

9        A.    Yes.

10       Q.    So do you know whether he has

11   knowledge of actually working on a job

12   site?

13       A.    Yes, yes.  He is very good.  He

14   knows everything about a job.

15       Q.    How frequently did he stop by

16   this work site?

17       A.    If he is not busy sometimes for

18   the five days I might see him like three

19   days out of the five days.

20       Q.    For the duration of the

21   project, on average, would he be at the

22   work site approximately three out of every

23   five days?

24       A.    Yes.

25       Q.    When he was on the job site,

1                          HUDSON

2    what did he do?

3          A.     He always doing something.

4    It's his own office.  If he has to check in

5    something that he wants to be changed, he

6    will give instruction or if he decide to

7    work something like, for example, if they

8    were doing the cage, there is a cage with

9    all the security stuff in there.  He come

10   and help us, set it up.  He basically like,

11   I say it's his project and he will check

12   everybody.  There was nobody off limits of

13   what is getting done.  He is paying to get

14   it done.  We pretty much have to do it to

15   his satisfaction.

16         Q.     So he had supervisory authority

17   over the entire job site?

18         A.     He owns the place.  So, yes.

19         Q.     Did he direct the work?

20         A.     Well, he would give

21   instructions.  For example, he tells me

22   what he wants to get done and I will do my

23   part and direct the workers that are

24   working underneath me.  He tells the

25   general contractor what needs to get done.

```
 1                    HUDSON
 2    They will do it.
 3         Q.    You keep referring to the
 4    general contractor but you testified
 5    earlier you don't know who that is.
 6              MR. RICHMAN:  He did testify
 7         that ten times already.  He said Gus
 8         was the general contractor.
 9              MR. BRIGANTIC:  We established
10         after we looked at the document.
11              MR. RICHMAN:  Bob, you showed
12         him a document.  The document said
13         what it said.  You asked him numerous
14         times who he believed the general
15         contractor was and he has said Gus.
16         So stop asking him the same question.
17              MR. BRIGANTIC:  Stop
18         testifying.
19              MR. RICHMAN:  I am not
20         testifying.
21              MR. BRIGANTIC:  Stop with the
22         colloquy and stop testifying.
23              MR. RICHMAN:  I am not
24         testifying.
25              MR. BRIGANTIC:  I am not here
```

1              HUDSON

2       for your testimony.  I am here for

3       the witness.  May I proceed?

4              MR. RICHMAN:  If you are not --

5       if you are going to ask the same

6       questions again.

7              MR. BRIGANTIC:  I am not asking

8       the same questions.  We are operating

9       now with respect to what David

10      Kleeman did on the work site.  We

11      didn't talk about that so far this

12      morning.  Let me move on.

13         Q.    Mr. Hudson, who was in

14   charge -- when you are on a work site, do

15   you have to sequence the work?

16         A.    Yes.

17         Q.    What does that mean?

18         A.    Meaning that you plan out the

19   day.  You plan out what the workers to do.

20   Sometimes I am in charge of ten, 15 guys.

21   So I plan out the sequence.  So when we

22   start in the morning everyone gets their

23   project.  I team them up with who is going

24   to work and I send them out.  As they go

25   along I check on them to see if they have

1               HUDSON

2   difficulties and assist.  When all of that

3   is done I am working foreman.  I go and

4   work and I do something.  Still I keep an

5   eye and everything that is getting done.

6        Q.    You sequence the work so it can

7   get done in an orderly fashion?

8        A.    Yes.  Plus we also have to meet

9   deadlines.  We definitely have to plan it

10   out.  If not it's going to be chaos, people

11   working on top of people and nothing is

12   going to get done.

13        Q.    On this job site, was there

14   documents that set forth what the schedule

15   would be; how long each trade would be

16   there and what they will do?

17        A.    I didn't see any documents that

18   showed that.  All I know, he wants to move

19   into his new office.  We try to get a

20   project done as perfect as possible and as

21   fast as I possible for him to move in.

22   Exact dates; no, I didn't see any documents

23   with exact dates.

24        Q.    On this particular job site,

25   who was responsible for scheduling the

Page 90

1                       HUDSON
2    work?
3         A.    David, he is responsible for
4    scheduling the work.  I went there to do my
5    part and he would schedule with AC guy,
6    with the plumbers and like I say Gus always
7    pretty much there every day.  So he know
8    what needs to get done from David.
9         Q.    So David would instruct Gus
10   what to do?
11        A.    Yes.  Instruct all of us.  It
12   could be something, for example, he tells
13   us Monday, he don't want to tell us again
14   and again.  He tell us what needs to be
15   done.  He come and observe and make sure
16   it's getting done.
17        Q.    If there had to be a change
18   order David would have to approve that?
19        A.    Well, in this case he just said
20   hey, I like that to be changed.  It's not a
21   regular process of being in the city where
22   it's kind of major to work in a change
23   order.  With him he say hey, I would like
24   for you to have an extra light in the
25   office.  Just by saying it we do it.  We

Page 91

1                              HUDSON

2      don't have to wait or get any other

3      approval.  We do basically what he wants.

4          Q.      So regardless of whether there

5      was the formality of the written change

6      order, David Kleeman would be the guy to

7      decide what he wanted done or not done?

8          A.      Yes.

9          Q.      He would confer with all the

10     trades, right?

11         A.      Yes.  He interacts with all of

12     us.  He interact with me, Gus, the plumber.

13     He definitely interacted.

14         Q.      After the accident occurred,

15     you never saw or talked to the Plaintiff

16     again, right?

17         A.      No.

18         Q.      Do you know if A.S.K.

19     Electrical conducted an investigation?

20         A.      I do not know.

21         Q.      Did this project have an

22     architect?

23         A.      I do not know.  I do not know

24     to be honest.

25         Q.      Do you ever recall David

1                    HUDSON
2    Kleeman being on the scene conferring with
3    an architect?
4        A.    No.
5        Q.    Did A.S.K. Electrical have a
6    project file?
7        A.    I do not know.
8        Q.    Did you ever see a project
9    file?
10        A.    No.
11        Q.    Did you personally, whether or
12    not there was a project file, did you work
13    with documents regarding this project?
14        A.    Just the blueprint.
15        Q.    Where was the blueprint kept?
16        A.    I kept a blueprint by my box.
17        Q.    Was there a blueprint available
18    for all the trades to refer to?
19        A.    Yes.  Yes.  Everybody has their
20    print that they work off of, work with.
21        Q.    Was it the same copy that you
22    used?
23        A.    Well, they would have whatever
24    trade they are working.  Mine I deal with
25    electrical and I kind of had everything.

Page 93

1                          HUDSON
2     But then they have to focus on if they do
3     the plumbing, they focus on the plumbing
4     drawing, the mechanical focus on mechanical
5     drawings.  The general contractor focuses
6     on their build out.
7          Q.    When you say you had
8     everything, what do you mean by that?
9          A.    Well, the full set of drawings.
10    That shows everything.
11         Q.    Did the other trades have a
12    full set of drawings?
13         A.    Yes.  Yes.  They have their
14    drawings but they also have access to the
15    main big drawing that if they need to come
16    and take a look at something that they deal
17    with their part of work.  It's there.  They
18    also had their drawings.  Some of them had
19    small printout of the same drawing.  But
20    the big main one was there on the job site
21    for anybody to use.
22         Q.    Was any equipment kept on-site
23    in the event that a trade wanted to use
24    equipment?
25         A.    Yes.  We have our own tools,

1              HUDSON

2    kept on-site.  The contractor, they had

3    their own tools.  We only use what is

4    provided by A.S.K. Electric and our own

5    personal tools.  The other trade, their

6    boss supply them with the tools they need

7    to get the job done.

8         Q.    I understand that.  What I am

9    asking is, putting aside that the trades

10   themselves might bring equipment onto the

11   site for their own use, was there equipment

12   at the job site for trades to use if they

13   wanted to or if they needed to?

14        A.    No.  Only, like I said, stuff

15   that they use it, whatever they provide for

16   them.  For us, whatever we need was

17   provided for us.  There was no equipment

18   like any type of machine or anything that

19   anybody could use.  Whatever they using is

20   specialized to that particular trade and to

21   who was going to use it.

22        Q.    Going back to the accident.

23   Did you see the Plaintiff work on the

24   ladder before he fell?

25        A.    No, I did not.

Page 95

1                    HUDSON

2        Q.    If you were going to work on

3    this ladder in the position where it was,

4    how would you properly use the ladder?

5        A.    There is two ways he could have

6    done it.  You could -- it depends on the

7    fact that the ladder -- the top of the

8    ladder is actually pretty much the same

9    height of the level where he was working.

10   So it could definitely open the ladder,

11   walk up and walk into the space or if he

12   decided to lean the ladder up against it he

13   has to make sure that it is something

14   secure and they put the ladder so he

15   doesn't slide out.  So the proper way would

16   be to always best to open the ladder.

17   That's the proper way.  It's designed to be

18   opened up not leaned against.  There are

19   special ladders that lean up against the

20   walls.  It's designed to opened up, full

21   extend out and you climb up onto it.

22       Q.    When you say you open the

23   ladder, you mean he has an A frame ladder

24   you open both sides and it locks into

25   place?

1                    HUDSON

2         A.     Yes.   You open both sides and

3    there are two supports, the left and right.

4    You have to make sure those are fully

5    extended before you actually climb on the

6    ladders.   Fully horizontal.

7         Q.     Prior to this accident

8    happening, you did not notice which way he

9    was using the ladder?

10        A.     I did not notice.

11        Q.     If you had seen him on the

12   ladder leaning up against the wall, would

13   you have told him not to do it that way?

14        A.     Yes, 100 percent.

15        Q.     Why is that?

16        A.     There is always a possibility.

17   When you have it leaned up depending,

18   because during the construction you have

19   all kind of particles, dust, all of this

20   stuff.   When you lean up on the side there

21   is always the risk of sliding from

22   underneath you.   There is always a risk.

23        Q.     After the accident occurred,

24   did you inspect to see whether the parts of

25   the ladder, when you open it up, that lock

1              HUDSON

2    in place, whether that was working

3    properly?

4         A.    Yes.   It was working properly.

5         Q.    Now, you said that at the top

6    of the ladder it was even with where that

7    opening was in the picture?

8         A.    Yes.   Approximately even with

9    where the opening is.   It's a closet and

10   when you walk into the closet then you have

11   a little storage section on the left-hand

12   side that was framed out.   Inside was

13   completely framed out.   To access it you

14   have to climb on the ladder to climb into

15   the storage area.

16        Q.    What was the purpose of that

17   little storage area?

18        A.    Just extra storage for the

19   office.   It's a big office.   Extra storage

20   where they can store files or whatever they

21   want to store it.   Try to utilize as much

22   space as possible.

23        Q.    At the time the Plaintiff was

24   injured, what was he doing in that area?

25        A.    I don't know exactly what he

1                           HUDSON
2    was doing. I know to finish up inside
3    there the plywood was laid down and
4    everything. Pretty much finish up. You
5    have to sheetrock, plaster and maybe finish
6    it and installing the doors. I don't know
7    exactly what it was but it was something
8    that has to do with inside the storage area
9    that I believe he was working on.
10       Q.    To your knowledge, was the
11   Plaintiff wearing a tool belt when he was
12   injured?
13       A.    Well, no. I don't know. When
14   he fall down I didn't see a tool belt or
15   anything. I couldn't answer that whether
16   he was wearing a tool belt.
17       Q.    To your knowledge, was he
18   wearing a harness?
19       A.    No harness.
20       Q.    There was no one else around
21   him within his vicinity?
22       A.    No. It was just me working at
23   the panel and he was by the closet.
24       Q.    Let me make a five minute
25   break, see whether I have anything at this

1                          HUDSON
2    moment.
3         A.      Thank you.
4                 (Whereupon, an off-the-record
5           discussion was held.)
6         Q.      Mr. Hudson, it's my
7    understanding that you would either like to
8    revise or extend your answer to a
9    particular question.  Go ahead and do that
10   if you would like.
11        A.      Okay.  Yes.  So if you guys
12   remember when I said I didn't see exactly
13   how he had the ladder when he went into the
14   storage area to work.  But I heard, when I
15   heard the sound I turned around and I saw
16   him falling down.  I said the ladder was
17   open but now I am really thinking about it.
18   There is no way he could have fallen if the
19   ladder was open.  He had to have the ladder
20   closed and lean upright above the opening.
21   The opening below the storage area.
22                MR. RICHMAN:  Can we call the
23           open area the cubby?
24        A.      The cubby.
25        Q.      So it's your belief that he did

1                           HUDSON

2       not have the ladder open but that it was

3       leaning up against a wall?

4            A.     Yes.   I am not sure how he had

5       it.   That's the only way he would be able

6       to fall the way he fall.   He had to have it

7       leaned up against the cubby.

8            Q.     After the accident, you said

9       you inspected the ladder, did you look at

10      the feet of the ladder?

11           A.     Yes.   I did inspection, I look

12      at the ladder to see any defects, any

13      issues with the ladder.

14           Q.     Can describe what the feet, the

15      bottom part of this ladder is in terms of

16      the feet of the ladder?

17           A.     All ladders have like a rubber.

18      It has a rubber insulation.   A fiberglass

19      ladder.   Fiberglass and rubber feet at the

20      bottom.

21           Q.     This one did?

22           A.     I don't remember 100 percent.

23      It's been a long time ago.   I don't

24      remember if this one had.   All I know is I

25      did not see any issues with the ladder.   I

1                        HUDSON

2    am assuming it had.  I didn't see any

3    issues or anything that arise any suspicion

4    that maybe the ladder was defective why it

5    fall.  The ladder was in good condition.

6         Q.    Now as I understand your

7    testimony, you had to make a phone call.

8    Mr. Kleeman was not at the site when this

9    accident occurred?

10         A.    No, he was not.

11         Q.    Did he come to the scene, to

12   the work site on the same day later?

13         A.    No.  He was away somewhere.  I

14   don't know if he was hunting or fishing, he

15   was away somewhere.  He did not come the

16   site the same day of the accident.

17         Q.    How soon after the accident did

18   he then come back to the work site?

19         A.    I don't remember exactly but I

20   know it was as soon as possible.  But

21   whatever he was doing he came back as soon

22   as possible.  I don't remember the exact

23   time or so when he came back.  I know he

24   came back as soon as possible.

25         Q.    Was it the next day?

1                      HUDSON

2        A.     I don't remember to be honest,

3    I don't remember if it was the next day.

4        Q.     When he did come back, the next

5    time that he came back to the work site,

6    after the accident, did he do any

7    inspection or investigation?

8        A.     Well, he asked me what happened

9    and he look and I showed him where the

10   accident occurred and he basically just

11   checked.  Checked to see exactly based on

12   whatever I told him that happened.  Based

13   on whatever he heard from what I told Gus

14   about the accident which is the same thing

15   I told him what happened.

16       Q.     Do you know what a waiver of

17   lien is?

18       A.     It's when somebody wants -- a

19   waiver of lien, that's when you restrict

20   somebody from -- for example, if you are

21   finishing up the a project and somebody

22   owes somebody money.  You can issue a

23   waiver of lien against that property.

24       Q.     Isn't it where if you do work

25   on a job site and you get paid you waive

1                          HUDSON

2     any continuing lien, right?

3          A.     Not sure.  I am not sure.

4          Q.     Have you ever seen a waiver of

5     lien?

6          A.     If what?

7          Q.     Have you ever seen a waiver of

8     lien?

9          A.     No, never seen.

10          Q.     Have you ever signed one?

11          A.     No.

12               MR. BRIGANTIC:   I am going to

13          show you Defendant's Exhibit C.   Did

14          you see what I put up on the screen?

15          A.     Yes.

16          Q.     Can you read off the very top

17     line which is the title of the document?

18          A.     Final combined waiver of lien

19     and general release.

20               (Whereupon, the aforementioned

21          Waiver of lien was marked as

22          Defendant's Exhibit C for

23          identification as of this date by the

24          Reporter.)

25          A.     To whom it may concern.

1                         HUDSON

2          Q.      You never seen this document

3    before?

4          A.      No.

5          Q.      This refers to Jim Associates

6    Corp. having been employed by A.S.K.

7    Electrical Corp. to furnish labor and/or

8    materials for the building at 217-14

9    Hempstead Avenue, Queens. Do you see that

10   in the first paragraph?

11         A.      Yes.  I just read it.

12         Q.      Does this refresh any

13   recollection you might have, whether it was

14   A.S.K. Electrical that hired Jim

15   Associates?

16         A.      No.  In terms of the paperwork

17   I never seen the paperwork that dealt with

18   the project.  Only paperwork I deal with

19   the prints that they gave me to proceed

20   with the build out for the electric.

21         Q.      There is a paragraph that

22   starts now, do you see that paragraph?

23         A.      Yes.

24         Q.      The next paragraph after that

25   is whereas.  Do you see that?

Page 105

1                          HUDSON

2        A.      Yes.

3        Q.      Can you read for me what the

4    first sentence in that whereas paragraph?

5        A.      Whereas Jim Associates Corp.

6    the undersigned, as releasor, successors

7    and assigns, in consideration of $62,891

8    total cumulative dollars and other goods

9    and valuable consideration, has released

10   and does release and forever discharge Days

11   Partners the owner and A.S.K. Electrical

12   Corp., general contractor, collectively

13   referred to herein as the releases and each

14   of the respective releases, shareholders,

15   officers, directors, employees, agents,

16   representatives, successors and assigns

17   from all actions, causes of actions, sums

18   of money, or any other liability arising

19   out of or in connection with the project

20   and work contracted for and demands

21   whatsoever, in law, admiralty or equity,

22   which against either or both of the

23   releasees.

24       Q.      That's the first sentence.   You

25   can stop there.

1                          HUDSON

2          A.     Okay,

3          Q.     You would agree with me that

4   this waiver of lien refers to Davs Partners

5   LLC as the owner and A.S.K. Electrical

6   Corp. as the general contractor, correct?

7          A.     I do not want to say.  Even

8   though I read it, I do not want to say.  I

9   still think this is something that should

10  definitely be between the lawyer and you

11  guys.  I do not want to give any statement

12  based on these documents which I am seeing

13  right now.

14         Q.     I'm sorry, Mr. Hudson.  That is

15  not responsive to my question.  All my

16  question is would you agree with me that

17  the waiver of lien refers to Davs Partners

18  LLC as the owner?

19         A.     Yes.

20         Q.     And A.S.K. Electrical as the

21  general contractor?

22         A.     Yes.  It said it on the

23  document.

24         Q.     Okay.  Does this refresh your

25  recollection you might have that it was

1                    HUDSON

2    actually A.S.K. Electrical Corp. that was

3    the general contractor?

4         A:    No.  Not based on this

5    document.  I know that -- like I said I

6    work for A.S.K.

7              It was their project that I'm

8    doing.

9              MR. BRIGANTIC:  That's all I

10         have subject to any follow-up to

11         anything else that anyone else may

12         have.  Thank you, Mr. Hudson.

13              MR. KLEIN:  I have a few

14         follow-up.

15    EXAMINATION BY

16    MR. KLEIN:

17         Q:    Sir, when you began working on

18    the morning of the accident, was the worker

19    who was involved in the accident, was he

20    already working?

21         A.    No.

22         Q:    Did you see him bring the

23    ladder up into that cubbyhole area that we

24    described?

25         A.    No.

1                        HUDSON

2        Q.    When did you first become aware

3   that he was working in that area?

4        A.    When I start -- when I started

5   working on the panel I only became aware of

6   it when I heard the noise from the whole

7   tumbling.

8        Q.    So you only became aware that

9   he was working in that cubbyhole area after

10  you heard a noise?

11       A.    Yes.

12       Q.    Which you later found out to be

13  the accident?

14       A.    Yes.  I heard the noise;  I

15  turned my head to the left and I saw him

16  coming down.  If it was a case where I

17  noticed any -- if I go there physically to

18  check and I see and I notice anything that

19  was wrong or saw something incorrectly I

20  would definitely fix the issue to prevent

21  accident.  It's always good to have an

22  accident free environment.

23       Q.    So you never saw him before you

24  heard that noise; is that correct?

25       A.    No.

1                        HUDSON

2          Q.     What was the size of the

3    cubbyhole area?

4          A.     I would say, roughly say about

5    five feet by five feet.  Five feet.

6          Q.     Five feet by five feet square?

7          A.     Yes.

8          Q.     Are you saying that a six foot

9    A frame ladder cannot have been set up in

10   that area fully opened?

11               MR. BRIGANTIC:   Objection to

12          the form of the question.  He can

13          answer.

14         A.     Yes.  If it was fully opened it

15   created a distance between him and the

16   cubby.   But he probably had it turned the

17   other way.  Maybe if say he was to face the

18   ladder and outside and maybe climb up on

19   the side but there is no way if he have it

20   fully open it creates a gap.  If he climb

21   up to go to the cubby and fully open, you

22   create a gap distance between the safe

23   landing of the cubby and the top of the

24   ladder.  It definitely would be a wrong way

25   to have it opened to climb in there.

1                    HUDSON

2        Q.    Could you bring up Exhibit 6

3    please.   You see that red toolbox?

4        A.    Yes.

5        Q.    Going inside that space, is

6    that where the cubbyhole area is?

7        A.    Is there anyway you can zoom

8    out?

9        Q.    Where is the cubbyhole.  Is it

10   where --

11       A.    Sorry.  If I am standing in the

12   closet, the cubby is on the left-hand side.

13       Q.    Where is the closet?  Is it

14   where his head is, the worker on the floor

15   head or in the area where that red toolbox

16   is?

17       A.    No.  It's where the red toolbox

18   is and the ladder is inside the closet.

19       Q.    There is no door or anything

20   closing off that cubbyhole area; correct,

21   it's an open entranceway in there?

22       A.    It was actually on the

23   construction.  Eventually there would be a

24   door installed to close it off.

25       Q.    But at the time of the accident

1                          HUDSON

2     there was no door there; correct?

3          A.    No.

4          Q.    You don't know if he was

5     working in the hole in the wall or if he

6     was working by standing on the ladder;

7     correct?

8          A.    Based on how I see him coming

9     down, he had to be working inside the hole

10    and -- based on how he fell, he had to be

11    working inside the cubbyhole and up and

12    exiting the hole.  That's when the whole

13    accident occurred.  Based on how I saw him

14    falling.

15         Q.    Before he fell, did you

16    actually see him place one of his feet on

17    the ladder, yes or --

18         A.    No.

19         Q.    Did you ever see him place any

20    feet on top of the ladder, yes or no?

21         A.    No.

22         Q.    When you saw him for the very

23    first time, tell me where his feet were.

24         A.    He came down head first.  So

25    the cubby is on the left-hand side.  He

1                    HUDSON

2    came tumbling down head first on the

3    right-hand side.

4         Q.    Where were his feet when you

5    first saw him?

6         A.    His feet were facing towards

7    the cubby on the left-hand side.

8         Q.    When you saw the ladder at that

9    time, was it opened or closed?

10        A.    The ladder was, it had to be

11   closed.  It had to be closed.

12        Q.    Not what it had to be.  When

13   you saw it was it opened or closed?

14        A.    Closed.

15             MR. RICHMAN:  Hold on.  For the

16        record when you say closed, does that

17        mean the A frame is not A frame or it

18        means something else?

19        A.    It would be closed being

20   exactly how you see the ladder right there.

21   Like folded in.  That I consider it closed.

22             MR. RICHMAN:  Just to clarify

23        for the record.  The way that you see

24        the ladder now is what you are

25        referring to as a closed ladder;

1                    HUDSON

2        correct;

3        A.    Yes.

4        Q.    To your understanding, what was

5    the reason he would use the ladder in a

6    closed position like that?

7        A.    Well, to get inside the cubby.

8    The cubby is probably approximately, I

9    would say, almost six feet high.  You need

10   a ladder to get inside the cubby.

11       Q.    If the ladder was placed

12   sideways along the opening, wouldn't he be

13   able to get into the opening that way?

14       A.    Yes.  Yes.  You would be able

15   to;

16       Q.    You didn't see him get into the

17   opening; correct?

18       A.    No.  I didn't see him get into

19   the opening.

20       Q.    You didn't see him get out of

21   the opening?

22       A.    No.  Just when he tumbling,

23   coming down.

24       Q.    You believe that using a ladder

25   in a closed position is an improper use of

1                              HUDSON
2    a ladder, correct?
3         A.     If you don't have the right
4    type of ladder.  We all do it on-site but
5    it's not recommended if you don't have the
6    proper type.  Depending on certain place
7    you're working you need various different
8    size ladders.
9         Q.     Would the ladder that is shown
10   in the photograph Exhibit 6 would be the
11   proper ladder to use under those
12   circumstances?
13        A.     I would recommend a shorter
14   ladder.
15        Q.     But if there was no shorter
16   ladder available, could the ladder shown in
17   this Exhibit 6 have been used?
18        A.     Yes.  It could be used.  They
19   had to be careful.  Properly set it up.
20        Q.     In a closed position though?
21        A.     Yes.  Yes.  There is always a
22   risk.  The way the ladder is right there,
23   there is always a risk whenever you use a
24   ladder like that.
25        Q.     But it could be used that way?

1                    HUDSON
2    correct?
3         A.    Yes.    In cases where you do use
4    it that way, they do not recommend it.
5         Q.    Now, who did you tell about the
6    accident again?
7         A.    I told David Kleeman which is
8    my boss.    I said on the phone about the
9    accident, I called Gus.    I told him what
10   happened.
11        Q.    Did you tell him that you saw
12   the ladder in a closed position?
13        A.    No.    I didn't tell him that I
14   saw the ladder in a closed position.
15        Q.    Why didn't you tell him you saw
16   the ladder in a closed position?
17        A.    No.    The reason -- no.    The
18   thing I am saying is, I only -- I know they
19   keep asking me before.    I know this whole
20   thing, you keep asking me before how he had
21   it before.    I pretty much saw when the
22   whole thing, when he is tumbling over.    So
23   the ladder was closed.    But as how before,
24   I don't know how he had it before or how it
25   was cleaned up before.    The way you are

1                        HUDSON

2   looking at the ladder right now, the ladder

3   was tumbled over on top of him.  So the way

4   it is positioned right now, it's moved.

5          Q.     Did you tell David Kleeman that

6   you saw the ladder in a closed position

7   after the accident, yes or no?

8          A.     Yes.  I told him I saw it in a

9   closed position.

10         Q.     So that would be something that

11  would be included in an accident report

12  because you would consider that something

13  important, correct?

14         A.     Yes.  Like I said I explained

15  to them what happened.  Exactly what

16  happened and if there was paperwork I was

17  filling out or signed, that would be

18  something that would be included in an

19  accident report.

20         Q.     Were there any shorter ladders

21  available for the worker to use?

22         A.     I do not know.  His boss

23  provided him with all the stuff that they

24  need and for us, we didn't have a shorter

25  ladder there for him to use.  He was using

Page 117

1                          HUDSON

2    his company ladder.  So I don't know if

3    they had a shorter one for him to use.

4              MR. KLEIN:  Thank you very

5         much, sir.  Nothing further.

6              MR. BRIGANTIC:  I have a very

7         brief follow-up.

8    EXAMINATION BY

9    MR. BRIGANTIC:

10        Q.    Mr. Hudson, after the accident

11   happened, where was the ladder?

12        A.    The ladder, just how you see

13   the ladder.  The ladder was taken off of

14   him and they leave the ladder off.

15        Q.    So right after the accident

16   occurred, the ladder was laying on top of

17   the Plaintiff?

18        A.    Yes.  The him, the ladder,

19   everything was tumbled down to the right of

20   the closet.

21        Q.    Somebody picked up that ladder

22   and put it up against the wall?

23        A.    It is naturally -- we pick the

24   ladder up off of him.  I can't tell you the

25   way -- the way it's positioned right now.

1                    HUDSON

2    If somebody purposely put it that side, the

3    ladder was taken up off of him.

4          Q.    Who did that?

5          A.    There was other workers who run

6    and came right when the whole thing

7    happened.  I was more concerned because I

8    saw the blood coming from his face.  I was

9    more concerned if he is okay while calling

10   for the ambulance.  Calling 911 to make

11   sure to get help.

12         Q.    Were they the coworkers of the

13   Plaintiff?

14         A.    Yes.

15         Q.    Do you know whether they spoke

16   to the Plaintiff before they picked up the

17   ladder off of him?

18         A.    No.  Everybody was trying to

19   find out, make sure he is okay.  They

20   trying to talk to him, make sure he is

21   okay.

22         Q.    Do you happen to know whose

23   legs are in that photograph?

24         A.    That's one of the co-workers

25   that work with the Plaintiff on the ground.

HUDSON

2 You can tell he has like the same piece of

3 the T-shirt.

4        Q.    I am asking, do you happen to

5 know the name of that person?

6        A.    No.

7             MR. BRIGANTIC:    That's all I

8        have.    Thank you.

9             (Whereupon, at 2:00 p.m., the

10        Examination of this witness was

11        concluded.)

12

13             o              o         o         o

14

15

16

17

18

19

20

21

22

23

24

25

1      HUDSON

2    D E C L A R A T I O N

3

4    I hereby certify that having been

5 first duly sworn to testify to the truth, I

6 gave the above testimony.

7

8    I FURTHER CERTIFY that the foregoing

9 transcript is a true and correct transcript

10 of the testimony given by me at the time

11 and place specified hereinbefore.

12

13

14

      _____

15

      DWAYNE HUDSON

16

17

18 Subscribed and sworn to before me

19 this _____ day of _____ 20___

20

21

    _____

22  NOTARY PUBLIC

23

24

25

Page 121

1                         HUDSON

2                   E X H I B I T S

3

4     PLAINTIFF'S EXHIBITS

5

6     EXHIBIT        EXHIBIT                        PAGE

7     NUMBER         DESCRIPTION

8      Exh 1         contract                        17

9      Exh 2         proposal                        19

10     Exh 3         proposal dated

11                   June 12, 2019                    21

12     Exh 4         proposal dated

13                   June 26, 2019                    22

14     Exh 5         photograph                       34

15     Exh 6         photograph                       34

16     Exh 7         piece of paper was deemed        8

17         (Exhibits retained by court reporter)

18    DEFENDANT'S EXHIBITS

19

20    EXHIBIT        EXHIBIT                        PAGE

21    NUMBER         DESCRIPTION

22     A             contract                        72

23     B             subcontract                     80

24     C             waiver of lien                 103

25         (Exhibits retained by Counsel.)



1            HUDSON

2

3          I N D E X

4

5    EXAMINATION BY                        PAGE

6    MR. KLEIN                        5, 107

7    MR. BRIGANTIC                       39

8

9     INFORMATION AND/OR DOCUMENTS REQUESTED

10   INFORMATION AND/OR DOCUMENTS       PAGE

11   (None)

12

13

14        QUESTIONS MARKED FOR RULINGS

15   PAGE LINE QUESTION

16   (None)

17

18

19

20

21

22

23

24

25

Page 123

```
 1                        HUDSON
 2              C E R T I F I C A T E
 3
 4    STATE OF NEW YORK          )
                                 :   SS.:
 5    COUNTY OF SUFFOLK          )
 6
 7           I, AILEEN KOVEN, a Notary Public for
 8    and within the State of New York, do hereby
 9    certify:
10           That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14           I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19           IN WITNESS WHEREOF, I have hereunto
20    set my hand this 29th day of April 2022.
21
```



```
22           _____
                      AILEEN KOVEN
23
24
25
```



Page 124

ERRATA SHEET
VERITEXT/NEW YORK REPORTING, LLC

CASE NAME: Reyes Espinoza, Stalin Rodrigo v. DAVS Partners LLC Et Al.
DATE OF DEPOSITION: 4/11/2022
WITNESSES' NAME: Dwayne Hudson

| PAGE | LINE (S) | CHANGE | REASON |
|------|----------|--------|--------|
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |
|      |          |        |        |

                                        Dwayne  Hudson

SUBSCRIBED AND SWORN TO BEFORE ME
THIS ____ DAY OF _____, 20___.

[NOTARY PUBLIC]                    MY COMMISSION EXPIRES:

**[& - aforementioned]**

**&**

**&** 2:4,8 5:17

**1**

**1** 17:19 18:14
  121:8
**100** 2:5 27:5 29:14
  63:17 96:14
  100:22
**10038** 2:5
**10158** 2:14
**103** 121:24
**10466** 5:13
**107** 122:6
**11** 1:10
**11530** 2:10
**11:00** 1:11
**12** 21:5,10 121:11
**15** 88:20
**17** 53:25 121:8
**19** 121:9

**2**

**2** 19:7,14 37:8
  121:9
**20** 40:16,17 120:19
  124:22
**2000** 40:13
**2005** 40:13,13,19
**2013** 11:12 45:19
**2019** 8:18 11:7,14
  11:24 14:12 19:10
  21:5,10 22:13,18
  23:2 26:13 121:11
  121:13
**2022** 1:10 123:20
**21** 121:11
**217-14** 13:3 104:8
**22** 121:13
**221** 3:2 4:2
**221.1** 3:3

**221.2** 3:17 4:7
**221.3** 4:3
**24** 40:17,17,18
**24693** 123:21
**26** 22:13,18 121:13
**27** 19:10
**28** 11:7,14 23:2
  26:13
**29** 41:2
**29th** 123:20
**2:00** 119:9

**3**

**3** 21:3,6,12 121:10
**30** 46:7
**300** 67:2
**31** 3:10
**3115** 3:5,14,22
**34** 121:14,15
**39** 122:7
**3:30** 23:10

**4**

**4** 22:12,16,19
  121:12
**4/11/2022** 124:3
**4423** 5:12

**5**

**5** 33:24 34:4
  121:14 122:6
**515197/19** 1:6

**6**

**6** 34:22,25 110:2
  114:10,17 121:15
**605** 2:14
**62** 51:25
**62.891** 105:7
**666** 2:9
**6:45** 23:19

**7**

**7** 7:17 8:8 121:16
**70** 65:22
**72** 121:22

**8**

**8** 121:16
**80** 121:23
**85** 67:16,17

**9**

**911** 30:15 56:4,14
  56:17 57:3 58:9
  118:10

**a**

**a.m.** 1:11
**a.s.k.** 8:22 9:3,7,8
  9:22 10:5,22,25
  11:8,10,20 12:11
  12:13,21 15:20
  17:6,24 18:5
  24:23 25:3,4,7
  26:15 31:7,19
  33:12 45:4,6,9,13
  45:18,21,24 49:19
  51:8 53:4 57:9
  58:18 64:10,17
  65:15,17 68:19,21
  68:24 73:4,10,12
  73:22 74:8,17
  79:14 80:10,13,19
  81:2,14,23 82:11
  82:16 85:3 91:18
  92:5 94:4 104:6
  104:14 105:11
  106:5,20 107:2,6
**a.s.k.'s** 9:17
**able** 44:14 100:5
  113:13,14
**aboard** 45:14,15
**ac** 14:15 18:20,21
  24:18 26:15 49:19

50:4 54:25,25
  76:13 77:3 90:5
**access** 93:14 97:13
**accident** 15:8 27:8
  27:22 30:19,22
  31:3,5,23 32:12,17
  32:20 33:8 35:8
  37:25 38:3,7
  46:20 47:22,24
  48:3 49:17 51:18
  56:17 59:6,21
  60:4,7,11,14 61:9
  61:18 62:8 69:2
  69:11,15,19 70:2,7
  70:11,24 71:12,15
  71:17 91:14 94:22
  96:7,23 100:8
  101:9,16,17 102:6
  102:10,14 107:18
  107:19 108:13,21
  108:22 110:25
  111:13 115:6,9
  116:7,11,19
  117:10,15
**accidents** 83:9
**accommodate**
  6:15
**accompanied** 3:23
**action** 123:16
**actions** 105:17,17
**activities** 51:13
  77:13
**actual** 65:13
**add** 10:18
**additional** 44:20
**address** 5:11
**admiralty** 105:21
**affect** 66:14
**affiliated** 20:3
**aforementioned**
  17:17 19:5 21:4

22:17 34:2,23
72:11 103:20
**agents** 105:15
**ago** 6:24 8:17
64:18 100:23
**agree** 106:3,16
**agreed** 4:10,13,16
4:20 10:19 11:3
**agreement** 81:4
**ahead** 15:25 38:19
80:7 99:9
**aileen** 1:18 123:7
123:22
**air** 76:25
**al** 124:2
**altogether** 10:7
**ambulance** 55:24
55:25 56:3,6
59:10 118:10
**answer** 3:8,12,17
3:17,21,22,23,24
6:7,18 26:7 36:8
39:17 55:11 74:23
74:25 75:5,20
79:5,10,16,16,23
83:20 98:15 99:8
109:13
**answered** 3:20 4:6
**answers** 6:8
**anybody** 7:3,7
30:4 69:11 93:21
94:19
**anytime** 6:10
**anyway** 31:20
110:7
**appear** 9:11
**appearing** 31:22
**apply** 3:9 27:2
**appreciate** 11:5
**apprentice** 41:19
42:11

**appropriate** 3:9
4:18
**approval** 91:3
**approve** 90:18
**approximately**
14:25 48:4 53:25
54:2 85:22 97:8
113:8
**april** 1:10 123:20
**architect** 91:22
92:3
**area** 28:6 71:22
97:15,17,24 98:8
99:14,21,23
107:23 108:3,9
109:3,10 110:6,15
110:20
**argumentative**
74:20
**arising** 105:18
**arrive** 23:16,18
**arrived** 70:18
**article** 3:10
**asad** 65:12
**aside** 94:9
**asked** 42:15 45:14
50:16 75:2,15
79:8,24 87:13
102:8
**asking** 5:19 36:5
37:16 50:14 53:17
53:23 54:3 55:7
69:25 79:7 87:16
88:7 94:9 115:19
115:20 119:4
**assertion** 76:9
**assigned** 54:8
**assigns** 105:7,16
**assist** 56:15 89:2
**assisting** 41:13

**associated** 50:18
**associates** 2:4 5:17
19:3,18 20:4,7,21
20:25 21:14,20
25:8,10,14,20 26:4
26:10 27:3,8 37:9
39:8 49:19 80:10
80:13 81:7,22
104:5,15 105:5
**assume** 68:3,5
**assuming** 36:2
63:19 67:25 101:2
**attend** 55:22
**attendance** 3:15
**attention** 28:6
36:18
**attorney** 3:12,21
4:4 7:18
**attorneys** 2:4,8,13
4:20,22
**authority** 26:18,22
51:12,22 52:18,24
86:16
**available** 92:17
114:16 116:21
**avenue** 2:14 5:12
13:3 104:9
**average** 85:21
**aware** 108:2,5,8

**b**

**b** 3:4,10 80:9,14
121:2,23
**back** 8:18 11:24
14:11 40:4 61:10
67:4 71:13 75:8
75:21,23 94:22
101:18,21,23,24
102:4,5
**background** 13:19
**barely** 70:8

**based** 14:17 52:3
54:3 82:6 102:11
102:12 106:12
107:4 111:8,10,13
**basement** 14:4,8
72:2
**basically** 24:17
41:13,16 55:14
86:10 91:3 102:10
**basis** 3:13,23 76:8
**bathroom** 6:11
**beautiful** 66:5
**began** 107:17
**begging** 45:14
**beginning** 67:13
84:15
**behalf** 10:3 21:22
73:22 81:22
**belief** 82:20 99:25
**believe** 12:12
32:21 59:14 65:11
98:9 113:24
**believed** 87:14
**belonged** 29:11,16
**belt** 98:11,14,16
**best** 95:16
**big** 93:15,20 97:19
**bit** 58:7
**black** 35:15
**blood** 118:8
123:16
**blue** 25:2,4
**blueprint** 92:14,15
92:16,17
**bob** 87:11
**body** 61:5
**boss** 12:9,16,20
29:11 37:12 51:6
51:24 52:12 56:21
56:25 57:4,6,8
94:6 115:8 116:22

[bottom - companies]    Page 3

| | | | |
|---|---|---|---|
| **bottom** 21:18 | **business** 43:10 | **certify** 120:4,8 | **closed** 99:20 112:9 |
| 100:15,20 | 44:6 | 123:9,14 | 112:11,11,13,14 |
| **box** 92:16 | **busy** 85:17 | **chair** 7:10 | 112:16,19,21,25 |
| **boxes** 67:10 72:5 | | **change** 90:17,22 | 113:6,25 114:20 |
| **brand** 14:15,15 | **c** | 91:5 124:5 | 115:12,14,16,23 |
| **break** 6:11,13,19 | **c** 2:2 3:4 103:13,22 | **changed** 86:5 | 116:6,9 |
| 32:4 98:25 | 120:2 121:24 | 90:20 | **closest** 56:8 71:16 |
| **breathe** 47:6 | 123:2,2 | **chaos** 89:10 | **closet** 28:10,16,18 |
| **brief** 68:10 117:7 | **cage** 86:8,8 | **charge** 4:22 11:15 | 34:13 58:4,4,5 |
| **brigantic** 2:15 | **call** 6:12,12 43:3 | 12:2,5 41:17 | 61:4 71:19 97:9 |
| 8:24 9:16,24 10:8 | 52:12 56:5,14,15 | 76:12 88:14,20 | 97:10 98:23 |
| 10:12,15 11:4 | 56:23,25 57:2,4 | **check** 32:4,8 86:4 | 110:12,13,18 |
| 15:24 20:18 31:9 | 58:9,9,9 59:11,16 | 86:11 88:25 | 117:20 |
| 31:12,16 32:3 | 59:17,18 65:10,12 | 108:18 | **closing** 110:20 |
| 35:23 38:18 39:13 | 99:22 101:7 | **checked** 102:11,11 | **collectively** 105:12 |
| 39:23 49:10 50:9 | **called** 5:2 19:3 | **chico** 45:11 | **colloquy** 87:22 |
| 53:20 70:20 72:7 | 30:15 38:3,4 | **choose** 67:14 83:8 | **combined** 103:18 |
| 74:22 75:17,21 | 55:23,25 56:3,16 | **chosen** 67:13 | **come** 40:11 45:8 |
| 79:9,19 80:3 87:9 | 57:3 83:3 115:9 | **circuits** 67:3 | 45:14,14 60:16 |
| 87:17,21,25 88:7 | **calling** 118:9,10 | **circumstances** | 71:6,14 84:14 |
| 103:12 107:9 | **cancel** 10:6 | 114:12 | 86:9 90:15 93:15 |
| 109:11 117:6,9 | **card** 46:10,11 | **city** 2:10 44:3,4,7 | 101:11,15,18 |
| 119:7 122:7 | **care** 18:21,23 48:9 | 44:20,23 45:5,10 | 102:4 |
| **bring** 21:3,18 | **careful** 114:19 | 45:12 46:3,4 | **comes** 6:6 38:17 |
| 33:24 34:22 94:10 | **carpenter** 41:18 | 83:16 90:21 | **coming** 24:8 28:11 |
| 107:22 110:2 | 42:2 | **civil** 3:5 | 30:3 54:13 108:16 |
| **bronx** 5:12 | **carpenters** 63:21 | **clarify** 112:22 | 111:8 113:23 |
| **brother** 37:19,20 | **carpentry** 41:12 | **cleaned** 115:25 | 118:8 |
| 39:11 64:2,3,5,6,6 | 41:12 42:11 | **cleaning** 41:14 | **comments** 3:16 |
| 64:7,8 | **case** 31:20 55:17 | **clear** 3:13,23 26:3 | **commission** |
| **brought** 28:6 | 66:12,20 67:16 | 49:5,7 73:14 74:5 | 124:25 |
| **build** 15:19,21 | 90:19 108:16 | 76:24 79:9 | **commotion** 27:24 |
| 76:16 93:6 104:20 | 124:2 | **clearly** 4:8 | 28:9,24 51:21 |
| **building** 13:24,25 | **cases** 115:3 | **clerk** 4:11 | 71:13 |
| 13:25 14:4,19,20 | **cause** 3:20 83:10 | **client** 10:23 | **communicating** |
| 14:22 24:16 50:25 | **caused** 28:4 67:3 | **climb** 95:21 96:5 | 4:4 |
| 51:5,25 71:11 | **causes** 105:17 | 97:14,14 109:18 | **communication** |
| 72:3 104:8 | **cell** 58:12 | 109:20,25 | 4:3,5,8 |
| **buildup** 12:3 | **cement** 24:16 | **close** 61:2 71:19 | **companies** 26:12 |
| **built** 14:20 17:12 | **certain** 13:2 47:15 | 71:25 110:24 | 26:15 50:15 |
| | 66:19,21 114:6 | | |

company 1:7 2:13
12:7,10,13 16:4,22
19:2 20:4 25:2,6
26:4,5 37:20
42:18,21 44:8,17
50:17 68:9,22
117:2
complete 3:25
completed 15:4
33:5 51:3 63:12
63:23 67:17
completely 31:17
97:13
compliance 3:6
concern 103:25
concerned 59:9
70:7 118:7,9
concluded 119:11
condition 22:14
26:20 61:21 101:5
conditioning
76:25
conditions 52:3
conduct 3:2 4:2
conducted 91:19
confer 91:9
conferring 92:2
confidentiality
3:18
connected 78:23
78:25
connection 17:7
18:16 105:19
consent 4:5
consider 112:21
116:12
consideration
105:7,9
construction 1:7
2:13 10:23 14:14
18:22 39:5 41:4,7

49:21 53:24 76:20
77:13,15 96:18
110:23
continue 24:3
43:19
continued 43:21
continuing 103:2
contract 12:15
17:4,13,18 18:11
20:21 53:8,10
54:6,9,20,21 55:2
55:4,4,5,15 72:8
72:12,20 74:10,14
81:20,21 121:8,22
contracted 105:20
contracting 80:20
81:2,14,24 82:11
82:17
contractor 15:12
15:16,18 16:3
19:25 20:16 29:16
39:2,4,8 42:13,22
44:9 53:7 54:8,12
55:9 68:17 72:21
74:18 75:12,16,25
76:3,10 81:13
86:25 87:4,8,15
93:5 94:2 105:12
106:6,21 107:3
contractors 83:19
contracts 50:22
80:23
controlling 4:18
46:23 47:2,9,9
conversation
10:17 59:14
copies 7:22,24
copy 4:21 32:6
72:8 92:21
corner 28:16 61:3

corp 10:23 73:5,23
74:8 80:20 81:2
81:14,24 82:12,17
104:6,7 105:5,12
106:6 107:2
corporation 19:3
19:18 21:15
correct 11:8,21
12:21 16:19 17:7
18:12 20:8,14
22:10 44:24 50:25
51:14 52:21,25
53:5 55:21 56:2
56:17 57:22 58:23
62:10 69:3,7
72:25 73:7,10,17
74:11 76:4 106:6
108:24 110:20
111:2,7 113:2,17
114:2 115:2
116:13 120:9
counsel 121:25
country 2:9
county 1:2 123:5
course 3:15
court 1:2,16 3:19
4:12 6:5 121:17
courtesy 11:5
covid 66:16,16
coworkers 118:12
cplr 3:10,14,22
4:15,17,18
create 109:22
created 109:15
creates 109:20
crew 38:10 77:2
critique 66:21
cubby 99:23,24
100:7 109:16,21
109:23 110:12
111:25 112:7

113:7,8,10
cubbyhole 107:23
108:9 109:3 110:6
110:9,20 111:11
cumulative 105:8
curious 61:23,24
70:12
currently 8:10
customer 20:10
cxe 40:4

d.

d 3:5 5:2,2 120:2
122:3
dangerous 27:4
52:5
date 1:10,17 8:8
15:7 17:20 19:8
21:7 22:20 32:22
34:5 35:2 37:24
46:6 47:22 72:14
80:15 103:23
124:3
dated 19:10 21:5
21:10 22:13,18
121:10,12
dates 6:25 7:13,13
89:22,23
daughter 67:25
david 12:12,16,17
12:20 13:9,20
15:23 17:23 18:3
21:22 22:5 37:12
51:6 55:17 57:6,8
58:9,20,21,22,22
73:23 81:24 88:9
90:3,8,9,18 91:6
91:25 115:7 116:5
days 1:7,15 2:9 9:5
9:12,13 11:2 12:8
12:13,14,17,24
13:15,20 22:10


25:18 33:12 73:7
73:15,16 74:7
84:24 105:10
106:4,17 124:2
**day** 23:17 37:4
49:17 88:19 90:7
101:12,16,25
102:3 120:19
123:20 124:22
**days** 23:11,12,13
24:8 85:18,19,19
85:23
**deadlines** 89:9
**deal** 92:24 93:16
104:18
**deals** 81:18
**dealt** 104:17
**decide** 86:6 91:7
**decided** 45:16
64:24 95:12
**decision** 64:24
**deemed** 4:17 8:7
121:16
**defect** 3:13
**defective** 101:4
**defects** 100:12
**defendant** 1:15
2:8,13 80:8
**defendant's** 72:12
80:14 103:13,22
121:18
**defendants** 1:8
**definitely** 29:16
89:9 91:13 95:10
106:10 108:20
109:24
**demands** 105:20
**demo** 12:2
**demolition** 62:15
62:21 77:22,24
78:5

**depending** 96:17
114:6
**depends** 95:6
**depict** 60:21,22,24
61:5
**deponent** 3:12,17
3:21,24 4:3,5
**deposed** 31:22
**deposition** 3:4,7,8
3:8,11,18,25 4:4
6:22 7:19 9:5,10
9:17,18,25 10:4,5
10:7,21,24 48:24
57:20 124:3
**depositions** 3:2,3
4:2
**describe** 13:22
100:14
**described** 107:24
**description** 121:7
121:21
**designed** 95:17,20
**designee** 9:12
**designs** 14:16
**details** 54:9
**determining** 4:6
**devices** 63:18,23
**different** 14:16
26:4 27:17 36:17
70:17 75:18 77:2
82:5 114:7
**difficulties** 89:2
**direct** 3:21 25:10
86:19,23
**direction** 3:22
28:4 66:22
**directors** 105:15
**disagreement**
64:23
**discharge** 105:10

**discuss** 68:11
**discussion** 10:13
99:5
**distance** 109:15,22
**document** 7:18
19:15 72:19,23,25
79:20,23 80:4,6,11
81:3,20 82:9
87:10,12,12
103:17 104:2
106:23 107:5
**documents** 9:3
31:18,19 33:3
81:21 82:7 89:14
89:17,22 92:13
106:12 122:9,10
**doing** 11:16 12:3
15:19,20,21 16:25
20:17 23:24 27:3
39:4 41:10,12
42:10,12 43:17,21
48:14 51:24 52:15
52:20 63:21 66:24
70:8 76:12,14,18
76:22 78:24 86:3
86:8 97:24 98:2
101:21 107:8
**dollars** 105:8
**door** 110:19,24
111:2
**doors** 98:6
**doubt** 32:9
**downstairs** 71:5
**drawing** 93:4,15
93:19
**drawings** 93:5,9
93:12,14,18
**drawn** 55:15
**duly** 5:3 120:5
123:11

**duration** 63:14
85:20
**dust** 96:19
**duties** 11:23,25
**dwayne** 5:10
120:15 124:3,21

**e**

**e** 2:2,2 3:6 5:2
12:19,19 58:25
69:10 120:2 121:2
122:3 123:2,2
**earlier** 48:23
57:20 62:10 74:13
87:5
**easiest** 67:14
**educate** 39:15
**effect** 4:11
**eight** 23:9
**either** 32:2 77:20
78:14 99:7 105:22
**electric** 8:14,16,22
9:4,8 10:22,25
11:8,11,15,17,21
12:2,11,13,21
14:16 15:20,21
17:6,24 18:6
24:18 25:3 26:16
31:7,20 33:12
41:24 42:12,16
43:19 45:4,6,9,13
45:19,22,25 48:8
48:10,22 49:9,19
50:4 51:8 52:10
53:4 57:9 58:19
63:7,22 64:11,17
65:15,17 68:20,21
68:24 73:4,10
76:13,23 79:14
80:10,13 83:25
85:3 94:4 104:20

Case 1:22-cv-01473-KAM-PK   Document 81-4   Filed 02/14/25   Page 130 of 144 PageID #: 4254

**electrical** 28:8
42:13 43:22 44:8
44:9 48:14 50:20
52:16 71:19 73:12
73:22 74:8,17
77:5,7 80:19 81:2
81:14,24 82:11,17
83:17,21 91:19
92:5,25 104:7,14
105:11 106:5,20
107:2
**electrician** 41:23
42:5,8 44:16 85:6
**electricians** 12:4
54:24
**emergency** 38:10
56:23
**employed** 8:10,14
8:15,19 11:7 20:7
26:9 104:5
**employee** 10:22
36:2
**employees** 24:23
35:21 36:5 71:8
105:15
**employer** 11:20
46:24 47:2,9,10
73:5
**enforce** 3:19
**entails** 54:10
**entire** 63:14 76:14
86:17
**entity** 51:4
**entranceway**
110:21
**environment**
108:22
**equipment** 25:16
25:19 93:22,24
94:10,11,17

**equity** 105:21
**errata** 124:1
**error** 3:13
**espinoza** 1:3 27:12
124:2
**esq** 2:6,10,15
**established** 87:9
**et** 124:2
**event** 4:7 93:23
**eventually** 56:25
110:23
**everybody** 52:6
70:12 86:12 92:19
118:18
**exact** 15:7 16:10
46:6 50:5 89:22
89:23 101:22
**exactly** 28:12
36:19 39:3 59:13
67:7 68:23 78:9
97:25 98:7 99:12
101:19 102:11
112:20 116:15
**examination** 1:14
3:15 4:14,21 5:6
39:22 107:15
117:8 119:10
122:5 123:10,12
**examined** 5:5
**examining** 3:24
**example** 54:23
71:2 86:7,21
90:12 102:20
**examples** 46:22
**exams** 40:5
**excuse** 8:24
**exh** 121:8,9,10,12
121:14,15,16
**exhibit** 7:16,17 8:7
17:19 18:14 19:7
19:14 21:3,6,12

22:12,15,19 33:24
34:4,22,25 37:8
72:9,13 80:9,14
103:13,22 110:2
114:10,17 121:6,6
121:20,20
**exhibits** 121:4,17
121:18,25
**existing** 14:20,22
**exiting** 111:12
**expensive** 66:17
**experience** 54:5
**experienced** 41:13
**expires** 46:12
124:25
**explained** 38:8
59:5 70:19 71:3,6
74:13 116:14
**extend** 95:21 99:8
**extended** 34:21
96:5
**extends** 14:6
**extent** 3:14
**exterior** 18:23
24:16 78:24
**extra** 84:13 90:24
97:18,19
**eye** 89:5

**f**

**f** 123:2
**face** 66:6 109:17
118:8
**facing** 112:6
**fact** 9:6 38:9 95:7
**fair** 53:21 75:11
**fairly** 27:19
**fall** 28:15,24 29:4
29:22,25 98:14
100:6,6 101:5
**fallen** 99:18

**falling** 29:18 99:16
111:14
**familiar** 5:24 12:7
12:9 13:2 15:11
27:7 38:16 64:5,8
64:8
**far** 39:24 46:19
66:3 88:11
**fashion** 89:7
**fast** 5:24 89:21
**feeding** 67:9,10
**feet** 27:25 28:8
71:18 100:10,14
100:16,19 109:5,5
109:5,6,6 111:16
111:20,23 112:4,6
113:9
**fell** 35:7 57:14
58:4,7 61:25
94:24 111:10,15
**fiberglass** 100:18
100:19
**file** 92:6,9,12
**files** 97:20
**filled** 39:10
**filling** 116:17
**final** 40:5 103:18
**finally** 6:10
**find** 50:2 118:19
**fine** 62:2
**finish** 16:14 20:2
32:7 53:20 63:10
82:14 98:2,4,5
**finished** 7:19
15:10 28:20 40:2
40:9 63:5
**finishing** 23:5
102:21
**fired** 45:12
**firm** 5:17

| | | | |
|---|---|---|---|
| **first** 5:3 8:23 14:9 23:20,22 28:14,16 29:3,18 46:7 47:16,21 55:22 56:11,13,16 62:21 63:3 64:6 65:8 104:10 105:4,24 108:2 111:23,24 112:2,5 120:5 | **forward** 71:14 **found** 12:10 50:12 108:12 **four** 23:9 24:9 **frame** 29:7 34:20 62:17 95:23 109:9 112:17,17 **framed** 3:11 97:12 97:13 | 106:6,21 107:3 **generally** 55:7 **gentleman** 35:22 **george** 37:18,19 37:21 39:2,10 50:5 64:5,9 68:22 78:23,25 79:2,11 79:14 **george's** 39:11 | **graduated** 40:10 **ground** 33:23 35:6 55:21 56:22 57:18 57:22 118:25 **grounds** 4:7 **guess** 16:18 26:7 53:15 55:18 68:4 79:7 **gus** 15:18,22 16:3 16:4,5,8 17:3 |
| **fishing** 101:14 **five** 13:24 23:8,11 23:13 24:9 79:25 85:18,19,23 98:24 109:5,5,5,6,6 **fix** 6:3 108:20 **floor** 14:9 36:7,15 76:20 110:14 **floors** 65:21 67:2 **focus** 84:4 93:2,3,4 **focuses** 93:5 **folded** 112:21 **follow** 47:17 107:10,14 117:7 **follows** 5:5 **foot** 29:8 34:20,21 109:8 **force** 4:11 **foregoing** 120:8 **foreman** 11:16 48:13,14,16 89:3 **forever** 105:10 **form** 3:13 35:24 69:10 72:20 80:20 81:15 109:12 **formal** 43:2,4,5 **formality** 91:5 **former** 10:21 **forms** 81:17 **forth** 3:19 4:7 67:4 89:14 123:11 | **framers** 63:5 **framing** 24:14 62:23 77:25 78:8 78:10,11,14 **free** 108:22 **frequently** 85:15 **friday** 23:14 **friends** 22:7 **front** 7:11 **full** 14:6 93:9,12 95:20 **fully** 26:6 34:21 96:4,6 109:10,14 109:20,21 **furnish** 104:7 **furnished** 4:21 **further** 4:10,13,16 4:20 39:21 75:4 117:5 120:8 123:14 **g** **gap** 109:20,22 **garden** 2:10 **general** 3:3 15:12 15:16,18 16:2 17:9 20:16 22:14 29:16 38:25 39:4 39:5,8 68:17 74:18 75:12,15,25 76:3,9,16,17 86:25 87:4,8,14 93:5 103:19 105:12 | **getting** 66:25 86:13 89:5 90:16 **give** 7:18 16:10 23:23 32:25 64:25 79:23 86:6,20 106:11 **given** 3:8 120:10 123:13 **go** 6:11 15:3,25 21:17 29:21 38:19 39:24 45:17 47:18 50:20 52:7 61:8 66:22 75:3 80:7 83:6,8 88:24 89:3 99:9 108:17 109:21 **going** 7:15 8:25 9:9,11 17:15 26:7 39:13 51:4,13 52:5 65:2,3 66:13 72:7 75:3 78:18 80:5,8 81:5 84:21 88:5,23 89:10,12 94:21,22 95:2 103:12 110:5 **good** 5:14,15 61:20 85:13 101:5 108:21 **goods** 105:8 **gorayeb** 2:4 5:17 **government** 40:6 | 18:22,24 20:11,13 20:15,16,16,21,25 22:2,5,9 23:25 24:5,20 26:5,6,9 26:16 35:21 36:3 37:12,16,18,24 38:11 39:2,10 50:5 59:15,18,18 59:20 62:5 68:22 70:18 74:3,6 75:25 76:9,11,12 76:14,24 77:4,8 82:17,21 87:7,15 90:6,9 91:12 102:13 115:9 **gus's** 16:18 24:12 29:15 36:5 59:15 **guy** 23:23 27:13 27:16,19 33:23 34:10 35:7 42:19 42:25 71:2 74:3 84:11 90:5 91:6 **guys** 12:3 18:21 24:2,7,9,10,15 26:16 27:17 32:14 58:2 71:4 78:22 78:24 83:24 88:20 99:11 106:11 |

**h**

h  5:2 121:2
half  14:4
hall  71:25
hand  28:17,18,22
  28:25 34:13 61:3
  61:11 97:11
  110:12 111:25
  112:3,7 123:20
happen  118:22
  119:4
happened  27:23
  27:25 30:19,22
  32:22 38:3,9
  46:22 52:11 56:8
  59:4,6 61:24,25
  70:5,13,14,19 71:4
  71:6,14 102:8,12
  102:15 115:10
  116:15,16 117:11
  118:7
happening  83:11
  96:8
harness  98:18,19
head  6:6 27:23
  28:14,16 29:3,17
  30:3 108:15
  110:14,15 111:24
  112:2
hear  19:2
heard  12:14 27:24
  28:7,9,24 30:2
  51:20 99:14,15
  102:13 108:6,10
  108:14,24
heartbeat  52:23
height  95:9
held  1:17 10:14
  83:13 99:5
help  56:12 86:10
  118:11

helper  84:15
helping  41:16
hempstead  13:3
  17:11 104:9
hereinbefore
  120:11 123:11
hereto  4:18,21
hereunto  123:19
hey  90:20,23
high  40:2,9 113:9
highway  47:4
hired  15:17 79:2
  79:11,14 82:18,21
  104:14
history  54:4
hold  112:15
holding  30:4
hole  111:5,9,12
home  84:21
honest  36:16
  59:17 91:24 102:2
horizontal  96:6
hours  23:7,9
hudson  5:1,10,14
  6:1 7:1 8:1 9:1
  10:1,21 11:1,6
  12:1 13:1 14:1
  15:1 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1
  24:1 25:1 26:1
  27:1 28:1 29:1
  30:1 31:1 32:1
  33:1 34:1 35:1
  36:1 37:1 38:1
  39:1,24 40:1,14
  41:1 42:1 43:1
  44:1 45:1 46:1
  47:1 48:1 49:1
  50:1 51:1 52:1
  53:1 54:1 55:1

  56:1 57:1 58:1
  59:1 60:1 61:1
  62:1 63:1 64:1
  65:1 66:1 67:1
  68:1 69:1 70:1
  71:1 72:1,15 73:1
  74:1 75:1,5,20
  76:1 77:1 78:1
  79:1 80:1 81:1
  82:1,15 83:1 84:1
  85:1 86:1 87:1
  88:1,13 89:1 90:1
  91:1 92:1 93:1
  94:1 95:1 96:1
  97:1 98:1 99:1,6
  100:1 101:1 102:1
  103:1 104:1 105:1
  106:1,14 107:1,12
  108:1 109:1 110:1
  111:1 112:1 113:1
  114:1 115:1 116:1
  117:1,10 118:1
  119:1 120:1,15
  121:1 122:1 123:1
  124:3,21
hudson's  10:20
hunting  101:14
hurt  27:13,15
  30:16,25

**i**

identification  8:8
  17:19 19:7 21:7
  22:20 34:4,25
  72:13 80:15
  103:23
identified  81:6,10
  81:13
ii  3:18
iii  3:19
immediate  71:22

important  116:13
improper  3:20
  113:25
inappropriate
  31:17
incident  15:2
  30:10,12 31:4
  33:9 37:4
include  3:13
included  116:11
  116:18
incorrectly  62:4
  108:19
index  1:5
indicate  74:16
individually  13:14
industry  53:24
information  16:24
  37:10 38:14 52:14
  122:9,10
injured  30:9 33:22
  38:20 55:19 56:9
  56:13,18,22 97:24
  98:12
injuries  83:11
inquiry  32:2
inside  34:12,13
  58:4,5 97:12 98:2
  98:8 110:5,18
  111:9,11 113:7,10
inspect  61:19,22
  96:24
inspected  100:9
inspection  100:11
  102:7
install  63:7
installed  110:24
installing  62:18
  98:6
instruct  90:9,11

instructing 74:23
instruction 86:6
instructions 86:21
insulation 100:18
interact 91:12
interacted 91:13
interacts 91:11
interested 123:17
interfere 3:16
interior 62:24
  63:3,15
interposed 3:6
interrupt 4:4
introduction
  68:10
investigate 60:15
  60:17
investigation
  60:14 91:19 102:7
involve 46:14
involved 80:22
  107:19
involving 27:8
irregularity 3:14
island 46:3,4
issue 8:25 9:13
  52:18 67:7,8,18
  102:22 108:20
issues 52:7 65:24
  100:13,25 101:3

**j**

jamaica 40:3,4,8
jim 19:3,18 20:3,7
  20:21,25 21:14,20
  25:8,10,13,19,24
  26:3,10,16,16 27:2
  27:8 29:15 37:9
  37:12,13,14,16,17
  37:18 39:8,9,11,11
  49:19 80:10,13
  81:6,22 104:5,14

105:5
job 15:18 24:21,24
  39:6 41:23 42:14
  43:14,18 44:22
  45:2 46:16 47:11
  47:19,21 48:2,6,17
  49:14,22 50:20,24
  51:3,24 52:7,11
  53:3 55:16 66:2,4
  67:16,21,22 75:13
  83:12 85:11,14,25
  86:17 89:13,24
  93:20 94:7,12
  102:25
jog 6:24
jorge 19:21,23
  20:3,6 21:19
  36:23,24 37:5,21
  63:25 81:10,22
  82:18,21
judge 4:12
june 8:18 11:7,13
  11:24 14:12 21:5
  21:10 22:13,18,25
  26:13 121:11,13

**k**

k 12:19
kalnitech 1:7 2:13
  10:23 49:21 80:9
keep 46:8 83:7
  87:3 89:4 115:19
  115:20
keith 2:10
kenneth 2:6 5:16
kept 58:16 92:15
  92:16 93:22 94:2
kind 6:24 14:5
  28:15 41:10 44:6
  58:3,6 66:21
  84:23 85:4 90:22
  92:25 96:19

kings 1:2
kleeman 12:16,17
  12:18,20 13:9
  17:23 21:22 22:5
  51:6 57:6,8 59:8
  64:20 67:23 68:13
  68:25 69:11 73:16
  73:20,23 81:25
  84:18,24 85:6
  88:10 91:6 92:2
  101:8 115:7 116:5
kleeman's 18:3
  68:6,7 82:3
klein 2:6 5:7,16
  8:5 18:14 31:11
  31:14 32:7 36:4
  36:10 39:20
  107:13,16 117:4
  122:6
know 13:7,10,12
  13:15,16,18,21
  14:15 15:7 16:8
  16:11,12,15,16,18
  16:21,23,24 17:3,5
  18:25 19:23 20:5
  20:13,15,16,20
  21:25 22:4,6,6,9
  25:18,22 26:6,9,11
  27:11,14 29:9
  32:11 33:11,15,16
  36:9,23 37:3,6,11
  37:11,15,19,22,23
  38:14,25 39:3,3,9
  39:10,12,16,17,18
  43:10 46:23 49:23
  49:25 50:5,7,17
  53:12,13,18,19
  54:5,15 55:6 59:6
  60:10 61:13 62:7
  64:4 65:13 67:24
  68:2,6,16,23 72:6

73:19 75:12 76:3
  77:23 78:3,4,6,7,9
  78:13,22 79:3,12
  79:13,18 82:22,23
  82:24,25 85:2,2,3
  85:10 87:5 89:18
  90:7 91:18,20,23
  91:23 92:7 97:25
  98:2,6,15 100:24
  101:14,20,23
  102:16 107:5
  111:4 115:18,19
  115:24 116:22
  117:2 118:15,21
  119:5
knowledge 59:22
  60:9,13 62:5
  69:14,16,17 71:23
  72:4 84:2 85:5,11
  98:10,17
known 12:8 20:6
knows 16:12 38:13
  85:14
koven 1:18 123:7
  123:22

**l**

l 12:19 120:2
labor 104:7
ladder 28:2,15
  29:2,4,6,8,9,15,22
  30:5 34:15,19,20
  51:17,20 61:8,10
  61:12,13,14,15,19
  61:20,22 62:2,6
  68:16,18,23 94:24
  95:3,4,7,8,10,12
  95:14,16,23,23
  96:9,12,25 97:6,14
  99:13,16,19,19
  100:2,9,10,12,13
  100:15,16,19,25

[ladder – morning]

101:4,5 107:23
109:9,18,24
110:18 111:6,17
111:20 112:8,10
112:20,24,25
113:5,10,11,24
114:2,4,9,11,14,16
114:16,22,24
115:12,14,16,23
116:2,2,6,25 117:2
117:11,12,13,13
117:14,16,18,21
117:24 118:3,17
**ladders** 25:13
95:19 96:6 100:17
114:8 116:20
**laid** 98:3
**landed** 60:21,23
60:25 61:4,6
**landing** 109:23
**law** 2:12 3:5 5:17
105:21
**lawsuit** 5:19
**lawyer** 7:4,6 16:9
16:12 79:4 106:10
**laying** 57:18,22
58:8 117:16
**lean** 95:12,19
96:20 99:20
**leaned** 95:18
96:17 100:7
**leaning** 61:10
96:12 100:3
**learn** 46:18 60:2
**learning** 41:24
42:16
**leave** 64:10,24
117:14
**leaves** 32:5
**leaving** 64:21

**left** 19:17 28:18,22
34:13 44:2,23
61:11 73:15 96:3
97:11 108:15
110:12 111:25
112:7
**legs** 118:23
**length** 14:6
**level** 95:9
**levine** 2:8
**liability** 105:18
**license** 44:18
**licensed** 41:25
42:4,7,21 44:15
85:6
**lien** 102:17,19,23
103:2,5,8,18,21
106:4,17 121:24
**light** 90:24
**lights** 63:18,23
**limitation** 3:19
**limits** 86:12
**line** 71:24 73:3
103:17 122:15
124:5
**listen** 43:23 52:13
**litigation** 9:10
**little** 34:12 58:7
67:5,11,14 97:11
97:17
**lived** 43:12
**llc** 1:7,15 2:9
13:15 22:10 73:7
74:8 106:5,18
124:1,2
**local** 60:3
**located** 43:11
**location** 13:5
51:10
**lock** 96:25

**locks** 95:24
**logo** 25:2,6
**long** 6:13 14:5
41:21 43:6,7
44:11 46:3,4 63:8
89:15 100:23
**longer** 67:12,15,19
**look** 28:4,10 43:20
53:13 61:11 62:5
79:4 93:16 100:9
100:11 102:9
**looked** 14:11
28:24 51:21 87:10
**looking** 53:16
116:2
**looks** 13:23 82:5,7
**loud** 5:23
**lying** 35:6 36:14

## m

**m** 12:19 65:7
**machine** 94:18
**mail** 58:25 69:10
**main** 37:11 54:20
55:2,3,15 93:15,20
**major** 90:22
**manager** 11:18,24
48:20,21,25 49:8
**mark** 7:16 72:8
80:8
**marked** 8:7 17:18
19:6 21:6 22:19
34:3,24 72:12
80:14 103:21
122:14
**marriage** 123:16
**master** 81:4
**material** 25:19
67:6
**materials** 65:24
66:15,18,25 67:20
67:20 104:8

**matter** 56:10
66:10,11,18,19
123:18
**mean** 50:13 53:10
77:16 88:17 93:8
95:23 112:17
**meaning** 47:4
88:18
**means** 112:18
**meant** 50:16 58:21
**mechanical** 93:4,4
**medical** 56:12
**meet** 43:14 89:8
**meeting** 6:23 83:2
83:5,8
**meetings** 83:13
84:3
**memory** 6:24
**mentioned** 64:2
66:23
**met** 64:6
**method** 26:24
**michael** 2:12
**mine** 92:24
**minute** 10:10
98:24
**minutes** 6:24
**mistaken** 66:15
**moment** 99:2
**monday** 23:14
90:13
**money** 102:22
105:18
**months** 15:3,9
41:23 42:10 47:23
48:2,4 62:10
64:18
**morning** 5:14,15
5:20 88:12,22
107:18

| | | | |
|---|---|---|---|
| **mornings** 83:14 | 72:25 73:2 91:15 | 76:5 79:15 109:11 | **ongoing** 23:8 |
| **moscoso** 19:21,23 | 103:9 104:2,17 | **objections** 3:3,3,3 | **open** 6:14,17 24:3 |
| 20:7 21:19 36:23 | 108:23 | 3:7,9,10 | 34:21 95:10,16,22 |
| 36:24 37:5 64:2 | **new** 1:2,19 2:5,5 | **observe** 51:16 | 95:24 96:2,25 |
| 81:10,22 82:18,21 | 2:10,14,14 5:4,12 | 90:15 | 99:17,19,23 100:2 |
| **move** 15:24 20:18 | 8:14,16 11:17 | **observed** 51:12 | 109:20,21 110:21 |
| 38:18 39:14 43:20 | 12:3 13:6,17,18 | 52:20 | **opened** 95:18,20 |
| 43:21 49:10 50:9 | 14:15,16,19 17:10 | **obtained** 46:10,11 | 109:10,14,25 |
| 58:2 64:14 74:20 | 17:11 27:19 48:9 | **obviously** 38:16 | 112:9,13 |
| 88:12 89:18,21 | 51:10 63:17,23 | 67:19 | **opening** 28:18,19 |
| **moved** 15:10 58:3 | 78:19 89:19 123:4 | **occasionally** 84:13 | 28:22 34:16 97:7 |
| 58:6 116:4 | 123:8 124:1 | **occupied** 51:8 | 97:9 99:20,21 |
| | **nice** 65:21 66:5 | **occupy** 51:4 | 113:12,13,17,19 |
| **n** | **nine** 23:8 | **occur** 27:22 | 113:21 |
| **n** 2:2 5:2,2 12:19 | **nods** 6:6 | **occurred** 48:3 | **operating** 88:8 |
| 120:2 122:3 | **noise** 28:7 30:2 | 60:11 69:2 70:24 | **opinion** 36:16 |
| **name** 5:8,16 16:6 | 108:6,10,14,24 | 71:15 91:14 96:23 | **opportunity** 64:15 |
| 16:10,10,19 18:3 | **nonresponsive** | 101:9 102:10 | **order** 1:17 3:19 |
| 27:11 42:17,23,24 | 20:19 70:21 | 111:13 117:16 | 52:19 81:15 90:18 |
| 42:24 43:2,4,5 | **normally** 47:15 | **occurring** 62:9 | 90:23 91:6 |
| 45:11 49:24 50:6 | 83:15 | **office** 10:9 11:17 | **ordering** 66:18 |
| 50:17 65:9,9,11,14 | **notary** 1:18 4:11 | 13:6,17,18 17:2,10 | **orderly** 89:7 |
| 68:7 74:3 81:9 | 5:4 120:22 123:7 | 17:11 31:6 33:19 | **orders** 15:22 |
| 119:5 124:2,3 | 124:25 | 43:13,15 48:9 | **osha** 45:22,23 46:7 |
| **named** 16:3,4,5 | **note** 55:10 | 51:10 58:15,18,18 | 46:10,11 51:25 |
| 37:13,16,17 | **noted** 3:7 75:19 | 60:3 81:18 84:21 | 59:25 60:3,9,10,13 |
| **names** 37:23 49:25 | **notepad** 7:10 | 86:4 89:19 90:25 | 60:16 |
| 50:14,18 | **notes** 7:11 16:8,9 | 97:19,19 | **outcome** 123:17 |
| **naturally** 117:23 | **notice** 60:10 64:25 | **officer** 3:7 | **outside** 10:9 |
| **need** 6:13 12:4 | 96:8,10 108:18 | **officers** 105:15 | 109:18 |
| 54:10 60:2 93:15 | **noticed** 108:17 | **offices** 2:12 63:6 | **owes** 102:22 |
| 94:6,16 113:9 | **notify** 60:3,6 | **okay** 6:4,8,16 8:2 | **owned** 68:19,22 |
| 114:7 116:24 | **number** 59:15,19 | 16:17 30:15,17 | **owner** 12:14,16 |
| **needed** 46:19 | 121:7,21 | 37:10 99:11 106:2 | 13:7,11,13,14,18 |
| 94:13 | **numerous** 87:13 | 106:24 118:9,19 | 57:11 72:21 73:9 |
| **needs** 86:25 90:8 | | 118:21 | 105:11 106:5,18 |
| 90:14 | **o** | **old** 2:9 13:19 | **owner's** 52:9,25 |
| **never** 9:7 18:11 | **o** 5:2 120:2 | 40:14,21,23,25 | **owning** 84:24 |
| 22:22 30:11 31:11 | **objecting** 74:24 | **once** 47:16 62:17 | **owns** 12:12 51:25 |
| 31:12,24,25 33:2,5 | **objection** 3:11,17 | 83:15,16 | 55:14 68:16 85:2 |
| 33:7,10 36:22 | 35:23,25 55:11 | | 86:18 |
| 69:21,22 70:9 | 74:19 75:14,18 | | |

## P

p 2:2,2
p.c 2:8
p.m. 119:9
pad 7:12
page 21:17,19
  22:14 121:6,20
  122:5,10,15 124:5
paid 102:25
painting 63:22
panel 28:8 98:23
  108:5
panels 62:19 71:19
paper 8:6 69:18
  121:16
paperwork 50:21
  81:19 104:16,17
  104:18 116:16
paragraph 104:10
  104:21,22,24
  105:4
part 18:22 22:9
  39:5 50:21 76:20
  86:23 90:5 93:17
  100:15
particles 96:19
particular 24:21
  48:11 68:12 83:10
  89:24 94:20 99:9
parties 1:16 4:5,17
  4:21 55:5,8
  123:15
partition 63:6
partner 12:24
partners 1:7,15
  2:9 9:5 11:2 12:8
  12:14,17,24 13:15
  13:20 22:10 33:13
  73:7,15,17 74:7
  84:25 105:11
  106:4,17 124:2

parts 96:24
party 3:24 9:9,22
  9:25 10:3,5,6
  31:15 54:22 68:9
pass 52:14 54:22
passed 58:14,17
path 67:12,14
pay 36:18
paying 86:13
pe 46:17
people 89:10,11
percent 27:6 29:14
  63:17 65:23 67:16
  67:17 96:14
  100:22
perfect 89:20
permit 44:18
permitted 3:14
person 3:9,21 16:3
  16:5 35:5 36:7,14
  37:17 41:17 51:4
  52:4,22 55:13
  56:9,16,21 65:25
  71:10,16 84:13
  119:5
person's 27:21
personal 94:5
personally 32:19
  32:23 47:25 92:11
persons 3:15
  37:11 84:14
perspective 54:14
phone 52:12 57:2
  58:13 59:17 101:7
  115:8
photo 33:17,18,21
  33:22 57:15
photograph 32:23
  34:3,7,9,24 35:3,9
  35:19 36:20 55:20
  55:23 57:17,21,24

57:25 58:11 60:18
  69:6 72:5 114:10
  118:23 121:14,15
photographs
  35:12
phrase 36:10
physically 108:17
pick 52:12 117:23
picked 117:21
  118:16
picture 58:10,15
  58:22 59:2,20,21
  61:12,14 97:7
piece 8:6 119:2
  121:16
pipe 67:18
pipes 67:9,11,11
  67:15
place 24:2 60:7
  71:12 86:18 95:25
  97:2 111:16,19
  114:6 120:11
placed 113:11
plainly 3:20
plaintiff 1:4 2:4
  5:18 28:5 31:21
  51:16 52:15 55:19
  57:14,18,21 59:21
  60:19 69:6,20
  70:2 71:9 80:5
  91:15 94:23 97:23
  98:11 117:17
  118:13,16,25
plaintiff's 7:17 8:7
  17:18 19:6 21:6
  22:19 34:3,24
  121:4
plan 14:17 88:18
  88:19,21 89:9
plaster 98:5

please 5:8 33:25
  110:3
plumber 91:12
plumbers 90:6
plumbing 77:17
  77:19,21 93:3,3
plus 12:5 89:8
plywood 98:3
point 44:24 63:16
portion 18:5 54:23
position 9:15,21
  11:13 56:10 61:6
  95:3 113:6,25
  114:20 115:12,14
  115:16 116:6,9
positioned 116:4
  117:25
possibility 96:16
possible 31:24
  89:20,21 97:22
  101:20,22,24
practice 3:5
prejudice 3:20
preparation 6:21
prepare 32:19
  69:15
prepared 19:20
  23:25 37:8
presently 42:7
preserve 3:18
president 81:10
pretty 14:5 16:9
  28:13 30:23,24
  42:20 43:14 45:16
  47:6,12 65:23
  76:22 84:19 86:14
  90:7 95:8 98:4
  115:21
prevent 83:11
  108:20

prime 53:7,8,10
54:5,12,21 55:4,8
72:20 74:10,14
print 92:20
printout 93:19
prints 104:19
prior 30:10 45:21
47:23 51:17 62:8
80:18 96:7
private 42:19
privilege 3:18
probably 27:16,18
40:16 56:19 62:3
63:20 65:22
109:16 113:8
problem 6:3 8:4
procedures 59:7
proceed 3:8 9:23
88:3 104:19
proceeding 10:20
process 90:21
produced 31:10
progressed 46:8
project 11:16,18
11:24 12:6,15
14:24 15:3,4,17
16:25,25 17:7
18:16 20:2,17
22:25 23:6,7
24:13 26:13 27:18
36:13 37:4 47:13
47:14,18 48:15,19
48:21,24 49:8
50:8,19 54:9,10
55:14 62:12,14
63:12,14,19,24
65:20,21,22,23
66:3,4,9,13 68:12
76:12,14,15 81:16
84:12,16 85:21
86:11 88:23 89:20

91:21 92:6,8,12,13
102:21 104:18
105:19 107:7
projects 50:2,22
proper 46:17
79:17 95:15,17
114:6,11
properly 95:4 97:3
97:4 114:19
property 13:3,8
13:11,23 14:5,7
57:12 102:23
proposal 19:6,9
20:22 21:5,9
22:13,18 37:7,9
121:9,10,12
proposals 20:25
22:23
proposed 65:3
protects 52:6
provide 25:7,13
94:15
provided 3:21
4:14,17 25:18
94:4,17 116:23
public 1:18 4:11
5:4 120:22 123:7
124:25
purpose 4:4,6
50:24 97:16
purposely 118:2
purposes 4:14
pursuant 1:16 3:4
3:10
put 10:16 14:17
60:10 72:16 95:14
103:14 117:22
118:2
putting 78:19 94:9

q

queens 13:4 104:9
question 3:20,24
4:6 5:21 6:2,14,17
6:18 17:25 35:24
36:9 38:15 53:16
55:12 74:25 75:6
75:8,18,23 78:2
79:16,17,24,24
87:16 99:9 106:15
106:16 109:12
122:15
questioning 3:12
3:16
questions 3:17
5:20 79:7 88:6,8
122:14
quit 65:3
quite 84:22

r

r 2:2 120:2 123:2
raised 3:11
reached 56:20,21
read 72:18,22 75:8
75:21,23 103:16
104:11 105:3
106:8
ready 23:25 78:11
real 65:11 66:5
really 24:22 26:8
30:24,25 36:18
66:25 70:9 99:17
reason 4:7 5:25
6:13 113:5 115:17
124:5
recall 34:18 91:25
recognize 17:21
18:8 34:6,14 35:5
74:6 82:3,6

recollection 82:10
82:15 104:13
106:25
recommend
114:13 115:4
recommended
114:5
record 4:8 5:9
10:12,14,16,17
22:12 49:7 99:4
112:16,23 123:12
records 58:16
red 110:3,15,17
redo 46:12
refer 92:18
referred 75:7,22
105:13
referring 87:3
112:25
refers 104:5 106:4
106:17
reframing 62:16
refresh 82:9,15
104:12 106:24
refusal 3:17,22
refused 65:19 66:6
regarding 33:8
92:13
regardless 91:4
regular 24:3 29:7
32:17 84:11 90:21
related 123:15
relationship 22:5
release 103:19
105:10
released 105:9
releasees 105:23
releases 105:13,14
releasor 105:6
relief 3:9

relocating 17:11
remain 63:8
remainder 3:25
remember 16:17
32:24 43:6 46:7
59:13 69:17 99:12
100:22,24 101:19
101:22 102:2,3
renovate 50:25
renovated 14:21
14:23 51:7
renovating 14:14
renovation 62:24
63:3,15 76:17
repeat 17:25 75:6
report 31:4,5,23
32:6,20,25 33:8
59:4 69:3,10,12,15
84:17 116:11,19
reporter 6:5 8:9
17:20 19:8 21:8
22:21 34:5 35:2
72:14 75:9,24
80:16 103:24
121:17
reporting 124:1
represent 5:18
representative
10:25 52:9,25
representatives
105:16
representing 4:22
request 3:12
requested 122:9
respect 4:18 41:7
47:19 60:18 83:21
88:9
respective 1:16
4:21 105:14
respond 70:9

responded 9:7
responsibilities
47:10
responsible 47:13
47:14 50:7 52:4
76:15 83:23,24
89:25 90:3
responsive 106:15
rest 77:14,16
83:18,19
restrict 102:19
restricted 3:10
restructure 62:16
retained 17:3,6
18:16,18 121:17
121:25
review 6:22
revise 99:8
reyes 1:3 27:12
124:2
richman 2:8,10
8:3 9:14,19 10:2
10:11 11:3 31:25
35:25 36:8 39:16
40:23 49:2,5
53:12,18 55:10,18
68:4 74:19,24
75:14 76:5 79:3,6
79:15,22 80:7
87:6,11,19,23 88:4
99:22 112:15,22
right 3:9,18,24
9:21 12:10 18:2,9
19:20 22:23 25:5
28:13,17,25 32:13
35:18 39:17 41:2
56:14 57:5 61:2,3
62:24 63:4 71:11
73:5,25 74:8,14
77:20 78:14 79:20
80:25 81:14 82:6

82:23 91:10,16
96:3 103:2 106:13
112:3,20 114:3,22
116:2,4 117:15,19
117:25 118:6
rights 4:17
risk 96:21,22
114:22,23
road 2:9
robert 2:15
rocky 42:24 43:3
43:24 44:2
rodrigo 1:3 27:12
124:2
rolling 9:2
roof 78:17,19,20
roofing 78:21
rosedale 43:13,16
roughly 109:4
rubber 100:17,18
100:19
rule 3:5,6,14,15,22
rules 3:2,5 4:2,7
47:17
rulings 122:14
run 37:20 118:5
running 11:16
62:18

s

s 2:2 5:2 121:2
124:5
safe 109:22
safety 46:15,16,17
47:16 52:2 59:25
83:6,9
satisfaction 86:15
satisfied 66:9,12
saw 7:9 17:16
18:11 22:22 26:19
27:2,16,18 28:2,11
28:12,13 29:17,18

29:24 30:3,5,15
33:2,5,7 36:22
38:9 56:8,8 69:25
81:8 91:15 99:15
108:15,19,23
111:13,22 112:5,8
112:13 115:11,14
115:15,21 116:6,8
118:8
sayed 32:16
saying 12:12 13:14
13:17 28:21 53:11
90:25 109:8
115:18
says 19:18,20
20:10 73:3 81:20
scenarios 46:22
scene 70:11 92:2
101:11
schedule 89:14
90:5
scheduling 89:25
90:4
school 39:25 40:3
40:7,10 46:4
screen 19:12 72:9
103:14
scroll 81:5
second 21:17 57:2
73:3 79:21
section 4:7 34:13
34:14 97:11
sections 4:18
secure 95:14
security 24:18
76:14 77:9,11
86:9
see 17:13 18:2
19:9,15,17 20:10
20:24 21:9,15,18
21:24 27:21 29:21

32:17 35:3 36:12
36:21 50:21 51:19
52:2,4 61:15,23,24
71:14 72:15,22
73:15,18,24 74:4
81:6,7,9,11,25
82:2,2,8 85:18
88:25 89:17,22
92:8 94:23 96:24
98:14,25 99:12
100:12,25 101:2
102:11 103:14
104:9,22,25
107:22 108:18
110:3 111:8,16,19
112:20,23 113:16
113:18,20 117:12
**seeing** 64:9 106:12
**seek** 56:12
**seen** 31:11,12,24
  31:25 61:14 69:21
  69:22 72:25 73:2
  80:11,19 81:15,18
  96:11 103:4,7,9
  104:2,17
**selfish** 56:23
**send** 7:24 58:20
  88:24
**sent** 31:5 32:23
  33:20 58:21
**sentence** 105:4,24
**separate** 78:24
**sequence** 62:20
  88:15,21 89:6
**serious** 56:19
**seriously** 66:4
**serving** 74:17
**set** 3:19 4:7 24:2
  62:3 67:9,10
  86:10 89:14 93:9
  93:12 109:9

114:19 123:11,20
**seton** 5:12
**seven** 23:10
**share** 72:9
**shareholders**
  105:14
**sheet** 124:1
**sheetrock** 24:15
  39:5 67:16,17
  76:16,18,19,21
  98:5
**sheets** 49:15
**shirt** 25:2 35:6
  36:14 119:3
**shirts** 24:21,24
  25:4 35:22 36:6
  36:13,17
**short** 72:20
**shorter** 114:13,15
  116:20,24 117:3
**show** 17:15 79:20
  103:13
**showed** 22:15
  35:15 37:8 38:6
  82:7 87:11 89:18
  102:9
**showing** 79:22
  80:18
**shown** 57:17,21
  114:9,16
**shows** 25:2 93:10
**side** 18:2 19:17
  28:17,18,22,25
  34:14 61:3,11,12
  81:23 96:20 97:12
  109:19 110:12
  111:25 112:3,7
  118:2
**sides** 95:24 96:2
**sideways** 113:12

**sign** 33:3 49:14
**signature** 18:8
  73:14 74:2,6 82:4
  82:8 123:21
**signatures** 17:22
**signed** 4:10,11
  17:24 21:20,22,25
  73:16,23 81:21,23
  103:10 116:17
**significant** 3:20
**signing** 32:24
  69:17
**similar** 36:6
**sir** 8:11 17:22
  18:15 19:9 21:9
  21:15,19 34:7
  35:3 39:14 107:17
  117:5
**sit** 68:15
**site** 38:17 43:15
  47:11,21 48:2,7
  49:14,18,22 51:13
  53:3 60:4,16 62:9
  63:2,9,13 71:24
  83:12 85:12,16,22
  85:25 86:17 88:10
  88:14 89:13,24
  93:20,22 94:2,11
  94:12 101:8,12,16
  101:18 102:5,25
  114:4
**sitting** 7:9
**situation** 52:13
  59:5 62:3
**six** 15:3 23:11 29:7
  34:20,21 41:22
  42:10 44:13 47:23
  48:2,4 62:10
  109:8 113:9
**size** 109:2 114:8

**slap** 66:6
**slide** 95:15
**sliding** 96:21
**small** 42:22 63:20
  93:19
**smooth** 47:18 52:7
**somebody** 21:23
  37:13 47:3 102:18
  102:20,21,22
  117:21 118:2
**soon** 57:3 101:17
  101:20,21,24
**sorry** 40:22
  106:14 110:11
**sound** 99:15
**space** 95:11 97:22
  110:5
**speak** 7:3,7 30:8
  30:13 50:3 68:7
  70:2,10,16,23 71:7
**speaking** 3:10
  5:23,23
**special** 95:19
**specialized** 94:20
**specific** 47:10
**specified** 120:11
**spell** 12:18 65:6
**spoke** 7:4 30:11
  68:25 69:19 70:9
  70:19 71:10
  118:15
**square** 109:6
**ss** 123:4
**stalin** 1:3 27:12
  124:2
**standing** 110:11
  111:6
**start** 11:10,12
  14:24 41:10 45:13
  47:21,24 63:10
  88:22 108:4

started 27:19
29:22,24 41:11,12
41:24 42:12,15
45:18 47:23,25
48:6 62:9,13,14,17
62:18 63:3,11
65:20 66:14 108:4
starting 42:22
starts 104:22
state 1:2,19 5:4,8
123:4,8
stated 3:11 4:8
statement 3:13,23
49:6 106:11
statements 3:16
step 10:9
stern 47:5
stink 9:6
stipulated 4:10,13
4:16,20
stop 26:19,23 27:5
51:12,23 52:5,19
52:19,22 85:15
87:16,17,21,22
105:25
stopped 84:19,21
storage 34:12,14
97:11,15,17,18,19
98:8 99:14,21
store 97:20,21
story 13:24,25,25
14:3,5
street 2:5
stretch 6:12
strike 15:24 20:18
38:18 39:14 49:11
50:9 70:20
stuff 6:25 10:18
41:14 50:3,22,23
62:19 65:25 66:19
66:21 86:9 94:14

96:20 116:23
sub 80:23
subcontract 54:15
54:18,19,21 80:9
80:12,20 81:4
121:23
subcontractor
54:24,25 81:6
subcontractors
18:15,19
subdivision 3:4,6
3:22
subject 3:9 107:10
subpoena 9:8
subpoenaed 9:3
31:18
subscribed 120:18
124:22
successors 105:6
105:16
succinct 3:23
succinctly 3:11 4:8
suffolk 123:5
suggest 3:12
sums 105:17
supervision 25:8
supervisor 64:23
65:2,4,16
supervisory 86:16
supply 94:6
supports 96:3
supreme 1:2
sure 10:11 16:9
22:3 26:8 29:14
30:14,16 67:25
75:10 84:4 90:15
95:13 96:4 100:4
103:3,3 118:11,19
118:20
surprise 79:13

suspicion 101:3
swimmer 2:12
sworn 5:3 120:5
120:18 123:11
124:22

t

t 24:21,24 25:2
35:22 36:6,13,14
119:3 120:2 121:2
123:2,2
take 6:5,11,19
15:22,22 18:21,23
35:9,11,14 44:20
57:24,25 58:12
66:2,4 93:16
taken 1:15 3:8
63:18,24 117:13
118:3
talk 16:15 38:7
55:3 70:6 88:11
118:20
talked 63:25 91:15
talking 30:24,25
47:20
talks 83:4,25
tall 34:18
tar 78:20
task 23:24
teach 42:15,25
team 88:23
tell 6:2,14 28:3,12
30:21 59:11,16
64:20 70:4 90:13
90:14 111:23
115:5,11,13,15
116:5 117:24
119:2
tells 86:21,24
90:12
ten 27:25 28:8
71:18 87:7 88:20

term 15:11,15
terms 50:4 66:14
100:15 104:16
testified 5:5 11:6
51:11 76:2 87:4
testify 7:16 48:23
49:3,4 87:6 120:5
testifying 4:22
49:13 87:18,20,22
87:24
testimony 49:11
60:20 72:24 88:2
101:7 120:6,10
123:13
text 58:22 59:2,20
texted 58:23 69:5
thank 6:4 8:5 11:4
99:3 107:12 117:4
119:8
therefor 3:23
thing 18:25 22:6
23:20,22 56:11,13
56:14 66:11
102:14 115:18,20
115:22 118:6
things 50:12 70:23
think 15:8 22:7
27:17 65:11 66:5
67:3 82:20 106:9
thinking 99:17
third 2:14
three 8:17 15:9
26:14 85:18,22
tiles 76:21
till 45:15
time 1:11,17 17:2
23:16 30:5 34:11
39:21 43:6 56:12
59:15 63:3 64:6
64:19 67:19 69:9
97:23 100:23

101:23 102:5
110:25 111:23
112:9 120:10
**times** 24:9 75:3
79:25 87:7,14
**title** 41:15 48:7,12
72:19,23 81:3
103:17
**today** 7:20 10:20
32:9 47:20 68:13
68:15
**today's** 6:21
**told** 31:18 32:22
49:24 56:11 96:13
102:12,13,15
115:7,9 116:8
**tool** 83:9,10 98:11
98:14,16
**toolbox** 82:25 83:3
83:5,13,25 84:3
110:3,15,17
**tools** 25:16,25 26:2
83:7 93:25 94:3,5
94:6
**top** 28:23 34:21
78:20 89:11 95:7
97:5 103:16
109:23 111:20
116:3 117:16
**topics** 83:9
**total** 105:8
**trade** 89:15 92:24
93:23 94:5,20
**trades** 49:18 91:10
92:18 93:11 94:9
94:12
**training** 41:6
44:21,22 45:22,24
46:2,4,13 52:2
59:24,25

**transcript** 4:10
10:19 120:9,9
**transferring** 51:9
**transmission** 5:22
**trial** 1:14 4:14
**tried** 74:15
**true** 120:9 123:12
**truth** 120:5
**try** 6:3 26:7 67:13
89:19 97:21
**trying** 30:14,16
53:21 118:18,20
**tumble** 29:2
**tumbled** 116:3
117:19
**tumbling** 28:2,14
29:17 108:7 112:2
113:22 115:22
**turn** 27:23,25
28:10
**turned** 30:2,5
51:21 99:15
108:15 109:16
**twice** 27:18
**two** 13:25 24:10
24:10 37:11 43:8
43:17,20,24 45:15
45:16 64:18 65:21
67:2 71:19 84:14
95:5 96:3
**type** 24:12,21,24
29:6 31:3 46:13
94:18 114:4,6

**u**

**u** 5:2
**n.s.** 40:11,12,15
41:3,9
**unclear** 67:5
**underneath** 81:21
86:24 96:22

**undersigned** 105:6
**understand** 5:21
6:2 9:14 60:20
94:8 101:6
**understanding**
12:23 15:14 38:23
39:7 99:7 113:4
**uniform** 3:2 4:2
**unit** 78:18
**unsafe** 26:19,23
51:13 52:20
**updating** 46:9
**upright** 99:20
**use** 5:24 7:15 67:6
80:5 83:7 93:21
93:23 94:3,11,12
94:15,19,21 95:4
113:5,25 114:11
114:23 115:3
116:21,25 117:3
**usual** 23:5,18
**usually** 6:6 55:8
83:13
**utilize** 97:21
**utilized** 4:14

**v**

**y** 124:2
**valuable** 105:9
**vanessa** 67:23
73:16,19
**various** 18:20 24:7
36:17 83:6,8
114:7
**verbal** 32:25 59:4
69:3
**verbalize** 6:8
**veritext** 124:1
**vicinity** 98:21

**w**

**w** 5:2 65:7
**wait** 91:2
**waited** 45:15
**waive** 102:25
**waived** 3:5 4:17
**waiver** 102:16,19
102:23 103:4,7,18
103:21 106:4,17
121:24
**waiving** 9:17,20
9:21 10:24
**walk** 95:11,11
97:10
**wall** 96:12 100:3
111:5 117:22
**walls** 95:20
**want** 6:10 10:15
16:11,18 47:5,14
49:6 53:15 66:20
67:6 68:3,5 79:6
90:13 97:21 106:7
106:8,11
**wanted** 65:25
66:22 91:7 93:23
94:13
**wants** 86:5,22
89:18 91:3 102:18
**way** 10:24 28:25
36:11 47:4,7,15
66:24 80:22 84:20
95:15,17 96:8,13
99:18 100:5,6
109:17,19,24
112:23 113:13
114:22,25 115:4
115:25 116:3
117:25,25 123:17
**ways** 95:5
**wazim** 65:5,8,13

[we've - zoom]

we've  31:23

wear   24:20,23,25
  35:21 36:5,19,19

wearing  36:7,13
  36:14 98:11,16,18

week  23:11,12,13
  83:16,17

weeks  8:17

went  29:2 40:7
  45:5 46:21 61:13
  70:13,15,22 90:4
  99:13

whatsoever
  105:21

whereof  123:19

white  35:15

wide  44:3,4,7,20
  44:23 45:5,10,12

wife  68:2,6,8

william  2:5

wires  62:18

witness  4:22 5:3
  9:11 10:9 22:15
  31:22 32:5 49:12
  53:22 88:3 119:10
  123:10,13,19

witnesses  32:11

witnesses'  124:3

word  5:24

words  13:24 15:17
  23:8

wore  25:4

work  12:3,5,11,12
  15:20 16:21 18:24
  23:17,18,21,23
  24:12,15,16,19
  25:25 26:23,23
  38:16 41:4,7,10,15
  41:21 42:10,11,12
  43:7,8,18,19,24,25
  44:11,18 45:8,11

45:13,18 50:6

51:12,23 52:16,19
52:19 54:4,22,25
60:3 62:20 64:16
66:2,9 67:18
78:11,16,24 81:15
84:5,23 85:4,16,22
86:7,19 88:10,14
88:15,24 89:4,6
90:2,4,22 92:12,20
92:20 93:17 94:23
95:2 99:14 101:12
101:18 102:5,24
105:20 107:6
118:25

workday  24:4

worked  38:12,21
  38:24 43:16 44:2
  44:12 45:3 53:24
  65:15

worker  27:3 28:5
  30:9 32:15 36:21
  38:11,21 45:10
  107:18 110:14
  116:21

workers  24:5,13
  24:20 25:11,14
  27:9 32:17 36:12
  58:6 70:18,25
  71:2 83:17,19,21
  84:3,5,6,9 86:23
  88:19 118:5,24

working  13:6
  14:18 23:23 24:6
  24:15 26:12,17,19
  27:19,24 28:7,19
  28:23,23 29:12
  32:14,16 34:11
  42:14,20 44:19
  45:21,24 47:21
  48:2 53:4 61:21

62:9 63:9 71:3,5,8
71:20 72:2 83:16
83:24 84:6,10
85:11 86:24 89:3
89:11 92:24 95:9
97:2,4 98:9,22
107:17,20 108:3,5
108:9 111:5,6,9,11
114:7

workplace  46:20

works  20:13,15
  38:25 39:3 63:20

write  69:9

written  33:7 91:5

wrong  5:22 66:24
  108:19 109:24

---

x

x  1:3,9 121:2
  122:3

---

y

y  5:2

year  46:8

years  43:9,17,20
  43:24 44:13,13
  45:15,16 53:25

yellow  7:10 35:6
  35:22 36:6,13,14

yesterday  71:3

york  1:2,19 2:5,5
  2:10,14,14 5:4,13
  8:14,16 123:4,8
  124:1

---

z

z  65:7

zoom  110:7

New York Code

Civil Practice Law and Rules

Article 31 Disclosure, Section 3116

(a) Signing. The deposition shall be submitted to the witness for examination and shall be read to or by him or her, and any changes in form or substance which the witness desires to make shall be entered at the end of the deposition with a statement of the reasons given by the witness for making them. The deposition shall then be signed by the witness before any officer authorized to administer an oath. If the witness fails to sign and return the deposition within sixty days, it may be used as fully as though signed. No changes to the transcript may be made by the witness more than sixty days after submission to the witness for examination.

DISCLAIMER:  THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

## VERITEXT LEGAL SOLUTIONS
### COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.